1
2
3
4
5

Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

6

*Counsel for Plaintiff*

7
8

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

9
10
11
12
13
14
15
16
17
18
19
20
21
22

| LUDE LIANG, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | Case No: |
|---|---|
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | JURY TRIAL DEMANDED |
| DOUYU INTERNATIONAL HOLDINGS LIMITED, SHAOJIE CHEN, WENMING ZHANG, CHAO CHENG, MINGMING SU, HAO CAO, TING YIN, HAIYANG YU, XI CAO, XUEHAI WANG, ZHAOMING CHEN, ZHI YAN, MORGAN STANLEY & CO. LLC, J.P. MORGAN SECURITIES LLC, BOFA SECURITIES, INC., CMB INTERNATIONAL CAPITAL LIMITED, TENCENT HOLDINGS LIMITED, RICHARD ARTHUR, and COGENCY GLOBAL INC., | |
| Defendants. | |

23
24
25
26
27
28

Plaintiff Lude Liang, individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges in this Complaint the following upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, inter alia: (a) review and analysis of relevant filings made by DouYu International Holdings Limited ("DouYu" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Defendants' public documents and press

- 1 -

releases; and (c) information readily obtainable on the Internet. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants (defined below) or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons and entities, other than Defendants, who purchased DouYu American Depositary Shares ("ADSs") pursuant and/or traceable to the Company's Registration Statement (defined below) issued in connection with the Company's July 16, 2019 initial public offering (the "IPO" or the "Offering"), seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act") (the "Class").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v).

4.      Venue is proper in this Judicial District pursuant to Section 28 U.S.C. § 1391(b) as the alleged misleading public filings and press releases entered this district.

5.       In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased shares of DouYu ADSs at artificially inflated prices pursuant and/or traceable to the Company's IPO and was damaged thereby.

7.      Defendant DouYu purports to one of China's top two live-streaming video-game platforms. Operating on personal computer ("PC") and mobile applications, DouYu enables users to

enjoy immersive and interactive games and entertainment live streaming. DouYu ADSs sold in the IPO trade on the NASDAQ under the ticker symbol "DOYU." Every DouYu ADS represents ten ordinary shares of the Company.

8.      Defendant Shaojie Chen ("Chen") founded DouYu and served, at all relevant times, as a director on DouYu's Board of Directors (the "Board") and as the Company's Chief Executive Officer ("CEO"). Prior to the IPO, Defendant Chen owned 4,323,857 DouYu ordinary shares, or approximately 15.4% of the Company's total outstanding stock. Defendant Chen reviewed, contributed to, and signed the Offering Documents (defined below).

9.      Defendant Wenming Zhang ("Zhang") co-founded DouYu and served, at all relevant times, as a director on the Board and as DouYu's co-CEO. Prior to the IPO, Defendant Zhang owned 892,402 DouYu ordinary shares, or approximately 3.2% of the Company's total outstanding stock. Defendant Zhang sold 345,575 DouYu ordinary shares in the IPO. Defendant Zhang reviewed, contributed to, and signed the Offering Documents.

10.      Defendant Chao Cheng ("Cheng") served, at all relevant times, as DouYu's Chief Operational Officer ("COO"). Defendant Cheng reviewed, contributed to, and signed the Offering Documents.

11.      Defendant Mingming Su ("Su") served, at all relevant times, as DouYu's Chief Strategy Officer ("CSO") and as a director on the Board. Defendant Su reviewed, contributed to, and signed the Offering Documents.

12.      Defendant Hao Cao ("Cao") served, at all relevant times, as DouYu's Vice President and as a director on the Board. Defendant Cao reviewed, contributed to, and signed the Offering Documents.

13.      Defendant Ting Yin ("Yin") served, at all relevant times, as both an employee of Defendant Tencent Holdings Limited ("Tencent") and as a director on the Board. Defendant Yin reviewed, contributed to, and signed the Offering Documents on her behalf and at the behest of Defendant Tencent. Defendant Yin was motivated by the financial implications of the Offering, given her status as a current employee of Defendant Tencent, which she joined in January 2014, held an

Class Action Complaint for Violation of the Federal Securities Laws

1  aggregate 37.2% 0f DouYu's outstanding ordinary shares, representing 37.2% of DouYu's total

2  voting power, at the time of the IPO.

3        14.     Defendant Haiyang Yu ("Yu") served, at all relevant times, as both an employee of

4  Defendant Tencent and as a director on the Board. Defendant Yu reviewed, contributed to, and signed

5  the Offering Documents on his behalf and at the behest of Defendant Tencent. Defendant Yu was

6  motivated by the financial implications of the Offering, given his status as a current employee of

7  Defendant Tencent, which he joined in August 2011, held an aggregate 37.2% of DouYu's

8  outstanding ordinary shares, representing 37.2% of DouYu's total voting power, at the time of the

9  IPO.

10        15.     Defendant Xi Cao ("X. Cao") served, at all relevant times, as a director on the Board.

11  Defendant X. Cao reviewed, contributed to, and signed the Offering Documents.

12        16.     Defendant Xuehai Wang ("Wang") was a director appointee of the Board at the time

13  of the IPO. Defendant Wang consented to the F-1/A.

14        17.     Defendant Zhaoming Chen ("Z. Chen") was a director appointee of the Board at the

15  time of the IPO. Defendant Z. Chen consented to the F-1/A.

16        18.     Defendant Zhi Yan ("Yan") was a director appointee of the Board at the time of the

17  IPO. Defendant Yan consented to the F-1/A.

18        19.     Defendant Richard Arthur ("Arthur") served as Assistant Secretary on behalf of

19  Defendant Cogency Global Inc. ("Cogency Global"), the designated U.S. representative of Defendant

20  DouYu, and reviewed, contributed to, and signed the Offering Documents. Defendant Arthur resides

21  and works in California.

22        20.     Defendants named in ¶¶ 8-19 above are collectively referred to herein as the

23  "Individual Defendants."

24        21.     Each of the Individual Defendants:

25            (a)     Participated in the preparation of and signed (or authorized the signing of) the

26  Registration Statement (defined below) and/or an amendment thereto, and the issuance of the

27  Registration Statement;

28            (b)     directly participated in the management of the Company;

Class Action Complaint for Violation of the Federal Securities Laws

(c)      was directly involved in the day-to-day operations of the Company at the highest levels;

(d)      was privy to confidential proprietary information concerning the Company and its business and operations;

(e)      was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(f)      was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)      approved or ratified these statements in violation of the federal securities laws.

