UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE DOUYU INTERNATIONAL HOLDINGS LIMITED SECURITIES LITIGATION | Case No.: 1:20-CV-7234 (ALC)<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |
| THIS IS APPLICABLE TO ALL ACTIONS | |

**AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS


I. NATURE AND SUMMARY OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 6

III. PARTIES ..... 6

IV. SUBSTANTIVE ALLEGATIONS ..... 15

A. Background of Douyu ..... 15

B. Douyu's Revenue is Derived Primarily from Purchases of "Virtual Gifts" ..... 18

C. Douyu's "Top Streamers" Drive Purchases of Virtual Gifts ..... 20

D. Douyu's "Lucky Draw" and Other Raffles Incentivize Purchases of Virtual Gifts ..... 27

E. Douyu's Sudden Profitability in Q1 2019 Allowed Defendants to Reap Outsized Returns in the Company's IPO ..... 34

V. MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE OFFERING DOCUMENTS ..... 36

A. The Offering Documents Misrepresented and/or Failed to Disclose that Yuchi and/or Lucky Draw Violated China's Regulations ..... 36

B. The Offering Documents Misrepresented and/or Failed to Disclose that Douyu's Revenues Were Inflated by Insider "Wash" Transactions ..... 39

C. The Offering Documents Misrepresented and/or Failed to Disclose that Streamers Could and Were Actively Misrepresenting Themselves on Douyu's Platform ..... 50

D. The Offering Documents Violated Items 303 and 503 of Regulation S-K. ..... 56

VI. THE TRUTH BEGINS TO EMERGE ..... 58

VII. PLAINTIFF'S CLASS ACTION ALLEGATIONS ..... 64

VIII. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ..... 66

IX. COUNT I ..... 66

X. COUNT II ..... 68

XI. COUNT III ..... 70

XII. PRAYER FOR RELIEF ..... 70

XIII. JURY TRIAL DEMANDED ..... 71

Lead Plaintiff Li Yunyan ("Li") and Named Plaintiff Heng Huang ("Huang," and together with Li, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys allege the following based upon their personal knowledge as to themselves and each of their own acts, and information and belief as to all other matters, based upon the investigation conducted by and through their attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Douyu International Holdings Limited ("Douyu" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Counsel for Plaintiffs has conducted extensive due diligence in preparation of this Amended Class Action Complaint ("Complaint"). Plaintiffs, among other things, retained the services of independent investigation firms with extensive investigative experience, which made significant efforts to identify, locate, contact and interview former employees of Defendants with information potentially relevant to the allegations in this Complaint.

## I. NATURE AND SUMMARY OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities, other than Defendants, who purchased Douyu's American Depositary Shares ("ADSs") pursuant and/or traceable to the Company's Registration Statement, as defined below, issued in connection with the Company's July 16, 2019 initial public offering (the "IPO" or the "Offering"), seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act") (the "Class").

2. This case arises out of Douyu's IPO. The Offering Documents for the IPO, as defined below, which include the Registration Statement, were negligently prepared and contained numerous statements about Douyu's business that were misleading, inaccurate, and/or incomplete because they failed to disclose that (i) Douyu's virtual currency "Yuchi" could be transferred between users and/or redeemed for currency and its Lucky Draw game did not comply with China's regulatory requirements; (ii) Douyu's revenues were inflated by *de facto* wash transactions where streamers made purchases of virtual gifts for themselves and Douyu kicked back half of the purchase price to the streamers; and (iii) certain of the Company's video content producers or "streamers" were misrepresenting their identities on Douyu's platform. When the truth was revealed to investors after the IPO, Douyu's share price plummeted.

3. Douyu is a video live streaming service or platform that runs on computers and/or through mobile applications ("apps") on smart phones and tablets. Live streaming technology lets an individual watch, create, and/or share videos in real time, and Douyu's platform allows individuals to broadcast, or "stream" videos over the Internet to Douyu's users. Douyu claims that it is "the largest game-centric live streaming platform in China and a pioneer in the eSports value chain."

4. Users who broadcast content on Douyu's platform are called "streamers." As of March 31, 2019, Douyu had 6.5 million registered streamers, 6,500 of whom were "top streamers." The Company's revenue overwhelmingly comes from purchases of "virtual gifts" by Douyu's users for streamers. In the first quarter of 2019 ("Q1 2019") ***90.9%*** of the Company's revenue, or $468.8 million,[1] was from the sale of virtual gifts.

---

[1] All references to monetary amounts in this complaint are to United States dollars ("USD"), unless otherwise noted. Where amounts were reported by Douyu in Chinese yuan ("RMB"),

5. Douyu users purchase virtual gifts on the platform in two steps. First, users buy "Yuchi," Douyu's "virtual currency." Second, once they have purchased Yuchi, users use that Yuchi to buy virtual gifts, which they give to streamers, a process not unlike when one tosses money in a street musician's instrument case. One Yuchi costs approximately one RMB, or $0.15. Douyu's streamers are able to generate enormous revenues for the Company by fostering delicate relationships with users that induce users to buy the streamers virtual gifts.

6. The Offering Documents assured investors that Douyu's virtual currency, Yuchi, could not "***be converted back to cash or be transferred between users***."[2] In addition, the Company touted its "Lucky Draw" raffle through which users could win Yuchi or virtual gifts to give to streamers, which Douyu claimed increased use engagement. The Offering Documents failed to disclose, however, that users were in fact regularly exchanging Yuchi for cash and transferring the currency between each other, that Lucky Draw was nothing more than improper gambling, and thus that the virtual currency and game violated China's regulations.

7. Douyu's Offering Documents also touted to investors the Company's increasing revenues, as well as that the Company had reported the first profitable quarter in its history in Q1 2019, when it reported $2.7 million in "net income," *i.e.*, profits. The Offering Documents did not disclose, however, that streamers routinely made large purchases of virtual gifts that they gave to themselves and for which the Company paid or "kicked back" 50% of the value of the purchase to the streamers. These purchases—akin to wash transactions—were intended to create the artificial impression that the streamer was earning more money from fans, and thus was more

---

those amounts have been converted to USD at a rate of RMB 6.7112 to USD 1.00, the rate used by Douyu in the Offering Documents.

[2] All emphases in this complaint have been added except where otherwise noted.

popular than he or she actually was, as well as that Douyu had larger numbers of transactions and revenues than the Company actually did.

8. Finally, the Offering Documents emphasized the integral role relationships between users and streamers played in the company's business, stating that "top streamers can inspire a large fan base of viewers ***with their [i.e., the streamers'] superior skillsets and passionate personality, and generate significant monetization opportunity and user engagement***." The Offering Documents also cautioned investors that if anything were to damage the streamer-user relationship, or if "***our streamers fail[] to keep our users engaged on our platform over a long period of time***," the Company's business prospects would suffer. The Offering Documents failed to disclose however, that some of Douyu's streamers—including the Company's top streamers—were misrepresenting themselves to users, which created the material risk that users would leave the platform when they discovered that the streamers were not who they purported to be.

9. Douyu had initially filed a Form F-1 Registration Statement with the SEC for its IPO on April 22, 2019, which sought approval to sell approximately $500 million of American Depositary shares ("ADSs") for the Company to investors. After several amendments, on July 12, 2019 Douyu filed a Form F-1/A Amended Registration Statement with the SEC for Company's IPO, which was declared effective on July 16, 2019 (the "Registration Statement"). The Registration Statement increased the amount of capital the Company sought to raise from $500 million to $639 million on the basis of the Company's sharply increased revenues in Q1 2019, which was the first profitable quarter in its history. On July 18, 2019, Douyu filed a prospectus for the IPO on Form 424B4, which incorporated and formed part of the Registration Statement (collectively, the "Offering Documents"), offering to sell to the public 67.3 million

Douyu ADSs at a price of $11.50 per ADS. Defendants ultimately raised approximately $774 million in gross offering proceeds using the misleading, inaccurate, and/or incomplete Offering Documents.

10. In the weeks following the IPO, investors learned the truth about Yuchi and Lucky Draw, Douyu's revenues, and streamers' concealment of their identities. First, on July 30, 2019, the BBC and other media outlets reported that a prominent Douyu streamer, who purported to a 20-year-old girl, was in fact a middle-aged woman, which outraged her followers and resulted in the Company shutting down her stream. Second, on August 11, 2019, Bloomberg published an article that disclosed that Douyu's revenues were inflated by streamers' purchases of gifts for themselves—including a $3.15 million purchase by a single streamer, an amount larger than *the profits the Company purported to have realized in Q1 2019* and profits on which Defendants *had raised an additional $274 million from investors*. Third, in October 2019, investors learned from a J.P. Morgan analyst report that Douyu's revenues had stalled because the Company had deactivated Lucky Draw for several weeks after public reports that the games were nothing more than gambling and because users were exchanging Yuchi for money and/or between themselves. The price of the Company's ADSs plummeted after each of these disclosures.

11. As revealed by these disclosures, the Offering Documents were negligently prepared and contained numerous statements that were misleading, incomplete, and/or inaccurate because they failed to disclose that Douyu's (i) Yuchi virtual currency was being exchanged for currency and/or between users and the platform's Lucky Draw feature was not compliant with China's regulations; (ii) revenues were inflated by purchases of virtual gifts by streamers for

themselves; and (iii) streamers were actively misrepresenting themselves on the Company's platform, which created a material risk that users would abandon Douyu.

12. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

13. The claims asserted herein arise under and pursuant to Sections 11, 12 and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

14. Venue is proper in this Judicial District pursuant to Section 22(a) of the Securities Act (15 U.S.C. §77v(a)), 28 U.S.C. § 1391(b), as the Company's IPO was marketed in this District.

15. In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the U.S. mails, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

16. Lead Plaintiff Li Yunyan, as set forth in the certification accompanying the Declaration of Jennifer Pafiti in support of Yunyan's Motion for Consolidated of Related Actions, Appointment as Lead Plaintiff and Approval of Lead Counsel, *see* Declaration of Jennifer Pafiti, *In re Douyu International Holdings Limited Securities Litigation*, No. 1:20-cv-07234-ALC (May 26, 2020 S.D.N.Y.), ECF No. 33, incorporated by reference herein, and

Exhibit A attached hereto to this complaint, purchased Douyu ADSs at artificially inflated prices from Defendant Morgan Stanley in the Company's IPO and was damaged thereby.

17. Named Plaintiff Heng Huang, as set forth in the certification accompanying the filing of his initial complaint in the action captioned *Huang v. Douyu International Holdings Limited*, No. 2:20-cv-03914-SVW-MAA (C.D. Cal. Apr. 29, 2020), ECF No. 1, incorporated by reference herein, purchased Douyu ADSs at artificially inflated prices pursuant and/or traceable to the Company's IPO and was damaged thereby.

18. Defendant Douyu is purportedly one of the People's Republic of China's ("PRC" or "China") top two live-streaming video-game platforms. Operating on PC and mobile applications, Douyu enables users to enjoy immersive and interactive games and live streaming of entertainment. Douyu ADSs sold in the IPO trade on the NASDAQ under the ticker symbol "DOYU." Every Douyu ADS represents ten ordinary shares of the Company.

19. Defendant Shaojie Chen ("Chen") founded Douyu and served, at all relevant times, as a director on Douyu's Board of Directors (the "Board") and as the Company's Chief Executive Officer ("CEO"). Prior to the IPO, Defendant Chen owned 4,323,857 Douyu ordinary shares, or approximately 15.4% of the Company's total outstanding stock. Defendant Chen reviewed, contributed to, and signed the Offering Documents (defined below). Defendant Chen participated in the preparation and dissemination of the Offering's "roadshow," *i.e.*, presentation to investors soliciting their purchases of ADSs in the Offering, as well as the roadshow's talking points and script. Defendant Chen participated in making materially inaccurate, misleading, and/or incomplete statements during the road show presentation. Defendant Chen was motivated by his desire to serve his own financial interests, which would be enhanced by the outcome of the Offering.

20. Defendant Wenming Zhang ("Zhang") co-founded Douyu and served, at all relevant times, as a director on the Board and as Douyu's co-CEO. Prior to the IPO, Defendant Zhang owned 892,402 Douyu ordinary shares, or approximately 3.2% of the Company's total outstanding stock. Defendant Zhang sold 345,575 Douyu ordinary shares in the IPO. Defendant Zhang reviewed, contributed to, and signed the Offering Documents.

21. Defendant Chao Cheng ("Cheng") served, at all relevant times, as Douyu's Chief Operational Officer ("COO"). Defendant Cheng reviewed, contributed to, and signed the Offering Documents.

22. Defendant Mingming Su ("Su") served, at all relevant times, as Douyu's Chief Strategy Officer and as a director on the Board. Defendant Su reviewed, contributed to, and signed the Offering Documents. Defendant Su participated in the preparation and dissemination of the Offering's "road show," *i.e.*, presentation to investors soliciting their purchases of ADSs in the Offering, as well as the roadshow presentation, talking points, and script. Defendant Su participated in making materially inaccurate, misleading, and/or incomplete statements during the roadshow. Defendant Su was motivated by his desire to serve his own financial interest, which would be enhanced by the outcome of the Offering.

23. Defendant Hao Cao ("Cao") served, at all relevant times, as Douyu's Vice President and as a director on the Board. Defendant Cao reviewed, contributed to, and signed the Offering Documents.

24. Defendant Ting Yin ("Yin") served, at all relevant times, as both an employee of Defendant Tencent Holdings Limited ("Tencent") and as a director on the Board. Tencent exercises control over Douyu, including with respect to the misstatements at issues here. Before IPO, Tencent held 43.1% of Douyu's equity, the largest shareholder. Defendant Yin reviewed,

contributed to, and signed the Offering Documents on her behalf and at the behest of Defendant Tencent. Defendant Yin was motivated by the financial implications of the Offering, given her status as a current employee of Defendant Tencent, which she joined in January 2014, held an aggregate 37.2% of Douyu's outstanding ordinary shares, representing 37.2% of Douyu's total voting power, at the time of the IPO.