22.      DouYu is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

23.      Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Morgan Stanley served as a representative of all the underwriters. Morgan Stanley also participated in conducting and promoting the Offering. Morgan Stanley's participation in the solicitation of the Offering was motivated by its financial interest. Defendant Morgan Stanley conducts business California.

24.      Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. J.P. Morgan served as a representative of all the underwriters. J.P. Morgan also participated in conducting and promoting the Offering. J.P. Morgan's participation in the solicitation of the Offering was motivated by its financial interest. Defendant J.P. Morgan conducts business in California.

25.      Defendant BofA Securities, Inc. ("BofA") was an underwriter for the IPO, serving as a financial adviser for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. BofA served as a representative of all the underwriters. BofA also

Class Action Complaint for Violation of the Federal Securities Laws

participated in conducting and promoting the Offering. BofA's participation in the solicitation of the Offering was motivated by its financial interest. Defendant BofA conducts business in California.

26.     Defendant CMB International Capital Limited ("CMBI") was an underwriter for the IPO, serving as a financial adviser for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.

27.     The Defendants named in ¶¶ 23-26 above are collectively referred to herein as the "Underwriter Defendants."

28.     The Underwriter Defendants agreed to purchase and sell DouYu ADSs to the public as follows:

| Name | Number of Shares |
|---|---|
| Morgan Stanley & Co. LLC | 26,954,844 |
| J.P. Morgan Securities LLC | 22,237,746 |
| BofA Securities, Inc. | 16,846,778 |
| CMB International Capital Ltd. | 1,347,742 |

29.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Offering Documents. The Underwriter Defendants' failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

30.     The Underwriter Defendants are primarily investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. As the underwriters of the Offering, the Underwriter Defendants earned lucrative underwriting fees as a result of their participation in the Offering.

31.     In addition, the Underwriter Defendants met with potential investors and presented highly favorable, but materially incorrect and/or misleading, information about the Company, its business, products, plans, and financial prospects and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

32.     Representatives of the Underwriter Defendants also assisted the Company and Individual Defendants with planning the Offering. They further purported to conduct an adequate and

Class Action Complaint for Violation of the Federal Securities Laws

reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

33.    In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price at which the Company's ADSs would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about the Company would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, at a minimum, the Underwriter Defendants should have known of the Company's undisclosed existing problems and plans and the material misstatements and omissions contained in the Offering Documents, as detailed herein.

34.    The Underwriter Defendants also demanded and obtained an agreement from DouYu that the Company would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

35.    Defendant Tencent operates as an investment holding company. Tencent, through its subsidiaries, provides Internet and mobile value-added services ("VAS"), online advertising, and ecommerce transactions. Tencent offers services to users worldwide, including in the United States, where its headquarters are located at 2747 Park Boulevard, Palo Alto, California 94306. Tencent exercises control over DouYu, including with respect to the misstatements at issues here. At the time of the IPO, DouYu and Tencent, through their respective People's Republic of China ("PRC") affiliated entities, were parties to an amended and restated strategic cooperation framework memorandum dated April 1, 2019. The Offering Documents repeatedly touted the benefits to DouYu of Tencent's strong capabilities and support, calling Tencent a "major shareholder and strategic partner," particularly "in live streaming, advertising and game distribution, which helps reinforce and

solidify [DouYu's] position as a leading game-centric live streaming platform in China[,]" and affirmed its intent to "further solidify [DouYu's] strategic cooperation with Tencent in the future." As a result, DouYu was (and remains) motivated by the desire to maintain a good relationship with Tencent. Likewise, Tencent was motivated by the financial implications of the Offering given its investment in DouYu to date. More specifically, at the time of the IPO, Tencent held 3,125,000 DouYu Series B-2 Preferred Shares, 1,114,376 DouYu Series C-l Preferred Shares, and 7,828,728 DouYu Series E Preferred Shares, through its wholly owned subsidiary, Nectarine. According to the Offering Documents, upon completion of the Offering, Nectarine will hold an aggregate 37.2% of DouYu's outstanding ordinary shares, representing 37.2% of the Company's total voting power, assuming the underwriters do not exercise their over-allotment option. "As a result," according to the Offering Documents, "Tencent has substantial influence over our business." Furthermore, Tencent, through Nectarine, has the right to appoint up to two directors as long as it beneficially owns no less than 33% of the shares it beneficially owned immediately prior to the completion of the Offering and exercised its influence over DouYu by appointing two employees to DouYu's Board. As indicated above, Defendants Yu and Yin currently work at Tencent, having joined Tencent in August 2011 and January 2014, respectively, and both signed the Offering Documents necessary to effectuate the Offering on their own behalves and at the behest of Defendant Tencent. Tencent is directly liable pursuant to the doctrine of *respondeat superior* for the misstatements of its employees Yu and Yin.

36. Defendant Cogency Global was DouYu's authorized U.S. representative for purposes of the IPO. Defendant Arthur, who signed the Offering Documents, was an employee of Defendant Cogency Global. As a result, Defendant Cogency Global is liable for the securities law Violations committed by Defendant Arthur in its capacity as his employer and as a control person under the Securities Act.

37. DouYu, the Individual Defendants, the Underwriter Defendants, Tencent, and Cogency Global are collectively referred to herein as the "Defendants."

Class Action Complaint for Violation of the Federal Securities Laws

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SUBSTANTIVE ALLEGATIONS

### Background

38.     DouYu purports to be "the largest game-centric live streaming platform in China and a pioneer in the eSports value chain."[1] Operating "on both PC and mobile apps," DouYu offers "immersive and interactive games and entertainment live streaming" to a massive and growing gamer community, particularly in China. "According to iResearch, China is the world's largest game-centric live streaming market, with approximately 4.9 times the MAUs [monthly active users] of the U.S. market as of 2018."[2]

39.     To meet the demands of this market, DouYu relies on a "comprehensive streamer development system[,]" which it credits for helping to establish "a deep pool of top streamers" that purportedly differentiates DouYu's platform from others and allows DouYu to continuously attract, engage, and retain viewers. According to the Offering Documents, "[a]s of March 31, 2018 and 2019, DouYu's platform had 4.6 million and 6.5 million registered streamers, including more than 2,000 and 6,500 top streamers, each of whom entered into an exclusive contract with [DouYu] directly as of each date, respectively."