25. Defendant Haiyang Yu ("Yu") served, at all relevant times, as both an employee of Defendant Tencent and as a director on the Board. Defendant Yu reviewed, contributed to, and signed the Offering Documents on his behalf and at the behest of Defendant Tencent. Defendant Yu was motivated by the financial implications of the Offering, given his status as a current employee of Defendant Tencent, which he joined in August 2011, held an aggregate 37.2% of Douyu's outstanding ordinary shares, representing 37.2% of Douyu's total voting power, at the time of the IPO.

26. Defendant Xi Cao ("X. Cao") served, at all relevant times, as a director on the Board. Defendant X. Cao reviewed, contributed to, and signed the Offering Documents.

27. Defendant Xuehai Wang ("Wang") was a director appointee of the Board at the time of the IPO. Defendant Wang consented to the F-1/A.

28. Defendant Zhaoming Chen ("Z. Chen") was a director appointee of the Board at the time of the IPO. Defendant Z. Chen consented to the F-1/A.

29. Defendant Zhi Yan ("Yan") was a director appointee of the Board at the time of the IPO. Defendant Yan consented to the F-1/A.

30. Defendant Richard Arthur ("Arthur") served as Assistant Secretary on behalf of Defendant Cogency Global Inc. ("Cogency Global"), the designated U.S. representative of Defendant Douyu, and reviewed, contributed to, and signed the Offering Documents.

31. Defendants Chen, Zhang, Cheng, Su, Cao, Yin, Yu, X. Cao, Wang, Z. Chen, Yan, and Arthur are collectively referred to herein as the "Individual Defendants."

32. Each of the Individual Defendants:

a) Participated in the preparation of and signed (or authorized the signing of) the Registration Statement and/or an amendment thereto, and the issuance of the Registration Statement;

b) directly participated in the management of the Company;

c) was directly involved in the day-to-day operations of the Company at the highest levels;

d) was privy to confidential proprietary information concerning the Company and its business and operations;

e) was involved in drafting, producing, reviewing and/or disseminating the materially false, inaccurate, misleading, and/or incomplete statements and information alleged herein;

f) was aware of or recklessly disregarded the fact that the materially false, inaccurate, misleading, and/or incomplete statements were being issued concerning the Company; and/or

g) approved or ratified these statements in violation of the federal securities laws.

33. Douyu is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

34. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and/or incomplete Offering Documents. Morgan Stanley served as a representative of all the underwriters. Morgan Stanley also participated in conducting and promoting the Offering. Morgan Stanley's participation in the

solicitation of the Offering was motivated by its financial interest. Defendant Morgan Stanley conducts business in New York.

35. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and/or incomplete Offering Documents. J.P. Morgan served as a representative of all the underwriters. J.P. Morgan also participated in conducting and promoting the Offering. J.P. Morgan's participation in the solicitation of the Offering was motivated by its financial interest. Defendant J.P. Morgan conducts business in New York.

36. Defendant BofA Securities, Inc. ("BofA") was an underwriter for the IPO, serving as a financial adviser for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and/or incomplete Offering Documents. BofA served as a representative of all the underwriters. BofA also participated in conducting and promoting the Offering. BofA's participation in the solicitation of the Offering was motivated by its financial interest. Defendant BofA conducts business in New York.

37. Defendant CMB International Capital Limited ("CMBI") was an underwriter for the IPO, serving as a financial adviser for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and/or incomplete Offering Documents.

38. Defendants Morgan Stanley, J.P. Morgan, BofA, and CMBI are collectively referred to herein as the "Underwriter Defendants."

39. The Underwriter Defendants agreed to purchase and sell Douyu ADSs to the public as follows:

| **Name** | **Number of Shares** |
|---|---|
| Morgan Stanley & Co. LLC | 26,954,844 |
| J.P. Morgan Securities LLC | 22,237,746 |
| BofA Securities, Inc. | 16,846,778 |
| CMB International Capital Ltd. | 1,347,742 |

40. Pursuant to the Securities Act, the Underwriter Defendants are liable for the false, inaccurate, misleading, and/or incomplete statements in the Offering Documents. The Underwriter Defendants' failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

41. The Underwriter Defendants are primarily investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. As the underwriters of the Offering, the Underwriter Defendants earned lucrative underwriting fees as a result of their participation in the Offering.

42. In connection with underwriting the IPO, each of the Underwriter Defendants received approximately the following underwriting discounts, fees, and/or commissions:

| **Name** | **Amount of Discounts and Commissions** |
|---|---|
| Morgan Stanley & Co. LLC | $13,949,131.60 |
| J.P. Morgan Securities LLC | $11,508,033.41 |
| BofA Securities, Inc. | $8,718,207.51 |
| CMB International Capital Ltd. | $697,456.48 |

43. In addition, the Underwriter Defendants met with potential investors and presented highly favorable, but materially incorrect and/or misleading, information about the

Company, its business, products, plans, and financial prospects and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

44. Representatives of the Underwriter Defendants also assisted the Company and Individual Defendants with planning the Offering. They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

45. In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price at which the Company's ADSs would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about the Company would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, at a minimum, the Underwriter Defendants should have known of the Company's undisclosed existing problems and plans and the material misstatements and omissions contained in the Offering Documents, as detailed herein.

46. The Underwriter Defendants also demanded and obtained an agreement from Douyu that the Company would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

47. Defendant Tencent operates as an investment holding company. Tencent, through its subsidiaries, provides Internet and mobile value-added services, online advertising, and e-commerce transactions. Tencent offers services to users worldwide, including in the U.S., where its headquarters are located at 2747 Park Boulevard, Palo Alto, California 94306. Tencent exercises control over Douyu, including with respect to the misstatements at issues here. At the time of the IPO, Douyu and Tencent, through their respective PRC affiliated entities, were parties to an amended and restated strategic cooperation framework memorandum dated April 1, 2019. The Offering Documents repeatedly touted the benefits of Tencent's strong capabilities and support to Douyu, calling Tencent a "major shareholder and strategic partner," particularly "in live streaming, advertising and game distribution, which helps reinforce and solidify [Douyu's] position as a leading game-centric live streaming platform in China[,]" and affirmed its intent to "further solidify [Douyu's] strategic cooperation with Tencent in the future." As a result, Douyu was, and remains, motivated by the desire to maintain a beneficial relationship with Tencent. Likewise, Tencent was motivated by the financial implications of the Offering given its investment in Douyu to date. Before IPO, Tencent held 43.1% of Douyu's equity, the largest shareholder. Douyu founder and CEO Chen Shaojie holds 15.4%, and Douyu co-founder and co-CEO Zhang Wenming holds 3.2%. More specifically, at the time of the IPO, Tencent held 3,125,000 Douyu Series B-2 Preferred Shares, 1,114,376 Douyu Series C-l Preferred Shares, and 7,828,728 Douyu Series E Preferred Shares, through its wholly owned subsidiary, Nectarine. According to the Offering Documents, upon completion of the Offering, Nectarine

will hold an aggregate 37.2% of Douyu's outstanding ordinary shares, representing 37.2% of the Company's total voting power, assuming the underwriters do not exercise their over-allotment option. "As a result," according to the Offering Documents, "Tencent has substantial influence over [Douyu's] business." Furthermore, Tencent, through Nectarine, has the right to appoint up to two directors as long as it beneficially owns no less than 33% of the shares it beneficially owned immediately prior to the completion of the Offering and exercised its influence over Douyu by appointing two employees to Douyu's Board. As indicated above, Defendants Yu and Yin currently work at Tencent, having joined Tencent in August 2011 and January 2014, respectively, and both signed the Offering Documents necessary to effectuate the Offering on their own behalves and at the behest of Defendant Tencent. Tencent is directly liable pursuant to the doctrine of *respondeat superior* for the misstatements of its employees Yu and Yin.

48. Defendant Cogency Global was Douyu's authorized U.S. representative for purposes of the IPO. Defendant Arthur, who signed the Offering Documents, was an employee of Defendant Cogency Global. As a result, Defendant Cogency Global is liable for the securities law violations committed by Defendant Arthur in its capacity as his employer and as a control person under the Securities Act.

49. Douyu, the Individual Defendants, The Underwriter Defendants, Tencent, and Cogency Global are collectively referred to herein as the "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background of Douyu

50. Douyu began operating in 2014 when it was spun off from Shanda Interactive, one of the largest online gaming companies in China. Douyu's name translates to "fighting fish." Defendants Chen and Zhang left Shanda to run Douyu, which largely operates in Asia.

51. Douyu is a video live streaming service or platform that runs on computers and/or mobile applications or "apps" on smart phones and tablets. Live streaming technology lets an individual watch, create, and/or share videos in real time, and Douyu's platform allows individuals to broadcast, or "stream" videos over the Internet to Douyu's users, who watch them. Users who broadcast content on Douyu's platform are called "streamers."

52. Douyu has far more users who view content than streamers. According to the Offering Documents, the Company had 280.9 million registered users as of March 31, 2019. By comparison, as of the same date, Douyu had only 6.5 million streamers. In addition, Douyu's business is driven by 6,500 streamers that the Company calls its "top streamers." Although, as of March 31, 2019, Douyu's top streamers made up only ***one-tenth of one percent*** of its streamers, they were responsible for ***61.2%*** of the Company's live streaming revenue.

53. In general, there are two types of streamers: (i) "IRL streamers," who stream videos of themselves going through their daily lives, including performing daily tasks, answering questions, singing, dancing, etc.; and (ii) "gamers," who stream videos of themselves playing video games. Streams of gamers playing video games, either by themselves, against other gamers, or in tournaments, are collectively known as "esports." The popularity of esports has exploded in recent years. According to a report commissioned by Douyu from iResearch Consulting Group (the "iResearch Report"), China's esports market alone is expected to grow at a rate of 24.7% per year to reach $5.8 billion by 2023.

54. In the Offering Documents, Douyu claimed to be "the largest game-centric live streaming platform in China and a pioneer in the eSports value chain." Douyu based this claim on the iResearch Report, which stated that Douyu had the largest average total monthly active

users ("MAUs")[3] "on both mobile and PC platforms in the first quarter of 2018 and 2019"; the longest "average total daily time spent by active users in the first quarter of 2018 and 2019"; and the most "top 100 games streamers . . . contracted in December 2018 and March 2019."

55. Although, at the time of its IPO, Douyu claimed to have more MAUs, longer "average total daily time spent by active users," and a larger number of "top 100 games streamers," Douyu lagged its chief rival in revenues. Douyu's chief rival, "Huya," is another Chinese game-streaming platform; its name loosely translates to "tiger's teeth." Huya went public over a year before Douyu, successfully launching an IPO of ADSs on the New York Stock Exchange in May 2018 that raised $180 million. A year later, in April 2019, Huya launched a secondary offering of ADSs that raised a an additional $327 million. Although Huya had far fewer MAUs (unique monthly active users), it was able to go public before Douyu at least in part because it reported substantially more paying users—users who actually spent money on the platform, as opposed to just watching streams—and more revenue. For example, in 2018, while Huya reported only 100 million average MAUs, Douyu reported ***36.4% more*** average MAUs, or 136.4 million. However, during the same period, Huya reported $678.3 million in revenue and 4.8 million paying users, while Douyu reported only $544.5 million in revenue and 3.8 million paying users, or approximately ***21% less*** than each of revenues and users than Huya.

56. The fact that Douyu lagged in revenues behind Huya was a significant concern for investors. For example, when Douyu initially announced its IPO in April 2019, S&P Global Market Intelligence published a reported entitled, "Analysts: Chinese livestreaming platform

---

[3] Douyu defines Monthly Active Users as the number of *unique* users on Douyu's platform in a month or 30-day period. Douyu states that it does not count an individual user more than once in a 30-day period, regardless of how often the user interacts with Douyu's platform.

Douyu will lag HUYA despite IPO filing." In the article, analyst Arun George pointedly observed, "HUYA ***is simply a better business as it has superior growth, margins and cash generation than Douyu***. I don't see the situation dramatically changing post-IPO as Douyu's underperformance was not due to lack of funds."

**B. Douyu's Revenue is Derived Primarily from Purchases of "Virtual Gifts"**

57. Douyu's revenue overwhelmingly comes from purchases of "virtual gifts" by users. According to the Offering Documents, 77.7% of the Company's revenue in 2016, 80.7% of its revenue in 2017, 86.1% of its revenue in 2018, and 90.9% of its revenue for the first quarter of 2019 ("Q1 2019") were "mainly from the sale of virtual gifts."

58. Douyu users purchase virtual gifts on the platform in two steps. First, users buy "Yuchi," Douyu's "virtual currency."[4] One Yuchi costs approximately one RMB, or $0.15. According to Douyu, users can purchase Yuchi on the Company's live streaming platform, "make in-app purchases using third-party payment channels such as WeChat pay, Alipay and Apple's App Store, or purchase Yuchi from our flagship store on Tmall.com." Douyu claims the price of Yuchi does not change and Yuchi does not expire.

59. Second, once they have purchased Yuchi, users use Yuchi to buy virtual gifts, which they give to streamers. This process is not unlike when one places money in a street musician's instrument case. Douyu records the entire value of the gift as revenue.[5] Douyu then

[4] A "virtual currency" is a type of unregulated digital currency that is not issued or controlled by a central bank. The most prominent example of a virtual currency is Bitcoin, a currency that was created in 2009 by an unknown person using the alias Satoshi Nakamoto. Live streaming companies in China like Douyu have their users purchase virtual gifts for streamers using virtual currencies.

[5] Douyu records unredeemed Yuchi as deferred revenue.

pays the streamer a portion of the value of the virtual gift, which is generally how streamers earn income.