40.     DouYu's "exclusive contract model with top streamers" purportedly "helps ensure a consistent supply of quality content, which is effectively supplemented by" relationships with talent agencies "that capture a large group of promising and rising streamers." With years of experience, as the Offering Documents claim, DouYu has "developed a well-designed system to discover, train, and promote streamers who are already popular or have demonstrated the potential to become popular, and to help them grow and monetize their popularity."

41.     DouYu also "employ[s] a multi-channel monetization model." Relying on its large number of viewers and pool of streamers, DouYu's monetization channels mainly consist of live streaming and advertisements. According to the Offering Documents, "[t]hese channels . . . supplement each other and unleash future monetization potential."

---

[1] "eSports" is a form of sport competition using Video games.
[2] "iResearch" refers to iResearch Consulting Group, a third—party industry research firm that Defendants cite to provide information regarding DouYu's industry and its market position in China.

Class Action Complaint for Violation of the Federal Securities Laws

42.     Live streaming, which DouYu considers to be its main monetization channel, "generated 77.7%, 80.7%, 86.1%, 81.5% and 90.9% of [DouYu's] total net revenue in 2016, 2017, 2018, and for the three months ended March 31, 2018 and 2019 respectively." Significantly, DouYu's "live streaming revenue is primarily derived from the sales of a wide array of *virtual gifts*[,]" which DouYu users purchase for DouYu's streamers, among others.

[Emphasis added]

43.     DouYu's ability to maintain its "deep pool of top streamers" was (and is) absolutely critical to its success and its efforts to differentiate itself from major competitors, such as Huya Inc. ("Huya").

**The Offering Documents Contained Materially Untrue and Misleading Statements**

44.     On April 22, 2019, the Company filed a registration statement with the SEC on Form F-l, which, after several amendments, was declared effective on July 16, 2019 (the "Registration Statement"). Thereafter, on July 18, 2019, the Company filed a prospectus for the IPO on Form 424B4, which incorporated and formed part of the Registration Statement (the "Prospectus" and with the Registration Statement, the "Offering Documents").

45.     The Registration Statement was used to sell to the investing public more than 67.3 million DouYu ADSs at $11.50 per ADS. Defendants generated more than $774 million in gross offering proceeds from their sale of the Company's securities in the IPO.

46.     The Offering Documents used to effectuate DouYu's IPO and secure this enormous sum for Defendants from Plaintiff and the Class (defined below) were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made therein not misleading. Specifically, the Offering Documents failed to disclose that prior to the IPO: (i) DouYu's risks related to its top streamers had materialized, including that: (a) a top streamer was actively misrepresenting herself on DouYu's platform; and (b) the costs associated with retaining top streamers was swelling; (ii) DouYu did not ensure that all of its products were fully compliant with current regulatory requirements before those products became available online; and (iii) key interactive features of DouYu's "lucky draw" were non-compliant with current

Class Action Complaint for Violation of the Federal Securities Laws

1    regulatory requirements, requiring DouYu to remove them from operations, which negatively

2    impacted user engagement activity and caused disappointing financial results.

3          47.     For example, claiming that DouYu was at the forefront of the game-centric live

4    streaming industry in China and that among its competitive strengths were its "[l]arge and highly

5    engaged user base" and "[d]eep pool of top streamers," the Offering Documents emphasized DouYu's

6    ability to "***realize [its] growth potential***" by offering "superior streamer development and

7    management mechanisms that are able to effectively identify, cultivate and ***retain top-quality***

8    ***streamers.***" [Emphasis added]

9          48.     Underscoring these purported competitive advantages, the Offering Documents go on

10    to credit DouYu's large, enthusiastic, and highly engaged user base for attracting and retaining its top

11    streamer pool, stating, in relevant part:

> ***We believe we are the go-to platform for game-centric live streaming in China. . . . Our rich and dynamic content offerings and engaging social media features bolster organic growth of our user base.***

* * *

> ***Our user base is also loyal and highly engaged.***

* * *

> ***We expand and solidify our user base through diverse product offerings and continuously enriched content. We engage our users via interactive social features and events both online and offline.***

* * *

> ***Our large, enthusiastic and highly engaged user base has attracted a deep pool of top streamers to our platform.*** According to iResearch, in December 2018 and March 2019, we ranked first in terms of the number of top 100 game streamers in China that we contracted with, which was 50 and 51 out of China's top 100 game streamers, respectively. As of March 31, 2018 and 2019, our platform had 4.6 million and 6.5 million registered streamers, respectively. ***We sign exclusive contracts with top individual streamers directly.*** We also sign contracts with streamer talent agencies to manage our streamers. ***Our exclusive contract model ensures the stability of top streamers and their production of high quality streaming content, and our platform is enhanced by our talent agency model, which captures a large group of promising, rising streamers.*** During the first quarter of 2018 and 2019, our streamers generated a total of 20.4 million and 30.2 million streaming hours, respectively. ***As of March 31,***

*2018 and 2019, we had entered into exclusive agreements with more than 2,000 and 6,500 top streamers, respectively. These top exclusive streamers streamed an average of 4.1 and 4.3 hours per show in the first quarter of 2018 and 2019, respectively. Followers of our exclusive streamers generated 65% and 66% of the total viewing time across our platform in the same periods.*

\* \* \*

After discovery and signing, *we invest significant resources to incubate and train our exclusive streamers to improve their live streaming techniques and develop their personal styles* to help grow their viewer base. In addition, we endeavor to increase streamers' influence beyond live streaming by offering them additional online and offline commercial opportunities. Consequently, *our platform is home to a large group of top streamers in China, evidenced by over 780 exclusive streamers each having more than one million viewers during the first quarter of 2019.* In December 2018 and March 2019, we had the highest share of the top 100 game streamers for eight of the top 10 streamed games in China, respectively, according to iResearch.