60. Although Douyu's business model is the Internet equivalent of tossing coins to buskers, when viewed collectively, an enormous amount of money changes hands in purchases of Yuchi and virtual gifts. For example, Douyu reported $544.5 million in revenue in 2018, ***$468.8 million*** of which was "primarily derived from the sales of a wide array of virtual gifts."

61. Unbeknownst to investors, however, Douyu's revenues were also inflated by streamers—including top streamers under exclusive contracts with Douyu—who engaged in *de facto* wash transactions by spending up to millions of dollars to buy virtual gifts for themselves and who effectively received kickbacks of half the value of the gifts. Streamers did this to make themselves seem more popular than they actually were, and Douyu recorded these transactions as revenue to inflate the platform's number of transactions and revenues. For example, in March 2019, Douyu entered into a contract with a prominent streamer named Liu Mou ("Liu"). Shortly thereafter, Mou spent nearly $3.15 million to buy himself votes during Douyu's annual online idol competition, half of which the Company then kicked back to Liu after his purchase. Defendant Chen personally confirmed such activity in a Bloomberg article published less than a month after the IPO.

62. Investors had no idea that Douyu's revenues were inflated by such *de facto* wash transactions between Douyu and its streamers because the Offering Documents carefully described how *other users* purchased virtual gifts for streamers, and never mentioned that streamers bought gifts *for themselves*. For example, the Offering Documents told investors that "[u]sers are able to purchase virtual gifts on our platform using our virtual currency ***and send them to streamers*** as a gesture of appreciation or support . . . we organize streamer popularity

contests ***to promote spending by viewers to show support of the streamers they follow***." Similarly, the Offering Documents stated that Douyu's "live streaming platforms . . . enable streamers and users to ***interact with each other*** during live streaming. ***The users have the option to purchase virtual currency*** . . . to redeem for virtual items to be used in the live streaming sessions." These and other similar statements communicated to investors that users bought virtual currency for *other streamers*, and did not suggest that streamers gamed Douyu's platform by buying gifts *for themselves* for the purposes of making themselves seem more popular, or that Douyu considered such wash transactions, half the value of which was kicked back to the streamers, to be legitimate revenue.

**C. Douyu's "Top Streamers" Drive Purchases of Virtual Gifts**

63. Douyu recruits and engages streamers in in three ways: (1) exclusive contracts that the Company entered into directly with streamers; (2) contracts the Company entered with "talent agencies" who manage streamers; and (3) users who registered on the Company's platform as streamers. As of March 31, 2019, Douyu had exclusive contracts with 6,500 top streamers, 491,000 streamers managed through talent agencies, and just over 6 million additional registered streamers.

64. Douyu's revenues depend on the performance of its "top streamers," who attract the most users and receive the most virtual gifts from those users. The Offering Documents disclosed that, as of the end of Q1 2019, Douyu 6,500 top streamers, who comprised only ***one-tenth of one percent*** of the Company's 6.5 million streamers, were responsible for ***65.8%*** of "total viewership in terms of viewing hours" and ***61.2%*** of the "total live streaming revenue generated from [Douyu's] platform" in Q1 2019. It is thus no surprise that the Offering Documents emphasized that Douyu's top streamers were "the bedrock of our platform and have contributed vastly to user attraction and retention and revenue generation," and that one of the

Company's "Strengths" was its "[d]eep pool of top streamers empowered by a comprehensive streamer development system."

65. Accordingly, the Offering Documents took pains to explain in detail for investors that top streamers were able to generate such enormous revenues for Douyu by fostering delicate relationships with users that induce users to buy Yuchi to purchase virtual gifts. For example, the documents advised that Douyu's ability to "***offer[] popular and attractive content on our platform to provide our viewers with engaging and satisfying viewing experiences*** . . . ***is dependent on our ability to attract and retain top streamers***." This was because, the Offering Documents said, "top streamers can inspire a large fan base of viewers ***with their superior skillsets and passionate personality, and generate significant monetization opportunity and user engagement***." The Offering Documents also highlighted that "[b]eing a new social phenomenon in China, ***streamers are like key opinion leaders or social icons who have gained wide popularity among the younger generation***."

66. The delicate streamer-user relationship is also reflected by the fact that IRL streamers generally induce larger average revenues per paying user ("ARPPUs") from individual users than gamers—*i.e.*, individual users on average buy more and larger gifts for IRL streamers than gamers. This could stem from the emotional bond that develops in users and IRL streamers, where users can see the IRL streamer's face and body as that streamer engages in daily life and performs for the user. Indeed, in April 2019, the podcast "Tech Buzz China" reported that ARPPUs for IRL streamers ***were twice as much*** as ARPPUs for gamers. The Offering Documents reflected this disparity, highlighting for investors the additional challenges gamers faced in developing relationships with users that induced users to buy virtual gifts: "[t]op-performing game live streamers need to possess not only superior game-playing skills but also

***the ability to inspire viewer interaction with streamers and other viewers***," and "***[c]reating and maintaining a social community among viewers and streamers create barriers of entry and is crucial to build strong engagement and loyalty to the live streaming platforms***."

67. Recognizing that anything that upset the relationship between its streamers and users could drive users away and/or cause users to disengage with streamers, the Offering Documents cautioned that the Company's business could suffer if "we are unable to combat spam on ***or inappropriate or abusive use of our platform***," or if "***our streamers failed to keep our users engaged on our platform over a long period of time***." In addition, the Offering Documents warned that:

> ***If we fail to retain our existing users, keep them engaged or further grow our user base, our business, operation, profitability and prospects may be materially and adversely affected.***
>
> The size of our user base and ***the level of our user engagement are critical to our success***. ***Our main monetization strategies—live streaming, advertisement and others depend on our ability to maintain and increase the size of our user base and user engagement level***. If our user base becomes smaller or our users become less active, it is probable that they would spend less on our virtual gifts and jointly operated games or visit our advertisements less frequently, or access our platform less in general. This would in turn drive top streamers away from our platform, discourage companies from purchasing advertisements on our platform and dissuade game developers and publishers from distributing their games through our platform. Our financial condition would suffer from the consequential decline in revenue and our business and operating results will be materially and adversely impacted.

68. Given the importance of the delicate user-streamer relationship to the Company's business, Defendants went out of their way to emphasize to investors that Douyu knew the identities of and monitored its streamers for improper conduct. For example, the Offering Documents stated that "[t]o become a streamer, a user must register on our platform and verify his or her identity with a government issued ID . . . . After the streamer's identity is verified, he or she may apply to create a new room for streaming." In addition, the Offering Documents

repeatedly referenced how the Company "believe[d] our strategic focus on ***exclusive contracts*** with top streamers offers us unique competitive advantages" and "enter[ed] into collaboration agreements with talent agencies to manage our streamers" under which the "agencies are responsible for recruiting, training, managing and promoting their own member streamers, and are also responsible for organizing streaming activities on our platform."

69. The Offering Documents also touted the Company's "comprehensive performance metric analytical system," which "identif[ied] top streamers with potential for high popularity, with whom we seek to sign exclusive contracts." These metrics purportedly included "the quality of a streamer's content, activity levels and user engagement." Once a streamer was identified, Douyu "we put them into different categories according to the demographics that they likely appeal to and help direct traffic from their target demographics to them by giving them top positions of streaming rooms." If the streamers "perform to our satisfaction after a performance monitoring period, we may sign exclusive base compensation contracts with them and further design career development plans for them."

70. In addition, Douyu assured investors that Douyu had a "Content Monitoring System" that took regular screen captures of streaming activity, and monitored the streams for inappropriate conduct, including fraud:

> Our live streaming platform contains real-time content, which we monitor to maintain a healthy ecosystem and ensure compliance with PRC laws and regulations. ***We have developed a comprehensive system to monitor content on our platform and filter inappropriate and illegal content and content that may infringe on the intellectual property rights of third parties.***
>
> * * *
>
> We utilize an automatic system to monitor our platform and the data generated in our system for sensitive key words or questionable materials on a real-time basis. The text identification system screens text content based on pre-set key words and an anti-spam system; the picture

> identification system screens picture content based on optical character recognition and illegal content detection; and the audio identification system screens audio content by converting it into text content and analyzing for illegal content. ***We have also developed a proprietary monitoring system in-house that takes screenshots of our live streaming channels every 10 seconds based on our "smart" image detection technology.*** Our system has machine learning capability and will update our database automatically.
>
> * * *
>
> ***All of the automatic detection results that are escalated are reviewed by our content monitoring staff manually***. We have a dedicated content monitoring team who also proactively check our rooms on a 24/7 basis for inappropriate or illegal content.
>
> * * *
>
> We deal with violations of varying severity in accordance with our strict policies and applicable regulations. Our actions may include warnings, cutting off or temporary suspension of the room and/or account for minor violations, with follow-up review to ensure effective enforcement and rectification. ***For serious violations, the relevant account is deleted permanently and all virtual currency and items are forfeited, and the room may be permanently closed***.

71. Defendants' references to the Company's registration requirements, direct contracts with streamers, outsourcing of streamer management, systems used to identify top streamers, and Content Monitoring System assured investors that Douyu knew the identities of its streamers and monitored those streamers for fraudulent conduct.

72. In spite of these assurances in the Offering Documents, at the time of the IPO Douyu's platform included top streamers who were engaged in improper conduct and/or were misrepresenting themselves to users. This was revealed to investors when, on July 30, 2019, prominent Douyu IRL streamer Qiao Biluo Xiadian, who purported to be an attractive Chinese 20-year-old was accidentally revealed to be a middle-aged woman. The revelation stunned both investors and Xiadian's over 100,000 devoted followers, who China's Global Times reported had been drawn to her "sweet and healing voice," "worshipped" her as a "cute goddess," had

purchased virtual gifts for her of more than $14,500 each. The Global Times reported that during a session with her fans, a filter the IRL streamer had been using stopped working and her real face became visible, at which point Douyu users began exiting her stream *en masse* and went on to stop following her and withdrew their transactions. Xiadian's misrepresentation of herself was plainly a "serious violation" because Douyu promptly closed her streaming room permanently.

73. News reports described how Defendants had notice of streamers completely misrepresenting themselves on Douyu's platform and thus creating a known, but undisclosed, material risk to Douyu's business. For example, on June 14, 2019, Veryol.com, a Chinese news website that covers online tech, finance, and education, published an article entitled, "Douyu Heading to the US to List at the Last Minute is Hit by Gambling Accusation, Are they Serious About an IPO?" ("Veryol Article"). The Veryol Article reported that, "[s]ince the first half of 2018, Douyu has been entangled ***in a web of public backlash that included accusations of hosting a large number of false livestream rooms***, questioning of its paid membership system, mentions of the company's layoff bloodbath, suspicions of promoting illegal loan advertisements, and comments regarding the massive loss of streamer talents." The article went on to state that, during China's "Ministry of Public Security's 'Clean Web 2018' campaign," Douyu suffered heavy losses. The article also stated that "among Douyu's top ten streamers in 2017, six streamers, including Feng Timo, Snake Brother, B Zong 001, Qige Zhang Qige, Chen Yifaer and Wuwukai, were called out by official media accounts and completely banned."

74. In addition, on August 2, 2019, Jufu Finance, a mainland Chinese website that publishes news and commentary on the financial sector, reported in an article published only in Chinese that the revelation that Xiandian was not a 20-year-old, but rather a middle-aged woman had come to be known as "Granny Gate." "Who would have thought," the article wrote, "instead

of the pure and lovely image in everyone's mind, the voice actor was actually a 50 year old 'grandmother!' The 'Lolita to Grandma' reveal scared a quite a large number of fans." The article also emphasized that this had happened before on Douyu's platform, stating that "***This is not the first time that Douyu has suffered a livestream room related scandal*** . . . . Consequently, Douyu once again became a central figure in the media frenzy . . . . The point is, ***for those fans who have spent money, especially a lot of money, the result of the scandal was a very bitter pill to swallow***." The article also emphasized that "According to relevant media reports, Douyu banned the streamer's room. However, as far as this matter is concerned, ***many people remain dissatisfied***" because, even though "Granny Gate" had received an enormous amount of media attention, Douyu "did not try to get to the bottom of the matter, choosing instead to ban the streamer from the platform, essentially burning that bridge."

75. Statements from former Douyu streamers who agreed to speak to Plaintiffs confidentially corroborate these news accounts and highlighted how Douyu turned a blind eye to such conduct. For example, CW1, who was a Douyu streamer from December 2018 to May 2019, told Plaintiffs that "Douyu has always had difficulty in monitoring streamers who misrepresent themselves. The platform also needs to make money, they absolutely need a lot of traffic. As long as the streamers aren't doing anything illegal, they will keep one eye closed and the other eye open, so to speak."

76. Similarly, CW2, a Douyu streamer from May 2019 to December 2019 and later a Douyu agent from December 2019 to June 2020 said, "Douyu never really took monitoring this type of content seriously. For example, when I was working there, I would go into streaming room and there would be a streamer who would ask for a "rocket" [*i.e.*, a gift worth $15]. The

streamer would then go into and they would go into a QQ group.[6] Then in the QQ group they would send a private message to a customer with a [sexually explicit] video. I think Douyu didn't really want to deal with it anyway, after all Douyu profited from it and gained traffic in the process."

### D. Douyu's "Lucky Draw" and Other Raffles Incentivize Purchases of Virtual Gifts

77. Douyu also incentivizes users to purchase virtual gifts by offering "online lucky draws, raffles and other similar activities" on its platform. Douyu assured investors that these games "promote user engagement," and that the prizes in these games can only be used to purchase virtual gifts for streamers on Douyu's platform.