[Emphasis added]

49.    Monitoring top streamers to prevent misconduct on DouYu's platform was also identified as important to the Company's continued success, particularly given the PRC's proclivity for censoring information. To that end, the Offering Documents touted DouYu's "*robust content monitoring system*" and assured investors that DouYu has "*implemented control procedures to detect and block illegal or inappropriate content and illegal or fraudulent activities conducted through the misuse of our platform*[.]" [Emphasis added] The Offering Documents also stated that, in the past, DouYu "promptly removed [a] streamer from our platform and *implemented measures to procure our platform users, in particular our streamers, to comply with relevant laws and regulations.*" [Emphasis added]

50.    The Offering Documents continued to emphasize the connection between DouYu's user base and the Company's ability to attract top streamers, explaining further how, together, they both influence the Company's live streaming revenue figures and results from operations:

*Our user base and level of user engagement help us attract top streamers who produce quality content. The curated content and interactive features of our platform help attract and retain users and encourage user participation, which in turn drives up virtual gifting activities and our live streaming revenue.* Our game live streaming combined with a broad range of other entertainment contents have been highly effective in attracting user traffic and boosting user spending. In addition, the broad user reach

Class Action Complaint for Violation of the Federal Securities Laws

and attractive commercial proposition of our platform continuously draw advertisers, game developers and other participants of the eSports industry to our platform.

We seek to continually grow our user base, invest in our brand recognition and stimulate active user engagement to strengthen our leadership position in the game-centric live streaming market. ***Our ability to maintain and expand our user base, as well as maintain and enhance user engagement, depends on, among other things, our ability to recruit, train, and retain high-quality streamers***, continually produce quality content, maintain our pivotal position in the ever-growing eSports industry in China, and continually improve our users' entertainment experience through technological innovation.

[Emphasis added]

51.     The Offering Documents continued:

***Popular streamers are critical to maintaining and expanding our user base and enhancing user engagement.*** As of March 31, 2019, we had 6.5 million registered streamers, among which more than 6,500 are top streamers each of whom entered into an exclusive contract with us directly and approximately 491,000 streamers managed through talent agencies. As of March 31, 2018, our platform had 4.6 million registered streamers, including more than 2,000 top streamers each of whom entered into an exclusive contract with us directly. ***We ranked first in terms of the number of top 100 game streamers we contracted with, which was 50 and 51 out of China's top 100 game streamers, and had the highest share of the top 100 game streamers for eight of the top 10 streamed games in China in December 2018 and March 2019, respectively,*** according to iResearch. As of March 31, 2019, approximately 62 former professional players streamed premium quality eSports content on our platform. In the first quarter of 2019, such former professional players attracted approximately 63.7 million viewers.

***The high quality content generated by our top streamers increases the vibrancies of our user community and in turn drives the growth of our revenue across live streaming, advertisement and game distribution.*** Our ability to attract and retain top streamers depends on, among other things, our brand awareness, size and engagement of our user base, the support from our platform, and monetization opportunities.

***We will continue to attract, nurture and promote our streamers through our comprehensive streamer development system and increase our streamers' stickiness to and reliance on our platform.***

[Emphasis added]

52.      According to the Offering Documents, DouYu's "***exclusive contract model***"
allowed it to "***recruit and retain high quality streamers***[,]" affording the Company a "***unique
competitive advantage[] as compared to other game-centric live streaming platforms***":

> Under this model, we enter into exclusive contracts with individual streamers directly.
> ***The exclusive contract model is an important way to recruit and retain high quality
> streamers. The over 6,500 top streamers we signed exclusive contracts with as of
> March 31, 2019, are the bedrock of our platform and have contributed vastly to user
> attraction and retention and revenue generation.*** In the first quarter of 2019, our
> exclusive streamers contributed 65.8% to total viewership in terms of viewing hours
> on our platform and 61.2% of the total live streaming revenue generated from our
> platform. We believe ***our strategic focus on exclusive contracts with top streamers
> offers us unique competitive advantages as compared to other game-centric live
> streaming platforms.***
>
> Our exclusive contracts have exclusivity clauses that require streamers to live stream
> on our platform only during the contract term. ***In addition to payments of a portion
> of virtual gift sales and advertisement sales, we typically pay our exclusive streamers
> base compensation based on the content he or she produces and the number of
> concurrent viewers who watch live-streaming at the same time.*** We have the right to
> review and adjust our streamers' base compensation taking into account their
> performance metrics. As such, our exclusive streamers are incentivized to produce
> engaging content that attracts more Viewers and promotes spending on our platform.
>
> ***We retain our top streamers by increasing the attractiveness of our platform.*** Our
> streamers enjoy broad exposure to a large user base through our network and we also
> invest in streamers' professional development by providing online and offline
> promotion activities to propel them to greater stardom. ***We take steps to mitigate the
> risk of losing our streamers to other platforms.*** For every streaming genre or section,
> we have several top streamers that are in friendly competition with each other to avoid
> a monopoly by one streamer and to attract viewers who may be viewing at different
> times of the day. We also try to discover and cultivate emerging streamers to serve as
> backups in case we lose certain top streamers for a genre. ***Historically, we have not
> suffered material losses or negative financial impact on our revenue due to the
> departure of top streamers.***
>
> [Emphasis added]

53.      Another way DouYu increased the attractiveness of its platform to streamers was by
sharing a portion of the legal currency used by users to purchase virtual currency and, in turn, virtual
items to give to streamers, with streamers. According to the Offering Documents:

> ***The major monetization channel for China's game-centric live streaming platforms
> stems from gifting virtual items.*** Users can purchase virtual items on the platforms for

Class Action Complaint for Violation of the Federal Securities Laws

the purpose of rewarding streamers that they like, and *live streaming platforms typically share a portion of the payment for virtual items.* By giving streamers virtual gifts, viewers show their appreciation for the streamers and get to engage in live streaming on a more interactive and real-time basis. Compared with other live streaming formats, game-centric live streaming offers a more sustainable context for virtual gifting due to the massive base of game fans with high engagement and propensity to spend on game-centric entertainment formats.