78. One of Douyu's most popular contests was "Lucky Draw." Users played Lucky Draw by purchasing Yuichi, then using that Yuichi to purchase chance cards—*i.e.*, raffle tickets—to enter into the drawing for virtual gifts, more Yuchi, or other prizes to give to streamers. A "winner" (or winners) was ostensibly selected at random. In other words, users participated in Lucky Draw by buying a small gift, which could result in them receiving a virtual prize worth thousands of RMB, or virtual currency worth up to tens of thousands of RMB. The Offering Documents, however, assured investors that the prizes could not be converted to cash or exchanged with other users—*i.e.*, that Lucky Draw was *not* illegal gambling.

79. The popularity of Lucky Draw and other raffles on Douyu meant that an interruption of those games, or any problem with Yuchi, which users needed to purchase to play the games, presented a substantial risk to Douyu's bottom line and, by extension, to investors.

---

[6] QQ, is an instant messaging software service and web portal developed by Defendant Tencent. QQ offers services that provide online social games, music, shopping, microblogging, movies, and group and voice chat software.

80. One of the most significant threats to Douyu's use of Yuchi and Lucky Draw was the system of regulations the Chinese government had put in place to monitor online gaming and virtual currency. For example, on June 4, 2009, the Chinese Ministry of Culture and Ministry of Commerce jointly issued the "Notice on the Strengthening of the Administration of Online Game Virtual Currency" ("Virtual Currency Notice"). Chapter Two, Article 13 of the Virtual Currency Notice stated that "companies operating internet gaming should not support the trade of digital currency between users, they must take technological measures to actively prohibit the exchange of digital currency between users." In addition, Chapter Three, Article 20 of the notice stated that "companies operating online games must not operate a lottery, draw, or random drawing that requires users to contribute cash or virtual currency with a payout of items or virtual currency."

81. In the Offering Documents, Defendants assured investors that Yuchi "is non-refundable and ***may not be converted back to cash or be transferred between users***." Defendants also assured investors that its raffles, including Lucky Draw, complied with the Chinese regulatory regime, including the Virtual Currency Notice. Specifically, the Offering Documents stated that "We do not believe such activities are specifically prohibited under PRC laws and regulations." Although Defendants assured investors in the Offering Documents that Yuchi could not be converted to cash and was non-transferrable, and that Lucky Draw, and other elements of Douyu's platform complied with China's regulations, Douyu users and streamers were actively converting the Yuchi to cash and transferring it between each other, and the currency and games constituted illegal gambling.

82. Contrary to Defendants' assurances, users commonly converted Yuchi they won in Lucky Draw to cash and/or transferred it between each other. For example, a user could purchase $150 of Yuchi (*i.e.*, 1,000 Yuchi), and then use that Yuchi to buy chance cards in

Lucky Draw. If the user won, the user could receive 5,000 Yuchi—or gifts worth 5,000 Yuchi. The user would then take the 4,000 Yuchi that the user had "won," and thus not paid for, and sell that Yuchi to a streamer or third party for $0.05 each, or $200. The streamer would then gift that Yuchi to himself, which made him seem more popular than he was, or the third party would sell the Yuchi to a streamer at a markup, *e.g.*, $0.10 each, and the streamer would gift the Yuchi to himself. In this way, Douyu users illegally gambled to win Yuchi, converted that Yuchi to cash, and/or exchanged Yuchi between one another.

83. Defendants had ample notice that this conduct was occurring, and that Lucky Draw constituted illegal gambling. For example, on January 22, 2019, a posting on the internet community Wangyihao, or "NetEase," a competitor of Defendant Tencent, described how one of Douyu's top streamers, XuXu BaoBao, would offer virtual prizes in Lucky Draw valued at almost $135,000. The post stated that users had noticed that winners of the prizes would have names that included combinations of phrases "win the prize" (or "中奖," in Chinese), which suggested that the game was fixed. The post also stated that players began frantically changing their names to include the phrase, which conveniently generated more money for Douyu since users had to pay a fee to change their names.

84. A June 5, 2019 article published by the Chinese media outlet "Investor Network" entitled, "Media outlets report Douyu's 'Lucky Draw' game suspected of illegal play" described how "some Douyu streamers use the platform's lottery activities as a disguised form of online gambling" and "[w]inners can directly receive cash transfers from the streamer." The article also stated that "China Net Technology" had reported that Douyu's "Lucky Draw" game was suspected of promoting gambling, and that the game's leisure version was flooded with information urging users to participate in this disguised form of gambling." The article also

stated that while virtual gifts are usually purchased by users for streams "based on users' appreciation of the streamer," in Lucky Draw, "most of the rewards are given for the purpose of winning a prize," *i.e.*, gambling. and it comes dangerously close to gambling. The article then cited a lawyer, who said that participating in Lucky Draw was similar to opening treasure boxes and smashing golden eggs, which had existed previously in China's online gaming industry.

85. Similarly, the Veryol Article described two separate allegations in 2019 that Lucky Draw was "***online gambling under the guise of a prize drawing***." Defendants were plainly aware of the allegations because the article went on to describe how Douyu formally denied that Lucky Draw constituted illegal gambling, but, in response to one accusation, "expressed that the company would investigate whether the livestream room was involved in online gambling, and handle the situation if it turned out to be true."

86. Similarly, on June 30, 2019, Sohu News (the "Sohu Article"), the news arm of a a major online portal in China, like Yahoo or AOL, reported in an article published only in Chinese that "[a]lthough Douyu's official stance is that Yuchi cannot be exchanged for cash, a reporter from China Business News found that users ***can sell Yuchi to resellers through relevant channels in exchange for cash***." The article went on to report that "Zhao Zhanling, a lawyer at Beijing Zhilin law firm, said in an interview with this article's reporter that the behavior of Douyu streamers' may be organized gambling in disguise, and that the aforementioned lottery activities do have qualities associated with gambling."

87. The Sohu Article also reported on a representative of a third-party agency that managed streamers for Douyu, who described how such agencies manipulated Lucky Draw on behalf of their streamers because only users who sent the most gifts or were most active would have any chance of winning. For example, the representative said that "we would sign a contract

with the streamer, and we would give [the streamer] several tens-of-thousand coins in virtual currency during their broadcast . . . . [W]e would send many gifts to reach the required amount and win the Lucky Draw."

88. In addition, according to the Chinese media and former Douyu streamers, users could exchange Yuchi and convert it into cash, both of which violated China's regulations. For example, the Sohu Article reported that:

> Under the pretense of applying for a streamer position, this reporter was also able to speak with A Huang (a pseudonym), the head of a livestream guild that works with Douyu. A Huang told the reporter that the Lucky Draw prize drawing was initiated by Douyu, and that the Yuchi prizes won by the fans were given by Douyu. While Yuchi cannot officially be exchanged for cash, they can be exchanged "through other means . . . we know people who specialize in reselling Yuchi—so [$745] in Yuchi can be exchanged for about [$600] in cash.

89. The representative of an agency that managed Douyu streamers who was quoted in the article stated that "we know people who recycle [*i.e.*, exchange] Yuchi." In addition, the article stated that "th[is] reporter discovered many QQ groups that trade Yuchi and entered a group under the pretense of selling Yuchi." Specifically, "[o]ne Yuchi reseller told the reporter that the price of a resold Yuchi was about 70–80% of a full price Yuchi. The Yuchi they buy from the market are be sold to streamers. 'All medium-sized streamers want popularity—they want popularity and we want money.'" The reseller stated that streamers would buy the discounted currency and "gift" the discounted currency to themselves to make them seem more popular than they really were.

90. Former Douyu streamers who agreed to speak with Plaintiffs confidentially corroborated these accounts of how Yuchi was exchanged between users and for cash. For example, CW1, who was a Douyu streamer from December 2018 to May 2019 described "third-parties or groups that will buy Yuchi back from users at a discount." According to CW3, "a

customer [*i.e.*, Douyu user] might win 1,000 Yuchi in a drawing, a third-party would buy them for CNY 200 and then would send the Yuchi to a streamer who would buy them for CNY 300, in this way the third-party gets the difference." CW1 also stated that "most of the posts in [Douyu's] user blog, called 'Yuba,' were about exchanging Yuchi privately."

91. Similarly, CW2, who was a Douyu streamer from May 2019 to December 2019 and then an agent on Douyu's platform from December 2019 to June 2020, described how users would convert Yuchi to cash by using the Yuchi to buy a gift, "send[ing] the gift to a streamer who would transfer a lower amount [of cash] to the user with Alipay or WeChat pay."

92. These types of violations of Chinese regulations—which long pre-dated the IPO—forced Douyu to deactivate Lucky Draw barely a month after the IPO closed. According to an October 15, 2019 analyst report by J.P. Morgan, on August 20, 2019, Douyu removed the Lucky Draw feature. According to an August 21, 2019 news report by Toubang Data, a website that provides news and data analysis about online streaming platforms, which was published only in Chinese, Douyu had Lucky Draw feature offline because of media reports, including the above-described articles, describing how the game was essentially "rigged gambling" in violation of China's regulations.

93. In addition, on November 6, 2019, an article on the investor website Seeking Alpha by the independent investment analyst Terracotta Investments disclosed that the feature was taken down because of unlawful exchanges of Yuchi between users and redemptions of Yuchi for cash. The Seeking Alpha article reported that, while "[t]here is nothing wrong with using a lottery system to attract viewers in China . . . ***the issue is that some of the virtual coins gained from lucky draws could be converted into real currency, which the regulators find it unacceptable hence it was stopped for some time***.

94. Douyu reinstated Lucky Draw on October 10, 2019 after, among other things, placing caps on the amounts of gifts that could be purchased, *i.e.*, putting in place safeguards to prevent manipulation of the game. The deactivation of the game, however, had a substantial effect on the Company's revenues as well as investor understanding of the Company's risks.

95. For example, the October 15, 2019 J.P. Morgan analyst report found that taking down Lucky Draw, "***will cause [Douyu's] 3Q19 revenue to decline 1.5% QoQ . . . 5% below the low end of company's 3Q19 guidance . . . and 7% lower than current Bloomberg consensus***." In other words, deactivating Lucky Draw for only a matter of weeks had torpedoed the Company's performance.

96. In addition, on January 23, 2020, J.P. Morgan released another analyst report that disclosed how the deactivation of Lucky Draw had negatively affected investors' confidence in the Company. The report attributed a 12% drop in the Company's ADS price on January 22, 2020 to investor concerns about "***the financial implications of such a broad-based key monetization feature suspension***[,]" *i.e.*, the deactivation of Lucky Draw, stating, in relevant part:

> [O]n January 22, 2020, all of the listed digital entertainment platforms (Douyu, Huya, . . .) that operate live broadcasting services have ***suspended interactive features that drive meaningful monetization for live streaming operators***. Share prices of Douyu/Huya . . . fell by 12%/10% . . . on Jan. 22, 2020, ***in our view due to investors' concerns about the financial implications of such a broad-based key monetization feature suspension***.

J.P. Morgan added: "We believe investors' cautious sentiment will remain in the near term ***due to a lack of clarity on the duration of this suspension***[.]"

97. An October 17, 2020 article on China Youth Net, a news site affiliated with the China Youth League ("Youth Article") later provided details on how Douyu's deactivation of Lucky Draw. In the Youth Article, a Douyu streamer named Xiaowei stated that Lucky Draw

began being used as gambling immediately after it was added to Douyu's platform on November 30, 2018. Xiaowei said that after Douyu deactivated Lucky Draw in the latter half of 2019, the Company sent a message to streamers stating "it will be forbidden to display the words 'cash back' to users from now on." Xiaowei also said that Douyu had told its streamers not to use specific words when streaming or in communications with users or streamer associations including mentioning specific amounts of money. Streamers were also instructed not to use certain words or phrases that suggested gambling. In the article, Xiaowei said that he believed that though company officials claimed to ban these activities, the company was tacitly supporting these activities because they would allow streamers to keep room names that explicitly stated they would give cash back to users.

### E. Douyu's Sudden Profitability in Q1 2019 Allowed Defendants to Reap Outsized Returns in the Company's IPO

98. On April 22, 2019, Douyu filed a registration statement with the SEC on Form F-l to offer 44.9 million ADSs in an IPO for $11.50 to $14 each and obtain approximately $500 million in capital. An analyst at S&P Global Market Intelligence speculated that the Company had likely chose the United States for its IPO because large tech IPOs had performed poorly in Hong Kong, dampening investor demand. Although the Company planned to start its IPO "roadshow" in May, it postponed its IPO following President Donald Trump's threat to boost tariffs on China.

99. After multiple amendments to its Form F-1, the Company launched the IPO roadshow on July 9, 2019. That day, investment website Nikkei Asia reported that Douyu had "raised the target for its Nasdaq debut after ***moving into the black for the first time last quarter***." The article reported that while Douyu had initially "sought a $500 million listing" it had just "filed to raise up to ***$629 million*** at $11.50 to $14 per American depositary share," and

that "[t]he increase in Douyu's IPO target comes as the company reported a $2.7 million profit on revenue of $222 million in the first three months of 2019 -- ***mostly from sales of virtual gifts to streamers*** and advertising. Last year, the company reported revenue of $544.5 million, double that of 2017." The article also quoted an analyst note from Arun George of Global Equity Research, who wrote that "Encouragingly, Douyu's ***revenue growth caught up with Huya***" in the first quarter of 2019. In other words, because Douyu's Offering Documents suggested that it was now in the same league as Huya, its main competitor, the Company could increase the size of its IPO.

100. The Company's amended F-1 was declared effective on July 16, 2019. Thereafter, on July 18, 2019, the Company filed a prospectus for the IPO on Form 424B4, which incorporated and formed part of the Offering Documents.

101. The Offering Documents were negligently prepared, however, and contained numerous statements that were misleading, incomplete, and inaccurate because they failed to disclose that Douyu's (i) Yuchi virtual currency was being exchanged for currency and/or between users and the platform's Lucky Draw feature was not compliant with China's regulations; (ii) revenues were inflated by purchases of virtual gifts by streamers for themselves; and (iii) streamers were actively misrepresenting themselves on the Company's platform, which created a material risk that users would abandon Douyu.