[Emphasis added]

54.     DouYu's "*[r]evenue sharing fees and content costs,*" which include payments to streamers, were described in the Offering Documents as follows:

Our revenue sharing fees represent our payment to streamers based on a percentage of revenue from sales of virtual items, including virtual gifts and other subscription based privileges. *When a viewer sends a virtual gift to a streamer, we pay a certain percentage of the sales of virtual gifts to the streamers or the talent agency of which the streamer is a member. In addition, we give certain of our streamers a monthly pay that is determined based on the popularity of the streamer. Our content cost mainly covers costs we incurred in purchasing content rights, compensating and recruiting streamers,* and those we incurred in generating self-produced content. *We expect the revenue sharing fees and content cost to increase in absolute amount as our business grows and we further expand our content offerings, enhance user engagement and strengthen investment in eSports. We expect the percentage of revenue sharing fees and content cost of total net revenues to decline as we benefit from economies of scale.*

[Emphasis added]

55.     The Offering Documents also provided the following table setting forth a breakdown of these components of cost of revenues from 2016 through the three months ended March 31, 2019:

| Cost of revenues | For the Year Ended December 31, | | | | | | | For the Three Months Ended March 31, | | | | |
| | 2016 | | 2017 | | 2018 | | | 2018 | | 2019 | | |
| | RMB | % | RMB | % | RMB | US$ | % | RMB | % | RMB | US$ | % |
| | | | | | (in millions, except for percentages) | | | | | | | |
| Revenue sharing fees and content cost[1] | 782.4 | 67.7 | 1,373.1 | 72.6 | 2,790.0 | 415.7 | 79.6 | 482.7 | 75.2 | 1,067.4 | 159.0 | 83.0 |
| Bandwidth cost | 334.9 | 29.0 | 433.6 | 22.9 | 555.9 | 82.8 | 15.9 | 128.0 | 19.9 | 162.3 | 24.2 | 12.6 |
| Other | 37.8 | 3.3 | 83.7 | 4.4 | 157.5 | 23.5 | 4.5 | 31.2 | 4.9 | 56.3 | 8.4 | 4.4 |
| Total | 1,155.1 | 100.0 | 1,890.4 | 100.0 | 3,503.4 | 522.0 | 100.0 | 641.9 | 100.0 | 1,286.0 | 191.6 | 100.0 |

Class Action Complaint for Violation of the Federal Securities Laws

56.     Next, the Offering Documents noted the importance for DouYu to maintain and expand its user base, which "made [DouYu] the go-to platform for top streamers," while at the same time ensure it enhances its users' engagement with top streamer, among others on the platform:

> Our ability of effectively maintaining and expanding our user base will affect the growth of our business and our revenue going forward. The following table sets forth our average next-month active user retention rate and average MAUS for each of the quarters indicated:

| | For the Three Months Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | March 31, 2017 | June 30, 2017 | September 30, 2017 | December 31, 2017 | March 31, 2018 | June 30, 2018 | September 30, 2018 | December 31, 2018 | March 31, 2019 |
| | (in millions, except for the average next-month active user retention rate) | | | | | | | | |
| Average Next-Month Active User Retention Rate | 72.9% | 75.2% | 76.1% | 76.7% | 74.1% | 74.4% | 75.9% | 75.0% | 78.6% |
| Average MAUs on PC Platform | 72.6 | 73.6 | 91.8 | 102.1 | 91.0 | 87.3 | 101.4 | 111.4 | 110.1 |
| Average MAUs on Mobile Platform | 25.7 | 23.8 | 28.5 | 32.2 | 35.7 | 35.5 | 41.3 | 42.1 | 49.1 |
| Average Total MAUs | 98.3 | 97.4 | 120.3 | 134.3 | 126.7 | 122.8 | 142.7 | 153.5 | 159.2 |

> We have generally achieved steady growth in our user base during these periods.

57.     DouYu closely monitored and measured its "number of paying users" and the "Average Revenue Per Paying User" ("ARPPU"). Both metrics were identified in the Offering Documents as fundamental indicators of the Company's performance:

> Our live streaming revenue is primarily driven by the number of paying users and ARPPU. **We have experienced significant growth in the number of paying users as a result of continual promotion of our streamers and expansion of virtual gifting scenarios.** Our quarterly average paying user base grew from 3. 6 million in the first quarter of 2018 to 6.0 million in the first quarter of 2019. Moreover, our quarterly average ARPPU increased from approximately RMB149 to RMB226 in the same periods. **We intend to attract and train more popular streamers, provide more quality content, diversify user paying scenarios on our platform, and enhance interaction between streamers and viewers to increase user willingness to pay. . . . We have generally experienced a steady increase in the number of our paying users and paying ratio due to active cultivation of our users' paying habits through compelling content and various promotional activities and events.**

> [Emphasis added]

58.     Central to DouYu's efforts to enhance user engagement was its introduction of various social features, which according to the Offering Documents, would lead to user loyalty:

- 16 -

Gamers have strong social attributes and seek to be part of a community sharing similar interest. Therefore, game-centric live streaming platforms introduced various social features for users to interact with each other, such as group chatting and bullet chatting. These platforms also offer ways for viewers to interact with streamers. For example, talented game streamers may play games together with their viewers. ***Creating and maintaining a social community among viewers and streamers create barriers of entry and is crucial to build strong engagement and loyalty to the live streaming platforms.***

[Emphasis added]

59.     Online "lucky draws" and raffles, both of which were used to promote user engagement, are two examples of social features offered by DouYu to enable "viewers to interact with streamers[,]" which the Offering Documents identified as one of a handful of "*[k]ey success factors for game-centric live streaming platforms*[.]"

60.     Significantly, both "lucky draws" and raffles involve virtual currencies, such as "Yuchi," the virtual currency DouYu launched in 2015 that is (and has since been) used by viewers to purchase the virtual gifts they give to top streamers as a gesture of appreciation or support. And further, both are significant drivers of DouYu's live streaming revenue. According to the Offering Documents, "users have the option to purchase virtual currency, which is non-refundable and can only be used to redeem for virtual items to be used in the live streaming sessions on [DouYu]'s platforms." Unredeemed virtual currency is recorded as deferred revenue while virtual currencies used to purchase virtual items are recognized as revenue, according to the Company's prescribed revenue recognition policies.