102. Using the Offering Documents, Defendants sold to the investing public more than 67.3 million Douyu ADSs at $11.50 per ADS, generating more than $774 million in gross offering proceeds for Defendants—over 54.8% more capital that what Defendants had originally sought approval for when it initially filed its F-1 in April 2019.

## V. MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE OFFERING DOCUMENTS

103. The Offering Documents used to effectuate Douyu's IPO and secure $774 million in gross offering proceeds for Defendants from Plaintiff and the Class were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made therein not misleading. Specifically, the Offering Documents failed to disclose that: (i) key interactive features of Douyu's Yuchi and Lucky Draw were non-compliant with current regulatory requirements, requiring Douyu to deactivate Luck Draw, which negatively impacted user engagement activity and caused disappointing financial results; (ii) Douyu's revenues were inflated by the equivalent of wash transactions where a top streamer would make large purchases of virtual currency and/or gifts, give the currency and/or gifts to himself, and Douyu would kick back half of the purchase price to the top streamer; and (iii) top streamers were misrepresenting their identities on Douyu's platform, which created the material risk that users would leave Douyu when they learned the true identities of the streamers.

### A. The Offering Documents Misrepresented and/or Failed to Disclose that Yuchi and/or Lucky Draw Violated China's Regulations

104. Douyu's Offering Documents, which were signed by all Defendants, touted to investors that the Company's virtual currency, Yuchi, could not be exchanged for cash or transferred between users, and that the platform's Lucky Draw feature drove purchases of Yuchi and virtual gifts. These statements were incomplete, misleading, and inaccurate, however, because Defendants knew that users could and were exchanging Yuchi for cash and transfering Yuchi between each other, and that key interactive features of Lucky Draw were illegal gambling and thus did not comply with current regulatory requirements. As a result, Defendants had to deactivate lucky draw shortly after the IPO, which negatively impacted user engagement activity and caused disappointing financial results.

105. For example, the Offering Documents stated that "Users can purchase the virtual currency on our site via various online third-party payment platforms, including WeChat Pay, AliPay and other payment platforms. In addition to purchasing these virtual currencies on our site, users can purchase virtual currencies from our online store at third-party websites such as Tmall.com. ***Other than the above-mentioned official purchase channels, there is no other means to purchase Yuchi***." The Offering Documents then assured investors that Yuchi "is non-refundable and ***may not be converted back to cash or be transferred between users***." This statement was materially inaccurate, misleading, and/or incomplete, however, because Douyu users were actively converting Yuchi back to cash and transferring Yuchi between each other.

106. The Offering Documents also included the following misleading warning about purchases of Yuchi:

> [F]rom time to time, certain third parties ***fraudulently claim that users can purchase Yuchi through them***. If our users choose to purchase our virtual currency from such third parties, they may suffer losses from such fraudulent activities by third parties. Although we are not directly responsible for such fraudulent activities conducted by third parties, our user experience may be adversely affected and they may choose to leave our platform as a result. Such fraudulent activities by third parties might also generate negative publicity, disputes or even legal claims. The measures we take in response to such negative publicity, disputes or legal claims may be expensive, time consuming and disruptive to our operations and divert our management's attention.

107. The warning in paragraph 106 above was misleading, inaccurate, and/or incomplete, however, because it only warned investors that third parties were claiming to sell counterfeit Yuchi and failed to disclose that users could exchange Yuchi for cash and/or transfer Yuchi between each other. This warning was also misleading because it communicated that these third parties were operating completely separately from Douyu's platform, when in fact Douyu's streamers were facilitating these transactions with Douyu's users.

108. The Offering Documents also touted Douyu's use of various social features to enhance user engagement, which according to Defendants, would lead to user loyalty:

> Gamers have strong social attributes and seek to be part of a community sharing similar interest. Therefore, game-centric live streaming platforms introduced various social features for users to interact with each other, such as group chatting and bullet chatting. These platforms also offer ways for viewers to interact with streamers. For example, talented game streamers may play games together with their viewers. ***Creating and maintaining a social community among viewers and streamers create barriers of entry and is crucial to build strong engagement and loyalty to the live streaming platforms.***

109. Chief among these social features was Lucky Draw, a raffle offered on Douyu's platform to enable "viewers to interact with streamers[,]" which the Offering Documents identified as one of a handful of "***[k]ey success factors for game-centric live streaming platforms***[.]"

110. The Offering Documents also claimed that Lucky Draw and similar raffles complied with China's regulations:

> In addition, there are ***online lucky draws, raffles*** and other similar activities conducted on our platform to promote user engagement, which involve virtual currencies (such as Yuchi). ***The prize of such activities can only be used to purchase virtual gifts or to give to streamers as reward on our platform.*** We do not believe such activities are specifically prohibited under PRC laws and regulations. We cannot assure you, however, that our platform will not be subject to liabilities due to third party activities (including steamers activities), or that the PRC government authority will not take a different view. ***If our platform is deemed to be engaged in illegal or inappropriate activities relating to issuance and use of virtual currencies by our platform (such as Yuchi), including due to third party activities, we may be subject to fines and penalties, which may have adverse impact our business, results of operations and reputation***.

111. The statements made in paragraphs 108–10 communicated to investors that Lucky Draw and other raffles complied with currently regulatory requirements in China. However, these statements were materially inaccurate, misleading, and/or incomplete because they failed to

disclose that Defendants knew that Lucky Draw constituted illegal gambling, that prizes from Lucky Draw were in fact being sold for currency and transferred between users, and that "Lucky Draw" accordingly did not comply with China's regulatory requirements and enhanced the risk that Douyu would deactivate lucky draw, which would negatively impact user engagement activity and cause disappointing financial results.

112. The statements made in paragraphs 105–10 above were material because over 90% over Douyu's revenue came from purchases of Yuchi, which was then used to purchase virtual gifts, and because Defendants touted to investors that Lucky Draw and other games were used to increase users' interactions with streamers, which was essential to driving purchases of Yuchi and virtual gifts, and thus the Company's financial performance.

## B. The Offering Documents Misrepresented and/or Failed to Disclose that Douyu's Revenues Were Inflated by Insider "Wash" Transactions

113. Douyu's Offering Documents, which were signed by all Defendants, touted to investors the Company's increasing revenues and ARPPU, as well as that the Company had reported "net income," *i.e.*, profits, for the first time in its history, and attributed those increases to users purchasing virtual gifts for streamers in response to the quality of the Company's product, *i.e.*, the appeal of the Company's streamers and the content those streamers created. These statements were materially inaccurate, misleading, and/or incomplete, however, because the Offering Documents did not disclose that Douyu's revenues and ARPPU were inflated by *de facto* wash transactions where streamers purchased gifts on Douyu's platform, gave those "gifts" to themselves, and Douyu kicked back half of the purchase price to the streamer.

114. For example, the Offering Documents touted how the Company's revenues were driven by "user satisfaction," "diversified opportunities for user spending" on a "wide array of

virtual gifts," when in reality the Company's revenues were inflated by streamers purchasing gifts for themselves:

> We believe ***the vibrant and interactive game community created on our platform drives user satisfaction, which provides diversified opportunities for user spending***. Leveraging a large number of viewers and a deep pool of streamers, our monetization channels mainly consists of live streaming, advertisement and others. ***These channels effectively supplement each other and unleash future monetization potential***. Live streaming is our main monetization channel and generated 77.7%, 80.7%, 86.1%, 81.5% and 90.9% of our total net revenue in 2016, 2017, 2018 and for the three months ended March 31, 2018 and 2019 respectively. ***Our live streaming revenue is primarily derived from the sales of a wide array of virtual gifts***.

115. Similarly, the Offering Documents repeatedly touted the Company's ever-increasing revenues, including turning a profit for the first time in Q1 2019—the last reported financial quarter before Douyu's IPO—but failed to disclose that these revenues were driven by purchases by streamers purchasing gifts for themselves. For example, the Offering Documents disclosed that:

> ***We have grown rapidly since our inception.*** Our revenue increased from RMB786.9 million in 2016 to RMB1,885.7 million in 2017 and further to RMB3,654.4 million (US$544.5 million) in 2018. ***Our revenue increased from RMB666.5 million for the three months ended March 31, 2018 to RMB1,489.1 million (US$221.9 million) for the same period of 2019***. ***We had*** net loss of RMB782.9 million, RMB612.9 million and RMB876.3 million (US$130.6 million) in 2016, 2017 and 2018, respectively, and ***net loss of RMB155.7 million and net income of RMB 18.2 million (US$2.7 million) for the three months ended March 31, 2018 and 2019, respectively***.

116. Elsewhere, the Offering Documents misleadingly disclosed the Company's revenues for the three months ended March 31, 2019 as compared to compared to three months ended March 31, 2018:

> ***Revenue***. Our revenues were RMB1,489.1 million (US$221.9 million) for the three months ended March 31, 2019, representing an increase of 123.4% from RMB666.5 million for the three months ended March 31,

> 2018. The increase was mainly attributable to an increase in live streaming revenue.
>
> *Live streaming revenue*. Our live streaming revenue increased by 149.2% from RMB543.4 million for the three months ended March 31, 2018 to RMB1,354.1 million (US$201.8 million) for the three months ended March 31, 2019, ***primarily attributable to our continuing cultivation of users' paying habits and growth in the number of paying users and ARPPU***.

117. The Offering Documents also misleadingly stated that the Company's "Net income" for the three months ended March 31, 2019 was "RMB18.2 million (US$2.7 million), as compared to a loss of RMB155.7 million for the three months ended March 31, 2018."

118. Elsewhere, the Offering Documents misleadingly disclosed that the Company's revenues for the year ended December 31, 2018 compared with the year ended December 31, 2017:

> ***Revenue.*** Our revenue increased by 93.8% from RMB1,885.7 million in 2017 to RMB3,654.4 million (US$544.5 million), mainly attributable to the increase in (i) live streaming revenue and (ii) advertisement and other revenues.
>
> *Live streaming revenue*. Our live streaming revenue increased by 106.8% from RMB1,521.8 million in 2017 to RMB3,147.2 million (US$468.9 million) in 2018. During the same periods, our quarterly average paying users grew from approximately 2.4 million to 3.8 million, and our quarterly average ARPPU grew from RMB156 to RMB208. ***The growth in live streaming revenue, quarterly average paying users and quarterly average ARPPU were attributable to our continuing effort in growing our user base and developing users' willingness to pay, including offering of compelling content especially eSports related content, increased popularity of our platform, optimized product features and introduction of interactive streaming channels***.

119. The Offering Documents also disclosed that the Company's revenues for the year ended December 31, 2017 compared with the year ended December 31, 2016:

> ***Revenue.*** Our revenue increased by 139.7% from RMB786.9 million in 2016 to RMB1,885.7 million in 2017, mainly attributable to the increase in (i) live streaming revenue and (ii) advertisement and other revenues.

> *Live streaming revenue*. Our live streaming revenue increased by 149.0% from RMB611.3 million in 2016 to RMB1,521.8 million in 2017, mostly attributable to the significant growth of quarterly average paying users from approximately 0.9 million to 2.4 million. As it takes time to cultivate new users' paying habits, the quarterly average ARPPU decreased slightly from RMB164 to RMB156. ***The growth in the live streaming revenue and paying user base were attributable to our continual effort in growing our user base and developing users' willingness to pay, including offering of compelling content especially eSports related content, increased popularity of our platform, optimized product features and introduction of interactive streaming channels***.

120. The Offering Documents also stated that the Company's "Net loss" had "decreased from RMB782.9 million in 2016 to RMB612.9 million in 2017."

121. The Offering Documents further disclosed that

> We have generally experienced steady growth in our quarterly net revenues for the nine quarters in the period from January 1, 2017 to March 31, 2019. ***The growth was mainly attributable to the growth of paying users from 1.7 million in the first quarter of 2017 to 6.0 million to the first quarter of 2019, and ARPPU from RMB135 to RMB226 in the same periods***. ***The increase in the number of paying users and ARPPU was a result of our continued efforts in growing user base and user engagement through popular streamers and rich and engaging content, and in cultivating active users' paying habit by creating various paying scenarios.*** The slight decrease in our net revenues in the first quarter of 2018 was due to the decrease in our advertisement revenues, as the demand for our advertisement services is generally lower in the first quarter of each year. This is primarily attributable to a general slowdown in business activities during the Chinese New Year holiday and the fact that advertisers typically limit their budgets for online platforms during this time of the year. The net revenues trend we experienced in the past may not apply to, or be indicative of, our future operating results.

122. The statements in paragraphs 114–21 above touted to investors that Douyu's ever-increasing revenues were the result of users purchasing virtual gifts for streamers in response to the quality of the Company's product, *i.e.*, appeal of the Company's streamers and the content those streamers created. These statements were materially inaccurate, misleading, and/or incomplete, however, because they failed to disclose that the Company's revenues were inflated

by *de facto* wash transactions where streamers purchased virtual gifts for themselves and the Company kicked back half the amount of the purchase to the streamer.

123. The Offering Documents also communicated to investors that fans or supporters of streamers—*i.e.*, users separate from the streamers themselves—were purchasing virtual gifts for those streamers, which enabled the Company to become profitable for the first time in its history in Q1 2019, but failed to disclose that streamers were purchasing gifts for themselves as a way to boost their profiles on Douyu's platform. For example, the Offering Documents stated that:

> We have developed diversified monetization channels to capitalize on our large and active user base as well as high-quality content offered by our deep pool of top streamers. We primarily generate revenues through live streaming and advertisement. ***Revenue from live streaming mainly consists of sales of virtual gifts which viewers give to streamers during live streaming to show appreciation and support*** . . . . Our revenue has increased from RMB786.9 million in 2016 to RMB1,885.7 million in 2017 and further to RMB3,654.4 million (US$544.5 million) in 2018. Our revenue increased from RMB666.5 million for the three months ended March 31, 2018 to RMB1,489.1 million (US$221.9 million) for the same period of 2019. We had net loss of RMB782.9 million, RMB612.9 million and RMB876.3 million (US$130.6 million) in 2016, 2017 and 2018, respectively, and ***net loss of RMB155.7 million and net income of RMB 18.2 million (US$2.7 million) for the three months ended March 31, 2018 and 2019, respectively***.