61.     Despite describing Yuchi as DouYu's "virtual currency," whose "price does not change" and which "does not expire," the Offering Documents claim that Yuchi is not controlled by then-existing restrictions on Virtual currency prescribed by the Ministry of Culture's and Ministry of Commerce's joint "Notice on the Strengthening of the Administration of Online Game Virtual Currency (the 'Virtual Currency Notice')":

On June 4, 2009, the Ministry of Culture and the Ministry of Commerce jointly issued Notice on the Strengthening of the Administration of Online Game Virtual Currency (the "Virtual Currency Notice"), which defines what virtual currency is and requires that entities obtain the approval from the competent culture administrative department before issuing virtual currency and engaging in transactions using virtual currency in connection with online games. ***The Virtual Currency Notice regulates that virtual***

*currency may only be used to purchase services and products provided by the online service provider that issues the virtual currency, and also prohibits businesses that issue online game virtual currency from issuing virtual currency to game players through means other than purchases with legal currency, and from setting game features that involve the direct payment of cash or virtual currency by players for the chance to win virtual gifts or virtual currency based on random selection through a lucky draw, wager or lottery.*

\* \* \*

Currently, the PRC government has not promulgated any specific rules, laws or regulations to directly regulate virtual currency, except for the above-mentioned online game virtual currency. Although the term "virtual currency" is widely used in live streaming industry, we believe that *such "virtual currency" used in our live streaming communities, including Yuchi, do not fall into the virtual currency defined under the Virtual Currency Notice*[.]

\* \* \*

In addition, there are *online lucky draws, raffles* and other similar activities conducted on our platform to promote user engagement, which involve virtual currencies (such as Yuchi). *The prize of such activities can only be used to purchase virtual gifts or to give to streamers as reward on our platform.*

[Emphasis added]

62.     Relatedly, the Offering Documents affirmatively stated that DouYu, "endeavor[s] to eliminate illicit content from our platform" and that it has "*made substantial investments in resources to monitor* content that users post on our platform and *the way in which our users engage with each other through our platform.*" [Emphasis added.] Such method, purportedly, "ensure[s] our platform remains a healthy and positive experience for our users."

63.     The statements made in ¶¶ 47-62 were materially inaccurate, misleading, and/or incomplete because they failed to disclose that: (1) DouYu's risks related to its top streamers had materialized, including that: (a) a top streamer was actively misrepresenting herself on DouYu's platform; and (b) the costs associated with retaining top streamers was swelling; (2) DouYu did not ensure that all of its products were fully compliant with current regulatory requirements before those products became available on line; and (3) key interactive features of DouYu's "lucky draw" were noncompliant with current regulatory requirements, requiring DouYu to remove them from

operations, which negatively impacted user engagement activity and caused disappointing financial results.

64.     In addition to the foregoing affirmative misrepresentations, Defendants' failure to disclose the material information described herein in the Offering Documents violated at least four independent duties to disclose.

65.     First, pursuant to Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303, and the SEC's related Interpretive Releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. As set forth above, at the time of the Offering, unbeknownst to investors, DouYu was experiencing high top streamer retention costs, all the while it knew that the present, ongoing, and likely continued departure of top streamers would negatively impact the Company's performance. Moreover, DouYu knew, yet concealed, that its failure to comply with then-existing regulatory requirements would require certain offerings to be stripped from users who relied on them to meaningfully engage with streams for certain periods of time. The adverse events and uncertainties associated with these negative trends were reasonably likely to (and did) have a material impact on the Company's financials and, therefore, were required to be disclosed in the Offering Document, but were not.

66.     Second, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503, required, in the "Risk Factors" section of the Offering Documents, a discussion of the most significant factors that make the Offering risky or speculative and that each risk factor adequately describe the risk. The Offering Documents' discussion of risk factors were themselves materially misleading because they provided generic statements of potential or contingent risk, yet failed to disclose that the potential future adverse impact described was *already* occurring. For example, the Offering Documents purported to warn that top streamers "*may* [] choose to depart us when their contract period ends," and that "their departure may cause a corresponding decline in our user base[,]" which "***may materially and negatively affect our user retention and thus our business and operations***" at a time when Defendants had already seen top streamers depart, in some cases, for competing platforms. [Emphasis added and in original.]

Class Action Complaint for Violation of the Federal Securities Laws

67.    Third, by affirmatively raising these topics, Defendants took on a duty to be complete and truthful about such topics. Defendants violated that duty by failing to disclose the material information described herein.

68.    Fourth, Defendants' failure to disclose the then-known facts that DouYu was experiencing high top streamer retention expenses, that the departure of top streamers was negatively impacting the Company's financial performance, and that certain of DouYu's offerings were in violation of then-existing regulation, all of which was having a negative impact on material financial metrics DouYu touted, along with the likely material effects these omissions would have on DouYu's share price, rendered false and misleading the Offering Documents' many references to known "risks," which "if" occurring "may" or "could" materially affect the Company, as these "risks" had already materialized at the time of the IPO.

**Additional Facts Demonstrating Materiality**

69.    On July 30, 2019, less than two weeks after DouYu 's IPO, *BBC News* published an article about a Chinese vlogger (known as "Qiao Biluo"), who used a filter to look younger and whose fans were left stunned after a technical glitch during a live-stream revealed her to be a middle-aged woman and not the young glamorous girl DouYu users had been "'worship[ing].'" According to the *BBC News* article:

The blogger, who initially boasted *a follower count of more than 100,000 on DouYu*, is believed to have used a filter on her face during her appearances, and had been renowned for her "sweet and healing voice".

China's Global Times said she had been "worshipped" as a "cute goddess" by *some members of her loyal audience with some fans even giving her more than 100,000 yuan ($14,533, £11,950).*

\* \* \*

The Global Times reports that all was as normal and that her fans urged her to show her face and remove her filter but she refused, instead apparently saying: "I can't show my face until I receive gifts worth 100,000 yuan ($11,950). After all, I'm a good-looking host."

*Followers began to send her donations with the largest reported to be 40,000 yuan ($5,813, £4,780) during the session.*

- 20 -

However, at some point, it seems the filter being used by the Vlogger stopped working and her real face became visible to her viewers.

She is reported to have noticed only when people who had signed up to her VIP access room **started exiting en masse.**

Many of her original followers - especially men - are said to have **stopped following her and withdrawn their transactions** after seeing her true identity.