124. Similarly, the Offering Documents touted "large following bases" of fans who "support these streamers with virtual gifts," again communicating to investors that separate users—*i.e.*, not the streamers themselves—were purchasing virtual gifts for streamers without disclosing that streamers were buying gifts for themselves:

> "***Our top streamers tend to have large following bases who regularly support these streamers with virtual gifts***, and they also tend to attract many integrated promotion activities during live streaming compared to self-registered streamers. ***Their charisma and the high-quality content that they create are primary contributors to user stickiness and are hard to replicate with self-registered streamers***. In the first quarter of 2018 and

> 2019, ***our exclusive streamers accounted for 46.0% and 61.2% of our total live streaming revenue***, respectively."

125. Likewise, when describing the Company's model for paying streamers, Defendants told investors that streamers received a percentage of the sales of virtual gifts bought by *other users* for those streamers, but did not disclose that streamers were purchasing virtual gifts for themselves:

> *Revenue sharing fees and content cost.* Our revenue sharing fees represent our payment to streamers based on a percentage of revenue from sales of virtual items, including virtual gifts and other subscription based privileges. ***When a viewer sends a virtual gift to a streamer, we pay a certain percentage of the sales of virtual gifts to the streamers or the talent agency of which the streamer is a member***. In addition, we give certain of our streamers a monthly pay that is determined based on the popularity of the streamer. Our content cost mainly covers costs we incurred in purchasing content rights, compensating and recruiting streamers, and those we incurred in generating self-produced content. We expect the revenue sharing fees and content cost to increase in absolute amount as our business grows and we further expand our content offerings, enhance user engagement and strengthen investment in eSports. We expect the percentage of revenue sharing fees and content cost of total net revenues to decline as we benefit from economies of scale.

126. In addition, the Offering Documents emphasized that the Company's revenues depended on growing the number of "paying users" on Douyu's platform, but failed to disclose that these "paying users" included streamers purchasing gifts for themselves in *de facto* wash transactions:

> The markets for our live streaming platform and the related products and services are relatively new and rapidly developing and are subject to significant challenges, especially in terms of ***converting non-paying users to paying users, maintaining a stable paying user base and attracting new paying users***. Our business plan relies heavily upon an expanding user base and the resulting increased revenue from live streaming and advertisement, as well as our ability to capitalize on the eSports industry and explore other monetization avenues.

127. Along the same lines as the statement in paragraph 126 above, the Offering Documents elsewhere disclosed that:

> We primarily generate live streaming revenues through the sales of virtual gifts. See "Business—Monetization opportunities—Live Streaming". ***We expect that our revenues from live streaming derived from the sale of virtual gifts to increase as we grow our user base, enhance our user engagement, expand virtual gifting scenarios, increase users' willingness to pay, and continue to capitalize on the significant market potential of eSports***."

128. In describing the Company's recognition of revenue, the Offering Documents also misleadingly communicated to investors that other users—*i.e.*, not the streamers themselves—were buying virtual gifts for streamers:

> We principally engage in operating our own live streaming platforms, ***which enable streamers and users to interact with each other during live streaming***. ***The users have the option to purchase virtual currency, which is non-refundable and can only be used to redeem for virtual items to be used in the live streaming sessions on the our [sic] platforms***. Unredeemed virtual currency is recorded as deferred revenue. Virtual currencies used to purchase virtual items are recognized as revenue according to the prescribed revenue recognition policies of virtual items addressed below unless otherwise stated.

129. Similarly, the Offering Documents elsewhere misleading described the user-streamer interactions without disclosing that streamers purchased virtual gifts for themselves, including for the purpose of misleading users into believing that the streamer was more popular than in reality they were:

> Through playing and narrating games live, streamers play a vital role in attracting and retaining user traffic as well as enhancing user engagement, and therefore are crucial assets to game-centric live streaming platforms. ***Streamers can in turn monetize on game-centric live streaming platforms through measures such as receiving virtual gifts from users, advertisement income by streamer endorsement and commercialization of content created***. The top streamers can inspire a large fan base of viewers ***with their superior skillsets and passionate personality***, and generate significant monetization opportunity and user engagement.

130. The Offering Documents also emphasized that *other users*, not the streamers themselves, purchased gifts for streamers when describing the "monetization channels," *i.e.*, sources of revenue, used by live-streaming platform companies:

> ***Users can purchase virtual items on the platforms for the purpose of rewarding streamers that they like, and live streaming platforms typically share a portion of the payment for virtual items. By giving streamers virtual gifts, viewers show their appreciation for the streamers and get to engage in live streaming on a more interactive and real-time basis.*** Compared with other live streaming formats, game-centric live streaming offers a more sustainable context for virtual gifting due to the massive base of game fans with high engagement and propensity to spend on game-centric entertainment formats.

131. The Offering Documents also detailed payments by the Company to its streamers without disclosing that the Company kicked back a portion of purchasers of virtual currency made by the streamers themselves:

> Our exclusive contracts have exclusivity clauses that require streamers to live stream on our platform only during the contract term. ***In addition to payments of a portion of virtual gift sales and advertisement sales, we typically pay our exclusive streamers base compensation based on the content he or she produces and the number of concurrent viewers who watch live streaming at the same time***. We have the right to review and adjust our streamers' base compensation taking into account their performance metrics. As such, ***our exclusive streamers are incentivized to produce engaging content that attracts more viewers and promotes spending on our platform.***

132. The Offering Documents also misleading described virtual gifts as items that *other users purchased and gave to streamers,* not as items that streamers *purchased for themselves* and received a kick-back from Douyu:

> ***Users are able to purchase virtual gifts on our platform using our virtual currency and send them to streamers as a gesture of appreciation or support.*** Users can purchase the virtual currency on our site via various online third-party payment platforms, including WeChat Pay, AliPay and other payment platforms. In addition to purchasing these virtual currencies on our site, users can purchase virtual currencies from our online store at third-party websites such as *Tmall.com*. The price of our virtual currency does not change and virtual currency does not expire. However, virtual currency is non-refundable and may not be converted back to cash or be transferred between users.
>
> ***When a streamer receives a virtual gift, that virtual gift is displayed in his or her profile. We pay our streamers fees based on a percentage of revenue from virtual gift sales on live streaming channels.*** We have the

> system in place to foster the interaction and promote spending on our platform.
>
> * * *
>
> A wide variety of virtual gifts are available to our users, with prices ranging from approximately RMB0.1 to approximately RMB2,000. We provide an innovative and diverse selection of virtual gifting to convert our active users to paying users and frequently release new virtual goods related to events and pop culture trends to increase sales. In addition, ***we organize streamer popularity contests to promote spending by viewers to show support of the streamers they follow***.

133. The Offering Documents also described how visitors to Douyu's platform could register to become streamers. While the Offering Documents disclosed that streamers could purchase virtual gifts, the Offering Documents misleadingly failed to disclose that streamers purchased and received a kickback on virtual gifts *for themselves*:

> To broaden our user base, we allow users to watch live streaming on our platform without registration, either through our website or mobile apps. ***To become a streamer, a user must register on our platform and verify his or her identity with a government issued ID. As a result, certain of our streamers are also active users as well as paying users on our platform.*** After the streamer's identity is verified, he or she may apply to create a new room for streaming. Once a room or channel is created, our streamers may customize video, audio and other room settings.

134. The Offering Documents's disclosure of "new products and features to enhance user experience and increase user engagement" also misleadingly communicated to investors *other users* bought gifts for streamers without disclosing that streamers purchased the gifts for themselves and received a kickback from the Company on those purchases:

> We also develop new products and features to enhance user experience and increase user engagement. Our platform features *Yu Bar* ("鱼吧"), a short-blogging community where streamers can interact with their followers by posting and replying to short blogs. During 2018, Yu-Bar witnessed approximately 144 million interactions including posts, responses, likes and forwards. In addition, we offer features such as "Streamer Tailor-made Gifts" that ***allow top streamers to design unique gifts to be purchased by their followers***. Our "*Douyu Fleet*" ("斗鱼车队") allows users to create private groups of up to

2,000 members to complete certain tasks together to create vibrant interactions.

135. The statements in paragraphs 123–34 above communicated to investors that Douyu's revenues from purchases of virtual gifts were the result of purchases of gifts by *other users* for streamers—*i.e.*, not the purchases of gifts by streamers for themselves. These statements were materially inaccurate, misleading, and/or incomplete, however, because they failed to disclose that the Company's revenues were inflated by *de facto* wash transactions where streamers purchased virtual gifts for themselves and the Company kicked back half the amount of the purchase to the streamer.

136. The Offering Documents also included numerous boilerplate Risk Factors that were misleading because they failed to disclose to investors that the Company's revenues also depended on the ability of streamers to purchase virtual gifts for themselves. For example, the Offering Documents advised investors that

> ***we generated positive gross profit for the first time recently in 2017 and then in 2018 and generated net profit in the first quarter of 2019***, such positive trend may not translate into continued net after-tax profit. The time it will take for us to eventually achieve profitability hinges on our ability to grow rapidly in a cost-effective way, and we may not be able to grow this way successfully.
>
> While ***our future revenue growth will be linked with the realization of our monetization strategies, which will be affected by user engagement, streamer retention and product offering***, our cost-effective growth will primarily rely on improvement of operational efficiency, which has been reflected so far in the continually decreasing percentage of our content costs and bandwidth and server costs in our total operating costs. This trend of operational efficiency improvement may not continue in the future, or it may not reach a sufficient level to generate profitability. ***Our ability to continue to improve operational efficiency will depend on our ability to maintain stronger bargaining position in contract negotiations with top streamers, streamline our operation, achieve economies of scale and employ more advanced streaming technologies at lower cost, among other things***. Additionally, ***our ability to achieve profitability is affected by various external factors, many of which are beyond our control, such as the PC and mobile games market and eSports industry in China, and***

> ***the development of social networking, live streaming services and mobile marketing services***. We cannot assure you that we will be able to improve our operational efficiency in the future.

137. Likewise, the Offering Documents also advised investors that:

> Our monetization model is new and evolving. Our streaming platform is free to access, and we generate revenues primarily from live streaming and advertisement. As a result, ***our revenue is affected by our ability to increase user engagement and convert non-paying users into paying users, which in turn depends on our ability to offer content, virtual gifts, advertisements and other services***.

138. In addition, the Offering Documents disclosed that

> ***Our revenue growth is heavily dependent on paying users and revenue per paying user. If we fail to continue to grow or maintain our paying user and continue to increase revenue per paying user, our live streaming revenue may not increase, which may materially and adversely affect our business operation and financial results***.
>
> Our quarterly average paying users grew from 0.9 million in 2016 to 2.4 million in 2017 and further to 3.8 million in 2018. Moreover, ***our average revenue per paying user ("ARPPU") per quarter changed from approximately RMB164 in 2016 to RMB156 in 2017 and increased to RMB208 in 2018. Whether we can continue this trend of increasing paying ratio amongst our users depends on many factors, and many of them are out of our control. For example, our paying users may have less disposable income as they need to meet financial obligations elsewhere, they may decide to no longer support a particular streamer that they used to follow financially, and an overall worsening economic conditions can lower disposable income for all existing paying users, causing them to spend less on our platform***. ***We expect that our business will continue to be heavily dependent on revenue collected from paying users in the near future***. Any decline in the number paying users or our paying ratio may materially and adversely affect our results of operations.

139. The statements in paragraphs 114–38 touted to investors that Douyu had become profitable for the first time in Q1 2019, and purported to advise investors as to the various risks that could affect the Company's revenue streams, but were materially inaccurate, misleading, and/or incomplete because they failed to disclose that the Company's revenues were inflated by inflated by *de facto* wash transactions where streamers purchased virtual gifts for themselves and

the Company kicked back half the amount of the purchase to the streamer, as well as that the Company's future profitability depended in part on its streamers' ability and willingness to continue making such purchases.

140. The statements in paragraphs 114–38 were material to investors because, as disclosed in the Registration statement purchases of virtual gifts made up the overwhelming majority of the Douyu's revenues, including 77.7%, 80.7%, 86.1%, 81.5% and 90.9% of its "total net revenue in 2016, 2017, 2018 and for the three months ended March 31, 2018 and 2019 respectively." In addition, Douyu was able to increase the size of its IPO by approximately $275 million at the last minute because it reported $2.7 million in profits in Q1 2019, which were inflated by purchases of virtual gifts by streamers for themselves. Indeed, at least one top streamer had purchased over $3 million in virtual currency for himself during that period. Douyu's analysts seized on the Company's purported profitability, emphasizing to investors that Douyu had "***mov[ed] into the black for the first time***" and its "***revenue growth [had] caught up with Huya***," the Company's chief rival.

### C. The Offering Documents Misrepresented and/or Failed to Disclose that Streamers Could and Were Actively Misrepresenting Themselves on Douyu's Platform

141. Douyu's Offering Documents, which were signed by all Defendants, emphasized to investors that Douyu knew the identities of its streamers, who the Company relied on to generate revenue by inducing users of Douyu's platform to buy virtual gifts for streamers. In addition, Douyu's Offering Documents assured investors that it had implemented a "Content Monitoring System" designed to identify and punish streamers who engaged in fraudulent conduct. These statements were materially inaccurate, misleading, and/or incomplete, however, because they failed to disclose that Douyu's platform allowed streamers to misrepresent

themselves to users, which created a material risk that users would leave Douyu when they learned the streamers' true identities.