[Emphasis added]

70.     On July 31, 2019, *Mic.com* also published a story, titled "Popular Chinese DouYu streamer revealed to be much older thanks to livestream glitch" (the "Mic Article"), on the glitch that revealed the true identity of Qiao Biluo whose DouYu users "fawned over the videos and photos that she uploaded . . ., which showed a young woman posing, playing games, and talking to the camera." According to the Mic Article, "*the revelation caused a considerable amount of drama, with many of her male subscribers expressing outrage that they had been tricked. They left the stream in droves, unsubscribed from her account and pulled donations.*" [Emphasis added]

71.     A day later, on August 1, 2019, *TechNode*, an online information outlet catering to the tech and startup community both inside and outside of China, revealed that DouYu "*banned [Qiao Biluo]* on Thursday for drumming up hype surrounding her accidental face reveal[.]" The *TechNode* article, titled "Douyu bans livestreamer for hyping face reveal," noted how:

- The livestreamer said in an earlier broadcast that she wouldn't show her face until she had received gifts totaling more than RMB 100,000 ($11,950).
- After the incident, the host claimed that the face reveal was planned, saying that she paid RMB 280,000 for it.
- According to the company's statement, the livestreamer's comments "challenged the bottom line of the public and caused negative social influence." As punishment, Douyu permanently banned her channel and remove all her content.

[Emphasis added]

72.     *TechNode* also put the incident in context, revealing that a number of well-known Chinese livestreamers have been banned for inappropriate behavior in the past, including "Lu Benwei, *one of Douyu 's most popular hosts, [who] was banned from all live-streaming platforms* by the

Case 1:20-cv-07234-ALC   Document 1   Filed 03/24/20   Page 22 of 29


country's top internet regulator, the Cyber Administration of China, for verbally abusing a content creator who accused him of cheating." [Emphasis added]

73.     The media continued to publish accounts of the incident over the next few days, often repeating the fact that the glitch caused Qiao Biluo's followers to unsubscribe en masse and rescind their gifts.

74.     On July 29, 2019, the day before the incident was first reported, DouYu ADSs closed at $10.08 per ADS. After the market absorbed all this information, on August 6, 2019, DouYu ADSs closed at $7.84 per ADS, or down 22.2%.

75.     On August 11, 2019, *Bloomberg* published an article from the *South China Morning Post*, profiling Liu Mou ("Liu"), a top streamer who plays exclusively on DouYu and purportedly contributed as much as 3% of DouYu's revenues in the second quarter of 2019 alone. In addition to explaining how DouYu lives and dies on virtual gifts from fans, with "[n]inety-one per cent of Douyu's revenue [coming]  from virtual gifts" in the previous quarter, the article warned that "***the cash burn on marketing and retaining top performers has caused investors to question the business model.***" [Emphasis added.] Using Liu as an example, the article noted how "Douyu pay[s] top gamers like Liu at least $4 million a year to retain them exclusively" and gives them half of whatever money was spent on "virtual gifts [bestowed upon them] from followers[.]"

76.     The article also warned about the Company's revenues given its focus on locking down and retaining top streamers. Specifically, the article revealed how "[s]treamers often need to spend their own money to buy fan support[,]" which DouYu recognizes as revenue, but in actuality, DouYu only retains half of that money while "the other half ***returns*** to [a streamer]'s pocket." [Emphasis added.] According to the article, "'Douyu's focus on top streamers makes it more susceptible to this [revenue] issue compared to [competitors].'" Further, DouYu's CEO confirmed that these arrangements existed.

77.     On August 13, 2019, DouYu ADSs closed at $8.84 per ADS, falling from $9.93 per ADS on August 12, or nearly 11%, before declining even further to $8.14 per share on August 14.

78.     Then, on October 15, 2019, J.P. Morgan announced in an analyst report that DouYu had temporarily removed its "lucky draw feature in late Aug 2019," before "reinstat[ing]" it "on Oct

Class Action Complaint for Violation of the Federal Securities Laws

10," which, according to J.P. Morgan, "*will cause its 3Q19 revenue to decline 1.5% QoQ . . ., 5% below the low end of company's 3Q19 guidance . . . and 7% lower than current Bloomberg consensus.*" [Emphasis added.] According to J.P. Morgan, which characterized the suspension of luck draw features as a "headwind":

> On Aug 20 2019, Douyu started a round of operation changes Which include: 1) removal of lucky draw feature, 2) enhance content monitoring within live broadcasting show room. On Oct 10 2019, DouYu re-launched lucky draw feature after National Day holiday with *stronger restriction on in-game consumption (cap on virtual gift amount etc). We estimate lucky draw feature to contribute to ~10% of Douyu 's revenue before 3Q19.*

> [Emphasis added]

79.     DouYu closed at $7.12 per ADS on October 16, 2019, or 4.7% lower than the previous day's close of $7.47 per ADS.

80.     On November 27, 2019, DouYu released its third quarter 2019 financial results. During the Q&A portion of the earnings call held the same day, the Company addressed the temporary removal of its "lucky draw" features:

> **Chun Man Poon** - *Morgan Stanley, Research Division - Equity Analyst*
> (foreign language) I'll translate my question. My first question is since *late August, you have removed certain lucky draw features. And can you let us know the reason why you took it off and also the revenue impact in Q3?* And also since you have restated these features, how is the revenue run rate at present? Is it better than before you removed these features already? And from here onwards, *how does the regulatory landscape look like for these features?*

> **Shaojie Chen** - *DouYu International Holdings Limited - Founder, CEO & Director*

> * * *

> [Interpreted]. Okay. Regarding the reason of the temporary removal of our quiz features since August, we have always prioritized the long-term and sustainable growth of DouYu. So in order to contribute to a positive Internet environment, *our management team made decision to carry out an assessment of certain interactive features in mid-August 2019* prior to China's anniversary celebration. And *as a result of our internal assessment, we adjusted certain functions of the interactive product featuring.*

> * * *

Class Action Complaint for Violation of the Federal Securities Laws

[Interpreted]. Regarding the revenue impact, ***our interactive features, including quiz, were designed to enhance the interaction between the streamers and users.*** So consequently, ***the removal of certain features has somehow affected users' engagement activity with streamers for a certain period of time in third quarter.*** And we -- after revision and improvement, we initially reacted (sic) [activated] part of the features in late third quarter, and we activated the rest in the fourth quarter. So after resuming the access to our interactive features, the users engagement for these interactive features are ***gradually recovering***, and we have also factored in all of these into our fourth quarter guidance for 2019.