142. Douyu's Offering Documents directly assured investors that the Company knew the identity of every streamer because: "To become a streamer, a user must register on our platform ***and verify his or her identity with a government issued ID*** . . . . After the streamer's identity is verified, he or she may apply to create a new room for streaming."

143. Defendants' Offering Documents also emphasized to investors that it knew the identities of its "top streamers," who generated the most revenue, because it had a program to identify, recruit and develop such streamers, and entered into exclusive contracts directly with those streamers:

> Our platform brings together a deep pool of top streamers and provides a sustainable streamer development system. As of March 31, 2018 and 2019, our platform had 4.6 million and 6.5 million registered streamers, ***including more than 2,000 and 6,500 top streamers, each of whom entered into an exclusive contract with us directly as of each date, respectively***. These top exclusive streamers streamed an average of 4.1 and 4.3 hours per show in the first quarter of 2018 and 2019, respectively, and all of our streamers generated a total of 20.4 million and 30.2 million streaming hours during the same periods. Approximately 440 and 780 of our streamers had more than one million viewers during the first quarter of 2018 and 2019, respectively. Approximately 491,000 of our streamers are managed through talent agencies as of March 31, 2019. ***Our exclusive contract model with top streamers helps ensure a consistent supply of quality content***, which is effectively supplemented by the talent agency model that captures a large group of promising and rising streamers. ***With years of experience, we have developed a well-designed system to discover, train, and promote streamers who are already popular or have demonstrated the potential to become popular, and to help them grow and monetize their popularity***.

144. Indeed, the Offering Documents touted that one of Douyu's "Strengths" that "contribute[s] to our success and differentiate[s] us from our competitors" was its "[d]eep pool of top streamers empowered by ***a comprehensive streamer development system***."

145. The Offering Documents also included multiple statements emphasizing how Douyu's streamers drove the Company's revenue by engaging with and inducing users to buy virtual gifts, which were the source of over 61% of the Company's revenue in the quarter before the Company's IPO:

- "Our user base and level of user engagement help us ***attract top streamers who produce quality content***. ***The curated content and interactive features of our platform help attract and retain users and encourage user participation, which in turn drives up virtual gifting activities and our live streaming revenue***. Our game live streaming combined with a broad range of other entertainment contents have been highly effective in attracting user traffic and boosting user spending. In addition, the broad user reach and attractive commercial proposition of our platform continuously draw advertisers, game developers and other participants of the eSports industry to our platform."

- "As of March 31, 2019, our streamer pyramid consisted of 6.5 million registered streamers, including more than 6,500 top streamers, each of whom entered into an exclusive contract with us directly, approximately 491,000 streamers managed through talent agencies and the rest who are self-registered streamers. As of March 31, 2018, our platform had 4.6 million registered streamers, including more than 2,000 top streamers each of whom entered into an exclusive contract with us directly. ***Our top streamers tend to have large following bases who regularly support these streamers with virtual gifts, and they also tend to attract many integrated promotion activities during live streaming compared to self-registered streamers. Their charisma and the high-quality content that they create are primary contributors to user stickiness and are hard to replicate with self-registered streamers***. In the first quarter of 2018 and 2019, ***our exclusive streamers accounted for 46.0% and 61.2% of our total live streaming revenue, respectively***."

146. The Offering Documents assured investors that Douyu monitored its streamers for, among other things, fraudulent conduct, using a sophisticated "Content Monitoring System" that monitored streamers, including by regularly taking screen captures of and by punishing streamers who engaged in improper conduct. Specifically, the Offering Documents represented that:

> **Content Monitoring System**
>
> Our live streaming platform contains real-time content, which we monitor to maintain a healthy ecosystem and ensure compliance with PRC laws and regulations. We have developed a comprehensive system to monitor content on our platform and filter inappropriate and illegal content and content that may infringe on the intellectual property rights of third parties.
>
> * * *
>
> ***We have also developed a proprietary monitoring system in-house that takes screenshots of our live streaming channels every 10 seconds based on our "smart" image detection technology***.
>
> * * *
>
> ***All of the automatic detection results that are escalated are reviewed by our content monitoring staff manually***. We have a dedicated content monitoring team who also proactively check our rooms on a 24/7 basis for inappropriate or illegal content
>
> * * *
>
> We deal with violations of varying severity in accordance with our strict policies and applicable regulations. Our actions may include warnings, cutting off or temporary suspension of the room and/or account for minor violations, with follow-up review to ensure effective enforcement and rectification. ***For serious violations, the relevant account is deleted permanently and all virtual currency and items are forfeited, and the room may be permanently closed***. Our streamers agree to indemnify us for all damages arising from third-party claims against us caused by the infringing content produced by them.

147. While the Offering Documents contained a detailed Risk Warning stating that the Content Monitoring System "may not be effective in preventing misconduct by our platform users," that warning did not apprise investors of the risk that streamers could misrepresent themselves on the platform:

> We are a game-centric live streaming platform that provides real-time streaming and interactions. Because we do not have full control over how and what streamers or viewers will use our platform to communicate, ***our platform may be misused by individuals or groups of individuals to engage in immoral, disrespectful, fraudulent or illegal activities***. For example, we detect spam accounts through which illegal or inappropriate

> content is streamed or posted and illegal or fraudulent activities are conducted on a timely basis. Media reports and Internet forums have covered some of these incidents, which have in some cases generated negative publicity about our platform and brand. We have implemented control procedures to detect and block illegal or inappropriate content and illegal or fraudulent activities conducted through the misuse of our platform, but such procedures may not prevent all such content from being broadcasted or posted or activities from being carried out. Moreover, as we have limited control over real-time and offline behavior of our users, to the extent such behavior is associated with our platform, our ability to protect our brand image and reputation may be limited. Our business and the public perception of our brand may be materially and adversely affected by misuse of our platform.

148. In addition, while the Offering Documents informed investors that the Douyu's platform included a "Facial Beautification" feature, the accompanying description of that feature did not disclose that streamers could use the feature to comprehensively alter their appearance and misrepresent themselves to users:

> Streamers on our platform can utilize the beautification tools on our platform to ***improve their appearances*** during streaming. Our facial beautification feature has been serving many streamers as a useful tool since its launch."

149. In fact, while the Offering Documents included a screen capture of the Douyu's platform to show investors how a stream would appear to users, that screen capture *did not* show the "Facial Beautification" feature:

*Facial beautification.* Streamers on our platform can utilize the beautification tools on our platform to improve their appearances during streaming. Our facial beautification feature has been serving many streamers as a useful tool since its launch.

Below is a screenshot of our platform interface for streamers on our PC app:




151

150. The statements and screen capture in paragraphs 142–49 above were materially inaccurate, misleading, and/or incomplete because Douyu's Offering Documents, which were signed by all Defendants, emphasized to investors that Douyu knew the identities of its streamers, who the Company relied on to generate revenue by inducing users of Douyu's platform to buy virtual gifts for streamers. In addition, Douyu's Offering Documents assured investors that it had implemented a "Content Monitoring System" designed to identify and punish streamers who engaged in fraudulent conduct. These statements were materially inaccurate, misleading, and/or incomplete, however, because they failed to disclose that Douyu's platform allowed streamers to misrepresent themselves to users, which created a material risk that users would leave Douyu when they learned the streamers' true identities.

151. In addition, the statements and screen capture in paragraphs 142–49 were material because Company warned investors that "The size of our user base and the level of our user engagement are critical to our success. Our main monetization strategies—live streaming,

advertisement and others depend on our ability to maintain and increase the size of our user base and user engagement level." The Company also advised that "to maintain and improve this already large size of user base and high level of user engagement, we would have to ensure that we adequately and timely respond to changes in user preferences, ***attract and retain enough popular streamers***, and offer new features and content that may attract new users." The Company also emphasized the importance of "top streamers," advising investors that "Our top streamers tend to have large following bases who regularly support these streamers with virtual gifts, and they also tend to attract many integrated promotion activities during live streaming compared to self-registered streamers. ***Their charisma and the high-quality content that they create are primary contributors to user stickiness and are hard to replicate with self-registered streamers***. In the first quarter of 2018 and 2019, our exclusive streamers accounted for 46.0% and 61.2% of our total live streaming revenue, respectively." The Offering Documents further advised that "***running a successful live streaming platform requires intensive capital outlay and a large team of quality streamers, who remain in short supply*** due to the fact that most have signed contracts with existing platforms, there are high entry barriers for our industry."

**D. <u>The Offering Documents Violated Items 303 and 503 of Regulation S-K.</u>**

152. In addition to the foregoing affirmative misrepresentations, Defendants' failure to disclose the material information described herein in the Offering Documents violated two provision of SEC Regulation S-K. 17 C.F.R. § 229.101 *et seq.*

153. First, pursuant to Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303, and the SEC's related Interpretive Releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. As set forth above, at the time of the Offering, unbeknownst to investors, Douyu streamers were

misrepresenting themselves on Douyu's platform, which Douyu knew would negatively impact the Company's performance. In addition, Douyu knew that its revenues were inflated by *de facto* wash transactions where streamers purchased virtual gifts for themselves to artificially simulate commercial activity on Douyu's platform. Moreover, Douyu knew, yet concealed, that its failure to comply with then-existing regulatory requirements would require certain offerings to be stripped from users who relied on them to meaningfully engage with streams for certain periods of time. The adverse events and uncertainties associated with these negative trends were reasonably likely to (and did) have a material impact on the Company's financials and, therefore, were required to be disclosed in the Offering Documents, but were not.

154. Second, Item 503 of SEC Regulation S-K, 17 C.F.R. § 229.503, required, in the "Risk Factors" section of the Offering Documents, a discussion of the most significant factors that make the Offering risky or speculative and that each risk factor adequately describe the risk. The Offering Documents' discussion of risk factors were themselves materially misleading because they provided generic statements of potential or contingent risk, yet failed to disclose that the potential future adverse impact described was ***already*** occurring. For example, the Offering Documents purported to warn that "***our platform may be misused by individuals or groups of individuals to engage in immoral, disrespectful, fraudulent or illegal activities***," and that "***our business and the public perception of our brand may be materially and adversely affected by misuse of our platform***" at a time when Defendants knew that streamers were misrepresenting themselves to users on Douyu's platform. In addition, the Offering Document purported to warn that "***[i]f our platform is deemed to be engaged in illegal or inappropriate activities relating to issuance and use of virtual currencies by our platform***," which "***may have adverse impact our business, results of operations and reputation***," at a time when Defendants

were on notice that users were using Yuchi in ways other than to buy virtual gifts and that the Company's "lucky draw" feature violated local regulations.

## VI. THE TRUTH BEGINS TO EMERGE

155. The materially inaccurate, misleading, and/or incomplete statements in the Offering Documents were revealed through a series of disclosures in the weeks following Douyu's IPO. *First*, on July 30, 2019, less than two weeks after the IPO, investors learned that Douyu streamers were misrepresenting themselves on the Company's platform when *BBC News* published an article about how Xiadian had been completely misrepresenting her appearance. A screen capture of Xiadian's actual appearance and altered appearance demonstrated for investors how Douyu's streamers could completely change their appearance and deceive users.




Your Highness Qiao Biluo's real appearance (left) and one of her filtered faces (right) from an earlier livestream on Douyu

156. The *BBC News* article reported that fans were left stunned after a glitch during a live-stream revealed Xiadian to be a middle-aged woman and not the young glamorous girl Douyu users had been "worship[ing]." According to the article:

> The blogger, who initially boasted ***a follower count of more than 100,000 on Douyu***, is believed to have used a filter on her face during her appearances, and had been renowned for her "sweet and healing voice".
>
> China's Global Times said she had been "worshipped" as a "cute goddess" by ***some members of her loyal audience with some fans even giving her more than 100,000 yuan ($14,533, £11,950)***.
>
> *** * ***
>
> The Global Times reports that all was as normal and that her fans urged her to show her face and remove her filter but she refused, instead apparently saying: "I can't show my face until I receive gifts worth 100,000 yuan ($11,950). After all, I'm a good-looking host."
>
> ***Followers began to send her donations with the largest reported to be 40,000 yuan ($5,813, £4,780) during the session.***
>
> However, at some point, it seems the filter being used by the Vlogger stopped working and her real face became visible to her viewers.
>
> She is reported to have noticed only when people who had signed up to her VIP access room ***started exiting en masse.***
>
> Many of her original followers - especially men - are said to have ***stopped following her and withdrawn their transactions*** after seeing her true identity.

157. The next day, July 31, 2019, a *Mic.com* article titled "Popular Chinese Douyu streamer revealed to be much older thanks to livestream glitch" (the "Mic Article"), further reported on the glitch that revealed the true identity of Xiadian whose Douyu users "fawned over the videos and photos that she uploaded . . . which showed a young woman posing, playing games, and talking to the camera." According to the Mic Article, "***the revelation caused a considerable amount of drama, with many of her male subscribers expressing outrage that they had been tricked. They left the stream in droves, unsubscribed from her account and pulled donations.***"

158. A day later, on August 1, 2019, *TechNode*, an online information outlet catering to the tech and startup community both inside and outside of China, revealed that Douyu

"***banned [Xiadian]*** on Thursday for drumming up hype surrounding her accidental face reveal." The *TechNode* article, titled "Douyu bans livestreamer for hyping face reveal," noted how:

- The livestreamer said in an earlier broadcast that she wouldn't show her face until she had received gifts totaling more than RMB 100,000 ($11,950).
- After the incident, the host claimed that the face reveal was planned, saying that she paid RMB 280,000 for it.
- According to the company's statement, the livestreamer's comments "challenged the bottom line of the public and caused negative social influence." As punishment, Douyu permanently banned her channel and remove all her content.