\* \* \*

[Interpreted]. Regarding future risk adjustment, ***we will pay close attention to development laws and regulations issued by the local authorities***, while maintaining active communication with government departments. Thank you.

[Emphasis added and in original.]

81.     The Company's ADSs closed at $7.46 per share on November 29, 2019, the next trading day, representing a decline of over 4.8%.

82.     On January 23, 2020, J.P. Morgan released an analyst report commenting on the suspension of interactive features and crediting the Company's 12% drop in ADS price on January 22 to investor concerns about "***the financial implications of such a broad—based key monetization feature suspension***[,]" stating, in relevant part:

> [O]n January 22, 2020, all of the listed digital entertainment platforms (Douyu, Huya, . . .) that operate live broadcasting services have ***suspended interactive features that drive meaningful monetization for live streaming operators.*** Share prices of Douyu/Huya . . . fell by 12%/10% . . . on Jan. 22, 2020, ***in our view due to investors' concerns about the financial implications of such a broad-based key monetization feature suspension.***

[Emphasis added]

83.     J.P. Morgan added, "We believe investors' cautious sentiment will remain in the near term ***due to a lack of clarity on the duration of this suspension***[.]" [Emphasis added]

84.     In response to all this information, the Company's ADSs have cratered, trading as low as $6.50 per ADS since going public, representing a decline of over 43% from the Offering Price.

## CLASS ACTION ALLEGATIONS

Class Action Complaint for Violation of the Federal Securities Laws

85.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired shares or DouYu ADSs in its IPO or purchased ADSs thereafter in the stock market pursuant and/or traceable to the Company's Registration Statement issued in connection with the IPO and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families legal representatives, heirs, successors or assigns and any entity in which the officers and directors of the Company have or had a controlling interest.

86.     The members of the Class are so numerous that joinder of all members is impracticable. There were over 67 million shares sold in the IPO. Since the IPO, the Company's securities have actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by DouYu or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

87.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

88.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

89.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

90.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

Class Action Complaint for Violation of the Federal Securities Laws

(g) Whether the Securities Act was violated by Defendants as alleged herein;

(h) Whether the Registration Statement were negligently prepared and contained materially misleading statements and/or omitted material information required to be stated therein;

(i) the extent to which members of the Class have sustained damages and the proper measure of damages

(j)  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

91.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### FIRST CAUSE OF ACTION
**Violation of Section 11 of The Securities Act**
**Against All Defendants**

92.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

93.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against Defendants.

94.    The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

Class Action Complaint for Violation of the Federal Securities Laws

95.     DouYu is the registrant for the IPO. Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

96.     As issuer of the shares, DouYu is strictly liable to Plaintiff and the Class for the misstatements and omissions.

97.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

98.     By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

99.     Plaintiff acquired shares of DouYu's ADSs pursuant and/or traceable to the Registration Statement for the IPO.

100.    Plaintiff and the Class have sustained damages. The value of DouYu ADSs has declined substantially subsequent to and due to Defendants' violations.

## SECOND CAUSE OF ACTION
### Violation of Section 12(a)(2) of the Securities Act
### Against All Defendants

101.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein.

102.    This Count does not sound in fraud. Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count. Plaintiff does not allege that Defendants had scienter or fraudulent intent, which are not elements of this claim.

103.    Defendants offered, sold and/or solicited a security, namely shares of DouYu's ADSs by means of the IPO identified above, or were-controlling persons of DouYu or of those who offered and sold DouYu ADSs. The Registration Statement contained untrue and/or misleading statements of material fact that the Defendants in the exercise of reasonable care should have known were false.

104.    Defendants actively solicited the sale of DouYu ADSs to serve their own financial interests.

105.    At the time of purchase of DouYu's ADSs, Plaintiff and other members of the Class did not know that the representations made to them by the Defendants in connection with the distribution of shares and the matters described above were untrue, and did not know the above described omitted material facts, were not disclosed.

106.    As a result, Plaintiff and Class members are entitled to tender DouYu they purchased and receive from Defendants the consideration paid for those shares with interest thereon, less the amount of any income received thereon, or damages resulting from Defendants' conduct.

107.    Defendants are liable to Plaintiff and Class members pursuant to Section 12(a)(2) of the Securities Act, as seller of the securities in connection with the IPO.

108.    This Action is brought within three years from the time that the securities upon this Count is brought were sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

### THIRD CAUSE OF ACTION
#### Violation of Section 15 of the Securities Act
#### Against Individual Defendants, Tencent, and Cogency Global

109.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

110.    This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

111.    The Individual Defendants were each control persons of DouYu by virtue of their positions as directors, senior officers, major shareholders and/or authorized representatives of DouYu. Individual Defendants had the power and influence and exercised the same to cause DouYu to engage in the acts described herein. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of DouYu.

112.    DouYu and the Individual Defendants were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or authorized

Class Action Complaint for Violation of the Federal Securities Laws

1  the signing of the Registration Statement and having otherwise participated in the process which

2  allowed the IPO to be successfully completed.

3       113.    This claim is brought within one year after discovery of the untrue statements and/or

4  omissions in the Offering that should have been made and/or corrected through the exercise of

5  reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

6                          **PRAYER FOR RELIEF**

7       **WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

8       A.    Determining that this action is a proper class action, designating Plaintiff as Lead

9  Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil

10 Procedure and Plaintiff's counsel as Lead Counsel;

11      B.    Awarding compensatory damages in favor of Plaintiff and the other Class members

12 against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

13 wrongdoing, in an amount to be proven at trial, including interest thereon;

14      C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

15 action, including counsel fees and expert fees; and

16      D.    Such other and further relief as the Court may deem just and proper.

17                          **JURY TRIAL DEMANDED**

18      Plaintiff hereby demands a trial by jury.

19 Dated: March 24, 2020                Respectfully submitted,

20

21                                      **THE ROSEN LAW FIRM, P.A.**

22                                      /s/ Laurence M. Rosen
                                        _____
23                                      Laurence M. Rosen, Esq. (SBN 219683)
                                        355 S. Grand Avenue, Suite 2450
24                                      Los Angeles, CA 90071
                                        Telephone: (213) 785-2610
25                                      Facsimile: (213) 226-4684
26                                      Email: lrosen@rosenlegal.com

27                                      *Counsel for Plaintiff*

28

Class Action Complaint for Violation of the Federal Securities Laws