159. *TechNode* also put the incident in context, revealing that a number of well-known Chinese live-streamers have been banned for inappropriate behavior in the past, including "Lu Benwei, ***one of Douyu 's most popular hosts, [who] was banned from all live-streaming platforms*** by the country's top internet regulator, the Cyber Administration of China, for verbally abusing a content creator who accused him of cheating."

160. The media continued to publish accounts of the Qiao Biluo incident over the next few days, often repeating the fact that the glitch caused her followers to unsubscribe en masse and rescind their gifts. On July 29, 2019, the day before the incident was first reported, Douyu ADSs closed at $10.08 per ADS. After the market absorbed all this information, on August 6, 2019, Douyu ADSs closed at $7.84 per ADS, or down 22.22%.

161. Then, on August 11, 2019, *Bloomberg* published an article from the *South China Morning Post*, profiling Liu, the above-described top streamer who, according to an analyst with Aequitas Research, purportedly was responsible for as much as 3% of Douyu's revenues in the second quarter of 2019 alone ("Bloomberg Article"). The article revealed to investors for the first time that "***[s]treamers often need to spend their own money to buy fan support***—a common industry practice that calls to question whether company revenue is inflated." The

article went on that "[s]oon after Douyu signed on Liu in March, he spent nearly ***20 million yuan [USD $3.15 million]*** to buy himself votes during Douyu's annual online idol competition. Half of that money goes to Douyu, and ***the other half returns to Liu's pocket. Douyu's CEO confirmed this.*** " The Bloomberg Article then quoted a Global Equity Research analyst as stating that "These 'fake' votes will be still counted as revenue as, under accounting standards, the streamer will be considered a paying customer . . . ***Douyu's focus on top streamers makes it more susceptible to this issue compared to Huya***."

162. The following day, on August 13, 2019, Douyu released its earnings for the Second Quarter of 2019 and reported $272.8 million in net revenues. Accordingly, based on the Bloomberg Article and Douyu's disclosure, investors realized that Liu himself was responsible for 3%, or ***$8.2 million*** of those revenues, and that the prior quarter Liu had spent over ***$3 million***, or just under half that amount, on his own purchases on Douyu's platform. Investors also realized that, since top streamers like Liu were responsible for "***61.2% of the total live streaming revenue generated from [Douyu's] platform***," according to the Offering Documents, a substantial portion of approximately $152 million—*i.e.*, 61.2% of 272.8 million—in Douyu's revenue could be *de facto* wash transactions by streamers trying to build their profiles, half of which is kicked back to the streamers themselves. In addition, the disclosure in the Bloomberg Article was especially shocking because Liu's purchase of $3.15 million for himself was more than the Company's entire ***$2.7 million*** reported net profit for Q1 2019. In other words, it was very likely that the Company had not been profitable in that quarter, and Defendants had increased the size of Douyu's IPO by $274 million under false pretenses.

163. On August 13, 2019, Douyu ADSs closed at $8.84 per ADS, falling from $9.93 per ADS the day before, or nearly 11%, before declining even further to $8.14 per share on August 14, 2019, a total decline of over 18%.

164. Finally, on October 15, 2019, J.P. Morgan disclosed to investors in an analyst report that Douyu had temporarily removed its "lucky draw feature in late Aug[ust] 2019," before "reinstat[ing]" it "on Oct 10," which, according to J.P. Morgan, "***will cause its 3Q19 revenue to decline 1.5% QoQ . . . 5% below the low end of company's 3Q19 guidance . . . and 7% lower than current Bloomberg consensus***." J.P. Morgan, which characterized the suspension of luck draw features as a "headwind," stated, in relevant part:

> On Aug 20 2019, Douyu started a round of operation changes Which include: 1) removal of lucky draw feature, 2) enhance content monitoring within live broadcasting show room. On Oct 10 2019, Douyu re-launched lucky draw feature after National Day holiday with ***stronger restriction on in-game consumption (cap on virtual gift amount etc). We estimate lucky draw feature to contribute to ~10% of Douyu 's revenue before 3Q19***.

In reality, Douyu had disabled the lucky draw feature because it was likely rigged online gambling in violation of China's regulations.

165. Douyu closed at $7.12 per ADS on October 16, 2019, or 4.69% lower than the previous day's close of $7.47 per ADS.

166. On November 27, 2019, Douyu released its third quarter 2019 financial results. During the question-and-answer portion of the earnings call held the same day, the Company addressed the temporary removal of its "lucky draw" features:

> **Chun Man Poon** - Morgan Stanley, Research Division - Equity Analyst
>
> (foreign language) I'll translate my question. My first question is since **late August, you have removed certain lucky draw features. And can you let us know the reason why you took it off and also the revenue impact in Q3?** And also since you have restated these features, how is the revenue run rate at present? Is it better than before you removed these

> features already? And from here onwards, **how does the regulatory landscape look like for these features?**
>
> **Shaojie Chen** - Douyu International Holdings Limited - Founder, CEO & Director
>
> *** * ***
>
> [Interpreted]. Okay. Regarding the reason of the temporary removal of our quiz features since August, we have always prioritized the long-term and sustainable growth of Douyu. So in order to contribute to a positive Internet environment, **our management team made decision to carry out an assessment of certain interactive features in mid-August 2019** prior to China's anniversary celebration. And **as a result of our internal assessment, we adjusted certain functions of the interactive product featuring**.
>
> *** * ***
>
> [Interpreted]. Regarding the revenue impact, **our interactive features, including quiz, were designed to enhance the interaction between the streamers and users.** So consequently, **the removal of certain features has somehow affected users' engagement activity with streamers for a certain period of time in third quarter.** And we -- after revision and improvement, we initially reacted (sic) [activated] part of the features in late third quarter, and we activated the rest in the fourth quarter. So after resuming the access to our interactive features, the users engagement for these interactive features are **gradually recovering**, and we have also factored in all of these into our fourth quarter guidance for 2019.
>
> * * *
>
> [Interpreted]. Regarding future risk adjustment, **we will pay close attention to development laws and regulations issued by the local authorities**, while maintaining active communication with government departments. Thank you.

167. The Company's ADSs closed at $7.46 per share on November 29, 2019, the next trading day, representing a decline of over 4.8%.

168. On January 23, 2020, J.P. Morgan released an analyst report commenting on the suspension of interactive features and crediting the Company's 12% drop in ADS price on January 22, 2020, to investor concerns about "***the financial implications of such a broad-based key monetization feature suspension***[,]" stating, in relevant part:

> [O]n January 22, 2020, all of the listed digital entertainment platforms (Douyu, Huya, . . .) that operate live broadcasting services have ***suspended interactive features that drive meaningful monetization for live streaming operators***. Share prices of Douyu/Huya . . . fell by 12%/10% . . . on Jan. 22, 2020, ***in our view due to investors' concerns about the financial implications of such a broad-based key monetization feature suspension***.

169. J.P. Morgan added: "We believe investors' cautious sentiment will remain in the near term ***due to a lack of clarity on the duration of this suspension***[.]"

170. In response to all this information, the Company's ADSs have cratered, trading as low as $6.50 per ADS since going public, representing a decline of over 43% from the Offering price.

## VII. PLAINTIFF'S CLASS ACTION ALLEGATIONS

171. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired shares or Douyu ADSs in its IPO or purchased ADSs thereafter in the stock market pursuant and/or traceable to the Company's Registration Statement issued in connection with the IPO and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families, legal representatives, heirs, successors or assigns and any entity in which the officers and directors of the Company have or had a controlling interest.

172. The members of the Class are so numerous that joinder of all members is impracticable. There were over 67 million shares sold in the IPO. Since the IPO, the Company's securities have actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by

Douyu or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

173. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

174. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

175. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

176. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Securities Act was violated by Defendants as alleged herein;

(b) whether the Offering Documents were negligently prepared and contained materially misleading statements and/or omitted material information required to be stated therein;

(c) the extent to which members of the Class have sustained damages; and

(d) the proper measure of damages.

177. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

178. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the untrue and misleading statements pleaded in this Complaint.

179. *First*, none of the misstatements complained of herein were forward-looking statements. Rather, they were misstatements concerning current facts and conditions existing at the time or prior to when the statements were made.

180. *Second*, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosure made by Defendants was not sufficient to insulate Defendants from liability for their materially untrue and misleading statements.

## IX. COUNT I

**(Violations of Section 11 of the Securities Act Against All Defendants)**

181. This claim does not sound in fraud. Plaintiffs do not allege that any Defendant acted with fraudulent intent. This claim is based on strict liability and negligence.

182. Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

183. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendants.

184. The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading, and failed to disclose required material information.

185. Douyu is the registrant for the IPO. Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

186. As issuer of the shares, Douyu is strictly liable to Plaintiff and the Class for the misstatements and omissions.

187. As signatories of the Registration Statement, the Individual Defendants are liable to Plaintiffs and the Class for the materially untrue statements and omissions that appeared in or were omitted from the Registration Statement.

188. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

189. By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

190. Plaintiff acquired shares of Douyu's ADSs pursuant and/or traceable to the Registration Statement for the IPO.

191. Plaintiff and the Class have sustained damages. The value of Douyu ADSs has declined substantially subsequent to and because of Defendants' violations.

## X. COUNT II

**(Violations of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants and Defendants Douyu, Chen, and Su)**

192. Plaintiffs repeat and reallege every allegation contained above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

193. This claim is brought pursuant to Section 12(a)(2) of the Securities Act against the Underwriter Defendants and Defendants Douyu, Chen, and Su in connection with the Offering.

194. The stock that was sold in the Offering was owned specifically by the Underwriter Defendants and/or Douyu. Thus, each of the Underwriter Defendants and/or Douyu was an offeror and seller of the Douyu common stock that was sold in the Offering pursuant to defective Offering Materials. In addition, Defendants Chen and Su directly solicited purchases of Douyu ADSs by, among other things, participating in the preparation and dissemination of the Offering's "road show," *i.e.*, presentation to investors soliciting their purchases of ADSs in the Offering, as well as the road show's presentation, talking points, and script. Defendants Chen and Su participated in making materially inaccurate, misleading, and/or incomplete statements during the road show presentation. Defendants Chen and Su were motivated by their desire to serve their own financial interest or those of Douyu securities owner.

195. The Prospectus included (and/or by incorporated by reference) untrue statements of material fact and/or omitted to state (and/or incorporated by reference documents that omitted to state) material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

196. The Underwriter Defendants and Defendants Douyu, Chen, and Su acted negligently in that it did not exercise reasonable care to ensure that the Prospectus did not include, or incorporate by reference, untrue or misleading statements or omissions of material fact.

197. This Count does not sound in fraud. Rather, this Count is based solely on negligence. For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that any Defendant acted with intentional, reckless or otherwise fraudulent intent, except that any challenged statements of opinion or belief made in (or incorporated by) the Registration Statement are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Offering.

198. When they acquired Douyu ADSs directly from Douyu and/or the Underwriter Defendants, Lead Plaintiff Yunyan and other members of the Class did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the Prospectus.

199. Lead Plaintiff Yunyan and other members of the Class suffered damages in connection with the purchase or acquisition of Weight Watchers common stock in, pursuant to, and/or traceable to the Offering.

200. By reason of the foregoing, the Underwriter Defendants and Defendants Douyu, Chen, and Su are liable to OFP and other members of the Class for either (i) the consideration paid for Douyu's ADSs, with interest thereon, less the amount of any income received thereon, upon tender of such securities; or damages as to the Douyu ADSs no longer owned.

## XI. COUNT III

**(Violations of Section 15 of the Securities Act Against the Individual Defendants, Tencent, and Cogency Global)**

201. Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

202. This Count is asserted against the Individual Defendants, Tencent, and Cogency Global, and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

203. The Individual Defendants, Tencent, and Cogency Global were each control persons of Douyu by virtue of their positions as directors, senior officers, major shareholders and/or authorized representatives of Douyu. The Individual Defendants, Tencent, and Cogency Global had the power and influence and exercised the same to cause Douyu to engage in the acts described herein. The Individual Defendants, Tencent, and Cogency Global each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Douyu.

204. Douyu and the Individual Defendants were culpable participants in the violations of §11 of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

205. This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## XII. PRAYER FOR RELIEF

206. WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiffs as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory and punitive damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C. Awarding Plaintiffs and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D. Awarding Plaintiffs and the other Class members such other relief as this Court may deem just and proper.

## XIII. JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury.

Dated: December 24, 2020

Respectfully submitted,

POMERANTZ LLP

*/s/ Brian Calandra*
Jeremy A. Lieberman
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: bcalandra@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505

Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

# EXHIBIT A

**DouYu International Holdings Limited (DOYU)** **Li Yunyan**

**List of Purchases and Sales**

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| 7/17/2019* | Purchase | 211,305 | $11.5000 |
| 3/19/2020 | Sale | (100) | $8.0700 |
| 3/27/2020 | Sale | (4,605) | $6.4100 |
| 3/27/2020 | Sale | (1,000) | $6.4000 |
| 3/27/2020 | Sale | (1,000) | $6.5000 |
| 3/27/2020 | Sale | (1,000) | $6.4500 |
| 4/1/2020 | Sale | (1,000) | $6.4000 |
| 4/1/2020 | Sale | (1,000) | $6.4200 |
| 4/1/2020 | Sale | (2,000) | $6.4300 |
| 4/1/2020 | Sale | (1,000) | $6.4500 |
| 4/1/2020 | Sale | (3,000) | $6.5000 |
| 4/3/2020 | Sale | (1,000) | $6.9000 |
| 4/3/2020 | Sale | (1,000) | $7.0500 |

*Indicates direct participation in initial public offering

**Certificate of Service**

I, Brian Calandra, hereby certify that I filed true and correct copy of the foregoing Amended Class Action Complaint with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated: December 24, 2020

By: *Brian Calandra*
Brian Calandra