UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE DOUYU INTERNATIONAL HOLDINGS LIMITED SECURITIES LITIGATION | Case No.: 1:20-CV-7234 (DLC)<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |
| THIS IS APPLICABLE TO ALL ACTIONS | |

**THIRD AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS


I. NATURE AND SUMMARY OF THE ACTION .......... 1

A. Securities Act Claims .......... 6

B. Exchange Act Claims .......... 11

II. Jurisdiction and Venue .......... 13

III. Parties .......... 14

IV. Confidential Witnesses .......... 22

V. COMMON ALLEGATIONS .......... 23

A. Background .......... 23

B. Huya .......... 26

C. Kuaishou .......... 27

D. DouYu's Revenues .......... 28

E. DouYu's "Top Streamers" Drive Purchases of Virtual Gifts .......... 30

F. DouYu's "Lucky Draw" and Other Raffles Incentivize Purchases of Virtual Gifts .......... 34

G. Unexpected Profitability in Q1 2019 Allows DouYu to Reap Outsized Returns in its IPO .......... 35

VI. SECURITIES ACT ALLEGATIONS .......... 37

A. Securities Act Defendants .......... 37

B. Securities Act Substantive Allegations .......... 42

1. Illegal Conduct Involving Yuchi and Lucky Draws .......... 43

2. *De Facto* Wash Transactions Inflated DouYu's Revenues .......... 51

3. DouYu's Streamers Were Misrepresenting Themselves to Users .......... 55

4. Tencent's Plan to Invest in Kuaishou .......... 58

5. DouYu's Adverse Financial Trends .......... 59

C. The Securities Act Defendants' Materially Inaccurate, Misleading, and/or Incomplete Statements in the Offering Documents in Violation of the Securities Act .......... 60

1. The Offering Documents Statements Concerning Yuchi and/or Lucky Draw Were Materially Inaccurate, Misleading, and/or Incomplete .......... 61

2. The Offering Documents Misrepresented and/or Failed to Disclose that DouYu's Revenues Were Inflated by Insider "Wash" Transactions .......... 64

3. The Offering Documents Misrepresented and/or Failed to Disclose that Streamers Could and Were Actively Misrepresenting Themselves on DouYu's Platform .......... 77

4. The Offering Documents' Misstatements and Omissions Regarding Tencent ........ 83

5. The Offering Documents' Misstatements Concerning DouYu's Growth Trajectory ........ 88

6. The Offering Documents Violated the Requirements of Form F-1 and Regulation S-K ........ 89

D. The Market Learns of the Inaccurate, Misleading, and/or Incomplete Statements in the Offering Documents ........ 93

VII. EXCHANGE ACT ALLEGATIONS ........ 103

A. Exchange Act Defendants ........ 103

B. Exchange Act Substantive Allegations ........ 104

1. Yuchi and Lucky Draw Violated Chinese Law ........ 105

2. DouYu's Revenues Were Inflated by Streamers Who Purchased Yuchi to Give to Themselves ........ 112

3. Users Were Stunned to Learn that DouYu Streamers Were Completely Misrepresenting Their Appearances Online ........ 115

4. Tencent Had Been Planning Since *Late June 2019* to Make a Major Investment in Kuaishou ........ 118

5. Although DouYu Presented Itself as in Fine Financial Condition, It's Net Income Was Rapidly Decelerating ........ 123

C. The Exchange Act Defendants' Materially False and Misleading Statements Violation of The Exchange Act ........ 124

1. The Exchange Act Defendants Misrepresented and/or Failed to Disclose that Yuchi and/or Lucky Draw Violated China's Regulations in the Offering Documents, Press Releases, and Merger Agreement ........ 124

2. The Exchange Act Defendants Made Knowing or Reckless Misrepresentations in Offering Documents and Press Releases Regarding DouYu's Revenues ........ 130

3. The Offering Documents Misrepresented and/or Failed to Disclose that Streamers Could and Were Actively Misrepresenting Themselves on DouYu's Platform ........ 143

4. The Offering Documents' Misstatements and Omissions Regarding Tencent ........ 149

5. The Offering Documents' Misstatements Concerning DouYu's Growth Trajectory ........ 154

6. The Offering Documents Violated the Requirements of Form F-1 and Regulation S-K ........ 157

D. The Truth Slowly Emerges ........ 160

E. The Exchange Act Defendants' Scienter .......... 170

F. Loss Causation .......... 177

G. Applicability of Presumption of Reliance (Fraud-On-The-Market Doctrine) .... 181

VIII. PLAINTIFFS' CLASS ACTION ALLEGATIONS .......... 183

IX. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE .......... 186

X. SECURITIES ACT COUNTS .......... 186

COUNT I .......... 187

(Violations of Section 11 of the Securities Act Against the Securities Act Defendants) 187

COUNT II .......... 188

(Violations of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants and Defendants DouYu, Chen, and Su) .......... 188

COUNT III .......... 190

(Violations of Section 15 of the Securities Act Against the Individual Defendants, Tencent, and Cogency Global) .......... 190

XI. EXCHANGE ACT COUNTS .......... 191

COUNT IV .......... 191

(Violations of Section 10(b) of the Exchange Act Against the Exchange Act Defendants) .......... 191

COUNT V .......... 195

(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants (excluding Defendant Arthur) and Defendant Tencent) .......... 195

XII. PRAYER FOR RELIEF .......... 196

XIII. JURY TRIAL DEMANDED .......... 197

Lead Plaintiff Li Yunyan ("Plaintiff Li") and Plaintiff Heng Huang ("Plaintiff Huang," and together with Li, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys for their Third Amended Class Action Complaint ("Complaint") allege the following based upon personal knowledge as to themselves and each of their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by the defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding DouYu International Holdings Limited, analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Counsel for Plaintiffs has conducted extensive due diligence in preparation of this Complaint. Plaintiffs, among other things, retained the services of independent investigation firms with extensive investigative experience, which made significant efforts to identify, locate, contact, and interview former employees of the defendants with information potentially relevant to the allegations in this Complaint. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE AND SUMMARY OF THE ACTION

1. This is a federal securities class action that brings claims on behalf of two distinct classes of investors. *First*, this action brings claims on behalf of all persons or entities, other than the defendants, that purchased or otherwise acquired American Depositary Shares ("ADSs") of DouYu International Holdings Limited ("DouYu" or the "Company") pursuant and/or traceable to the Company's Registration Statement, effective July 16, 2019, and other Offering Documents (as

defined below) issued pursuant to same, in connection with the Company's July 16, 2019 initial public offering ("IPO" or "Offering") (the "Securities Act Class"). Plaintiffs bring these claims on behalf of the Securities Act Class to recover damages caused by the Securities Act Defendants' (as defined below) violations of the Securities Act of 1933 (the "Securities Act").

2. DouYu had initially filed a Form F-1 Registration Statement with the SEC for its IPO on April 22, 2019, which sought approval to sell approximately $500 million in ADSs for the Company to investors. After several amendments, on July 12, 2019, DouYu filed a Form F-1/A Amended Registration Statement with the SEC for Company's IPO, which was declared effective on July 16, 2019 (the "Registration Statement"). On July 18, 2019, DouYu filed a prospectus for the IPO on Form 424B4, which incorporated and formed part of the Registration Statement (collectively, the "Offering Documents"). As alleged herein, the Offering Documents for the IPO contained numerous statements about DouYu's business that were materially misleading, inaccurate, and/or incomplete.

3. These statements included assertions that (i) DouYu's virtual currency "Yuchi" could be transferred between users and/or redeemed for currency and DouYu's online "lucky draw" raffles did not comply with China's regulatory requirements; (ii) DouYu's revenues were based on purchases of gifts by DouYu "users" for the Company's video content producers, called "streamers, when in fact substantial DouYu revenues were *de facto* wash transactions where streamers bought virtual gifts for themselves using funds given to them by DouYu; and (iii) DouYu was taking steps to ensure the authenticity of its streamers, when in fact the streamers were completely misrepresenting their identities on DouYu's platform. In addition, other statements in the Offering Documents were misleading because the Offering Documents failed to disclose that, at the time of the IPO, (iv) Defendant Tencent was planning to invest over $1 billion in an upstart

rival of DouYu, Kuaishou, and to facilitate Kuaishou's entrance into the "eSports" market and challenge DouYu's leading position in China's live gaming market; and (v) DouYu was experiencing adverse financial trends. When the truth underlying each of these misleading statements was revealed to investors after the IPO, DouYu's share price plummeted. The Securities Act Defendants are liable for the materially misleading, inaccurate, and/or incomplete statements in the Offering Documents because they failed to conduct a reasonable investigation or possessed no reasonable basis for their belief that the statements in the Offering Documents were true.

4. *Second*, this action is brought by Plaintiff Huang on behalf of all persons and entities, other than Defendants, who purchased or otherwise acquired DouYu's ADSs during the period from July 17, 2019 to January 21, 2020, inclusive (the "Exchange Act Class" and the "Class Period," respectively). Plaintiff Huang brings these claims on behalf of the Exchange Act Class to recover damages caused by the Exchange Act Defendants' (as defined below) violations of the Securities Exchange Act of 1934 (the "Exchange Act").

5. As alleged herein, not only did the statements in the Offering Documents harm investors who had purchased DouYu's ADSs in the IPO, they also harmed investors who bought DouYu's shares in the secondary market after the IPO in reliance on those statements. Further, the Exchange Act Defendants made additional false and misleading statements in SEC filings, press releases, and a merger agreement on similar topics. When the truth underlying each of these false and misleading statements to investors who bought ADSs in the secondary market leaked out in the ensuing months, DouYu's ADS price plummeted, harming investors. The Exchange Act Defendants (as defined below) are liable for the materially false and misleading statements they are alleged to have made in violation of the Exchange Act because they made those statements with fraudulent intent and/or knowledge of or a reckless disregard for their truth.

6. Founded in 2014, DouYu is a video live streaming service or platform that runs on computers and/or through mobile applications ("apps") on smart phones and tablets. Live streaming technology lets an individual watch, create, and/or share videos in real time, and DouYu's platform allows individuals to broadcast, or "stream" videos over the Internet to DouYu's users. DouYu claims that it is "the largest game-centric live streaming platform in China and a pioneer in the eSports value chain." As of the end of Q1 2019, DouYu had 6.5 million registered streamers and 280 million registered users. Of DouYu's 6.5 million registered streamers, DouYu identified 6,500 as "top streamers" and 491,000 as streamers managed through talent agencies.

7. DouYu's revenue overwhelmingly comes from purchases of "virtual gifts" by DouYu's users for streamers. In Q1 2019, ***90.9%*** of the Company's revenue, or $468.8 million,[1] was from the sale of virtual gifts to users to give to streamers.

8. DouYu users purchase virtual gifts on the platform in two steps. First, users buy "Yuchi," DouYu's "virtual currency." One Yuchi costs approximately one RMB, or $0.15. DouYu's Offering Documents emphasized that Yuchi could be only purchased in specific places, could not be exchange for cash, and could not be transferred between users.

9. Second, once they have purchased Yuchi, users use that Yuchi to buy virtual gifts, which they give to streamers, a process not unlike when one tosses money in a street musician's instrument case. DouYu claims that its streamers generate enormous revenues for the Company because they foster delicate relationships with users that induce users to buy streamers virtual gifts.

[1] All references to monetary amounts in this Complaint are to United States dollars ("USD"), unless otherwise noted. Where amounts were reported by DouYu in Chinese yuan ("RMB"), those amounts have been converted to USD at a rate of RMB 6.7112 to USD 1.00, which is the rate used by DouYu in the Offering Documents.

DouYu passes 50% of the value of the virtual gifts the streamers receive to the streamers and keeps 50% of the value for itself. DouYu also paid salaries to certain popular streamers.

10. DouYu's platform also incentivizes users to purchase virtual gifts by offering "online lucky draws, raffles and other similar activities." One of DouYu's most popular contests was "Lucky Draw." Users played Lucky Draw by purchasing Yuchi, then using that Yuchi to purchase chance cards—*i.e.*, raffle tickets—to enter a drawing for virtual gifts, more Yuchi, or other prizes to give to streamers. A "winner" (or winners) was ostensibly selected at random. In other words, a user participated in Lucky Draw by buying a small gift, which could result in he or she being awarded a virtual prize worth thousands of RMB, or virtual currency worth up to tens of thousands of RMB. User spending on Lucky Draw generated roughly 10% of DouYu's total revenues as of the IPO.

11. DouYu is controlled by Defendant Tencent, a Chinese media conglomerate and the Company's largest shareholder. Prior to the IPO, DouYu and Tencent had entered into a strategic alliance to support DouYu's business and growth, which DouYu promoted in the Offering Documents. At the time of the IPO, it was believed that the only serious threat to DouYu's market dominance was Huya, another Chinese live streaming platform in which Defendant Tencent also held a large financial interest. While the two companies dominated live streaming in China, they had somewhat different demographics and revenue and profit models: DouYu focused on PC users; Huya had more mobile users.

12. DouYu's dominant market position was particularly valuable because of the Company's first mover advantage in the Chinese live gaming industry, and the relatively high

barriers to entry in the "eSports" market.[2] For example, like many online media platforms, the user ecosystem and content created and fostered by DouYu could not be matched without extraordinary financial resources and a stable of leading "streamers," or users who broadcast content on DouYu's platform. DouYu's tremendous growth rate, strategic partnership with Tencent, dominant market position, stable of top streamers, and the high barriers to entry in the live gaming industry were the Company's investment thesis or "elevator pitch." Accordingly, there factors were of material importance to DouYu's business, financial results and prospects, and thus the Company's investors.

**A. Securities Act Claims**

13. Plaintiffs' Securities Act claims arise out of DouYu's IPO. The Offering Documents for the IPO contained numerous statements about DouYu's business that were materially misleading, inaccurate, and/or incomplete. These statements in the Offering Documents were misleading because (i) DouYu's virtual currency "Yuchi" could be transferred between users and/or redeemed for currency and its Lucky Draw game did not comply with China's regulatory requirements; (ii) DouYu's revenues were inflated by *de facto* wash transactions where streamers made purchases of virtual gifts for themselves using funds that DouYu had paid to the streamers, and DouYu kicked back half of the purchase price to the streamers; (iii) certain of the Company's video content producers or "streamers" were misrepresenting their identities on DouYu's platform; (iv) at the time of the IPO, Defendant Tencent was planning to invest over $1 billion in an upstart rival of DouYu, Kuaishou, and to facilitate Kuaishou's entrance into the eSports market and challenge DouYu's leading position in China's live gaming market; and (v) DouYu was

[2] As alleged in further detail herein, streams of gamers playing video games, either by themselves, against other gamers, or in tournaments, are collectively known as "eSports."

experiencing adverse financial trends at the time of the IPO. When the truth was revealed to investors after the IPO, DouYu's share price plummeted.

14. For example, the Offering Documents assured investors that DouYu's virtual currency, Yuchi, was lawful under Chinese law because it could not "***be converted back to cash or be transferred between users***."[3] In addition, the Offering Documents touted DouYu's "Lucky Draw" raffle, which, DouYu asserted, was legal because it did not constitute gambling under Chinese law. The Offering Documents failed to disclose, however, that users were in fact regularly exchanging Yuchi for cash and transferring the currency between each other, that interactive gaming features like Lucky Draw were nothing more than improper gambling, and thus that both the virtual currency and game violated China's regulations.

15. DouYu's Offering Documents also touted to investors the Company's increasing revenues, as well as that the Company had reported the first profitable quarter in its history in Q1 2019, when it reported $2.7 million in "net income," *i.e.*, profits. The Offering Documents did not disclose, however, that streamers routinely made large purchases of virtual gifts, including by using the money they received from DouYu, and then gave those gifts to themselves, after which they received or were "kicked back" 50% of the value of those purchases. These purchases—akin to wash transactions—were intended to artificially create the impression that the streamer was more popular than he or she actually was, allow the streamer to appear to fulfill monthly traffic requirements set by DouYu, and allow DouYu to represent that it had larger numbers of transactions and revenues from interactions between users and other streamers than the Company actually did.

[3] All emphases in this complaint have been added except where otherwise noted.

16. The Offering Documents also emphasized the integral role that relationships between users and streamers played in the company's business, stating that "top streamers can inspire a large fan base of viewers ***with their* [i.e., *the streamers'] superior skillsets and passionate personality, and generate significant monetization opportunity and user engagement***." The Offering Documents also cautioned investors that if anything were to damage the streamer-user relationship, or if "***our streamers fail[] to keep our users engaged on our platform over a long period of time***," the Company's business prospects would suffer. The Offering Documents failed to disclose however, that some of DouYu's streamers—including the Company's top streamers—were misrepresenting themselves to users, which created the material risk that users would leave the platform when they discovered that the streamers were not who they purported to be.

17. In addition, the Offering Documents failed to disclose that at the time of the IPO, Defendant Tencent was planning to invest over $1 billion in an upstart rival of DouYu, called "Kuaishou," and to facilitate Kuaishou's entrance into the eSports market to challenge DouYu's leading position in China's live gaming market. By the end of 2019, Tencent's investment in Kuaishou grew to $2 billion, transforming the former bit player in the live game streaming market into a serious competitive threat for DouYu. Not only did the Offering Documents for the IPO fail to disclose this essential information to investors, but the Offering Documents also represented that DouYu "***benefit[s]*** from the strong capabilities and support of Tencent, [DouYu's] major shareholder and strategic partner, in live streaming, advertisement and game distribution." The Offering Documents further claimed that Tencent's support "***helps reinforce and solidify [DouYu's] position as a leading game-centric live streaming platform in China***" and that DouYu would "***further solidify [its] strategic cooperation with Tencent in the future.***"

18. DouYu had initially filed a Form F-1 Registration Statement with the SEC for its IPO on April 22, 2019, which sought approval to sell approximately $500 million in ADSs for the Company to investors. After several amendments, on July 12, 2019, DouYu filed a Form F-1/A Amended Registration Statement with the SEC for Company's IPO, which was declared effective on July 16, 2019. The Registration Statement increased the amount of capital the Company sought to raise from $500 million to $639 million on the basis that the Company's net income had rocketed up in Q1 2019. In fact, the Offering Documents reported that while DouYu had experienced a ***net loss*** for Q4 2018 of approximately $40.4 million, the Company reported net ***income*** of $2.7 million in Q1 2019. Indeed, Q1 2019 was the Company's ***first-ever profitable quarter***, and the increase in net income represented a quarter-over-quarter increase of 106.67%.

19. On July 18, 2019, DouYu filed a prospectus for the IPO on Form 424B4, which incorporated and formed part of the Registration Statement, *i.e.*, the Offering Documents, offering to sell to the public 67.3 million DouYu ADSs at a price of $11.50 per ADS. Defendants ultimately raised approximately $774 million in gross offering proceeds using the misleading, inaccurate, and/or incomplete Offering Documents.

20. In the weeks following the IPO, investors learned the truth about Yuchi and Lucky Draw, streamers' purchases of virtual gifts for themselves and misrepresentation of their identities, Tencent's plans for Kuaishou, and that, contrary to the rosy picture painted in the Offering Documents, the Company's growth was shockingly decelerating.

21. *First*, on July 18, 2019, within hours of the IPO, Beijing News published an article entitled "Kuaishou Will Receive Investment from Tencent, and Live Game Streaming Becomes Its 'Weapon' to Tackle Southern Market." This article revealed for the first time that as it was helping DouYu plan its IPO, Tencent was concurrently planning to make a substantial investment

in Kuaishou so that Kuaishou could become a direct competitor of DouYu and threaten DouYu's dominance in online gaming and eSports.

22. *Second*, on July 30, 2019, the BBC and other media outlets reported that a prominent DouYu streamer, who purported to a 20-year-old girl, was in fact a middle-aged woman, which outraged her followers and resulted in the Company shutting down her stream and a mass exodus of the users who supported her from the platform.

23. *Third*, on August 11–12, 2019, Bloomberg published an article that disclosed that DouYu's revenues were inflated by streamers' purchases of gifts for themselves—including a $3.15 million purchase by a single streamer, an amount larger than *the net income the Company purported to have realized in Q1 2019*, on which Defendants *had raised an additional $274 million from investors*.

24. *Fourth*, on August 13, 2019 DouYu reported net income for Q2 2019 of only $3.4 million, reflecting a quarter-over-quarter increase of only ***27.5%***—in stark contrast with the ***106.67%*** in Q1 2019, which reflected a shockingly rapid deceleration in growth. Although Q2 2019 had ended only 17 days before the IPO, the Offering Documents did not disclose the Q2 2019 results or otherwise reveal this significant deceleration.

25. *Fifth*, in October 2019, investors learned from a J.P. Morgan analyst report that DouYu's revenues had stalled in part because the Company had deactivated Lucky Draw for several weeks after public reports that the games were nothing more than gambling and because users were exchanging Yuchi for money and/or between themselves.

26. The price of the Company's ADSs plummeted after each of the above disclosures. In fact, after the IPO, the market price of DouYu ADSs sold in the Offering plummeted in value, trading as low as $6.11 per ADS – or ***47% below*** the IPO price.

27. As set forth below, the Securities Act Defendants failed to conduct a reasonable investigation or possessed no reasonable basis for their belief that the statements in the Offering Documents about (i) Yuchi and Lucky Draw, (ii) streamers' purchases of virtual gifts for themselves, (iii) streamers' misrepresentations of themselves to users, (iv) Tencent support for DouYu, and (v) the Company's decelerating performance was true. As a result, Plaintiffs and the Securities Act Class have suffered significant losses and damages.

**B. Exchange Act Claims**

28. Plaintiffs' Exchange Act claims also arise out of the above statements in the Offering Documents, on which investors relied purchasing DouYu's ADSs in the shares' secondary market after the IPO. In addition, the Exchange Act Defendants other false and misleading statements on similar topics in the Class Period in SEC filings, press releases, and a merger agreement.

29. For example, on August 13, 2019, the Company issued a press release, which was also filed with the SEC, disclosing its financial performance for Q2 2019. The press release, among other things, attributed the Company's performance to "***the Company's optimization of its platform's interactive features and continuous refinement of its event models, both of which helped to further cultivate users' paying habits***." By attributing the Company's performance to its platform's "interactive features" cultivation of users' "paying habits," the Exchange Act Defendants took on an obligation to disclose that the Company's performance was also the result of illegal conduct, namely its use of Yuchi, which could be exchanged for cash and between users, and Lucky Draw constituted illegal gambling, each of which violated Chinese law. Defendants violated this duty by failing to disclose that the Company's performance was boosted by illegal conduct.

30. Likewise, a merger agreement filed by DouYu with the SEC in October 2019 represented that neither it "***nor any of its Subsidiaries is or has been in material violation of any Law applicable to DouYu***." This, however, was also false and misleading because in August 2019, Defendants had been forced by the Chinese government to deactivate Lucky Draw because it constituted illegal gambling and because users were exchanging Yuchi won in Lucky Draw for cash, both in violation of Chinese regulations.

31. The Exchange Act Defendants made these and other fraudulently false and misleading statements in the Offering Documents, press releases and merger agreement with actual knowledge or reckless disregard to their truth.

32. For example, Defendant Shaojie Chen, DouYu's founder and chief executive officer confirmed to investors on an earnings call that the Company's management had collectively agreed to deactivate Lucky Draw, *i.e.*, knew that the game constituted illegal gambling. In addition, in a news article published shortly after the IPO, Defendant Chen confirmed that the Company knew that its streamers purchased substantial amounts of Yuchi to use to give virtual gifts to themselves. Finally, Defendant Tencent plainly was planning to invest in DouYu in the lead-up to the IPO, because Tencent granted Kuaishou special access to a Tencent-owned application that would give Kuaishou a pronounced competitive advantage less than a month prior to the IPO.

33. When the truth underlying these and other false and misleading statements made by the Exchange Act Defendants leaked out in the ensuing months, DouYu's share price plummeted, harming investors. The Exchange Act Defendants thus are liable for their false and misleading statements under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder because they made those statements knowingly, recklessly, and or with fraudulent intent.

34. As a result of the Exchange Act Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities following corrective disclosures, Plaintiff Huang and the Exchange Act Class have suffered significant losses and damages.

## II. <u>Jurisdiction and Venue</u>

35. The Securities Act claims asserted herein arise under and pursuant to Sections 11, 12 and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o). This Court has jurisdiction over the subject matter of the Securities Act claims in this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

36. Venue is proper in this Judicial District for the Securities Act claims asserted herein pursuant to 28 U.S.C. § 1391(b) and Section 22(a) of the Securities Act (15 U.S.C. §77v(a)), as the Company's IPO was marketed in this District.

37. In connection with the acts, conduct and other wrongs alleged herein under the Securities Act, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the U.S. mails, interstate telephone communications, and the facilities of a national securities exchange.

38. The Exchange Act claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of the Exchange Act claims in this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

39. Venue is proper in this Judicial District for the Exchange Act claims asserted herein pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this

Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

40. In connection with the acts, conduct and other wrongs alleged herein under the Exchange Act, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the U.S. mails, interstate telephone communications, and the facilities of a national securities exchange.

## III. Parties

41. Lead Plaintiff Li Yunyan, as set forth in the certification accompanying the Declaration of Jennifer Pafiti in support of Yunyan's Motion for Consolidated of Related Actions, Appointment as Lead Plaintiff and Approval of Lead Counsel, *see* Declaration of Jennifer Pafiti, *In re DouYu International Holdings Limited Securities Litigation*, No. 1:20-cv-07234-ALC (May 26, 2020 S.D.N.Y.), ECF No. 33, incorporated by reference herein, and Exhibit A attached hereto to this complaint, purchased DouYu ADSs at artificially inflated prices from Defendant Morgan Stanley in the Company's IPO and was damaged thereby.

42. Plaintiff Heng Huang, as set forth in the certification accompanying the filing of his initial complaint in the action captioned *Huang v. DouYu International Holdings Limited*, No. 2:20-cv-03914-SVW-MAA (C.D. Cal. Apr. 29, 2020), ECF No. 1, incorporated by reference herein, purchased DouYu ADSs at artificially inflated prices pursuant and/or traceable to the Company's IPO and was damaged thereby. Heng Huang also purchased or otherwise acquired DouYu ADSs at artificially inflated prices in the secondary market during the Class Period and was damaged by Defendants' false and misleading statements made during the Class Period.

43. Defendant DouYu is purportedly one of the People's Republic of China's ("PRC" or "China") top live-streaming video-game platforms. Operating on PC and mobile applications, DouYu enables users to enjoy immersive and interactive games and live streaming of

entertainment. DouYu's ADSs sold in the IPO trade on the NASDAQ under the ticker symbol "DOYU." Every DouYu ADS represents ten ordinary shares of the Company. DouYu reaped proceeds of approximately $493 million from the IPO (before expenses), with another $245 million in proceeds going to certain of DouYu's "selling shareholders" (including the Company's co-CEO, Defendant Wenming Zhang).

44. Defendant Shaojie Chen ("Chen") founded DouYu and served, at all relevant times, as a director on DouYu's Board of Directors (the "Board") and as the Company's Chief Executive Officer ("CEO"). Prior to the IPO, Defendant Chen owned 4,323,857 DouYu ordinary shares, or approximately 15.4% of the Company's total outstanding stock. Defendant Chen reviewed, contributed to, and signed the Offering Documents. Defendant Chen participated in the preparation and dissemination of the Offering's "roadshow," *i.e.*, presentation to investors soliciting their purchases of ADSs in the Offering, as well as the roadshow's talking points and script. Defendant Chen participated in making materially inaccurate, misleading, and/or incomplete statements during the road show presentation. Defendant Chen was motivated by his desire to serve his own financial interests, which would be enhanced by the outcome of the Offering.

45. Defendant Wenming Zhang ("Zhang") co-founded DouYu and served, at all relevant times, as a director on the Board and as DouYu's co-CEO. Prior to the IPO, Defendant Zhang owned 892,402 DouYu ordinary shares, or approximately 3.2% of the Company's total outstanding stock. Defendant Zhang sold 345,575 DouYu ordinary shares in the IPO. Defendant Zhang reviewed, contributed to, and signed the Offering Documents.

46. Defendant Chao Cheng ("Cheng") served, at all relevant times, as DouYu's Chief Operational Officer ("COO"). Defendant Cheng reviewed, contributed to, and signed the Offering Documents.

47. Defendant Mingming Su ("Su") served, at all relevant times, as DouYu's Chief Strategy Officer and as a director on the Board. Defendant Su reviewed, contributed to, and signed the Offering Documents. Defendant Su participated in the preparation and dissemination of the Offering's road show, as well as the roadshow presentation, talking points, and script. Defendant Su participated in making materially inaccurate, misleading, and/or incomplete statements during the roadshow. Defendant Su was motivated by his desire to serve his own financial interest, which would be enhanced by the outcome of the Offering.

48. Defendant Hao Cao ("Cao") served, at all relevant times, as DouYu's Vice President and as a director on the Board. Defendant Cao reviewed, contributed to, and signed the Offering Documents.

49. Defendant Ting Yin ("Yin") served, at all relevant times, as both an employee of Defendant Tencent Holdings Limited ("Tencent") and as a director on DouYu's Board. Tencent exercises control over DouYu, including with respect to the misstatements at issue here. Before the IPO, Tencent held 43.1% of DouYu's equity and was DouYu's largest shareholder. Defendant Yin reviewed, contributed to, and signed the Offering Documents on her behalf and at the behest of Defendant Tencent. Defendant Yin was motivated by the financial implications of the Offering, given her status as a current employee of Defendant Tencent, which she joined in January 2014, held an aggregate 37.2% of DouYu's outstanding ordinary shares, representing 37.2% of DouYu's total voting power, at the time of the IPO.

50. Defendant Haiyang Yu ("Yu") served, at all relevant times, as both an employee of Defendant Tencent and as a director on DouYu's Board. Defendant Yu reviewed, contributed to, and signed the Offering Documents on his behalf and at the behest of Defendant Tencent. Defendant Yu was motivated by the financial implications of the Offering, given his status as a

current employee of Defendant Tencent, which he joined in August 2011, held an aggregate 37.2% of DouYu's outstanding ordinary shares, representing 37.2% of DouYu's total voting power, at the time of the IPO.

51. Defendant Xi Cao ("X. Cao") served, at all relevant times, as a director on the Board. Defendant X. Cao reviewed, contributed to, and signed the Offering Documents.

52. Defendant Xuehai Wang ("Wang") was a director appointee of the Board at the time of the IPO. Defendant Wang consented to the F-1/A.

53. Defendant Zhaoming Chen ("Z. Chen") was a director appointee of the Board at the time of the IPO. Defendant Z. Chen consented to the F-1/A.

54. Defendant Zhi Yan ("Yan") was a director appointee of the Board at the time of the IPO. Defendant Yan consented to the F-1/A.

55. Defendant Richard Arthur ("Arthur") served as Assistant Secretary on behalf of Defendant Cogency Global Inc. ("Cogency Global"), the designated U.S. representative of Defendant DouYu, and reviewed, contributed to, and signed the Offering Documents.

56. Defendants Chen, Zhang, Cheng, Su, Cao, Yin, Yu, X. Cao, Wang, Z. Chen, Yan, and Arthur are collectively referred to herein as the "Individual Defendants."

57. Each of the Individual Defendants:

a) Participated in the preparation of and signed (or authorized the signing of) the Offering Documents, including the Registration Statement and/or an amendment thereto, and the issuance of the Offering Documents, including the Registration Statement;

b) directly participated in the management of the Company;

c) was directly involved in the day-to-day operations of the Company at the highest levels;

d) was privy to confidential proprietary information concerning the Company and its business and operations;

e) was involved in drafting, producing, reviewing and/or disseminating the materially false, inaccurate, misleading, and/or incomplete statements and information alleged herein;

f) approved or ratified these statements in violation of the federal securities laws.

58. DouYu is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

59. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and/or incomplete Offering Documents. Morgan Stanley served as a representative of all the underwriters. Morgan Stanley also participated in conducting and promoting the Offering. Morgan Stanley's participation in the solicitation of the Offering was motivated by its financial interest. Defendant Morgan Stanley conducts business in New York.

60. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and/or incomplete Offering Documents. J.P. Morgan served as a representative of all the underwriters. J.P. Morgan also participated in conducting and promoting the Offering. J.P. Morgan's participation in the solicitation of the Offering was motivated by its financial interest. Defendant J.P. Morgan conducts business in New York.

61. Defendant BofA Securities, Inc. ("BofA") was an underwriter for the IPO, serving as a financial adviser for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and/or incomplete Offering Documents. BofA served as a

representative of all the underwriters. BofA also participated in conducting and promoting the Offering. BofA's participation in the solicitation of the Offering was motivated by its financial interest. Defendant BofA conducts business in New York.

62. Defendant CMB International Capital Limited ("CMBI") was an underwriter for the IPO, serving as a financial adviser for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and/or incomplete Offering Documents. By serving as a financial adviser for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and/or incomplete Offering Documents, and by causing its name to appear on the cover of the Offering prospectus, CMBI purposefully availed itself of the privilege of doing business in the United States and in this judicial district. CMBI knew that the Offering Documents were made to comply with the laws governing securities offerings in markets in the United States and that they would be used and relied upon by investors in the United States. CMBI thus could reasonably foresee that it would be haled into court in the United States and this judicial district.

63. Defendants Morgan Stanley, J.P. Morgan, BofA, and CMBI are collectively referred to herein as the "Underwriter Defendants."

64. Defendant Tencent operates as an investment holding company. Tencent, through its subsidiaries, provides Internet and mobile value-added services, online advertising, and e-commerce transactions. Tencent offers services to users worldwide, including in the United States, where its headquarters are located at 2747 Park Boulevard, Palo Alto, California 94306. Tencent exercises control over DouYu, including with respect to the misstatements at issues here. At the time of the IPO, DouYu and Tencent, through their respective PRC affiliated entities, were parties to an amended and restated strategic cooperation framework memorandum dated April 1, 2019.

By causing Defendants Yin and Yu to sign the Offering Documents at its behest, Tencent purposefully availed itself of the privilege of doing business in the United States and in this judicial district. Tencent knew that the Offering Documents were made to comply with the laws governing securities offerings in markets in the United States and that they would be used and relied upon by investors in the United States. Tencent thus could reasonably foresee that it would be haled into court in the United States and this judicial district.

65. The Offering Documents repeatedly touted the benefits of Tencent's strong capabilities and support to DouYu, calling Tencent a "major shareholder and strategic partner," particularly "in live streaming, advertising and game distribution, which helps reinforce and solidify [DouYu's] position as a leading game-centric live streaming platform in China[,]" and affirmed its intent to "further solidify [DouYu's] strategic cooperation with Tencent in the future." As a result, DouYu was, and remains, motivated by the desire to maintain a beneficial relationship with Tencent.

66. Likewise, Tencent was motivated by the financial implications of the Offering given its investment in DouYu to date. Before the IPO, Tencent held 43.1% of DouYu's equity and was the Company's the largest shareholder. DouYu founder and CEO Shaojie Chen holds 15.4%, and DouYu co-founder and co-CEO Wenming Zhang holds 3.2%. More specifically, at the time of the IPO, Tencent held 3,125,000 DouYu Series B-2 Preferred Shares, 1,114,376 DouYu Series C-l Preferred Shares, and 7,828,728 DouYu Series E Preferred Shares, through its wholly owned subsidiary, Nectarine.

67. According to the Offering Documents, upon completion of the Offering, Nectarine will hold an aggregate 37.2% of DouYu's outstanding ordinary shares, representing 37.2% of the Company's total voting power, assuming the underwriters do not exercise their over-allotment

option. "As a result," according to the Offering Documents, "Tencent has substantial influence over [DouYu's] business." Furthermore, Tencent, through Nectarine, has the right to appoint up to two directors as long as it beneficially owns no less than 33% of the shares it beneficially owned immediately prior to the completion of the Offering and exercised its influence over DouYu by appointing two employees to DouYu's Board. As indicated above, Defendants Yu and Yin currently work at Tencent, having joined Tencent in August 2011 and January 2014, respectively, and both signed the Offering Documents necessary to effectuate the Offering on their own behalves and at the behest of Defendant Tencent. Tencent is directly liable pursuant to the doctrine of *respondeat superior* for the misstatements of its employees Yu and Yin. Defendant Tencent was a "control person" of DouYu within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act, including with respect to the materially untrue, misleading, and incomplete statements at issue here.

68. Tencent further maintained and cemented its control over DouYu through a variety of shareholder agreements that provided Tencent with power over DouYu and its affairs far in excess of the voting power of Tencent's shares in the Company. These agreements included: (a) a strategic cooperation agreement; (b) a share purchase agreement; and (c) a shareholders' agreement. These agreements provided Tencent with numerous rights and powers over DouYu, including, inter alia, the right to force DouYu to register the DouYu shares held by Tencent to allow for their sale in a public offering, and access-to-information and inspection rights that gave Tencent extensive abilities and powers to review non-public information about DouYu and its affairs. For example, DouYu was required to deliver to Tencent its combined and consolidated financial statements, and any other documents or information sent to any regulatory body or government authority. In addition, Tencent was entitled to inspect and review DouYu's facilities,

properties, records, books, and accounts, and DouYu was required to cooperate with Tencent and its advisors in connection with Tencent's audit of DouYu's accounts.

## IV. Confidential Witnesses[4]

69. CW1 was a DouYu streamer from December 2018 to May 2019.

70. CW2 was a DouYu streamer from May 2019 to December 2019 and later a DouYu agent from December 2019 to June 2020.

71. CW3 is a financial analyst who has had a DouYu account for the past five years.

72. CW4 was a Senior Auditor at DouYu from February 2018 to February 2020. CW4 was responsible for reviewing videos, audios, and posts of live broadcast on DouYu's platform, including games, shows, and IRL streamers.

73. CW5 was a DouYu streamer from August 2018 to February 2020.

74. CW6 worked for DouYu as a content reviewer from January 2016 to August 2019 and oversaw a team of 500 reviewers.

75. CW7 worked for DouYu as a contract streamer from July/August 2017 to approximately April 2021. CW7 first signed a contract with DouYu, after which DouYu transferred him to a talent agency, with whom she signed additional contracts and renewals to act as a DouYu streamer.

76. CW8 worked as a DouYu IRL streamer from April 2019 to May 2020. CW8 signed a contract directly with DouYu to a be a streamer initially, and then signed a contract with a talent agency to act as a DouYu streamer.

77. CW9 is a journalist based in China who researched and wrote on DouYu for a China-based financial news website.

---

[4] All confidential witnesses ("CWs") is referred to in the feminine to protect her identity.

## V. COMMON ALLEGATIONS

### A. Background

78. DouYu began operating in 2014 when it was spun off from Shanda Interactive, one of the largest online gaming companies in China. DouYu's name translates to "fighting fish." Defendants Chen and Zhang left Shanda to run DouYu, which largely operates in Asia.

79. DouYu is a video live streaming service or platform that runs on computers and/or mobile applications or "apps" on smart phones and tablets. Live streaming technology lets an individual watch, create, and/or share videos in real time, and DouYu's platform allows individuals to broadcast, or "stream" videos over the Internet to DouYu's users, who watch them. Users who broadcast content on DouYu's platform are called "streamers."

80. DouYu recruits and engages streamers in three ways: (1) exclusive contracts that the Company entered into directly with streamers; (2) contracts the Company entered with "talent agencies" who manage streamers; and (3) users who registered on the Company's platform as streamers.

81. DouYu has far more users who view content than streamers. According to the Offering Documents, the Company had 280.9 million registered users as of March 31, 2019. By comparison, as of the same date, DouYu had only 6.5 million streamers.

82. DouYu's business is driven by 6,500 streamers (both IRL streamers and gamers) that the Company calls its "top streamers." As of March 31, 2019, DouYu had exclusive contracts with those 6,500 top streamers. DouYu also had 491,000 streamers that were managed through talent agencies. Finally, DouYu had just over 6 million additional registered streamers.

83. Although, as of March 31, 2019, DouYu's top streamers made up only ***one-tenth of one percent*** of its streamers, they were responsible for ***61.2%*** of the Company's live streaming revenue.

84. In general, there are two types of streamers: (i) "gamers," who stream videos of themselves playing video games; and (ii) "IRL streamers," who stream videos of themselves going through their daily lives, including performing daily tasks, answering questions, singing, dancing, etc.

85. China is the largest game-live broadcasting ("gaming") market in the world, representing 46% of the global market. Indeed, the dollar value of China's gaming market is 25% larger than that of the United States, with three times the number of gamers. Within this market, eSports games are key drivers. (Streams of gamers playing video games, either by themselves, against other gamers, or in tournaments, are collectively known as "eSports.") The popularity of eSports has exploded in recent years. According to a report commissioned by DouYu from iResearch Consulting Group (the "iResearch Report"), China's eSports market alone is expected to grow at a rate of 24.7% per year to reach $5.8 billion by 2023.

86. In the Offering Documents, DouYu claimed to be "the largest game-centric live streaming platform in China and a pioneer in the eSports value chain." DouYu based this claim on the iResearch Report, which stated that DouYu had the largest average total monthly active users ("MAUs")[5] "on both mobile and PC platforms in the first quarter of 2018 and 2019"; the longest "average total daily time spent by active users in the first quarter of 2018 and 2019"; and the most "top 100 games streamers . . . contracted in December 2018 and March 2019."

87. In addition to allowing its users to play various eSport video games online with other users, "streaming" platforms, including DouYu, also provide video game fans with the ability to watch their favorite professional eSport players, via live-stream video, compete in a wide variety

[5] DouYu defines Monthly Active Users as the number of unique users on DouYu's platform in a month or 30-day period. DouYu states that it does not count an individual user more than once in a 30-day period, regardless of how often the user interacts with DouYu's platform.

of eSports events. These events can range from high profile (and heavily watched) tournaments to more "ordinary" live-streamed content showing professional player-hosts playing against a computer or other online players. DouYu, along with other streaming platforms thus effectively serve as the major distribution channels for eSport content, similar to ESPN's role as a major distribution channel for traditional sports. Top eSport games in China include LoL, Peacekeeper Elite, and HoK, which generate roughly 50% of total traffic.

88. Watching eSport competitions has been analogized to watching football games on television—except that the biggest eSport tournaments (such as the championship LoL tournament) now draw millions more viewers than the NFL's Super Bowl. Thus, like traditional sports, a huge number of eSport users do not play the games themselves, but simply enjoy watching the top professional streamers play the game.

89. In contrast to broadcasters or distributors of traditional sports content, live-stream gaming providers, such as DouYu, also provide their users with the ability to engage electronically with the live onscreen gaming action and eSport streamers who play the games and "host" their own live-streamed gaming sessions. For example, eSport fans can engage in real-time commentary (or "bullet chat") during eSport competitions, whereby their comments are livestreamed to all other viewers in a screen window adjacent to the main window on which the game play is being broadcast. Other windows on the user's screen may live-stream video of the streamer playing the game, with the streamer typically sitting in front of their computer and wearing a headset microphone (which they can use to provide simultaneous narration and game commentary while playing). Based on their playing skill, personality, and overall ability to engage with their viewers, popular eSport streamers can develop significant fan followings.

**B. <u>Huya</u>**

90. Although, at the time of its IPO, DouYu claimed to have more MAUs, longer "average total daily time spent by active users," and a larger number of "top 100 games streamers," DouYu lagged its chief rival, "Huya," in revenues. Huya is another Chinese game-streaming platform, and its name loosely translates to "tiger's teeth." While most DouYu users accessed DouYu's platform via PCs, Huya had more mobile users. Mobile users tend to be more profitable for live streaming companies, particularly eSports vendors, because they have higher monetization rates than PC users.

91. Huya went public over a year before DouYu, successfully launching an IPO of ADSs on the New York Stock Exchange in May 2018 that raised $180 million. A year later, in April 2019, Huya launched a secondary offering of ADSs that raised a an additional $327 million. Although Huya had far fewer MAUs (unique monthly active users), it was able to go public before DouYu at least in part because it reported substantially more paying users—users who actually spent money on the platform, as opposed to just watching streams—and more revenue. For example, in 2018, while Huya reported only 100 million average MAUs, DouYu reported ***36.4% more*** average MAUs, or 136.4 million. However, during the same period, Huya reported $678.3 million in revenue and 4.8 million paying users, while DouYu reported only $544.5 million in revenue and 3.8 million paying users, or approximately ***21% less*** than each of revenues and users than Huya.

92. Huya was also buoyed by tremendous growth. For example, in its fiscal 2018, Huya increased its net revenues by 113% to $661.6 million and increased its gross profits by 186% to $108.6 million. In addition, shortly before DouYu's IPO, Huya reported that its average MAUs reached 123.8 million, that its average mobile MAUs had reached 53.9 million, and that its total paying users had reached 5.4 million in the first quarter of 2019. Huya also reported a sharp 108.6%

increase in its gross profits to $40.7 million and a 16.8% increase in its gross margins. Similarly, Huya's net income increased 102% to $9.5 million, and its adjusted net income increased 94% to $19.6 million during the quarter.

93. The fact that DouYu lagged in these financial performance metrics behind Huya was a significant concern for investors. For example, when DouYu initially announced its IPO in April 2019, S&P Global Market Intelligence published a reported entitled, "Analysts: Chinese livestreaming platform DouYu will lag HUYA despite IPO filing." In the article, analyst Arun George pointedly observed, "***HUYA is simply a better business as it has superior growth, margins and cash generation than DouYu***. I don't see the situation dramatically changing post-IPO as DouYu's underperformance was not due to lack of funds."

94. Huya's popularity and success in monetizing users and generating mobile MAUs meant that it was very important to potential IPO investors that DouYu also be able to show and sustain very high growth and improved profitability. In the lead up to the IPO, it appeared that this was, in fact, occurring. DouYu reported a year-over-year increase in net revenues of 94% for 2018, $544.5 million. As reported in the Offering Documents, this strong performance purportedly continued in the first quarter of 2019, resulting in further reported sequential revenue growth and allowing DouYu to report its first net income—*i.e.*, profit—of $2.7 million ever in a fiscal quarter.

**C. Kuaishou**

95. In the lead-up to the IPO, another live-streaming company, Kuaishou (which translates as "Fast Hand"), was also increasing its share in the live video market and active user base. However, Kuaishou had historically focused on live streaming short videos (rather than eSports) and catered to rural areas of China. Its growth had been supported by rounds of private financing in 2018, which included Tencent's acquisition of a relatively small 5.5% interest in the company.

96. Given its relatively small eSports presence, Kuaishou was not viewed by prospective IPO investors as a major competitive threat to DouYu (or Huya) because, among other things, Tencent had invested far more money in DouYu (and Huya) than in Kuaishou, Kuaishou was not a major player in the eSports industry, and Kuaishou's line-up of streamers in less popular games, such as "King's Glory" and "PlayerUnknown's Battleground," was not nearly as valuable as DouYu's much larger roster of top streamers in the much more popular games where DouYu was the leader (such as LoL, Peacekeeper Elite, and HoK, which alone generated roughly 50% of total gaming traffic). For example, according to Xiaohulu, a third-party game live broadcasting data tracker, as of the IPO, Kuaishou had only one streamer among the top ten most profitable streamers and only six among the top 100—while DouYu and Huya combined had nine of the top ten and 73 of the top 100. In addition, DouYu's exclusive top streamers accounted for 61.2% of its total live streaming revenue for the first quarter of 2019.

**D. <u>DouYu's Revenues</u>**

97. Like other live-streaming companies, DouYu's three main sources of revenue (or "monetization" channels) are (a) live streaming revenue from users; (b) ad revenue from advertisers; and (c) "other revenue." Live streaming accounts for the vast majority of DouYu's revenues, contributing over 86% of the Company's total net revenues for 2018.

98. DouYu's advertising revenue is derived from payment from advertisers for the placement of ads that appear on its users' screens and for promotional commentary made during live streaming. "Other revenue" is mainly game distribution revenue from third-party developers. For example, DouYu will allow a developer's games to be displayed on (and downloaded from) DouYu's platform and will then collect fees from the developer based on any in-game amounts spent by the user while playing the developer's downloaded game.

99. Notwithstanding ad revenue and "other revenue," DouYu's revenue overwhelmingly comes from purchases of "virtual gifts" by users for streamers. According to the Offering Documents, 77.7% of the Company's revenue in 2016, 80.7% of its revenue in 2017, 86.1% of its revenue in 2018, and 90.9% of its revenue for Q1 2019 were "mainly from the sale of virtual gifts." In addition to paying for "virtual gifts" (including through Lucky Draw), DouYu users could also use their virtual currency to purchase monthly premium subscription services, which DouYu treated as revenue from its "live streaming" channel.

100. DouYu users purchase virtual gifts on the platform in two steps. First, users buy "Yuchi," DouYu's "virtual currency."[6] One Yuchi costs approximately one RMB, or $0.15. According to DouYu, users can purchase Yuchi on the Company's live streaming platform, "make in-app purchases using third-party payment channels such as WeChat pay, Alipay and Apple's App Store, or purchase Yuchi from our flagship store on Tmall.com." DouYu claims the price of Yuchi does not change and Yuchi does not expire.

101. Second, once they have purchased Yuchi, users use Yuchi to buy virtual gifts, which they give to streamers. This process is not unlike when one places money in a street musician's instrument case. DouYu records the entire value of the gift as revenue.[7] DouYu then pays the streamer a portion of the value of the virtual gift (usually 50% of the value), which is generally how streamers earn income.

---

[6] A "virtual currency" is a type of unregulated digital currency that is not issued or controlled by a central bank. The most prominent example of a virtual currency is Bitcoin, a currency that was created in 2009 by an unknown person using the alias Satoshi Nakamoto. Live streaming companies in China like DouYu have their users purchase virtual gifts for streamers using virtual currencies.

[7] DouYu records unredeemed Yuchi as deferred revenue.

102. Although DouYu's business model is the Internet equivalent of tossing coins to buskers, when viewed collectively, DouYu claims that an enormous amount of money changes hands from users to streamers via purchases of Yuchi and virtual gifts. For example, DouYu reported $544.5 million in revenue in 2018, ***$468.8 million*** of which was "primarily derived from the sales of a wide array of virtual gifts."

**E. <u>DouYu's "Top Streamers" Drive Purchases of Virtual Gifts</u>**

103. DouYu's revenues overwhelming depend on the performance of its "top streamers." As alleged above, although, as of March 31, 2019, DouYu's 6,500 top streamers comprised only ***one-tenth of one percent*** of the Company's 6.5 million streamers, those top streamers were responsible for ***65.8%*** of "total viewership in terms of viewing hours" and ***61.2%*** of the "total live streaming revenue generated from [DouYu's] platform" in Q1 2019.

104. The Offering Documents emphasized that DouYu's top streamers were "the bedrock of our platform and have contributed vastly to user attraction and retention and revenue generation," and that one of the Company's "Strengths" was its "[d]eep pool of top streamers empowered by a comprehensive streamer development system."

105. The Offering Documents also took pains to explain in detail for investors that top streamers were able to generate such enormous revenues for DouYu by fostering delicate relationships with users that induce users to buy Yuchi to purchase virtual gifts. For example, the documents advised that DouYu's ability to "***offer[] popular and attractive content on our platform to provide our viewers with engaging and satisfying viewing experiences . . . is dependent on our ability to attract and retain top streamers***." This was because, the Offering Documents said, "top streamers can inspire a large fan base of viewers ***with their superior skillsets and passionate personality, and generate significant monetization opportunity and user engagement***." The Offering Documents also highlighted that "[b]eing a new social phenomenon

in China, ***streamers are like key opinion leaders or social icons who have gained wide popularity among the younger generation***."

106. The delicate streamer-user relationship is also reflected by the fact that IRL streamers generally induce larger average revenues per paying user ("ARPPUs") than gamers—*i.e.*, individual users on average buy more and larger gifts for IRL streamers than gamers. This could stem from the emotional bond that develops in users and IRL streamers, where users can see the IRL streamer's face and body as that streamer engages in daily life and performs for the user.

107. In April 2019, the podcast "Tech Buzz China" reported that ARPPUs for IRL streamers ***were twice as much*** as ARPPUs for gamers. The Offering Documents reflected this disparity, highlighting for investors the additional challenges gamers faced in developing relationships with users that induced users to buy virtual gifts: "[t]op-performing game live streamers need to possess not only superior game-playing skills but also ***the ability to inspire viewer interaction with streamers and other viewers***," and "***[c]reating and maintaining a social community among viewers and streamers create barriers of entry and is crucial to build strong engagement and loyalty to the live streaming platforms***."

108. Recognizing that anything that upset the relationship between its streamers and users could drive users away and/or cause users to disengage with streamers, the Offering Documents cautioned that the Company's business could suffer if "we are unable to combat spam on or ***inappropriate or abusive use of our platform***," or if "***our streamers failed to keep our users engaged on our platform over a long period of time***." In addition, the Offering Documents warned that:

> ***If we fail to retain our existing users, keep them engaged or further grow our user base, our business, operation, profitability and prospects may be materially and adversely affected.***

> The size of our user base and ***the level of our user engagement are critical to our success***. ***Our main monetization strategies—live streaming, advertisement and others depend on our ability to maintain and increase the size of our user base and user engagement level***. If our user base becomes smaller or our users become less active, it is probable that they would spend less on our virtual gifts and jointly operated games or visit our advertisements less frequently, or access our platform less in general. This would in turn drive top streamers away from our platform, discourage companies from purchasing advertisements on our platform and dissuade game developers and publishers from distributing their games through our platform. Our financial condition would suffer from the consequential decline in revenue and our business and operating results will be materially and adversely impacted.

109. Given the importance of the delicate user-streamer relationship to the Company's business, Defendants went out of their way to emphasize to investors that DouYu knew the identities of and monitored its streamers for improper conduct. For example, the Offering Documents stated that "[t]o become a streamer, a user must register on our platform and verify his or her identity with a government issued ID . . . . After the streamer's identity is verified, he or she may apply to create a new room for streaming." In addition, the Offering Documents repeatedly referenced how the Company "believe[d] our strategic focus on ***exclusive contracts*** with top streamers offers us unique competitive advantages" and "enter[ed] into collaboration agreements with talent agencies to manage our streamers" under which the "agencies are responsible for recruiting, training, managing and promoting their own member streamers, and are also responsible for organizing streaming activities on our platform."

110. The Offering Documents also touted the Company's "comprehensive performance metric analytical system," which "identif[ied] top streamers with potential for high popularity, with whom we seek to sign exclusive contracts." These metrics purportedly included "the quality of a streamer's content, activity levels and user engagement." Once a streamer was identified, DouYu said that it "put[s] them into different categories according to the demographics that they likely appeal to and help direct traffic from their target demographics to them by giving them top

positions of streaming rooms." If the streamers "perform to our satisfaction after a performance monitoring period, we may sign exclusive base compensation contracts with them and further design career development plans for them."

111. In addition, DouYu assured investors that DouYu had a "Content Monitoring System" that took regular screen captures of streaming activity, and monitored the streams for inappropriate conduct, including fraud:

> Our live streaming platform contains real-time content, which we monitor to maintain a healthy ecosystem and ensure compliance with PRC laws and regulations. ***We have developed a comprehensive system to monitor content on our platform and filter inappropriate and illegal content and content that may infringe on the intellectual property rights of third parties.***
>
> * * *
>
> We utilize an automatic system to monitor our platform and the data generated in our system for sensitive key words or questionable materials on a real-time basis. The text identification system screens text content based on pre-set key words and an anti-spam system; the picture identification system screens picture content based on optical character recognition and illegal content detection; and the audio identification system screens audio content by converting it into text content and analyzing for illegal content. ***We have also developed a proprietary monitoring system in-house that takes screenshots of our live streaming channels every 10 seconds based on our "smart" image detection technology.*** Our system has machine learning capability and will update our database automatically.
>
> * * *
>
> ***All of the automatic detection results that are escalated are reviewed by our content monitoring staff manually***. We have a dedicated content monitoring team who also proactively check our rooms on a 24/7 basis for inappropriate or illegal content.
>
> * * *
>
> We deal with violations of varying severity in accordance with our strict policies and applicable regulations. Our actions may include warnings, cutting off or temporary suspension of the room and/or account for minor violations, with follow-up review to ensure effective enforcement and

> rectification. ***For serious violations, the relevant account is deleted permanently and all virtual currency and items are forfeited, and the room may be permanently closed***.

**F. <u>DouYu's "Lucky Draw" and Other Raffles Incentivize Purchases of Virtual Gifts</u>**

112. DouYu also claimed to incentivize users to purchase virtual gifts by offering "online lucky draws, raffles and other similar activities" on its platform. DouYu assured investors that these games "promote user engagement," and that the prizes in these games can only be used to purchase virtual gifts for streamers on DouYu's platform.

113. One of DouYu's most popular contests was "Lucky Draw." Users played Lucky Draw by purchasing Yuchi, then using that Yuchi to purchase chance cards—*i.e.*, raffle tickets—to enter into the drawing for virtual gifts, more Yuchi, or other prizes to give to streamers. A "winner" (or winners) was ostensibly selected at random. In other words, users participated in Lucky Draw by buying a small gift, which could result in them receiving a virtual prize worth thousands of RMB, or virtual currency worth up to tens of thousands of RMB. The Offering Documents, however, assured investors that the prizes could not be converted to cash or exchanged with other users—*i.e.*, that Lucky Draw was *not* illegal gambling. User spending on Lucky Draw generated roughly 10% of DouYu's total revenues as of the IPO.

114. The popularity of Lucky Draw and other raffles on DouYu meant that an interruption of those games, or any problem with Yuchi, which users needed to purchase to play the games, presented a substantial risk to DouYu's bottom line and, by extension, to investors.

115. One of the most significant threats to DouYu's use of Yuchi and Lucky Draw was the system of regulations the Chinese government had put in place to monitor online gaming and virtual currency. For example, on June 4, 2009, the Chinese Ministry of Culture and Ministry of Commerce jointly issued the "Notice on the Strengthening of the Administration of Online Game

Virtual Currency" ("Virtual Currency Notice"). Chapter Two, Article 13 of the Virtual Currency Notice stated that "companies operating internet gaming should not support the trade of digital currency between users, they must take technological measures to actively prohibit the exchange of digital currency between users." In addition, Chapter Three, Article 20 of the notice stated that "companies operating online games must not operate a lottery, draw, or random drawing that requires users to contribute cash or virtual currency with a payout of items or virtual currency."

116. In the Offering Documents, Defendants assured investors that Yuchi "is non-refundable and ***may not be converted back to cash or be transferred between users***," *i.e.*, complied with the Virtual Currency Notice. Defendants also assured investors that its raffles, including Lucky Draw, complied with the Chinese regulatory regime, including the Virtual Currency Notice. Specifically, the Offering Documents stated that "We do not believe such activities are specifically prohibited under PRC laws and regulations."

### G. Unexpected Profitability in Q1 2019 Allows DouYu to Reap Outsized Returns in its IPO

117. On April 22, 2019, DouYu filed the Registration Statement with the SEC to offer 44.9 million ADSs in an IPO for $11.50 to $14 each and obtain approximately $500 million in capital. An analyst at S&P Global Market Intelligence speculated that the Company had likely chose the United States for its IPO because large tech IPOs had performed poorly in Hong Kong, dampening investor demand. Although the Company planned to start its IPO "roadshow" in May, it postponed its IPO following the then-U.S. President's threat to boost tariffs on China.

118. After multiple amendments to its Form F-1, the Company launched the IPO roadshow on July 9, 2019. That day, investment website Nikkei Asia reported that DouYu had "raised the target for its Nasdaq debut after ***moving into the black for the first time last quarter***." The article reported that while DouYu had initially "sought a $500 million listing" it had just "filed

to raise up to ***$629 million*** at $11.50 to $14 per American depositary share," and that "[t]he increase in DouYu's IPO target comes as the company reported a $2.7 million profit on revenue of $222 million in the first three months of 2019 -- ***mostly from sales of virtual gifts to streamers*** and advertising. Last year, the company reported revenue of $544.5 million, double that of 2017."

119. The Nikkei Asia article also quoted an analyst note from Arun George of Global Equity Research, who wrote that "Encouragingly, DouYu's ***revenue growth caught up with Huya***" in the first quarter of 2019. In other words, because DouYu's Offering Documents suggested that it was now in the same league as Huya, its main competitor, the Company could increase the size of its IPO.

120. In addition to confirming that DouYu had turned a profit for the first time, the Offering Documents claimed that DouYu was poised for further significant growth as it took advantage of China's "massive and growing gaming community." In addition to increasing its annual revenue from $117.2 million in 2016 $544.5 million in 2018, DouYu's ability to turn a profit represented an important milestone for it after years of losses, including, specifically, a quarterly profit of $2.7 million compared to reported ***losses*** of $23.2 million in the first quarter of 2018. The Offering Documents also discussed how DouYu's growth was fueled primarily by revenue derived from its users' spending on "virtual gift" features (which included DouYu's "lucky draw" feature) and how its business model was built on DouYu's success in hiring and retaining the largest number of its top streamers. The Offering Documents also stated that DouYu had experienced a ***28% sequential net revenue increase*** in the first quarter of 2019.

121. The Offering Documents also included the following chart, which portrayed the Chinese live-stream gaming market as experiencing significant and sustained growth:




The Offering Documents further stated: "As one of the first game-centric live-streaming platforms to make the foray into eSports, ***we are strategically positioned to benefit from the proliferation of the eSports industry in China***."

122. The Company's amended F-1 was declared effective on July 16, 2019. Thereafter, on July 18, 2019, the Company filed a prospectus for the IPO on Form 424B4, which incorporated and formed part of the Offering Documents.

123. Using the Offering Documents, Defendants sold to the investing public more than 67.3 million DouYu ADSs at $11.50 per ADS, generating more than $774 million in gross offering proceeds for Defendants—over 54.8% more capital that what Defendants had originally sought approval for when it initially filed its F-1 in April 2019.

## VI. SECURITIES ACT ALLEGATIONS

### A. Securities Act Defendants

124. Plaintiffs make the allegations contained in paragraphs 125–300 below with respect to their claims under Sections 11, 12 and 15 of the Securities Act only. The Securities Act claims in this Complaint are asserted against Defendant DouYu, Defendant Tencent, Defendant Cogency Global, the Individual Defendants, and the Underwriter Defendants (collectively, the "Securities

Act Defendants"). Plaintiffs disclaims any reliance upon the allegations or incorporation of the allegations in Sections 1.B *supra*, or VII *infra*, *i.e.*, the claims asserted in this Complaint under the Exchange Act.

125. Each of Defendant DouYu, Defendant Tencent, the Individual Defendants, and Cogency Global failed to conduct a reasonable investigation or possessed no reasonable basis for their belief that the statements in the Offering Documents alleged to be materially inaccurate, misleading, and/or incomplete in Section VI.C, *infra*, were true. Defendant DouYu, Defendant Tencent, the Individual Defendants, and Cogency Global are not alleged to have intentionally, recklessly or fraudulently made the statements in the Offering Documents alleged to be materially inaccurate, misleading, and/or incomplete in Section VI.C, *infra*.

126. Defendant Cogency Global was DouYu's authorized U.S. representative for purposes of the IPO. Defendant Arthur, who signed the Offering Documents, was an employee of Cogency Global. As a result, Cogency Global is liable for the securities law violations committed by Arthur in its capacity as his employer and as a control person under the Securities Act. Only claims under the Securities Act are asserted against Arthur and Cogency Global. As set forth below, Arthur and Cogency Global failed to conduct a reasonable investigation or possessed no reasonable basis for their belief that the statements in the Offering Documents alleged to be materially inaccurate, misleading, and/or incomplete in Section VI.C, *infra*, were true. Arthur and Cogency Global are not alleged to have intentionally, recklessly, or fraudulently made the statements in the Offering Documents alleged to be materially inaccurate, misleading, and/or incomplete in Section VI.C, *infra*. Arthur and Cogency Global's failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

127. In addition, Defendant Morgan Stanley was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and/or incomplete Offering Documents. Only claims under the Securities Act are asserted against Morgan Stanley. As set forth below, Morgan Stanley failed to conduct a reasonable investigation or possessed no reasonable basis for its belief that the statements in the Offering Documents alleged to be materially inaccurate, misleading, and/or incomplete in Section VI.C, *infra*, were true. Morgan Stanley is not alleged to have intentionally, recklessly, or fraudulently made the statements in the Offering Documents alleged to be materially inaccurate, misleading, and/or incomplete in Section VI.C, *infra*. Morgan Stanley's failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

128. Defendant J.P. Morgan was also an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and/or incomplete Offering Documents. Only claims under the Securities Act are asserted against J.P. Morgan. As set forth below, J.P. Morgan failed to conduct a reasonable investigation or possessed no reasonable basis for its belief that the statements in the Offering Documents alleged to be materially inaccurate, misleading, and/or incomplete in Section VI.C, *infra*, were true. J.P. Morgan is not alleged to have intentionally, recklessly, or fraudulently made the statements in the Offering Documents alleged to be materially inaccurate, misleading, and/or incomplete in Section VI.C, *infra*. J.P. Morgan's failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

129. Defendant BofA was also an underwriter for the IPO, serving as a financial adviser for and assisting in the preparation and dissemination of the Company's materially inaccurate,

misleading, and/or incomplete Offering Documents. Only claims under the Securities Act are asserted against BofA. As set forth below, BofA failed to conduct a reasonable investigation or possessed no reasonable basis for its belief that the statements in the Offering Documents alleged to be materially inaccurate, misleading, and/or incomplete in Section VI.C, *infra*, were true. BofA is not alleged to have intentionally, recklessly, or fraudulently made the statements in the Offering Documents alleged to be materially inaccurate, misleading, and/or incomplete in Section VI.C, *infra*. BofA's failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

130. Defendant CMBI was also an underwriter for the IPO, serving as a financial adviser for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and/or incomplete Offering Documents. Only claims under the Securities Act are asserted against CMBI. As set forth below, CMBI failed to conduct a reasonable investigation or possessed no reasonable basis for its belief that the statements in the Offering Documents alleged to be materially inaccurate, misleading, and/or incomplete in Section VI.C, *infra*, were true. CMBI is not alleged to have intentionally, recklessly, or fraudulently made the statements in the Offering Documents alleged to be materially inaccurate, misleading, and/or incomplete in Section IV, *infra*. CMBI's failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

131. The Underwriter Defendants agreed to purchase and sell DouYu ADSs to the public as follows:

| **Name** | **Number of Shares** |
|---|---|
| Morgan Stanley & Co. LLC | 26,954,844 |
| J.P. Morgan Securities LLC | 22,237,746 |

| | |
|---|---|
| BofA Securities, Inc. | 16,846,778 |
| CMB International Capital Ltd. | 1,347,742 |

132. Pursuant to the Securities Act, the Underwriter Defendants are liable for the materially inaccurate, misleading, and/or incomplete statements in the Offering Documents. The Underwriter Defendants' failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

133. The Underwriter Defendants are primarily investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. As the underwriters of the Offering, the Underwriter Defendants earned lucrative underwriting fees as a result of their participation in the Offering.

134. In connection with underwriting the IPO, each of the Underwriter Defendants received approximately the following underwriting discounts, fees, and/or commissions:

| **Name** | **Amount of Discounts and Commissions** |
|---|---|
| Morgan Stanley & Co. LLC | $13,949,131.60 |
| J.P. Morgan Securities LLC | $11,508,033.41 |
| BofA Securities, Inc. | $8,718,207.51 |
| CMB International Capital Ltd. | $697,456.48 |

135. In addition, the Underwriter Defendants met with potential investors and presented highly favorable, but materially incorrect and/or misleading, information about the Company, its business, products, plans, and financial prospects and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

136. Representatives of the Underwriter Defendants also assisted the Company and Individual Defendants with planning the Offering. They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

137. In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price at which the Company's ADSs would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about the Company would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, at a minimum, the Underwriter Defendants should have known of the Company's undisclosed existing problems and plans and the materially inaccurate, misleading, and/or incomplete statements contained in the Offering Documents, as detailed in Section VI.C, *infra*.

138. The Underwriter Defendants also demanded and obtained an agreement from DouYu that the Company would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

**B. <u>Securities Act Substantive Allegations</u>**

139. The Offering Documents contained numerous statements that were misleading, incomplete, and inaccurate because (i) DouYu's virtual currency "Yuchi" could be transferred

between users and/or redeemed for currency and DouYu's Lucky Draw game constituted illegal gambling and did not comply with China's regulatory requirements; (ii) DouYu's revenues were inflated by *de facto* wash transactions where streamers made purchases of virtual gifts for themselves using funds that DouYu had paid to the streamers, and DouYu kicked back half of the purchase price to the streamers; (iii) certain of the Company's streamers were misrepresenting their identities on DouYu's platform; (iv) at the time of the IPO, Defendant Tencent was planning to invest over $1 billion in Kuaishou, another video content company, and to facilitate Kuaishou's entrance into the eSports market to challenge DouYu's leading position in China's live gaming market; and (v) DouYu was experiencing adverse financial trends at the time of the IPO.

**1. Illegal Conduct Involving Yuchi and Lucky Draws**

140. Although the Securities Act Defendants assured investors in the Offering Documents that Yuchi could not be converted to cash and was non-transferrable, and that Lucky Draw, and other elements of DouYu's platform complied with China's regulations, DouYu users and streamers were actively converting the Yuchi to cash and transferring it between each other, and the currency and games constituted illegal gambling.

141. Contrary to Securities Act Defendants' assurances, users commonly converted Yuchi they won in Lucky Draw to cash and/or transferred it between each other. For example, a user could purchase $150 of Yuchi (*i.e.*, 1,000 Yuchi), and then use that Yuchi to buy chance cards in Lucky Draw. If the user won, the user could receive 5,000 Yuchi—or gifts worth 5,000 Yuchi. The user would then take the 4,000 Yuchi that the user had "won," and thus not paid for, and sell that Yuchi to a streamer or third party for $0.05 each, or $200. The streamer would then gift that Yuchi to himself, which made him seem more popular than he or she was, or the third party would sell the Yuchi to a streamer at a markup, *e.g.*, $0.10 each, and the streamer would use the Yuchi to

buy gifts for him or herself. In this way, DouYu users illegally gambled to win Yuchi, converted that Yuchi to cash, and/or exchanged Yuchi between one another.

142. There is substantial evidence that these exchanges of Yuchi occurred, and that Lucky Draw constituted illegal gambling. For example, on January 22, 2019, a posting on the internet community Wangyihao, or "NetEase," a competitor of Defendant Tencent, described how one of DouYu's top streamers, XuXu BaoBao, would offer to users virtual prizes in Lucky Draw valued at almost $135,000. The post stated that users had noticed that winners of the prizes would have names that included combinations of phrases "win the prize" (or "中奖," in Chinese), which suggested that the game was fixed. The post also stated that players began frantically changing their names to include the phrase, which conveniently generated more money for DouYu since users had to pay a fee to change their names.

143. On June 3, 2019, a site led by the State Council Information Office, reported that it had received reports DouYu's Lucky Draw was illegal gambling. The article reported that the highest single prize of the lucky draw reached 50,000 Yuchi (equivalent to about RMB 50,000 or $7,450). The article described how DouYu users could buy Yuchi (the virtual currency of the Douyu platform) through the games and give the Yuchi in the form of "gifts" to get a chance to win the lucky draw. The more gifts that were given to a streamer, the article said, the greater the probability of winning Yuchi from Lucky Draw. This violated Chapter Three, Article 20 of the Virtual Currency Notice, which stated that "companies operating online games must not operate a lottery, draw, or random drawing that requires users to contribute cash or virtual currency with a payout of items or virtual currency."

144. A June 5, 2019 article published by the Chinese media outlet "Investor Network" entitled, "Media outlets report DouYu's 'Lucky Draw' game suspected of illegal play" described

how "some DouYu streamers use the platform's lottery activities as a disguised form of online gambling" and "[w]inners can directly receive cash transfers from the streamer." The article also stated that "China Net Technology" had reported that DouYu's "Lucky Draw" game was suspected of promoting gambling, and that the game's leisure version was flooded with information urging users to participate in this disguised form of gambling." The article also stated that while virtual gifts are usually purchased by users for streamers "based on users' appreciation of the streamer," in Lucky Draw, "most of the rewards are given for the purpose of winning a prize," *i.e.*, gambling. The article then cited a lawyer, who said that participating in Lucky Draw was similar to opening treasure boxes and smashing golden eggs, which had existed previously in China's online gaming industry.

145. Similarly, on June 14, 2019, Veryol.com, a Chinese news website that covers online tech, finance, and education, published an article entitled, "DouYu Heading to the US to List at the Last Minute is Hit by Gambling Accusation, Are they Serious About an IPO?" (the "Veryol Article"). The Veryol Article described two separate allegations in 2019 that Lucky Draw was "***online gambling under the guise of a prize drawing***." The acts described violated Chapter Three, Article 20 of the Virtual Currency Notice, which stated that "companies operating online games must not operate a lottery, draw, or random drawing that requires users to contribute cash or virtual currency with a payout of items or virtual currency."

146. Then, on June 30, 2019, Sohu News (the "Sohu Article"), the news arm of a major online portal in China, like Yahoo or AOL, reported in an article published only in Chinese that "[a]lthough DouYu's official stance is that Yuchi cannot be exchanged for cash, a reporter from China Business News found that users ***can sell Yuchi to resellers through relevant channels in exchange for cash***." The article went on to report that "Zhao Zhanling, a lawyer at Beijing Zhilin

law firm, said in an interview with this article's reporter that the behavior of DouYu streamers' may be organized gambling in disguise, and that the aforementioned lottery activities do have qualities associated with gambling." The acts described violated Chapter Two, Article 13 of the Virtual Currency Notice, which stated that "companies operating internet gaming should not support the trade of digital currency between users, they must take technological measures to actively prohibit the exchange of digital currency between users."

147. The Sohu Article also reported on a representative of a third-party agency that managed streamers for DouYu, who described how such agencies manipulated Lucky Draw on behalf of their streamers because only users who sent the most gifts or were most active would have any chance of winning. For example, the representative said that "we would sign a contract with the streamer, and we would give [the streamer] several tens-of-thousand coins in virtual currency during their broadcast . . . . [W]e would send many gifts to reach the required amount and win the Lucky Draw." The acts described violated Chapter Two, Article 13 of the Virtual Currency Notice, which stated that "companies operating internet gaming should not support the trade of digital currency between users, they must take technological measures to actively prohibit the exchange of digital currency between users."

148. In addition, according to the Chinese media and former DouYu streamers, users could exchange Yuchi and convert it into cash, both of which violated China's regulations. For example, the Sohu Article reported that:

> Under the pretense of applying for a streamer position, this reporter was also able to speak with A Huang (a pseudonym), the head of a livestream guild that works with DouYu. A Huang told the reporter that the Lucky Draw prize drawing was initiated by DouYu, and that the Yuchi prizes won by the fans were given by DouYu. While Yuchi cannot officially be exchanged for cash, they can be exchanged "through other means . . . we know people who specialize in reselling Yuchi—so [$745] in Yuchi can be exchanged for about [$600] in cash.

149. The representative of an agency that managed DouYu streamers who was quoted in the article stated that "we know people who recycle [*i.e.*, exchange] Yuchi." In addition, the article stated that "th[is] reporter discovered many QQ groups that trade Yuchi and entered a group under the pretense of selling Yuchi." Specifically, "[o]ne Yuchi reseller told the reporter that the price of a resold Yuchi was about 70–80% of a full price Yuchi. The Yuchi they buy from the market are be sold to streamers. 'All medium-sized streamers want popularity—they want popularity and we want money.'" The reseller stated that streamers would buy the discounted currency and "gift" the discounted currency to themselves to make them seem more popular than they really were.

150. Former DouYu streamers who agreed to speak with Plaintiffs confidentially corroborated these accounts of how Yuchi was exchanged between users and for cash. For example, CW1, who was a DouYu streamer from December 2018 to May 2019 described "third-parties or groups that will buy Yuchi back from users at a discount." According to CW1, "a customer [*i.e.*, DouYu user] might win 1,000 Yuchi in a drawing, a third-party would buy them for CNY 200 and then would send the Yuchi to a streamer who would buy them for CNY 300, in this way the third-party gets the difference." CW1 also stated that "most of the posts in [DouYu's] user blog, called 'Yuba,' were about exchanging Yuchi privately."

151. Similarly, CW2, who was a DouYu streamer from May 2019 to December 2019 and then an agent on DouYu's platform from December 2019 to June 2020, described how users would convert Yuchi to cash by using the Yuchi to buy a gift, "send[ing] the gift to a streamer who would transfer a lower amount [of cash] to the user with Alipay or WeChat pay."

152. CW3, a financial analyst who has had a DouYu account for the past five years, stated Yuchi could be purchased illegally at a discount through "backpack traders." "Backpack

traders" are individuals or entities who pay users for Yuchi and then sell the purchased Yuchi to streamers. CW3 said that DouYu had never taken any actions to stop the illegal purchases and transfers of Yuchi.

153. CW7 corroborated CW3's descriptions of backpack traders selling Yuchi. CW7 said that backpack traders had two business models. In one model, a DouYu user wins virtual gifts in lucky draws on DouYu's platform. If the user does not want to give the virtual gifts to a streamer, the user sells the gifts to a backpack trader. The backpack traders then resell the gift to streamers who use the Yuchi to make it appear as though they are receiving more gifts from fans. CW7 said that the second backpack trader business model was just to purchase Yuchi directly from DouYu users at a discount, resell it at a lower discount, and keep the difference as profit.

154. CW7 also described how DouYu users played lucky draw games and received cash for their winnings. CW7 stated that the winner of a lucky draw would take his or her winnings, *e.g.*, Yuchi, and sell that Yuchi to a backpack trader at a 65% discount in exchange for cash. CW7 said that streamers set up rooms and ran lucky draw games for the sole purpose of allowing users to gamble in this way and try to win Yuchi that they could exchange for cash.

155. All of these acts described in the articles and by the confidential witnesses violated Chapter Two, Article 13, and Chapter Three, Article 20 of the Virtual Currency Notice. These types of violations of Chinese regulations—which long pre-dated the IPO—forced DouYu to deactivate Lucky Draw barely a month after the IPO closed.

156. According to an August 21, 2019 news report by Toubang Data, a website that provides news and data analysis about online streaming platforms, which was published only in Chinese, DouYu took the Lucky Draw feature offline because of media reports, including the above-described articles, describing how the game was essentially "rigged gambling" in violation

of China's regulations. The Toubang Data news report was corroborated by an October 15, 2019 analyst report by J.P. Morgan, which reported that DouYu removed the Lucky Draw feature on August 20, 2019.

157. CW4 corroborated the description of events contained in the Toubang Data news report. CW4 stated that the government took action against DouYu as media reports and complaints that Lucky Draw was online gambling accumulated and had DouYu remove this functionality.

158. In addition, on November 6, 2019, an article on the investor website Seeking Alpha by the independent investment analyst Terracotta Investments disclosed that the feature was taken down because of unlawful exchanges of Yuchi between users and redemptions of Yuchi for cash, i.e., conduct that violated the Virtual Currency Notice. The Seeking Alpha article reported that, while "[t]here is nothing wrong with using a lottery system to attract viewers in China . . . ***the issue is that some of the virtual coins gained from lucky draws could be converted into real currency, which the regulators find it unacceptable hence it was stopped for some time***.

159. DouYu reinstated Lucky Draw on October 10, 2019 after, among other things, placing caps on the amounts of gifts that could be purchased, *i.e.*, putting in place safeguards to prevent manipulation of the game. The deactivation of the game, however, had a substantial effect on the Company's revenues as well as investor understanding of the Company's risks.

160. For example, the October 15, 2019 J.P. Morgan analyst report found that taking down Lucky Draw, "***will cause [DouYu's] 3Q19 revenue to decline 1.5% QoQ . . . 5% below the low end of company's 3Q19 guidance . . . and 7% lower than current Bloomberg consensus***." In other words, deactivating Lucky Draw for only a matter of weeks had torpedoed the Company's performance.

161. In addition, on January 23, 2020, J.P. Morgan released another analyst report that disclosed how the deactivation of Lucky Draw had negatively affected investors' confidence in the Company. The report attributed a 12% drop in the Company's ADS price on January 22, 2020 to investor concerns about "***the financial implications of such a broad-based key monetization feature suspension***[,]" *i.e.*, the deactivation of Lucky Draw, stating, in relevant part:

> [O]n January 22, 2020, all of the listed digital entertainment platforms (DouYu, Huya, . . .) that operate live broadcasting services have ***suspended interactive features that drive meaningful monetization for live streaming operators***. Share prices of DouYu/Huya . . . fell by 12%/10% . . . on Jan. 22, 2020, ***in our view due to investors' concerns about the financial implications of such a broad-based key monetization feature suspension***.

J.P. Morgan added: "We believe investors' cautious sentiment will remain in the near term ***due to a lack of clarity on the duration of this suspension***[.]"

162. An October 17, 2020 article on China Youth Net, a news site affiliated with the China Youth League ("Youth Article") later provided details on how DouYu's deactivation of Lucky Draw. In the Youth Article, a DouYu streamer named Xiaowei stated that Lucky Draw began being used as gambling immediately after it was added to DouYu's platform on November 30, 2018. Xiaowei said that after DouYu deactivated Lucky Draw in the latter half of 2019, the Company sent a message to streamers stating, "it will be forbidden to display the words 'cash back' to users from now on." Xiaowei also said that DouYu had told its streamers not to use specific words when streaming or in communications with users or streamer associations including mentioning specific amounts of money. Streamers were also instructed not to use certain words or phrases that suggested gambling. In the article, Xiaowei said that he believed that though company officials claimed to ban these activities, the company was tacitly supporting these activities because they would allow streamers to keep room names that explicitly stated they would give cash back to users.

163. The Youth Article also stated that after Lucky Draw was released, the entire DouYu platform was filled with an atmosphere of "explosive treasure." Streamers no longer did broadcasts for content or effect, but rather to sell treasures and do transactions. Some streamers even specialize in live broadcasts of "explosive treasures." One DouYu streamer quoted in the Youth Article said, "Doing a good broadcast content does not 'explode the treasure'; doing transactions makes more money."

### 2. *De Facto* Wash Transactions Inflated DouYu's Revenues

164. In addition, unbeknownst to investors, DouYu's revenues were inflated by streamers—including top streamers under exclusive contracts with DouYu—who engaged in *de facto* wash transactions. These streamers received salaries from DouYu, then used a portion of those salaries to buy up to millions of dollars of virtual gifts for themselves. DouYu then kicked back half the value of the purchases to the streamers. Other streamers took the funds the received from DouYu—*i.e.*, payments 50% of the value of the virtual gifts received—and put those funds directly back into DouYu by purchasing virtual gifts to give themselves.

165. Streamers did this to make themselves seem more popular than they actually were, which would increase their prominence on DouYu's platform, which (they hoped) would make it more likely that users would buy them virtual gifts, as well as to meet monthly traffic quotas set by DouYu. DouYu recorded these transactions as revenue to inflate the platform's number of transactions and revenues.

166. For example, in March 2019, DouYu entered into a contract with a prominent streamer named Liu Mou ("Liu"). Shortly thereafter, Liu spent nearly $3.15 million to buy himself votes during DouYu's annual online idol competition, half of which the Company then kicked back to Liu after his purchase.

167. In addition, shortly before the IPO, on May 1, 2019, Sohu News published an article that was available only in Chinese describing how DouYu's most popular streamers all made extensive purchases of Yuchi and virtual gifts for themselves. The article described how a DouYu female streamer named "Drooling Little Panda" had created a phony DouYu user account to purchase gifts for herself and thus boost her profile on the site. When hostile users began to send the phony user messages telling the phony user not to support Drooling Little Panda, the DouYu streamer lashed out in a public message to the hostile users. The article stated that streamers buying gifts for themselves was very common and pointedly observed that this behavior was common among DouYu's most popular streamers, and that "[b]ig anchors [*i.e.*, streamers] like Qian Xiaojia, PDD, Baby Xu, etc." each "set up a 'trumpet' [*i.e.*, fake account] and gave themselves a lot of gifts."

168. Statements from former DouYu streamers who agreed to speak to Plaintiffs confidentially corroborate this news account and demonstrate that these self-purchases of Yuchi and virtual gifts by streamers for themselves were widespread. CW3, a financial analyst who has had a DouYu account for the past five years, stated that DouYu's contracts with streamers set monthly targets of gifts for streamers, and streamers received larger salaries and kickbacks after reaching gift targets set by DouYu. CW3 stated that to reach these targets, streamers bought Yuchi to buy gifts for themselves to achieve those targets. CW3 further stated that streamers would buy Yuchi at a discount through "backpack traders"[8] that they would then use to buy gifts for themselves. CW3 said that DouYu had *never* taken any actions to stop the illegal purchases and transfers of Yuchi, which also violated the Virtual Currency Notice.

---

[8] "Backpack traders" are individuals or entities who pay users for Yuchi and then sell the purchased Yuchi to streamers.

169. CW4, a Senior Auditor at DouYu from February 2018 to February 2020, said gift rewarding to streamers to artificially inflate their popularity was a common practice at DouYu. CW4 also described how "brokers" or backpack traders sold Yuchi to streamers at a discount so that the streamers could use the Yuchi to buy gifts for themselves.

170. CW5, a DouYu streamer from August 2018 to February 2020, also stated that DouYu streamers bought Yuchi and gifts for themselves. CW6, a DouYu content reviewer from January 2016 to August 2019, said it was common for DouYu streamers to buy Yuchi and gifts for themselves.

171. CW7 stated that in her experience "at least 70 to 90%" of streamers buy Yuchi to give gifts to themselves, and that only a select few streamers who are "very distinctive" make so much money from fans that they do not have to buy Yuchi to give gifts to themselves to ensure that their profile stays high on DouYu's platform.

172. CW7 stated that during the four years she was a DouYu contract streamer, *i.e.*, was in the elevated group of streamers who were good enough to have a contract with a talent agency, ***she only bought Yuchi and virtual gifts for herself*** and did not use the Yuchi and virtual gifts she purchased for any other streamer. CW7 estimated that she bought thousands of virtual gifts for herself each month. CW7 said that, in her experience, virtually all of DouYu's streamers have bought Yuchi to give gifts to themselves "since the beginning," *i.e.*, since she became a DouYu streamer. In fact, CW7 said, top-ranked streamers spend "dozens of thousands of RMB to buy gifts for themselves ***every month***," *i.e.*, spend thousands of U.S. dollars every month to buy Yuchi and virtual gifts for themselves.

173. CW8 corroborated CW7's account of streamers buying Yuchi to give to themselves throughout her time at DouYu. CW8 stated that DouYu's platform had a "monthly flow indicator

requirement" for streamers, and that streamers—especially streamers represented by talent agencies—*have to* buy gifts for themselves so that they can meet the monthly traffic flow requirements. CW8 stated that DouYu allows streamers to buy gifts for themselves because it "increases the income for the platform." CW8 said that famous streamers usually buy Yuchi for themselves because they make enough money—*i.e.*, from DouYu—that they can afford to do it.

174. CW9 stated that her research in writing about DouYu she learned that "large sized" streamers—*i.e.*, streamers with large followings—which corroborated CW8's account of how famous and popular streamers bought Yuchi to give as gifts for themselves. CW9 said that based on her research, about 70% of streamers buy Yuchi to give gifts to themselves.

175. Investors had no idea that DouYu's revenues were inflated by such *de facto* wash transactions by streamers because the Offering Documents carefully described how *other users* purchased virtual gifts for streamers, and never mentioned that streamers bought gifts *for themselves*. For example, the Offering Documents told investors that "[u]sers are able to purchase virtual gifts on our platform using our virtual currency ***and send them to streamers*** as a gesture of appreciation or support . . . we organize streamer popularity contests ***to promote spending by viewers to show support of the streamers they follow***." Similarly, the Offering Documents stated that DouYu's "live streaming platforms . . . enable streamers and users to ***interact with each other*** during live streaming. ***The users have the option to purchase virtual currency*** . . . to redeem for virtual items to be used in the live streaming sessions." These and other similar statements communicated to investors that users bought virtual currency for *other streamers* and did not suggest that streamers gamed DouYu's platform by buying gifts *for themselves* for the purposes of making themselves seem more popular.

### 3. DouYu's Streamers Were Misrepresenting Themselves to Users

176. The Offering Documents assured investors that the Company knew the identities of its streamers and monitored those streamers using the Company's registration requirements, direct contracts with streamers, outsourcing of streamer management, systems used to identify top streamers, and Content Monitoring System.

177. Despite these assurances in the Offering Documents, at the time of the IPO DouYu's platform included top streamers who were engaged in improper conduct and/or were misrepresenting themselves to users. This was revealed to investors when, on July 30, 2019, prominent DouYu IRL streamer Qiao Biluo Xiadian, who purported to be an attractive Chinese 20-year-old, was accidentally revealed to be a middle-aged woman. The revelation stunned both investors and Xiadian's over 100,000 devoted followers, who China's Global Times reported had been drawn to her "sweet and healing voice," "worshipped" her as a "cute goddess," had purchased virtual gifts for her of more than $14,500 each. The Global Times reported that during a session with her fans, a filter the IRL streamer had been using stopped working and her real face became visible, at which point DouYu users began exiting her stream *en masse* and went on to stop following her and withdrew their transactions. Xiadian's misrepresentation of herself was plainly a "serious violation" because DouYu promptly closed her streaming room permanently.

178. News reports also described streamers completely misrepresenting themselves on DouYu's platform. For example, the Veryol Article reported that, "[s]ince the first half of 2018, DouYu has been entangled ***in a web of public backlash that included accusations of hosting a large number of false livestream rooms***, questioning of its paid membership system, mentions of the company's layoff bloodbath, suspicions of promoting illegal loan advertisements, and comments regarding the massive loss of streamer talents."

179. In addition, on August 2, 2019, Jufu Finance, a mainland Chinese website that publishes news and commentary on the financial sector, reported in an article published only in Chinese that the revelation that Xiandian was not a 20-year-old, but rather a middle-aged woman had come to be known as "Granny Gate." "Who would have thought," the article wrote, "instead of the pure and lovely image in everyone's mind, the voice actor was actually a 50 year old 'grandmother!' The 'Lolita to Grandma' reveal scared a quite a large number of fans." The article also emphasized that this had happened before on DouYu's platform, stating that "***This is not the first time that DouYu has suffered a livestream room related scandal*** . . . . Consequently, DouYu once again became a central figure in the media frenzy . . . . The point is, ***for those fans who have spent money, especially a lot of money, the result of the scandal was a very bitter pill to swallow***." The article also emphasized that "According to relevant media reports, DouYu banned the streamer's room. However, as far as this matter is concerned, ***many people remain dissatisfied***" because, even though "Granny Gate" had received an enormous amount of media attention, DouYu "did not try to get to the bottom of the matter, choosing instead to ban the streamer from the platform, essentially burning that bridge."

180. Indeed, as Jufu Finance reported, a DouYu streamer previously had been implicated in a scandal that led to users abandoning the platform. A May 5, 2019 internet post described how popular singing stream "Aleng" had become unpopular after her "real face was revealed":

181. Likewise, another pre-IPO post on the site zhihu.com commented that "Another Douyu popular streamer 'Nado' is also fat in real person and looks like a human tank and she must be over 70kg. The Douyu streamer 'Zhang Qige' is oversized, and rich fans wanted to drop out of DouYu." Despite the obviously risks presented by users misrepresenting themselves on DouYu's platform, DouYu failed to advise investors that users could alter their appearance on the site.

182. Statements from former DouYu streamers who agreed to speak to Plaintiffs confidentially corroborate these news accounts and highlighted how DouYu turned a blind eye to such conduct. For example, CW1, who was a DouYu streamer from December 2018 to May 2019, told Plaintiffs that "DouYu has always had difficulty in monitoring streamers who misrepresent themselves. The platform also needs to make money, they absolutely need a lot of traffic. As long as the streamers aren't doing anything illegal, they will keep one eye closed and the other eye open, so to speak."

183. Similarly, CW2, a DouYu streamer from May 2019 to December 2019 and later a DouYu agent from December 2019 to June 2020 said, "DouYu never really took monitoring this type of content seriously. For example, when I was working there, I would go into streaming room and there would be a streamer who would ask for a "rocket" [*i.e.*, a gift worth $15]. The streamer would then go into and they would go into a QQ group.[9] Then in the QQ group they would send a private message to a customer with a [sexually explicit] video. I think DouYu didn't really want to deal with it anyway, after all DouYu profited from it and gained traffic in the process."

184. CW7 also said that it was common for streamers to completely alter their appearance on DouYu's platform to be attractive women, including by using "fake noses and breasts." CW7 said that "100% of female streamers use filter to alter appearance. It is less common for male streamers." She said that "fans are not aware."

185. CW9 said that it was common for DouYu streamers to change their appearance on DouYu's platform as well.

[9] QQ, is an instant messaging software service and web portal developed by Defendant Tencent. QQ offers services that provide online social games, music, shopping, microblogging, movies, and group and voice chat software.

### 4. Tencent's Plan to Invest in Kuaishou

186. Unbeknownst to investors, shortly before and in advance of the IPO, Defendant Tencent was preparing to invest ***over $1 billion*** into DouYu's up-and-coming competitor, Kuaishou.

187. On July 18, 2019, only ***hours*** after the IPO was conducted, Beijing News published an article entitled "Kuaishou Will Receive Investment from Tencent, and Live Game Streaming Becomes Its 'Weapon' to Tackle Southern Market" ("July Beijing News Article"). The article expressly stated that it was communicating news "[o]n the eve of DouYu's IPO." The article then stated that although Kuaishou was "known for its low profile," Beijing News's correspondent, Jinlei Bai, had "obtained the exclusive news that live game streaming had become the strong weapon for Kuaishou to 'tackle' the southern market," and that Kuaishou would soon "take a series of measures on the live game streaming market, including signing with the leading streamers, introducing the local guild, launching the paid videos of online game, launching the companion function in games, etc." The article then reported that Kuaishou was obtaining a round of funding from Tencent, or would form a new joint venture with Tencent, which would allow it to take these steps. In other words, moments after DouYu's IPO, a major Chinese media outlet was reporting that Defendant Tencent was making a substantial investment in a company specifically so that Company, which had not previously been considered a direct DouYu competitor, could transform into itself into a serious major direct competitor to DouYu in the live-game streaming sector.

188. In the days after the July Beijing News Article, additional articles emerged stating that Tencent planned to inject significant capital into Kuaishou. For example, barely two weeks later, on August 2, 2019, Beijing News published a second article by the same journalist, Jinlei Bai, entitled "Tencent's investment in Kuaishou is almost finished: Tencent will hold about thirty

to forty percent of Kuaishou's shares and invest new assets or resources" (the "August Beijing News Article"). The article stated that

> "On August 2, a number of sources confirmed exclusively to The Beijing News that negotiation of Tencent's investment in Kuaishou is almost finished. The evaluation of Kuaishou for this round is more than USD $25 billion. The two parties may set up a new joint venture company with Tencent holding 30% to 40% of the shares and a cooperation model similar to that for Tencent's investment in JD.com before. Tencent will also invest new assets (or resources) in the new company."

189. The August Beijing News article went on to state that "a source close to Kuaishou's senior management also told The Beijing News that: 'Tencent and Kuaishou's relationship will change recently.'"

190. Ultimately, Defendant Tencent would invest ***$2 billion*** in Kuaishou by January 2020, catapulting the upstart firm into the ranks of DouYu's major competitors. Tencent's dramatically expanded investments in Kuaishou and related strategic support facilitated Kuaishou's rapid expansion into the Chinese live game streaming industry and the related growth and strengthening of Kuaishou's user base, content ecosystem, and revenue generation capabilities.

191. By the end of November 2019, Kuaishou's gaming unit boasted 51 million DAUs, a 46% increase over June 2019 user metrics. Defendant Tencent's massive support for Kuaishou was instrumental in eliminating the significant barriers to entry that Kuaishou would have otherwise faced, allowing Kuaishou to encroach on DouYu's business turf, and materially undermining DouYu's purported competitive advantages in the gaming industry.

### 5. DouYu's Adverse Financial Trends

192. Finally, the Securities Act Defendants failed to reveal that DouYu's financial fortunes had already turned dramatically downward before the IPO. A company's "Net Income (Loss)" is "[t]he figure that most comprehensively reflects a business's profitability—and used in

publicly traded companies to calculate their earnings per share (EPS)" and "represents the renowned *bottom line* of an income statement.[10] Unbeknownst to investors, while the Offering Document represented that DouYu's bottom line was on the upswing, given that DouYu had just posted a positive quarter for the first time in Q1 2019, DouYu's bottom line was decelerating rapidly.

193. The Offering Documents reported that after DouYu had experienced a net *loss* for Q4 2018 of approximately $40.4 million, the Company reported its first-ever profit in Q1 2019 of $2.7 million, or a quarter-over-quarter increase of 106.67%. Less than a month after the IPO, however, DouYu reported net income for Q2 2019 of only $3.4 million, reflecting a quarter-over-quarter increase of only 27.5%—in stark contrast with the 106.67% reflecting a *rapid* deceleration in growth. Although Q2 2019 had ended only 17 days before the IPO, the Offering Documents did not disclose the Q2 2019 results or otherwise reveal this significant deceleration.

194. The net income deceleration in Q2 2019 was not a blip. The following quarter, Q3 2019, *i.e.*, the quarter in which the IPO occurred, DouYu suffered a net *loss* of $24.6 million, representing an 813% decrease from the $3.45 million in net income of the previous quarter. In other words, as of the IPO, DouYu was operating at a loss and its revenue growth had decelerated effectively to zero.

### C. <u>The Securities Act Defendants' Materially Inaccurate, Misleading, and/or Incomplete Statements in the Offering Documents in Violation of the Securities Act</u>

195. The misstatements and claims alleged in this Section VI.C are based on principles of negligence and strict liability only. Plaintiffs repeat and reallege each and every allegation

[10] *See* Clarie Boyte-White, *Is Net Income the Same As Profit?*, Investopedia (Aug. 9, 2020), https://www.investopedia.com/ask/answers/122414/net-income-same-profit.asp/.

above, exclusive of allegations that contain facts necessary to prove any elements *not* required to state a claim under Sections 11, 12, or 15 of the Securities Act. In addition, Plaintiffs assert these claims only against the Securities Act Defendants, and Plaintiffs do not allege that any Securities Defendant acted with fraudulent intent in connection with these claims.

196. The Offering Documents used to effectuate DouYu's IPO and secure $774 million in gross offering proceeds for DouYu from Plaintiffs and the Securities Act Class were negligently prepared and, as a result, contained numerous statements that were materially misleading, incomplete, and/or inaccurate. Specifically, the Offering Documents made numerous statements that were materially misleading, incomplete, and/or inaccurate because those statements failed to disclose that: (i) DouYu's virtual currency "Yuchi" could be transferred between users and/or redeemed for currency and its Lucky Draw game did not comply with China's regulatory requirements; (ii) DouYu's revenues were inflated by *de facto* wash transactions where streamers made purchases of virtual gifts for themselves using funds that DouYu had paid to the streamers, and DouYu kicked back half of the purchase price to the streamers; (iii) certain of the Company's video content producers or "streamers" were misrepresenting their identities on DouYu's platform; and (iv) at the time of the IPO, Defendant Tencent was planning to invest over $1 billion in Kuaishou and to facilitate Kuaishou's entrance into the "eSports" market and challenge DouYu's leading position in China's live gaming market; and (v) DouYu was experiencing adverse financial trends at the time of the IPO.

### 1. The Offering Documents Statements Concerning Yuchi and/or Lucky Draw Were Materially Inaccurate, Misleading, and/or Incomplete

197. DouYu's Offering Documents, which were signed by all the Securities Act Defendants, touted to investors that the Company's virtual currency, Yuchi, could not be exchanged for cash or transferred between users, and that the platform's Lucky Draw feature drove

purchases of Yuchi and virtual gifts. These statements were incomplete, misleading, and inaccurate, however, because users could and were exchanging Yuchi for cash and transferring Yuchi between each other, and key interactive features of Lucky Draw were illegal gambling and thus did not comply with current regulatory requirements. As a result, DouYu had to deactivate lucky draw shortly after the IPO, which negatively impacted user engagement activity and caused disappointing financial results. Each of the Securities Act Defendants failed to conduct a reasonable investigation or possessed no reasonable basis for their belief that statements in the Registration Statement concerning Yuchi and Lucky Draw were true.

198. For example, the Offering Documents misleadingly, inaccurately, and/or incompletely stated that "Users can purchase the virtual currency on our site via various online third-party payment platforms, including WeChat Pay, AliPay and other payment platforms. In addition to purchasing these virtual currencies on our site, users can purchase virtual currencies from our online store at third-party websites such as Tmall.com. ***Other than the above-mentioned official purchase channels, there is no other means to purchase Yuchi***." The Offering Documents then assured investors that Yuchi "is non-refundable and ***may not be converted back to cash or be transferred between users***." This statement was materially inaccurate, misleading, and/or incomplete because DouYu users were actively converting Yuchi back to cash and transferring Yuchi between each other.

199. The Offering Documents also included the following misleading, inaccurate, and/or incomplete warning about purchases of Yuchi:

> [F]rom time to time, certain third parties ***fraudulently claim that users can purchase Yuchi through them***. If our users choose to purchase our virtual currency from such third parties, they may suffer losses from such fraudulent activities by third parties. Although we are not directly responsible for such fraudulent activities conducted by third parties, our user experience may be adversely affected and they may choose to leave

> our platform as a result. Such fraudulent activities by third parties might also generate negative publicity, disputes or even legal claims. The measures we take in response to such negative publicity, disputes or legal claims may be expensive, time consuming and disruptive to our operations and divert our management's attention.

200. The statement in paragraph 199 above was misleading, inaccurate, and/or incomplete because it only warned investors that third parties were claiming to sell counterfeit Yuchi and failed to disclose that users could exchange Yuchi for cash and/or transfer Yuchi between each other. This warning was also misleading, inaccurate, and/or incomplete because it communicated that these third parties were operating completely separately from DouYu's platform, when in fact DouYu's streamers were facilitating these transactions with DouYu's users.

201. The Offering Documents also misleadingly, inaccurately, and/or incompletely touted DouYu's use of various social features to enhance user engagement, which would lead to user loyalty:

> Gamers have strong social attributes and seek to be part of a community sharing similar interest. Therefore, game-centric live streaming platforms introduced various social features for users to interact with each other, such as group chatting and bullet chatting. These platforms also offer ways for viewers to interact with streamers. For example, talented game streamers may play games together with their viewers. ***Creating and maintaining a social community among viewers and streamers create barriers of entry and is crucial to build strong engagement and loyalty to the live streaming platforms.***

202. Chief among these social features was Lucky Draw, a raffle offered on DouYu's platform to enable "viewers to interact with streamers[,]" which the Offering Documents identified as one of a handful of "***[k]ey success factors for game-centric live streaming platforms***[.]"

203. The Offering Documents also misleadingly, inaccurately, and/or incompletely claimed that Lucky Draw and similar raffles complied with China's regulations:

> In addition, there are ***online lucky draws, raffles*** and other similar activities conducted on our platform to promote user engagement, which involve virtual currencies (such as Yuchi). ***The prize of such activities can only be***

> ***used to purchase virtual gifts or to give to streamers as reward on our platform. We do not believe such activities are specifically prohibited under PRC laws and regulations***. We cannot assure you, however, that our platform will not be subject to liabilities due to third party activities (including steamers activities), or that the PRC government authority will not take a different view. ***If our platform is deemed to be engaged in illegal or inappropriate activities relating to issuance and use of virtual currencies by our platform (such as Yuchi), including due to third party activities, we may be subject to fines and penalties, which may have adverse impact our business, results of operations and reputation***.

204. The statements made in paragraphs 201–03 communicated to investors that Lucky Draw and other raffles complied with current regulatory requirements in China. These statements were materially inaccurate, misleading, and/or incomplete because they failed to disclose that Lucky Draw constituted illegal gambling, that prizes from Lucky Draw were in fact being sold for currency and transferred between users, and that "Lucky Draw" accordingly did not comply with China's regulatory requirements and enhanced the risk that DouYu would deactivate lucky draw, which would negatively impact user engagement activity and cause disappointing financial results.

205. The statements made in paragraphs 197–204 above were material because over 90% over DouYu's revenue came from purchases of Yuchi, which was then used to purchase virtual gifts, and because the Offering Documents touted to investors that Lucky Draw and other games were used to increase users' interactions with streamers, which was essential to driving purchases of Yuchi and virtual gifts, and thus the Company's financial performance.

### 2. The Offering Documents Misrepresented and/or Failed to Disclose that DouYu's Revenues Were Inflated by Insider "Wash" Transactions

206. DouYu's Offering Documents, which were signed by the Securities Act Defendants, touted to investors the Company's increasing revenues and ARPPU, as well as that the Company had reported "net income," *i.e.*, profits, for the first time in its history, and attributed those increases to users purchasing virtual gifts for streamers in response to the quality of the

Company's product, *i.e.*, the appeal of the Company's streamers to users and the content those streamers created. These statements were materially inaccurate, misleading, and/or incomplete, however, because the Offering Documents did not disclose that DouYu's revenues and ARPPU were inflated by *de facto* wash transactions where streamers purchased gifts on DouYu's platform, gave those "gifts" to themselves, and DouYu kicked back half of the purchase price to the streamer. The overwhelming majority of DouYu's streamers engaged in these transactions, especially DouYu's top streamers, so that the streamers could boost their profiles, try to attract fans, and meet monthly traffic quotas.

207. For example, the Offering Documents misleadingly, inaccurately, and/or incompletely touted how the Company's revenues were driven by "user satisfaction," "diversified opportunities for user spending" on a "wide array of virtual gifts," when in reality the Company's revenues were inflated by streamers purchasing gifts for themselves:

> We believe ***the vibrant and interactive game community created on our platform drives user satisfaction, which provides diversified opportunities for user spending***. Leveraging a large number of viewers and a deep pool of streamers, our monetization channels mainly consists of live streaming, advertisement and others. ***These channels effectively supplement each other and unleash future monetization potential***. Live streaming is our main monetization channel and generated 77.7%, 80.7%, 86.1%, 81.5% and 90.9% of our total net revenue in 2016, 2017, 2018 and for the three months ended March 31, 2018 and 2019 respectively. ***Our live streaming revenue is primarily derived from the sales of a wide array of virtual gifts***.

208. Similarly, the Offering Documents repeatedly misleadingly, inaccurately, and/or incompletely touted the Company's ever-increasing revenues, including turning a profit for the first time in Q1 2019—the last reported financial quarter before DouYu's IPO—but failed to disclose that these revenues were driven by purchases by streamers purchasing gifts for themselves. For example, the Offering Documents disclosed that:

> ***We have grown rapidly since our inception.*** Our revenue increased from RMB786.9 million in 2016 to RMB1,885.7 million in 2017 and further to

> RMB3,654.4 million (US$544.5 million) in 2018. Our revenue increased from RMB666.5 million for the three months ended March 31, 2018 to RMB1,489.1 million (US$221.9 million) for the same period of 2019. ***We had net loss of RMB782.9 million, RMB612.9 million and RMB876.3 million (US$130.6 million) in 2016, 2017 and 2018, respectively, and net loss of RMB155.7 million and net income of RMB 18.2 million (US$2.7 million) for the three months ended March 31, 2018 and 2019, respectively.***

209. Elsewhere, the Offering Documents misleadingly, inaccurately, and/or incompletely disclosed the Company's revenues for the three months ended March 31, 2019 as compared to compared to three months ended March 31, 2018:

> ***Revenue***. Our revenues were RMB1,489.1 million (US$221.9 million) for the three months ended March 31, 2019, representing an increase of 123.4% from RMB666.5 million for the three months ended March 31, 2018. The increase was mainly attributable to an increase in live streaming revenue.
>
> *Live streaming revenue*. Our live streaming revenue increased by 149.2% from RMB543.4 million for the three months ended March 31, 2018 to RMB1,354.1 million (US$201.8 million) for the three months ended March 31, 2019, ***primarily attributable to our continuing cultivation of users' paying habits and growth in the number of paying users and ARPPU***.

210. Elsewhere, the Offering Documents inaccurately, misleadingly, and incompletely disclosed the Company's "Revenue sharing fees and content cost" for the three months ended March 31, 2019 as compared to compared to three months ended March 31, 2018:

> Our revenue sharing fees and content cost increased by 121.1% from RMB482.7 million in the three months ended March 31, 2018 to RMB1,067.4 million (US$159.0 million) in the three months ended March 31, 2019, primarily due to the increases in (i) the revenue sharing fees in line with the increase in live streaming revenue, and (ii) ***content cost as we introduced high quality content in our platform and invest in eSports related content***.

211. Elsewhere, the Offering Documents inaccurately, misleadingly, and incompletely disclosed that the Company's revenues for the year ended December 31, 2018 compared with the year ended December 31, 2017:

> ***Revenue.*** Our revenue increased by 93.8% from RMB1,885.7 million in 2017 to RMB3,654.4 million (US$544.5 million), mainly attributable to the increase in (i) live streaming revenue and (ii) advertisement and other revenues.
>
> *Live streaming revenue.* Our live streaming revenue increased by 106.8% from RMB1,521.8 million in 2017 to RMB3,147.2 million (US$468.9 million) in 2018. During the same periods, our quarterly average paying users grew from approximately 2.4 million to 3.8 million, and our quarterly average ARPPU grew from RMB156 to RMB208. ***The growth in live streaming revenue, quarterly average paying users and quarterly average ARPPU were attributable to our continuing effort in growing our user base and developing users' willingness to pay, including offering of compelling content especially eSports related content, increased popularity of our platform, optimized product features and introduction of interactive streaming channels***.

212. The Offering Documents also inaccurately, misleadingly, and incompletely disclosed that the Company's revenues for the year ended December 31, 2017 compared with the year ended December 31, 2016:

> ***Revenue.*** Our revenue increased by 139.7% from RMB786.9 million in 2016 to RMB1,885.7 million in 2017, mainly attributable to the increase in (i) live streaming revenue and (ii) advertisement and other revenues.
>
> *Live streaming revenue*. Our live streaming revenue increased by 149.0% from RMB611.3 million in 2016 to RMB1,521.8 million in 2017, mostly attributable to the significant growth of quarterly average paying users from approximately 0.9 million to 2.4 million. As it takes time to cultivate new users' paying habits, the quarterly average ARPPU decreased slightly from RMB164 to RMB156. ***The growth in the live streaming revenue and paying user base were attributable to our continual effort in growing our user base and developing users' willingness to pay, including offering of compelling content especially eSports related content, increased popularity of our platform, optimized product features and introduction of interactive streaming channels***.

213. Elsewhere, the Offering Documents inaccurately, misleadingly, and incompletely disclosed the Company's "Revenue sharing fees and content cost" for the year ended December 31, 2018 compared with the year ended December 31, 2017:

> Our revenue sharing fees and content cost increased by 103.2% from RMB1,373.1 million in 2017 to RMB2,790.0 million (US$415.7 million)

> in 2018, primarily due to the increases in (i) the revenue sharing fees in line with the increase in live streaming revenue, and (ii) ***content cost as we continuously introduce high quality content such as eSports related content on our platform***.

214. Elsewhere, the Offering Documents inaccurately, misleadingly, and incompletely disclosed the Company's "Revenue sharing fees and content cost" for the year ended December 31, 2017 compared with the year ended December 31, 2016:

> Our revenue sharing fees and content cost increased by 75.5% from RMB782.4 million in 2016 to RMB1,373.1 million in 2017, primarily due to the increases in (i) the revenue sharing fees in line with the increase in live streaming revenue, and (ii) ***content cost as we continuously introduce high quality content, such as eSports related content on our platform***.

215. The Offering Documents also inaccurately, misleadingly, and incompletely disclosed that:

> Our cost of revenues grew for the nine quarters in the period from January 1, 2017 to March 31, 2019 ***as a result of our business growth, which requires higher revenue sharing fees and content cost*** as well as bandwidth costs. Growth in our cost of revenues accelerated in the period from January 1, 2018 to March 31, 2019 due to ***our strategic focus on recruiting top streamers to attract more users and diversify our content offerings, which contributed significantly to our revenue sharing fees and content cost***.

216. The Offering Documents further inaccurately, misleadingly, and incompletely disclosed that:

> We have generally experienced steady growth in our quarterly net revenues for the nine quarters in the period from January 1, 2017 to March 31, 2019. ***The growth was mainly attributable to the growth of paying users from 1.7 million in the first quarter of 2017 to 6.0 million to the first quarter of 2019, and ARPPU from RMB135 to RMB226 in the same periods***. ***The increase in the number of paying users and ARPPU was a result of our continued efforts in growing user base and user engagement through popular streamers and rich and engaging content, and in cultivating active users' paying habit by creating various paying scenarios.*** The slight decrease in our net revenues in the first quarter of 2018 was due to the decrease in our advertisement revenues, as the demand for our advertisement services is generally lower in the first quarter of each year. This is primarily attributable to a general slowdown in business activities

> during the Chinese New Year holiday and the fact that advertisers typically limit their budgets for online platforms during this time of the year. The net revenues trend we experienced in the past may not apply to, or be indicative of, our future operating results.

217. The statements in paragraphs 206–16 above touted to investors that DouYu's ever-increasing revenues were the result of users purchasing virtual gifts for streamers in response to the quality of the Company's product, *i.e.*, appeal of the Company's streamers and the content those streamers created. The statements were materially inaccurate, misleading, and/or incomplete, however, because they described and misattributed the reasons for increases in revenue sharing fees and content costs without disclosing that these costs included payments to streamers, which the streamers then used to purchase Yuchi and gifts for themselves, as well as kickbacks of half the value of these purchases by streamers for themselves. These statements were also materially inaccurate, misleading, and/or incomplete because they failed to disclose that the Company's revenues were inflated by these *de facto* wash transactions.

218. The Offering Documents also communicated to investors that fans or supporters of streamers—*i.e.*, users separate from the streamers themselves—were purchasing virtual gifts for those streamers, which enabled the Company to become profitable for the first time in its history in Q1 2019, but failed to disclose that the newfound profitability was the result of streamers were purchasing gifts for themselves as a way to boost their profiles and/or maintain their monthly traffic flow quotas on DouYu's platform. For example, the Offering Documents stated that:

> We have developed diversified monetization channels to capitalize on our large and active user base as well as high-quality content offered by our deep pool of top streamers. We primarily generate revenues through live streaming and advertisement. ***Revenue from live streaming mainly consists of sales of virtual gifts which viewers give to streamers during live streaming to show appreciation and support*** . . . . Our revenue has increased from RMB786.9 million in 2016 to RMB1,885.7 million in 2017 and further to RMB3,654.4 million (US$544.5 million) in 2018. Our revenue increased from RMB666.5 million for the three months ended March 31, 2018 to RMB1,489.1 million (US$221.9 million) for the same

> period of 2019. We had net loss of RMB782.9 million, RMB612.9 million and RMB876.3 million (US$130.6 million) in 2016, 2017 and 2018, respectively, and ***net loss of RMB155.7 million and net income of RMB 18.2 million (US$2.7 million) for the three months ended March 31, 2018 and 2019, respectively***.

219. Similarly, the Offering Documents touted "large following bases" of fans who "support these streamers with virtual gifts," again inaccurately, misleadingly, and incompletely communicating to investors that separate users—*i.e.*, not the streamers themselves—were purchasing virtual gifts for streamers without disclosing that streamers were buying gifts for themselves:

> "***Our top streamers tend to have large following bases who regularly support these streamers with virtual gifts***, and they also tend to attract many integrated promotion activities during live streaming compared to self-registered streamers. ***Their charisma and the high-quality content that they create are primary contributors to user stickiness and are hard to replicate with self-registered streamers***. In the first quarter of 2018 and 2019, ***our exclusive streamers accounted for 46.0% and 61.2% of our total live streaming revenue***, respectively."

220. Likewise, when describing the Company's model for paying streamers, the Offering Documents inaccurately, misleadingly, and incompletely stated that streamers received a percentage of the sales of virtual gifts bought by *other users* for those streamers, and did not disclose that streamers were purchasing virtual gifts for themselves:

> *Revenue sharing fees and content cost*. Our revenue sharing fees represent our payment to streamers based on a percentage of revenue from sales of virtual items, including virtual gifts and other subscription based privileges. ***When a viewer sends a virtual gift to a streamer, we pay a certain percentage of the sales of virtual gifts to the streamers or the talent agency of which the streamer is a member***. In addition, we give certain of our streamers a monthly pay that is determined based on the popularity of the streamer. ***Our content cost mainly covers costs we incurred in purchasing content rights, compensating and recruiting streamers, and those we incurred in generating self-produced content.*** We expect the revenue sharing fees and content cost to increase in absolute amount as our business grows and we further expand our content offerings, enhance user engagement and strengthen investment in eSports. We expect the

> percentage of revenue sharing fees and content cost of total net revenues to decline as we benefit from economies of scale.

221. In addition, the Offering Documents inaccurately, misleadingly, and incompletely communicated that the Company's revenues depended on growing the number of "paying users" on DouYu's platform, and failed to disclose that these "paying users" included streamers purchasing gifts for themselves in *de facto* wash transactions:

> The markets for our live streaming platform and the related products and services are relatively new and rapidly developing and are subject to significant challenges, especially in terms of ***converting non-paying users to paying users, maintaining a stable paying user base and attracting new paying users***. Our business plan relies heavily upon an expanding user base and the resulting increased revenue from live streaming and advertisement, as well as our ability to capitalize on the eSports industry and explore other monetization avenues.

222. Along the same lines as the statement in paragraph 221 above, the Offering Documents elsewhere inaccurately, misleadingly, and incompletely disclosed that:

> We primarily generate live streaming revenues through the sales of virtual gifts. See "Business—Monetization opportunities—Live Streaming". ***We expect that our revenues from live streaming derived from the sale of virtual gifts to increase as we grow our user base, enhance our user engagement, expand virtual gifting scenarios, increase users' willingness to pay, and continue to capitalize on the significant market potential of eSports***."

223. In describing the Company's recognition of revenue, the Offering Documents were also materially inaccurate, misleading, and/or incomplete because they communicated to investors that other users—*i.e.*, not the streamers themselves—were buying virtual gifts for streamers:

> We principally engage in operating our own live streaming platforms, ***which enable streamers and users to interact with each other during live streaming***. ***The users have the option to purchase virtual currency, which is non-refundable and can only be used to redeem for virtual items to be used in the live streaming sessions on the our [sic] platforms***. Unredeemed virtual currency is recorded as deferred revenue. Virtual currencies used to purchase virtual items are recognized as revenue according to the prescribed revenue recognition policies of virtual items addressed below unless otherwise stated.

224. Similarly, the Offering Documents elsewhere were materially inaccurate, misleading, and/or incomplete because they described the user-streamer interactions without disclosing that streamers purchased virtual gifts for themselves, including for the purpose of misleading users into believing that the streamer was more popular than in reality he or she was and to meet the streamer's monthly traffic quotas:

> Through playing and narrating games live, streamers play a vital role in attracting and retaining user traffic as well as enhancing user engagement, and therefore are crucial assets to game-centric live streaming platforms. ***Streamers can in turn monetize on game-centric live streaming platforms through measures such as receiving virtual gifts from users, advertisement income by streamer endorsement and commercialization of content created***. The top streamers can inspire a large fan base of viewers ***with their superior skillsets and passionate personality***, and generate significant monetization opportunity and user engagement.

225. The Offering Documents also inaccurately, misleadingly, and incompletely stated that *other users*, not the streamers themselves, purchased gifts for streamers when describing the "monetization channels," *i.e.*, sources of revenue, used by live-streaming platform companies:

> ***Users can purchase virtual items on the platforms for the purpose of rewarding streamers that they like, and live streaming platforms typically share a portion of the payment for virtual items. By giving streamers virtual gifts, viewers show their appreciation for the streamers and get to engage in live streaming on a more interactive and real-time basis.*** Compared with other live streaming formats, game-centric live streaming offers a more sustainable context for virtual gifting due to the massive base of game fans with high engagement and propensity to spend on game-centric entertainment formats.

226. The Offering Documents also inaccurately, misleadingly, and incompletely described payments by the Company to its streamers without disclosing that the Company kicked back a portion of purchases of virtual currency made by the streamers themselves:

> Our exclusive contracts have exclusivity clauses that require streamers to live stream on our platform only during the contract term. ***In addition to payments of a portion of virtual gift sales and advertisement sales, we typically pay our exclusive streamers base compensation based on the content he or she produces and the number of concurrent viewers who***

> ***watch live streaming at the same time***. We have the right to review and adjust our streamers' base compensation taking into account their performance metrics. As such, ***our exclusive streamers are incentivized to produce engaging content that attracts more viewers and promotes spending on our platform.***

227. The Offering Documents also inaccurately, misleadingly, and incompletely described virtual gifts as items that *other users purchased and gave to streamers*, not as items that streamers *purchased for themselves* and received a kickback from DouYu:

> ***Users are able to purchase virtual gifts on our platform using our virtual currency and send them to streamers as a gesture of appreciation or support.*** Users can purchase the virtual currency on our site via various online third-party payment platforms, including WeChat Pay, AliPay and other payment platforms. In addition to purchasing these virtual currencies on our site, users can purchase virtual currencies from our online store at third-party websites such as *Tmall.com*. The price of our virtual currency does not change and virtual currency does not expire. However, virtual currency is non-refundable and may not be converted back to cash or be transferred between users.
>
> ***When a streamer receives a virtual gift, that virtual gift is displayed in his or her profile. We pay our streamers fees based on a percentage of revenue from virtual gift sales on live streaming channels.*** We have the system in place to foster the interaction and promote spending on our platform.
>
> * * *
>
> A wide variety of virtual gifts are available to our users, with prices ranging from approximately RMB0.1 to approximately RMB2,000. We provide an innovative and diverse selection of virtual gifting to convert our active users to paying users and frequently release new virtual goods related to events and pop culture trends to increase sales. In addition, ***we organize streamer popularity contests to promote spending by viewers to show support of the streamers they follow***.

228. The Offering Documents also inaccurately, misleadingly, and incompletely described how visitors to DouYu's platform could register to become streamers. While the Offering Documents disclosed that streamers could purchase virtual gifts, the Offering Documents

were also materially inaccurate, misleading, and/or incomplete because they failed to disclose that streamers purchased and received a kickback on virtual gifts *for themselves*:

> To broaden our user base, we allow users to watch live streaming on our platform without registration, either through our website or mobile apps. ***To become a streamer, a user must register on our platform and verify his or her identity with a government issued ID. As a result, certain of our streamers are also active users as well as paying users on our platform.*** After the streamer's identity is verified, he or she may apply to create a new room for streaming. Once a room or channel is created, our streamers may customize video, audio and other room settings.

229. The Offering Documents' disclosure of "new products and features to enhance user experience and increase user engagement" was also materially inaccurate, misleading, and/or incomplete because it communicated to investors that *other users* bought gifts for streamers without disclosing that streamers purchased the gifts for themselves and received a kickback from the Company on those purchases:

> We also develop new products and features to enhance user experience and increase user engagement. Our platform features *Yu Bar* ("鱼吧"), a short-blogging community where streamers can interact with their followers by posting and replying to short blogs. During 2018, Yu-Bar witnessed approximately 144 million interactions including posts, responses, likes and forwards. In addition, we offer features such as "Streamer Tailor-made Gifts" that ***allow top streamers to design unique gifts to be purchased by their followers***. Our "*DouYu Fleet*" ("斗鱼车队") allows users to create private groups of up to 2,000 members to complete certain tasks together to create vibrant interactions.

230. The Offering Documents also inaccurately, misleadingly, and incompletely described how the Company was working to control "streamer compensation" by failing to disclose that the compensation was used by streamers to purchase gifts for themselves:

> Our costs of revenues were RMB1,286.0 million (US$191.6 million) for the three months ended March 31, 2019, representing an increase of 100.4% from RMB641.9 million for the three months ended March 31, 2018, primarily attributable to the increase in revenue sharing fees and content costs in parallel with the growth in our live streaming revenue and business expansion, ***partially offset by our efforts to increase operating efficiency and control costs such as streamer compensation***.

231. The statements in paragraphs 218–30 above communicated to investors that DouYu's revenues from purchases of virtual gifts were the result of purchases of gifts by *other users* for streamers—*i.e.*, not the purchases of gifts by streamers for themselves. These statements were materially inaccurate, misleading, and/or incomplete, however, because they failed to disclose that the Company's revenues were inflated by *de facto* wash transactions where streamers purchased virtual gifts for themselves and the Company kicked back half the amount of the purchase to the streamer.

232. The Offering Documents also included numerous boilerplate inaccurate, misleading, and incomplete Risk Factors that failed to disclose to investors that the Company's revenues also depended on the ability of streamers to purchase virtual gifts for themselves. For example, the Offering Documents advised investors that:

> ***we generated positive gross profit for the first time recently in 2017 and then in 2018 and generated net profit in the first quarter of 2019***, such positive trend may not translate into continued net after-tax profit. The time it will take for us to eventually achieve profitability hinges on our ability to grow rapidly in a cost-effective way, and we may not be able to grow this way successfully.
>
> While ***our future revenue growth will be linked with the realization of our monetization strategies, which will be affected by user engagement, streamer retention and product offering***, our cost-effective growth will primarily rely on improvement of operational efficiency, which has been reflected so far in the continually decreasing percentage of our content costs and bandwidth and server costs in our total operating costs. This trend of operational efficiency improvement may not continue in the future, or it may not reach a sufficient level to generate profitability. ***Our ability to continue to improve operational efficiency will depend on our ability to maintain stronger bargaining position in contract negotiations with top streamers, streamline our operation, achieve economies of scale and employ more advanced streaming technologies at lower cost, among other things***. Additionally, ***our ability to achieve profitability is affected by various external factors, many of which are beyond our control, such as the PC and mobile games market and eSports industry in China, and the development of social networking, live streaming services and mobile marketing services***. We cannot assure you that we will be able to improve our operational efficiency in the future.

233. Likewise, the Offering Documents also inaccurately, misleadingly, and incompletely advised investors that:

> Our monetization model is new and evolving. Our streaming platform is free to access, and we generate revenues primarily from live streaming and advertisement. As a result, ***our revenue is affected by our ability to increase user engagement and convert non-paying users into paying users, which in turn depends on our ability to offer content, virtual gifts, advertisements and other services***.

234. In addition, the Offering Documents inaccurately, misleadingly, and incompletely disclosed that:

> ***Our revenue growth is heavily dependent on paying users and revenue per paying user. If we fail to continue to grow or maintain our paying user and continue to increase revenue per paying user, our live streaming revenue may not increase, which may materially and adversely affect our business operation and financial results***.
>
> Our quarterly average paying users grew from 0.9 million in 2016 to 2.4 million in 2017 and further to 3.8 million in 2018. Moreover, ***our average revenue per paying user ("ARPPU") per quarter changed from approximately RMB164 in 2016 to RMB156 in 2017 and increased to RMB208 in 2018. Whether we can continue this trend of increasing paying ratio amongst our users depends on many factors, and many of them are out of our control. For example, our paying users may have less disposable income as they need to meet financial obligations elsewhere, they may decide to no longer support a particular streamer that they used to follow financially, and an overall worsening economic conditions can lower disposable income for all existing paying users, causing them to spend less on our platform***. ***We expect that our business will continue to be heavily dependent on revenue collected from paying users in the near future***. Any decline in the number paying users or our paying ratio may materially and adversely affect our results of operations.

235. The statements in paragraphs 232–34 above touted to investors that DouYu had become profitable for the first time in Q1 2019, and purported to advise investors as to the various risks that could affect the Company's revenue streams, but were materially inaccurate, misleading, and/or incomplete because they failed to disclose that the Company's revenues were inflated by *de facto* wash transactions where streamers purchased virtual gifts for themselves and the

Company kicked back half the amount of the purchase to the streamer, as well as that the Company's future profitability depended in part on its streamers' ability and willingness to continue making such purchases.

236. The statements in paragraphs 206–35 were material to investors because, as disclosed in the Registration statement purchases of virtual gifts made up the overwhelming majority of the DouYu's revenues, including 77.7%, 80.7%, 86.1%, 81.5% and 90.9% of its "total net revenue in 2016, 2017, 2018 and for the three months ended March 31, 2018 and 2019 respectively." In addition, DouYu was able to increase the size of its IPO by approximately $275 million at the last minute because it reported $2.7 million in profits in Q1 2019, which were inflated by purchases of virtual gifts by streamers for themselves. Indeed, at least one top streamer had purchased over $3 million in virtual currency for himself during that period. DouYu's analysts seized on the Company's purported profitability, emphasizing to investors that DouYu had "***mov[ed] into the black for the first time***" and its "***revenue growth [had] caught up with Huya***," the Company's chief rival, not realizing that it was unsustainable self-purchases, not income produced organically in DouYu's user-streamer "ecosystem" that caused its sudden profitability.

### 3. The Offering Documents Misrepresented and/or Failed to Disclose that Streamers Could and Were Actively Misrepresenting Themselves on DouYu's Platform

237. DouYu's Offering Documents, which were signed by all the Securities Act Defendants, emphasized to investors that DouYu knew the identities of its streamers, who the Company relied on to generate revenue by inducing users of DouYu's platform to buy virtual gifts for streamers. In addition, DouYu's Offering Documents assured investors that it had implemented a "Content Monitoring System" designed to identify and punish streamers who engaged in fraudulent conduct. These statements were materially inaccurate, misleading, and/or incomplete, however, because they failed to disclose that DouYu's platform allowed streamers to misrepresent

themselves to users, which created a material risk that users would leave DouYu when they learned the streamers' true identities.

238. DouYu's Offering Documents directly assured investors that the Company knew the identity of every streamer because: "To become a streamer, a user must register on our platform ***and verify his or her identity with a government issued ID*** . . . . After the streamer's identity is verified, he or she may apply to create a new room for streaming."

239. The Offering Documents also emphasized to investors that it knew the identities of its "top streamers," who generated the most revenue, because it had a program to identify, recruit and develop such streamers, and entered into exclusive contracts directly with those streamers:

> Our platform brings together a deep pool of top streamers and provides a sustainable streamer development system. As of March 31, 2018 and 2019, our platform had 4.6 million and 6.5 million registered streamers, ***including more than 2,000 and 6,500 top streamers, each of whom entered into an exclusive contract with us directly as of each date, respectively***. These top exclusive streamers streamed an average of 4.1 and 4.3 hours per show in the first quarter of 2018 and 2019, respectively, and all of our streamers generated a total of 20.4 million and 30.2 million streaming hours during the same periods. Approximately 440 and 780 of our streamers had more than one million viewers during the first quarter of 2018 and 2019, respectively. Approximately 491,000 of our streamers are managed through talent agencies as of March 31, 2019. ***Our exclusive contract model with top streamers helps ensure a consistent supply of quality content***, which is effectively supplemented by the talent agency model that captures a large group of promising and rising streamers. ***With years of experience, we have developed a well-designed system to discover, train, and promote streamers who are already popular or have demonstrated the potential to become popular, and to help them grow and monetize their popularity***.

240. Indeed, the Offering Documents touted that one of DouYu's "Strengths" that "contribute[s] to our success and differentiate[s] us from our competitors" was its "[d]eep pool of top streamers empowered by ***a comprehensive streamer development system***."

241. The Offering Documents also included multiple statements emphasizing how DouYu's streamers drove the Company's revenue by engaging with and inducing users to buy

virtual gifts, which were the source of over 61% of the Company's revenue in the quarter before the Company's IPO:

- "Our user base and level of user engagement help us ***attract top streamers who produce quality content***. ***The curated content and interactive features of our platform help attract and retain users and encourage user participation, which in turn drives up virtual gifting activities and our live streaming revenue***. Our game live streaming combined with a broad range of other entertainment contents have been highly effective in attracting user traffic and boosting user spending. In addition, the broad user reach and attractive commercial proposition of our platform continuously draw advertisers, game developers and other participants of the eSports industry to our platform."

- "As of March 31, 2019, our streamer pyramid consisted of 6.5 million registered streamers, including more than 6,500 top streamers, each of whom entered into an exclusive contract with us directly, approximately 491,000 streamers managed through talent agencies and the rest who are self-registered streamers. As of March 31, 2018, our platform had 4.6 million registered streamers, including more than 2,000 top streamers each of whom entered into an exclusive contract with us directly. ***Our top streamers tend to have large following bases who regularly support these streamers with virtual gifts, and they also tend to attract many integrated promotion activities during live streaming compared to self-registered streamers. Their charisma and the high-quality content that they create are primary contributors to user stickiness and are hard to replicate with self-registered streamers***. In the first quarter of 2018 and 2019, ***our exclusive streamers accounted for 46.0% and 61.2% of our total live streaming revenue, respectively***."

242. The Offering Documents assured investors that DouYu monitored its streamers for, among other things, fraudulent conduct, using a sophisticated "Content Monitoring System" that monitored streamers, including by regularly taking screen captures of and by punishing streamers who engaged in improper conduct. Specifically, the Offering Documents represented that:

> **Content Monitoring System**
>
> Our live streaming platform contains real-time content, which we monitor to maintain a healthy ecosystem and ensure compliance with PRC laws and regulations. We have developed a comprehensive system to monitor content

> on our platform and filter inappropriate and illegal content and content that may infringe on the intellectual property rights of third parties.
>
> * * *
>
> ***We have also developed a proprietary monitoring system in-house that takes screenshots of our live streaming channels every 10 seconds based on our "smart" image detection technology***.
>
> * * *
>
> ***All of the automatic detection results that are escalated are reviewed by our content monitoring staff manually***. We have a dedicated content monitoring team who also proactively check our rooms on a 24/7 basis for inappropriate or illegal content
>
> * * *
>
> We deal with violations of varying severity in accordance with our strict policies and applicable regulations. Our actions may include warnings, cutting off or temporary suspension of the room and/or account for minor violations, with follow-up review to ensure effective enforcement and rectification. ***For serious violations, the relevant account is deleted permanently and all virtual currency and items are forfeited, and the room may be permanently closed***. Our streamers agree to indemnify us for all damages arising from third-party claims against us caused by the infringing content produced by them.

243. While the Offering Documents contained a detailed Risk Warning stating that the Content Monitoring System "may not be effective in preventing misconduct by our platform users," that warning did not apprise investors of the risk that streamers could misrepresent themselves on the platform:

> We are a game-centric live streaming platform that provides real-time streaming and interactions. Because we do not have full control over how and what streamers or viewers will use our platform to communicate, ***our platform may be misused by individuals or groups of individuals to engage in immoral, disrespectful, fraudulent or illegal activities***. For example, we detect spam accounts through which illegal or inappropriate content is streamed or posted and illegal or fraudulent activities are conducted on a timely basis. Media reports and Internet forums have covered some of these incidents, which have in some cases generated negative publicity about our platform and brand. We have implemented control procedures to detect and block illegal or inappropriate content and illegal or fraudulent activities

> conducted through the misuse of our platform, but such procedures may not prevent all such content from being broadcasted or posted or activities from being carried out. Moreover, as we have limited control over real-time and offline behavior of our users, to the extent such behavior is associated with our platform, our ability to protect our brand image and reputation may be limited. Our business and the public perception of our brand may be materially and adversely affected by misuse of our platform.

244. In addition, while the Offering Documents informed investors that the DouYu's platform included a "Facial Beautification" feature, the accompanying description of that feature did not disclose that streamers could use the feature to comprehensively alter their appearance and misrepresent themselves to users:

> Streamers on our platform can utilize the beautification tools on our platform to ***improve their appearances*** during streaming. Our facial beautification feature has been serving many streamers as a useful tool since its launch."

245. In fact, while the Offering Documents included a screen capture of the DouYu's platform to show investors how a stream would appear to users, that screen capture *did not* show the "Facial Beautification" feature, so investors had no idea how it would operate in practice, and no understanding that it could enable a streamer to completely misrepresent their identity to users and place the delicate, essential user-streamer relationship at risk:

*Facial beautification.* Streamers on our platform can utilize the beautification tools on our platform to improve their appearances during streaming. Our facial beautification feature has been serving many streamers as a useful tool since its launch.

Below is a screenshot of our platform interface for streamers on our PC app:




151

246. The statements and screen capture in paragraphs 239–45 above were materially inaccurate, misleading, and/or incomplete because DouYu's Offering Documents, which were signed by all the Securities Act Defendants, emphasized to investors that DouYu knew the identities of its streamers, who the Company relied on to generate revenue by inducing users of DouYu's platform to buy virtual gifts for streamers. In addition, DouYu's Offering Documents assured investors that it had implemented a "Content Monitoring System" designed to identify and punish streamers who engaged in fraudulent conduct. These statements were materially inaccurate, misleading, and/or incomplete, however, because they failed to disclose that DouYu's platform allowed streamers to misrepresent themselves to users, which created a material risk that users would leave DouYu when they learned the streamers' true identities.

247. In addition, the statements and screen capture in paragraphs 239–45 were material because Company repeatedly stressed the importance of the streamer-user relationship. For

example, the Offering Documents warned investors that "The size of our user base and the level of our user engagement are critical to our success. Our main monetization strategies—live streaming, advertisement and others depend on our ability to maintain and increase the size of our user base and user engagement level." The Company also advised that "to maintain and improve this already large size of user base and high level of user engagement, we would have to ensure that we adequately and timely respond to changes in user preferences, ***attract and retain enough popular streamers***, and offer new features and content that may attract new users." The Company also emphasized the importance of "top streamers," advising investors that "Our top streamers tend to have large following bases who regularly support these streamers with virtual gifts, and they also tend to attract many integrated promotion activities during live streaming compared to self-registered streamers. ***Their charisma and the high-quality content that they create are primary contributors to user stickiness and are hard to replicate with self-registered streamers***. In the first quarter of 2018 and 2019, our exclusive streamers accounted for 46.0% and 61.2% of our total live streaming revenue, respectively." The Offering Documents further advised that "***running a successful live streaming platform requires intensive capital outlay and a large team of quality streamers, who remain in short supply*** due to the fact that most have signed contracts with existing platforms, there are high entry barriers for our industry."

#### 4. The Offering Documents' Misstatements and Omissions Regarding Tencent

248. The Offering Documents also repeatedly emphasized the importance of DouYu's relationship with Tencent. For example, the Offering Documents stated: "We also benefit from the strong capabilities and support of Tencent, our major shareholder and strategic partner, in live streaming, advertisement and game distribution, which helps reinforce and solidify our position as a leading game-centric live streaming platform in China." The Offering Documents further

highlighted DouYu's "Relationship with Tencent," in particular emphasizing the purported benefits of a "strategic cooperation agreement" that the two partners had entered into at the time of the IPO, stating, in pertinent part:

> Our Relationship with Tencent
>
> Tencent became a shareholder of Wuhan Douyu, one of our wholly-owned subsidiaries, in April 2016 when it purchased certain of Wuhan Douyu's shares through Linzhi Lichuang, an entity controlled by Tencent. Tencent subsequently increased its investment in Wuhan Douyu by purchasing shares in Wuhan Douyu's subsequent rounds of financing and in our company by subscribing for Series E Preferred Shares. Upon the completion of this offering, Tencent will hold 37.2% of our total outstanding ordinary shares (excluding 2,106,321 ordinary shares issued to Douyu Employees Limited, our employee shareholding platform established for the RSUs granted under the Amended and Restated 2018 RSU Scheme) through Nectarine, representing 37.2% of our total voting power, assuming the underwriters do not exercise their over-allotment option.
>
> * * *
>
> On December 20, 2017, we and Tencent, through our respective PRC affiliated entities, entered into a strategic cooperation agreement, which became effective on January 31, 2018 and was subsequently replaced by the Amended and Restated SCFM [Strategic Cooperation Framework Memorandum] dated April 1, 2019. Pursuant to the Amended and Restated SCFM, the parties agreed to pursue strategic cooperation in various areas of game live streaming, advertisement and game distribution. We plan to promote content related to games owned by or licensed to Tencent at certain prominent places of our platform. The specific location, content, and operations of the cooperation between Tencent and us are subject to further negotiation pursuant to market principles. The Amended and Restated SCFM has a term of three years, which may be renewed if certain conditions are met. We also use CDN, P2P streaming technologies, online payment and website technology support services provided by Tencent and engage in other related party transactions with Tencent.
>
> * * *
>
> In addition to the Amended and Restated SCFM, we also entered into a share purchase agreement (the "Share Purchase Agreement") with Nectarine on March 8, 2018. Pursuant to the Share Purchase Agreement, we issued 7,828,728 of Series E Preferred Shares to Nectarine at a price of approximately US$80.6 per share, representing 25.95% of our total outstanding shares on an as-converted basis as of the closing of the

> transaction. Nectarine also holds 3,125,000 of our Series B-2 Preferred Shares and 1,114,376 of our Series C-1 Preferred Shares.

249. In addition, the Offering Documents stated that Tencent had bolstered DouYu's business through the provision of support services worth several hundred million RMB in the lead up to the IPO and that DouYu had likewise generated significant fees through its provision of services to Tencent. As the Offering Documents stated:

> **Transactions with Tencent**
>
> ***In 2016, 2017, 2018 and for the three months ended March 31, 2019, we provided services to Tencent's PRC affiliated entities in relation to advertisements, game distribution and promotional activities on our platform for the total amount of approximately RMB9.5 million, RMB21.7 million, RMB50.8 million and RMB17.3 million in fees, respectively.*** As of March 31, 2019, we had an amount of approximately RMB24.2 million due from certain of Tencent's PRC affiliated entities, representing the unsettled balance of fees for the services we provided to them.
>
> ***In 2016, 2017, 2018 and for the three months ended March 31, 2019, Tencent provided services to us through its PRC affiliated entities in relation to CDN, P2P streaming technologies, online payment and website technology support and licensed certain copyrights to us for the total amount of approximately RMB77.0 million, RMB219.2 million, RMB387.7 million and RMB86.3 million in fees, respectively.*** As of March 31, 2019, we had an amount of approximately RMB234.0 million due to certain of Tencent's PRC affiliated entities, representing the unsettled balance of fees for the services and copyrights they provided to us.
>
> We have entered into the Amended and Restated SCFM and other agreements with Tencent through its PRC affiliated entities.

250. Moreover, the Offering Documents claimed DouYu would "***further solidify our strategic cooperation with Tencent in the future***," indicating that DouYu was set to further strengthen its relationship with Defendant Tencent and that Tencent would continue to support DouYu's operations.

251. The Offering Documents also downplayed the potential competitive threat from newcomers in the eSports industry. For example, the Offering Documents stated, "Since running a successful live streaming platform requires intensive capital outlay and a large team of quality streamers, who remain in short supply due to the fact that most have signed contracts with existing platforms, ***there are high entry barriers for our industry***." The Offering Documents further claimed that DouYu's only "major competitors" were "streaming platforms with an established presence in the industry" (citing Huya while omitting any mention of Kuaishou) and that "***such competition may only come from a few established players instead of many newcomers***."

252. In addition, the Offering Documents stated that DouYu was "at the forefront of the game-centric live streaming industry in China" and also listed several "competitive strengths" that purportedly "contribute to [DouYu's] success and differentiate [it] from [its] competitors," including DouYu's: (a) "Leading game-centric live streaming platform"; (b) "Large and highly engaged user base"; (c) "Deep pool of top streamers empowered by a comprehensive streamer development system"; (d) "Strategic[] position[] in eSports" that had "secure[d] coveted access to premium content"; (e) "Technology-and big data-enabled user experience and value proposition"; (f) "Multiple monetization channels with significant potential"; and (g) "Visionary and experienced management team with strong shareholder support."

253. Unbeknownst to investors, however, the statements identified in paragraphs 248–52 were materially inaccurate, misleading, and/or incomplete because they failed to disclose that, as of the IPO, Defendant Tencent was preparing to invest ***over $1 billion*** into Kuaishou. Indeed, just after the IPO was conducted, news emerged in China (in a Chinese language publication) that Tencent planned to inject significant capital into Kuaishou, which now suddenly loomed as a serious major direct competitor to DouYu in the live-game streaming sector.

254. The Offering Documents also misleadingly stated that "Tencent ***may*** devote resources or attention to the other companies it has an interest in, including our direct or indirect competitors," which "***may*** materially and adversely affect our business and results of operations." The Offering Documents similarly stated that Tencent "***may*** in the future continue to invest in our direct or indirect competitor." However, these and similar statements regarding DouYu's relations with Tencent (and the so-called potential "risk" of Tencent investments) were materially misleading, incomplete, and inadequate because they failed to disclose that, as of the IPO, Tencent had already planned (and indeed was on the verge of consummating) a massive new investment in a direct competitor of DouYu, namely Kuaishou, ultimately valued at $2 billion. Indeed, by using language characterizing any possibility that Tencent "may" support a competitor as merely a contingent and future possibility, the Offering Documents inaccurately and misleadingly indicated to the market that Tencent was not planning to make such an investment as of the IPO, and certainly not any investment of the kind of exceptional magnitude and consequence to DouYu represented by Tencent's Kuaishou investment plans.

255. Indeed, Tencent's investment of more than $1 billion in Kuaishou greatly facilitated Kuaishou's ability to dramatically expand its eSports streaming business and to undercut DouYu's market dominance in that area. Tencent, despite being Kuaishou's controlling shareholder and strategic business partner, almost singlehandedly launched Kuaishou from a minor eSports position into a major market player and competitive threat to DouYu, based on Tencent's' calculus that Kuaishou provided favorable economics compared to DouYu and that a massive investment in Kuaishou (though detrimental to DouYu) would serve Tencent's own financial interests. ***Yet the Offering Documents did not even mention Kuaishou***, let alone the fact that Tencent was on the cusp of catapulting this formerly minor player into a highly dangerous and well-financed

competitor. This omission was all the more notable because, as the Offering Documents noted, the eSports industry in which DouYu operated had "high barriers to entry."

256. The failure of the Offering Documents to disclose Tencent's plans as of the IPO to invest more than $1 billion in Kuaishou—at the same time the Offering Documents highlighted Tencent's ostensible strategic benefits to DouYu—rendered the Offering Documents' statements regarding Tencent's relationship with DouYu (and the purported competitive advantages flowing to DouYu as a result thereof) materially misleading, inaccurate, and/or incomplete.

### 5. The Offering Documents' Misstatements Concerning DouYu's Growth Trajectory

257. The Offering Documents also contained numerous other statements designed to assure investors that DouYu's favorable growth trends were continuing at the time of the IPO. For example, the Offering Documents emphasized the "steady" consistency of the favorable trends that the Company was purportedly experiencing: "We have generally achieved steady growth in our user base during these periods." Similarly, the Offering Documents stated, "We have generally experienced a steady increase in the number of our paying users and paying ratio due to active cultivation of our users' paying habits through compelling content and various promotional activities and events." Likewise, the Offering Documents stated, "We have generally experienced steady growth in our quarterly net revenues for the nine quarters in the period from January 1, 2017 to March 31, 2019" due to "the growth of paying users."

258. In particular, the Offering Documents highlighted revenues generated by the sale of virtual gifts on the DouYu platform and other interactive features. For example, the Offering Documents stated that "***[w]e expect that our revenues from live streaming derived from the sale of virtual gifts to increase*** as we grow our user base, enhance our user engagement, expand virtual

gifting scenarios, increase users' willingness to pay, and continue to capitalize on the significant market potential of eSports."

259. Unbeknownst to investors, however, the statements identified in paragraphs 257–58 were materially inaccurate, misleading, and/or incomplete because, as of the IPO: (a) DouYu's margins and the rate of growth in its meager profits had declined to effectively zero; (b) the robust 28% sequential revenue growth described in the Offering Documents had decelerated to effectively zero by the time of the IPO; (c) DouYu was operating at a loss by the time of the IPO; and (d) DouYu was suffering from heightened competitive dynamics from other streaming companies, such as Huya and Kuaishou, and limited monetization capabilities – and thus was not positioned to catch up with Huya's profitability in the near term while also on the verge of ceding significant competitive ground to upstart Kuaishou.

260. Furthermore, the Offering Documents contained "risk disclosure" language that failed to apprise investors of the negative financial that DouYu was experiencing as of the IPO, instead presenting these so-called "risks" as future, contingent possibilities. For example, the Offering Documents stated that "[o]ur business ***may*** suffer ***if*** we fail to successfully implement our monetization strategies" and that "***[i]f*** we fail to continue to grow or maintain our paying user and continue to increase revenue per paying user, our live streaming revenue ***may*** not increase, which ***may*** materially ***and*** adversely affect our business operation and financial results." These and similar statements were materially misleading, incomplete, and inadequate because they failed to disclose that, as of the IPO, DouYu was ***already*** experiencing undisclosed financial trends.

### 6. The Offering Documents Violated the Requirements of Form F-1 and Regulation S-K.

261. In addition to the foregoing affirmative misrepresentations, the Offering Documents also violated Item 5 of Form 20-F because it failed to disclose material information.

262. The Registration Statement DouYu filed for the IPO, which forms a part of the Offering Documents, was filed on Form F-1. Item 4 of Form F-1 requires a registrant to disclose "Information required by Part I of Form 20-F." Item 5 of Form 20-F is in Part I of Form 20-F, thus the information that must be disclosed under Item 5 must be disclosed on Form F-1.

263. The SEC states that Item 5 of Form 20-F "call[s]for the same disclosure as Item 303" of SEC Regulation S-K, 17 C.F.R. § 229.101 *et seq*, *i.e.*, or "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition." Accordingly, DouYu was required to disclose in the Offering Documents events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.

264. As of the IPO and the issuance of the Offering Documents, the Securities Act Defendants were aware, but did not disclose, that Tencent was planning to invest over $1 billion in a direct competitor, Kuaishou, and that such an investment was likely to have a material adverse effect DouYu's future performance. Such knowledge can be inferred from, *inter alia*: (a) Defendant Tencent itself had direct involvement in the investment; (b) Defendant Tencent appointed several directors to the DouYu Board, including Tencent employees, and the two companies maintained an extremely close strategic partnership; (c) news reports surfaced in China ***within hours*** of the IPO, stating that Tencent had decided to make a substantial investment in Kuaishou; (d) the magnitude of the investment, ultimately valued at $2 billion; (e) the material importance to DouYu's business of competition and maintaining the competitive advantage for

DouYu in the eSports industry, as acknowledged in the Offering Documents; and (f) the nature of the investment, which indicated a deliberate negotiation process over a period of time that preceded the IPO.

265. As of the IPO and the issuance of the Offering Documents, the Securities Act Defendants were also aware, but did not disclose, that DouYu's revenue growth was decelerating significantly and its ability to compete with Huya's profitability (and with upstart Kuaishou) was suffering and that these factors would negatively impact DouYu's future performance.

266. As of the IPO and the issuance of the Offering Documents, the Securities Act Defendants were also aware, but did not disclose, that DouYu's failure to comply with then-existing regulatory requirements placed lucrative interactive product offerings by the Company at risk of termination or suspension by the Chinese government, which would negatively impact DouYu's future performance.

267. The undisclosed negative events, trends and uncertainties referenced in paragraphs 264–66 each represented known trends or uncertainties that were reasonably expected to have a material unfavorable impact on the Company's business, sales, revenues, and/or income from continuing operations and, therefore, were required to be (but were not) disclosed in the Offering Documents.

268. The failure of the Offering Documents to disclose material adverse information also violated Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105") and Item 3.D of Form 20-F ("Item 3.D"). Specifically, both Item 105 and Item 3.D provide, in pertinent part, that the "Risk Factors" section of Offering Documents filed with the SEC discuss the most significant factors that make an offering risky or speculative and that each risk factor adequately describe the risk.

269. As detailed above, the Offering Documents' discussion of risk factors were themselves materially misleading because they provided generic statements of potential or contingent risk yet failed to disclose that the potential future adverse impacts described were ***already*** occurring at the time of the IPO. For example, the Offering Documents noted that Tencent "***may*** in the future continue to invest in our direct or indirect competitor," but failed to disclose Tencent's decision and preparation at the time of the IPO to provide more than $1 billion in financial assistance to DouYu's lesser-known rival, Kuaishou, for the specific purpose of boosting that platform's entry into live video game streaming in direct competition with DouYu. Indeed, the Offering Documents failed to make ***any*** mention of a competitive threat from Kuaishou to DouYu's business and prospects, as was required by SEC rules and regulations. Under Item 105, the Securities Act Defendants were required to disclose in the Offering Documents the known risks and likely impacts of this massive, planned investment.

270. Similarly, the Offering Documents stated: "***If*** we fail to continue to grow or maintain our paying user and continue to increase revenue per paying user, our live streaming revenue ***may*** not increase," but failed to disclose that the Company was already suffering significantly slower revenue growth that would call into question its purported market dominance for the reasons identified above.

271. Similarly Offering Documents purported to warn that "[r]estrictions on virtual currency ***may*** adversely affect our revenue, business and reputation," but failed to disclose the need to modify or remove lucrative interactive feature on DouYu's platform and instead specifically disclaimed that "such activities are specifically prohibited under PRC laws and regulations." Further, the Offering Documents stated: "***If*** we fail to continue to grow or maintain our paying user and continue to increase revenue per paying user, our live streaming revenue ***may***

not increase," but failed to disclose that the Company was already suffering significantly slower revenue growth that would call into question its purported market dominance for the reasons identified above.

272. In addition, by affirmatively raising these topics, the Securities Act Defendants assumed a duty to be complete and truthful about such topics. The Securities Act Defendants violated that duty by failing to disclose the material information described herein.

### D. The Market Learns of the Inaccurate, Misleading, and/or Incomplete Statements in the Offering Documents

273. The materially inaccurate, misleading, and/or incomplete statements in the Offering Documents were revealed through a series of disclosures in the weeks and months following DouYu's IPO.

274. For example, on or after July 18, 2019, Chinese language reports began to surface in China, citing multiple independent sources, that Tencent was planning to make a huge new investment in Kuaishou and thereby to promptly convert Kuaishou from a bit player into a well-financed and formidable competitive threat to DouYu in China's live-stream gaming market. Tencent was reported to be leading a massive new round of financing in which Tencent would inject $1 to $1.5 billion into Kuaishou, just as Kuaishou was (according to Chinese language reports that also began to circulate in China at the same time) getting ready to also announce a major initiative to increase its eSports presence.

275. For example, on July 18, 2019, correspondent Jinlei Bai of Beijing News published an article in Chinese (the "Kuaishou Article") stating that "live game streaming had become the strong weapon for Kuaishou to 'tackle' the southern market," and that "[b]efore the end of summer vacation, Kuaishou would take a series of measures on the live gaming streaming market, including signing with the leading streamers, introducing the local guild, launching the paid videos

of online game, launching the companion function in games, etc." The Kuaishou Article then went on to state that "[a]ccording to information from ***several independent sources***, Kuaishou will announce a new round of funding from Tencent in the coming days, or it will form a new joint venture with Tencent with the valuation of above USD 25 billion."

276. On July 23, 2019—***less than one week after the IPO***—Kuaishou officially launched an effort to support an astounding one million streamers on its platform, which was estimated to have surpassed over 35 million DAUs. Other initiatives reportedly being pursued by Kuaishou as it finalized its new financing agreement with Tencent included signing up leading streamers, introducing local guilds (talent agencies that recruit, retain, and promote online game live streamers), launching paid online games, and expanding companion game functions—all actions that would compete with DouYu and undermine DouYu's competitive position.

277. On August 3, 2020, a local Chinese media outlet, *IPO Zaozhidao*, also reported that Tencent would be investing up to $1.5 billion in Kuaishou, followed by various additional stories reported in China over the next few days that headlined Tencent's plans to invest between US $1.0 and US $1.5 billion in Kuaishou.

278. These stories were then picked up, and reported, by various English language outlets. For example, on August 6, 2019, *www.kr-asia.com* published an English language report, titled "Tencent will invest up to USD 1.5 billion in short video app Kuaishou" The report cited the earlier *IPO Zaozhidao* and August 2, 2019 *Bejing News* reports. On this news, the price of DouYu's ADSs declined from $8.20 per ADS to $7.84 per ADS, or 4.4%.

279. On July 30, 2019, less than two weeks after the IPO, investors learned that DouYu streamers were misrepresenting themselves on the Company's platform when *BBC News* published an article about how Xiadian had been completely misrepresenting her appearance. A

screen capture of Xiadian's actual appearance and altered appearance demonstrated for investors how DouYu's streamers could completely change their appearance and deceive users.




Your Highness Qiao Biluo's real appearance (left) and one of her filtered faces (right) from an earlier livestream on Douyu

280. The *BBC News* article reported that fans were left stunned after a glitch during a live stream revealed Xiadian to be a middle-aged woman and not the young glamorous girl DouYu users had been "worship[ing]." According to the article:

> The blogger, who initially boasted ***a follower count of more than 100,000 on DouYu***, is believed to have used a filter on her face during her appearances, and had been renowned for her "sweet and healing voice".
>
> China's Global Times said she had been "worshipped" as a "cute goddess" by ***some members of her loyal audience with some fans even giving her more than 100,000 yuan ($14,533, £11,950)***.
>
> * * *
>
> The Global Times reports that all was as normal and that her fans urged her to show her face and remove her filter but she refused, instead apparently saying: "I can't show my face until I receive gifts worth 100,000 yuan ($11,950). After all, I'm a good-looking host."
>
> ***Followers began to send her donations with the largest reported to be 40,000 yuan ($5,813, £4,780) during the session.***

> However, at some point, it seems the filter being used by the Vlogger stopped working and her real face became visible to her viewers.
>
> She is reported to have noticed only when people who had signed up to her VIP access room ***started exiting en masse.***
>
> Many of her original followers - especially men - are said to have ***stopped following her and withdrawn their transactions*** after seeing her true identity.

281. The next day, July 31, 2019, a *Mic.com* article titled "Popular Chinese DouYu streamer revealed to be much older thanks to livestream glitch" (the "Mic Article"), further reported on the glitch that revealed the true identity of Xiadian whose DouYu users "fawned over the videos and photos that she uploaded . . . which showed a young woman posing, playing games, and talking to the camera." According to the Mic Article, "***the revelation caused a considerable amount of drama, with many of her male subscribers expressing outrage that they had been tricked. They left the stream in droves, unsubscribed from her account and pulled donations.***"

282. A day later, on August 1, 2019, *TechNode*, an online information outlet catering to the tech and startup community both inside and outside of China, revealed that DouYu "***banned [Xiadian]*** on Thursday for drumming up hype surrounding her accidental face reveal." The *TechNode* article, titled "DouYu bans livestreamer for hyping face reveal," noted how:

- The livestreamer said in an earlier broadcast that she wouldn't show her face until she had received gifts totaling more than RMB 100,000 ($11,950).
- After the incident, the host claimed that the face reveal was planned, saying that she paid RMB 280,000 for it.
- According to the company's statement, the livestreamer's comments "challenged the bottom line of the public and caused negative social influence." As punishment, DouYu permanently banned her channel and remove all her content.

283. *TechNode* also put the incident in context, revealing that a number of well-known Chinese live-streamers have been banned for inappropriate behavior in the past, including "Lu

Benwei, ***one of DouYu 's most popular hosts, [who] was banned from all live-streaming platforms*** by the country's top internet regulator, the Cyber Administration of China, for verbally abusing a content creator who accused him of cheating."

284. The media continued to publish accounts of the Qiao Biluo incident over the next few days, often repeating the fact that the glitch caused her followers to unsubscribe en masse and rescind their gifts. On July 29, 2019, the day before the incident was first reported, DouYu ADSs closed at $10.08 per ADS. After the market absorbed all this information, on August 6, 2019, DouYu ADSs closed at $7.84 per ADS, or down 22.22%.

285. Then, on August 11, 2019, *Bloomberg* published an article, profiling Liu, the above-described top streamer who, according to an analyst with Aequitas Research, purportedly was responsible for as much as 3% of DouYu's revenues in the second quarter of 2019 alone ("Bloomberg Article"). The article was published by the *South China Morning Post* on August 12, 2019. It was also updated by *Bloomberg* after the markets closed on August 12, 2019. The article revealed to investors for the first time that "***[s]treamers often need to spend their own money to buy fan support***—a common industry practice that calls to question whether company revenue is inflated." The article went on that "[s]oon after DouYu signed on Liu in March, he spent nearly ***20 million yuan [USD $3.15 million]*** to buy himself votes during DouYu's annual online idol competition. Half of that money goes to DouYu, and ***the other half returns to Liu's pocket. DouYu's CEO confirmed this.***" The Bloomberg Article then quoted a Global Equity Research analyst as stating that "These 'fake' votes will be still counted as revenue as, under accounting standards, the streamer will be considered a paying customer . . . ***DouYu's focus on top streamers makes it more susceptible to this issue compared to Huya***."

286. In addition, based on the Bloomberg Article and DouYu's disclosure, investors realized that Liu himself was responsible for 3%, or ***$8.2 million*** of those revenues, and that the prior quarter Liu had spent over ***$3 million***, or just under half that amount, on his own purchases on DouYu's platform. Investors also realized that, since top streamers like Liu were responsible for "***61.2% of the total live streaming revenue generated from [DouYu's] platform***," according to the Offering Documents, a substantial portion of approximately $152 million—*i.e.*, 61.2% of 272.8 million—in DouYu's revenue could be *de facto* wash transactions by streamers trying to build their profiles, half of which is kicked back to the streamers themselves. In addition, the disclosure in the Bloomberg Article was especially shocking because Liu's purchase of $3.15 million for himself was more than the Company's entire ***$2.7 million*** reported net profit for Q1 2019. In other words, it was very likely that the Company had not been profitable in that quarter, and the Offering Documents materially inaccurate, misleading, and/or incomplete statements had increased the size of DouYu's IPO by $274 million under false pretenses.

287. On August 13, 2019, DouYu released its earnings for the Second Quarter of 2019 and reported $272.8 million in net revenues. DouYu issued a press release announcing its financial results for the quarter ended June 30, 2019—the quarter that had closed more than two weeks before the IPO. The press release stated that DouYu generated only $264.5 million in revenue and only US $3.3 million in net income for the quarter, implying a net margin of only 1.2%. The release also provided disappointing revenue trends, including an expected slowing of the Company's revenue growth rate for the third quarter (*i.e.*, the quarter in which the IPO had been completed) to just 5% sequential growth at the projected midpoint, as compared to the prior 28% sequential revenue growth rate referenced in the Offering Documents.

288. A Morgan Stanley analyst report issued later that same day stated that the disappointing revenue trend "suggests [DouYu] may not catch up with HUYA's profitability in the near term." Indeed, Huya issued its own second quarter 2019 earnings release on August 13, 2019, stating that its net income had grown to $17.2 million, or roughly ***five times higher*** that DouYu's net income results for the same quarter.

289. On August 13, 2019, DouYu ADSs closed at $8.84 per ADS, falling from $9.93 per ADS the day before, or nearly 11%, before declining even further to $8.14 per share on August 14, 2019, a total decline of over 18%.

290. On August 20, 2019, DouYu implemented a series of operational changes, including what was later described as the "temporary suspension" and removal of the Company's "lucky draw" feature. On August 21, 2019 (China time), an article ran in China that reported that DouYu had taken the lucky draw feature offline overnight due to "gambling" characteristics of the feature that drew the concern of government regulators, adding that DouYu's game hosts could no longer use this feature to "fleece the flock." Although DouYu reinstated a modified version of "lucky draw" on October 10, 2019, the new version had significant revisions that materially reduced the feature's revenue potential, including stronger restrictions on in-game consumption and caps on virtual gift amounts.

291. On October 15, 2019, J.P. Morgan disclosed to investors in an analyst report that DouYu had temporarily removed its "lucky draw feature in late Aug[ust] 2019," before "reinstat[ing]" it "on Oct 10," which, according to J.P. Morgan, "***will cause its 3Q19 revenue to decline 1.5% QoQ . . . 5% below the low end of company's 3Q19 guidance . . . and 7% lower than current Bloomberg consensus***." J.P. Morgan, which characterized the suspension of luck draw features as a "headwind," stated, in relevant part:

> On Aug 20 2019, DouYu started a round of operation changes Which include: 1) removal of lucky draw feature, 2) enhance content monitoring within live broadcasting show room. On Oct 10 2019, DouYu re-launched lucky draw feature after National Day holiday with ***stronger restriction on in-game consumption (cap on virtual gift amount etc). We estimate lucky draw feature to contribute to ~10% of DouYu 's revenue before 3Q19***.

In reality, DouYu had disabled the lucky draw feature because it was likely rigged online gambling in violation of China's regulations. In addition, J.P. Morgan was estimating that, going forward, the loss of the original "lucky draw" feature (and its replacement with the significantly modified version after October 2019) would cost the Company at least RMB 1 billion in each of 2020 and 2021 and would cause its third quarter 2019 revenues to actually decline quarter-over-quarter.

292. DouYu closed at $7.12 per ADS on October 16, 2019, or 4.69% lower than the previous day's close of $7.47 per ADS.

293. On November 6, 2019, an article titled "DouYu: The Changing Face of Sports Media," published on Seeking Alpha, stated that DouYu's lucky draw feature had run afoul of regulators and allowed users to engage in the illicit conversion of virtual currency into fiat currency:

> To remind investors, DOYU launched its virtual currency, Yuchi, in 2015 that can be used by the viewers to purchase virtual gifts on the site. ***Viewers can participate in the lucky draw games by gifting a small amount of the virtual gif to the host and in return, they could receive a virtual gift that worth thousands of RMB, or virtual currency worth up to tens of thousands of RMB.*** The virtual gifts and the currency can only be used within the DOYU platform and are not allowed to be converted into fiat currency.
>
> Given that much of the user traffic involving streaming platforms is largely stable and that viewers will only shift from one platform to another when there is a shift in streamers, ***DOYU's streamers are under increasing pressure to utilize lucky draws to attract more traffic onto their broadcast***.
>
> There is nothing wrong with using a lottery system to attract viewers in China, ***but the issue is that some of the virtual coins gained from lucky draws could be converted into real currency, which the regulators find it unacceptable hence it was stopped for some time.***

294. On November 27, 2019, DouYu released its third quarter 2019 financial results. During the question-and-answer portion of the earnings call held the same day, the Company addressed the temporary removal of its "lucky draw" features:

> **Chun Man Poon** - Morgan Stanley, Research Division - Equity Analyst
>
> (foreign language) I'll translate my question. My first question is since **late August, you have removed certain lucky draw features. And can you let us know the reason why you took it off and also the revenue impact in Q3?** And also since you have restated these features, how is the revenue run rate at present? Is it better than before you removed these features already? And from here onwards, **how does the regulatory landscape look like for these features?**
>
> **Shaojie Chen** - DouYu International Holdings Limited - Founder, CEO & Director
>
> *** * ***
>
> [Interpreted]. Okay. Regarding the reason of the temporary removal of our quiz features since August, we have always prioritized the long-term and sustainable growth of DouYu. So in order to contribute to a positive Internet environment, **our management team made decision to carry out an assessment of certain interactive features in mid-August 2019** prior to China's anniversary celebration. And **as a result of our internal assessment, we adjusted certain functions of the interactive product featuring**.
>
> *** * ***
>
> [Interpreted]. Regarding the revenue impact, **our interactive features, including quiz, were designed to enhance the interaction between the streamers and users.** So consequently, **the removal of certain features has somehow affected users' engagement activity with streamers for a certain period of time in third quarter.** And we -- after revision and improvement, we initially reacted (sic) [activated] part of the features in late third quarter, and we activated the rest in the fourth quarter. So after resuming the access to our interactive features, the users engagement for these interactive features are **gradually recovering**, and we have also factored in all of these into our fourth quarter guidance for 2019.
>
> * * *
>
> [Interpreted]. Regarding future risk adjustment, **we will pay close attention to development laws and regulations issued by the local authorities**,

> while maintaining active communication with government departments. Thank you.

295. The Company's ADSs closed at $7.46 per share on November 29, 2019, the next trading day, representing a decline of over 4.8%.

> On December 13, 2019, CCB International released an analyst report commenting on DouYu's "***heavy reliance on top streamers***," such as the former top performer Qiao Biluo. The report noted that DouYu's top streamers contributed over 61% of its live streaming revenue in the first quarter of 2019, but that "Douyu has little control over the behavior of its non-exclusive top streamers, whether on the platform or offline. It may need to increase its compensation to these players if it is to retain them while attracting new players. The added expense could hurt its financial performance."

296. By December 2019, Tencent had invested ***over $2 billion*** in Kuaishou, leading a funding round that generated hundreds of millions of dollars in additional financing for the platform from other institutional investors. As a result, Kuaishou was able to rapidly expand its live game-streaming capabilities, boost user engagement, and significantly encroach on DouYu's business turf.

297. On December 16, 2019, HSBC released an analyst report commenting on DouYu's "***bumpy road ahead***" related to "***[c]ompetition intensifying with Tencent-backed Kuaishou***."

298. On January 23, 2020, J.P. Morgan released an analyst report commenting on the suspension of interactive features and crediting the Company's 12% drop in ADS price on January 22, 2020, to investor concerns about "***the financial implications of such a broad-based key monetization feature suspension***[,]" stating, in relevant part:

> [O]n January 22, 2020, all of the listed digital entertainment platforms (DouYu, Huya, . . .) that operate live broadcasting services have ***suspended interactive features that drive meaningful monetization for live streaming operators***. Share prices of DouYu/Huya . . . fell by 12%/10% . . . on Jan. 22, 2020, ***in our view due to investors' concerns about the financial implications of such a broad-based key monetization feature suspension***.

J.P. Morgan added: "We believe investors' cautious sentiment will remain in the near term ***due to a lack of clarity on the duration of this suspension***[.]"

299. On March 30, 2020, a Seeking Alpha article. titled "DouYu: Improving Fundamentals," provided further details on the suspensions of interactive features at DouYu, which, similar to the previously suspended "lucky draw" feature, allowed users to bet a small amount for the chance to potentially win a much larger virtual gift:

> Furthermore, Q1 guidance is impacted by the suspension of the 'interactive feature'. ***The feature is a sort of gamification where a user can donate a small amount to a streamer & participate in a game, such as spin the wheel, and potentially win a much more expensive virtual gift***. Other live streaming platforms like YY live will most likely be more affected, since they truly mastered the interactive feature. Analysts estimate low to mid single digit impact on 2020 revenues for live streaming companies.

300. In response to all this information, the Company's ADSs have cratered, trading as low as $6.11 per ADS on March 30, 2020 since going public, representing a 47% decline from the IPO offering price.

## VII. EXCHANGE ACT ALLEGATIONS

301. Plaintiff Huang purchased or otherwise acquired DouYu ADSs during the Class Period. Plaintiff Huang, and no other plaintiff, makes the allegations contained in paragraphs 302–520 below with respect to his claims under Sections 10(b) and 20(a) of the Exchange Act only. Plaintiff Huang disclaims any reliance upon the allegations or incorporation of the allegations in Sections 1.A or VI, *supra*, *i.e.*, the claims asserted in this Complaint under the Securities Act.

### A. Exchange Act Defendants

302. The Exchange Act claims in this Complaint are asserted against Defendant DouYu, Defendant Tencent, and the Individual Defendants, *excluding* Defendant Arthur (collectively, the "Exchange Act Defendants").

303. Throughout the Class Period, the Exchange Act Defendants were able to control the content of the various Offering Documents, SEC filings, press releases, merger agreement, and other public statements pertaining to the Company. The Exchange Act Defendants had access to the Offering Documents, SEC filings, press releases, merger agreement, and other public statements alleged to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or to cause them to be correct. Accordingly, the Exchange Act Defendants are responsible for the accuracy of the public reports and other statements detailed herein and are therefore primarily liable for the representations contained therein.

304. The Exchange Act Defendants are makers of the statements contained in the Offering Documents SEC filings, press releases, merger agreement, and other public statements alleged to be fraudulently false and misleading because DouYu is the issuer of the statements and the Individual Defendants (excluding Defendant Arthur) and/or Defendant Tencent signed their name to those statements, indicating that they were makers thereof.

305. As set forth in further detail below, each of the Exchange Act Defendants intentionally or recklessly misled Class members as to the statements alleged to be false and misleading in the Offering Documents, Press Releases, merger agreement and other public statements.

**B. <u>Exchange Act Substantive Allegations</u>**

306. Certain statements by the Exchange Act Defendants in SEC filings during the Class Period were knowingly or recklessly false and misleading because they failed to disclose that (i) DouYu's platform did not comply with China's regulatory requirements because Yuchi could be transferred between users and/or redeemed for currency and Lucky Draw games constituted illegal gambling; (ii) streamers' purchases of virtual gifts for themselves using funds that DouYu had

paid to the streamers had inflated the Company's revenues and were driven by the Company's monthly traffic requirements; (iii) streamers were completely altering their appearances on DouYu's platform, increasing the likelihood that users would abandon the platform when the truth emerged; (iv) Defendant Tencent was planning a major investment that would create a substantial competitor for DouYu at the time of the IPO; and (v) DouYu's revenue growth was decelerating dramatically at the time of the IPO. The Exchange Act Defendants made the statements even though they knew, or were reckless in not knowing, that they were false and misleading.

**1. Yuchi and Lucky Draw Violated Chinese Law**

307. Although the Exchange Act Defendants assured investors in the Offering Documents that Yuchi could not be converted to cash and was non-transferrable, and that Lucky Draw, and other elements of DouYu's platform complied with China's regulations, the Exchange Act Defendants knew or were reckless in not knowing that DouYu users and streamers were actively converting the Yuchi to cash and transferring it between each other, and that Lucky Draw constituted illegal gambling.

308. Contrary to the Exchange Act Defendants' knowing or reckless false assurances in the Offering Documents, users commonly converted Yuchi they won in Lucky Draw to cash and/or transferred it between each other. For example, a user could purchase $150 of Yuchi (*i.e.*, 1,000 Yuchi), and then use that Yuchi to buy chance cards in Lucky Draw. If the user won, the user could receive 5,000 Yuchi—or gifts worth 5,000 Yuchi. The user would then take the 4,000 Yuchi that the user had "won," and thus not paid for, and sell that Yuchi to a streamer or third party for $0.05 each, or $200. The streamer would then gift that Yuchi to himself, which made him seem more popular than he was, or the third party would sell the Yuchi to a streamer at a markup, *e.g.*, $0.10 each, and the streamer would gift the Yuchi to himself. In this way, DouYu users illegally gambled to win Yuchi, converted that Yuchi to cash, and/or exchanged Yuchi between one another.

309. The Exchange Act Defendants had ample notice, and thus actual knowledge or reckless disregard of the fact, that Yuchi was being exchanged for cash and traded between users and streamers, and that Lucky Draw constituted illegal gambling. For example, a January 22, 2019 posting on NetEase described how DouYu top streamer XuXu BaoBao would offer virtual prizes in Lucky Draw valued at almost $135,000. Users had noticed that draw winners consistently had names that included combinations of phrases "win the prize," suggesting that the game was rigged to favor those players. According to the post, players quickly changed their names to include the phrase. These name changes actually generated income for DouYu because users had to pay a fee to change their names.

310. The State Council Information Office reported on June 3, 2019 that it had received reports that Lucky Draw was illegal gambling. The article reported that lucky draw prizes had become worth up to 50,000 Yuchi (or about RMB50,000). The article also stated that DouYu users could buy Yuchi through the games, give the Yuchi in the form of "gifts," and get a chance to win the lucky draw, and that more gifts a user gave, the greater the probability of winning.

311. A June 5, 2019 article published by the Chinese media outlet "Investor Network" entitled, "Media outlets report DouYu's 'Lucky Draw' game suspected of illegal play" stated that "some DouYu streamers use the platform's lottery activities as a disguised form of online gambling" and "[w]inners can directly receive cash transfers from the streamer." The article also stated that "China Net Technology" had reported that DouYu's "Lucky Draw" game was suspected of promoting gambling, and that the game's leisure version was flooded with information urging users to participate in this disguised form of gambling." The article also stated that while virtual gifts are usually purchased by users for streamers "based on users' appreciation of the streamer," in Lucky Draw, "most of the rewards are given for the purpose of winning a prize," or gambling.

312. Similarly, a June 14, 2019 article on Veryol.com, a Chinese news website that covers online tech, finance, and education, described two separate allegations in 2019 that Lucky Draw was "***online gambling under the guise of a prize drawing***." The Exchange Act Defendants were plainly aware of the allegations because the article went on to describe how DouYu formally denied that Lucky Draw constituted illegal gambling, but, in response to one accusation, "expressed that the company would investigate whether the livestream room was involved in online gambling, and handle the situation if it turned out to be true."

313. Then, on June 30, 2019, Sohu News, which was part of a major online portal in China published an article in Chinese which communicated that "[a]lthough DouYu's official stance is that Yuchi cannot be exchanged for cash, a reporter from China Business News found that users ***can sell Yuchi to resellers through relevant channels in exchange for cash***." The article cited an interview with a Beijing lawyer, who said that the conduct "may be organized gambling in disguise, and that the aforementioned lottery activities do have qualities associated with gambling."

314. The Sohu Article also quoted a representative of a talent agency that managed DouYu streamers. The representative described how the agencies manipulated Lucky Draw on behalf of their streamers because only users who sent the most gifts or were most active would have any chance of winning. The representative said that "we would sign a contract with the streamer, and we would give [the streamer] several tens-of-thousand coins in virtual currency during their broadcast . . . . [W]e would send many gifts to reach the required amount and win the Lucky Draw."

315. In addition, Chinese news articles also described how users could exchange Yuchi and convert it into cash, both of which violated China's regulations. For example, the Sohu Article reported that:

> Under the pretense of applying for a streamer position, this reporter was also able to speak with A Huang (a pseudonym), the head of a livestream guild that works with DouYu. A Huang told the reporter that the Lucky Draw prize drawing was initiated by DouYu, and that the Yuchi prizes won by the fans were given by DouYu. While Yuchi cannot officially be exchanged for cash, they can be exchanged "through other means . . . we know people who specialize in reselling Yuchi—so [$745] in Yuchi can be exchanged for about [$600] in cash.

316. The representative of an agency that managed DouYu streamers who was quoted in the article stated that "we know people who recycle [*i.e.*, exchange] Yuchi." In addition, the article stated that "th[is] reporter discovered many QQ groups that trade Yuchi and entered a group under the pretense of selling Yuchi." Specifically, "[o]ne Yuchi reseller told the reporter that the price of a resold Yuchi was about 70–80% of a full price Yuchi. The Yuchi they buy from the market are be sold to streamers. 'All medium-sized streamers want popularity—they want popularity and we want money.'" The reseller stated that streamers would buy the discounted currency and "gift" the discounted currency to themselves to make them seem more popular than they really were.

317. Each of the acts described in the above articles plainly violated These acts plainly violated Chapter Two, Article 13 of the Virtual Currency Notice, which stated that "companies operating internet gaming should not support the trade of digital currency between users, they must take technological measures to actively prohibit the exchange of digital currency between users," and/or Chapter Three, Article 20, of the Virtual Currency Notice, which stated that "companies operating online games must not operate a lottery, draw, or random drawing that requires users to contribute cash or virtual currency with a payout of items or virtual currency."

318. Former DouYu streamers who agreed to speak with Plaintiffs confidentially corroborated that Yuchi was exchanged between users and for cash. For example, CW1described "third-parties or groups that will buy Yuchi back from users at a discount." According to CW1, "a customer [*i.e.*, DouYu user] might win 1,000 Yuchi in a drawing, a third-party would buy them for CNY 200 and then would send the Yuchi to a streamer who would buy them for CNY 300, in this way the third-party gets the difference." CW1 also stated that "most of the posts in [DouYu's] user blog, called 'Yuba,' were about exchanging Yuchi privately."

319. Similarly, CW2, who worked first as a streamer and later as an agent for DouYu, described how users would convert Yuchi to cash by using the Yuchi to buy a gift, "send[ing] the gift to a streamer who would transfer a lower amount [of cash] to the user with Alipay or WeChat pay."

320. CW3 described how Yuchi could be purchased illegally at a discount through "backpack traders." "Backpack traders" are individuals or entities who pay users for Yuchi and then sell the purchased Yuchi to streamers. CW3 said that DouYu had never taken any actions to stop the illegal purchases and transfers of Yuchi.

321. CW7 corroborated CW3's descriptions of backpack traders selling Yuchi. CW7 said that a backpack trader could acquire Yuchi when a DouYu user wins virtual gifts in lucky draws on DouYu's platform and the user sells the gifts to a backpack trader, who resells the gift to streamers, who then use give the Yuchi to themselves to make it appear as though they are receiving more gifts from fans. CW7 said that backpack traders also purchase Yuchi directly from users at a discount and resell it, keeping a small mark-up (*i.e.*, lower discount) as profit.

322. CW7 also described how DouYu users played lucky draw games and turned their winnings into cash. CW7 stated that the winner of a lucky draw would take the Yuchi they won

and sell it to a backpack trader at a 65% discount in exchange for cash. CW7 said that streamers set up rooms and ran lucky draw games for the sole purpose of allowing users to gamble in this way and try to win Yuchi that they could exchange for cash.

323. The acts described by these confidential witnesses plainly violated Chapter Two, Article 13 of the Virtual Currency Notice, which states that "companies operating internet gaming should not support the trade of digital currency between users, they must take technological measures to actively prohibit the exchange of digital currency between users."

324. These violations of Chinese regulations forced DouYu to deactivate Lucky Draw barely a month after the IPO closed. According to an October 15, 2019 analyst report by J.P. Morgan, on August 20, 2019, DouYu removed the Lucky Draw feature. According to an August 21, 2019 news report by Toubang Data, a website that provides news and data analysis about online streaming platforms, which was published only in Chinese, DouYu took Lucky Draw offline because of media reports, including the above-described articles, describing how the game was essentially "rigged gambling" in violation of China's regulations.

325. CW4 corroborated the Toubang Data news reports and said that the government took action against DouYu as media reports and complaints that Lucky Draw was online gambling accumulated. According to CW4, the government had DouYu remove this functionality.

326. In addition, on November 6, 2019, an article by independent investment analyst Terracotta Investments that was published on investment website Seeking Alpha disclosed that the Company took down Lucky Draw because of unlawful exchanges of Yuchi between users and redemptions of Yuchi for cash. The Seeking Alpha article reported that, while "[t]here is nothing wrong with using a lottery system to attract viewers in China . . . ***the issue is that some of the***

***virtual coins gained from lucky draws could be converted into real currency, which the regulators find it unacceptable hence it was stopped for some time***.

327. DouYu reinstated Lucky Draw on October 10, 2019 after, among other things, placing caps on the amounts of gifts that could be purchased, *i.e.*, putting in place safeguards to prevent manipulation of the game. The deactivation of the game, however, had a substantial effect on the Company's revenues as well as investor understanding of the Company's risks.

328. For example, the October 15, 2019 J.P. Morgan analyst report found that taking down Lucky Draw, "***will cause [DouYu's] 3Q19 revenue to decline 1.5% QoQ . . . 5% below the low end of company's 3Q19 guidance . . . and 7% lower than current Bloomberg consensus***." Removing Lucky Draw for only two months had dramatically affected the Company's performance.

329. In addition, on January 23, 2020, J.P. Morgan disclosed in a report that the deactivation of Lucky Draw had negatively affected investors' confidence in the Company. The report attributed a 12% drop in the Company's ADS price on January 22, 2020 to investor concerns about "***the financial implications of such a broad-based key monetization feature suspension***[,]" *i.e.*, the deactivation of Lucky Draw:

> [O]n January 22, 2020, all of the listed digital entertainment platforms (DouYu, Huya, . . .) that operate live broadcasting services have ***suspended interactive features that drive meaningful monetization for live streaming operators***. Share prices of DouYu/Huya . . . fell by 12%/10% . . . on Jan. 22, 2020, ***in our view due to investors' concerns about the financial implications of such a broad-based key monetization feature suspension***.

J.P. Morgan added: "We believe investors' cautious sentiment will remain in the near term ***due to a lack of clarity on the duration of this suspension***[.]"

330. An October 17, 2020 article on China Youth Net, a news site affiliated with the China Youth League ("Youth Article"), corroborated these allegations about the deactivation of

Lucky Draw. The Youth Article quoted a DouYu streamer named Xiaowei, who stated that Lucky Draw was used as gambling immediately when it was added to DouYu's platform on November 30, 2018. Xiaowei said that after DouYu deactivated Lucky Draw in the latter half of 2019, the Company sent a message to streamers stating, "it will be forbidden to display the words 'cash back' to users from now on."

331. In the Youth Article, Xiaowei also said that DouYu had told its streamers not to use specific words when streaming or in communications with users or streamer associations, including mentioning specific amounts of money, and not to use certain words or phrases that suggested gambling. Xiaowei went on to say that he believed that though Company officials claimed to ban these activities, DouYu was tacitly supporting these activities because they would allow streamers to keep room names that explicitly stated they would give cash back to users.

### 2. DouYu's Revenues Were Inflated by Streamers Who Purchased Yuchi to Give to Themselves

332. The Exchange Act Defendants also misled investors by failing to disclose that DouYu's revenues were inflated by streamers who engaged in *de facto* wash transactions. Some of these streamers received salaries from DouYu, then used a portion of those salaries to buy up to millions of dollars of virtual gifts for themselves. DouYu then kicked back half the value of the purchases to the streamers.

333. Streamers did this to artificially boost their popularity, try to attract fans, and meet monthly traffic quotas set by DouYu. DouYu recorded these transactions as revenue to inflate the platform's number of transactions and revenues. For example, in March 2019, DouYu entered into a contract with a prominent streamer named Liu Mou ("Liu"). Shortly thereafter, Liu spent nearly $3.15 million to buy himself votes during DouYu's annual online idol competition, half of which the Company then kicked back to Liu after his purchase.

334. Statements from former DouYu streamers who agreed to speak to Plaintiffs confidentially corroborate Liu's description of his self-purchase of Yuchi and gifts and demonstrate this conduct was widespread. CW3 stated that DouYu's contracts with streamers set monthly targets of gifts for streamers, and streamers received larger salaries and kickbacks after reaching gift targets. CW3 stated that to reach these targets, streamers bought Yuchi to buy gifts for themselves to achieve those targets. CW3 further stated that streamers would buy Yuchi at a discount through "backpack traders" that they would then use to buy gifts for themselves. CW3 said that DouYu had never taken any actions to stop the illegal purchases and transfers of Yuchi.

335. CW4 said streamers buying Yuchi to give themselves gifts to artificially inflate their popularity was a common practice at DouYu. CW4 also described how brokers or backpack traders sold Yuchi to streamers at a discount so that the streamers could use the Yuchi to buy gifts for themselves. CW5 also stated that DouYu streamers bought Yuchi and gifts for themselves, as did CW6.

336. CW7 quantified the widespread nature of these purchases, saying that, in her experience, "at least 70 to 90%" of streamers bought Yuchi to give gifts to themselves, and that only a select few streamers who are "very distinctive" make so much money from fans that they do not have to buy Yuchi to give gifts to themselves to ensure that their profile stays high on DouYu's platform.

337. CW7 stated that during the four years she was a DouYu contract streamer, *i.e.*, was in the elevated group of streamers who were good enough to have a contract with a talent agency, she ***only bought Yuchi and virtual gifts for herself*** and did not use the Yuchi and virtual gifts she purchased for any other streamer. CW7 estimated that she bought thousands of virtual gifts for herself each month. CW7 said that in her experience virtually all DouYu's streamers have bought

Yuchi to give gifts to themselves "since the beginning," *i.e.*, since she became a DouYu streamer. In fact, CW7 said, top-ranked streamers spend "dozens of thousands of RMB to buy gifts for themselves ***every month***," *i.e.*, spend thousands of U.S. dollars every month to buy Yuchi and virtual gifts for themselves.

338. CW7 stated that she learned during his time working as a contract streamer that DouYu management knew that streamers purchased Yuchi to give gifts to themselves.

339. CW8 corroborated CW7's account of streamers buying Yuchi to give to themselves throughout her time at DouYu. CW8 stated that DouYu's platform had a "monthly flow indicator requirement" for streamers, and that streamers—especially streamers represented by talent agencies—had to buy gifts for themselves to meet monthly traffic flow requirements. CW8 stated that DouYu allows streamers to buy gifts for themselves because it "increases the income for the platform." CW8 said that famous streamers usually buy Yuchi for themselves because they make enough money—*i.e.*, from DouYu—that they can afford to do it.

340. CW9 stated that her research in writing about DouYu she learned that "large sized" streamers—*i.e.*, streamers with large followings—which corroborated CW8's account of how famous and popular streamers bought Yuchi to give as gifts for themselves. CW9 said that based on her research, about 70% of streamers buy Yuchi to give gifts to themselves. She said through her research she learned that DouYu's management knew that its streamers purchased gifts for themselves. She also said that streamers engaged in these self-purchases to boost their popularity in the hopes that other fans will buy gifts for them as well.

341. The Exchange Act Defendants misled investors about the fact that DouYu's revenues were inflated by such *de facto* wash transactions by carefully describing in the Offering Documents and other SEC filings and press releases how *other users* purchased virtual gifts for

streamers, and knowingly or recklessly never mentioning how streamers bought gifts *for themselves*. For example, the Exchange Act Defendants in the Offering Documents knowingly or recklessly told investors that "[u]sers are able to purchase virtual gifts on our platform using our virtual currency ***and send them to streamers*** as a gesture of appreciation or support . . . we organize streamer popularity contests ***to promote spending by viewers to show support of the streamers they follow***." Similarly, the Exchange Act Defendants in the Offering Documents knowingly or recklessly told investors that DouYu's "live streaming platforms . . . enable streamers and users to ***interact with each other*** during live streaming. ***The users have the option to purchase virtual currency*** . . . to redeem for virtual items to be used in the live streaming sessions." The Exchange Act Defendants' statements knowingly or recklessly communicated to investors that users bought virtual currency for *other streamers* and did not suggest that streamers gamed DouYu's platform by buying gifts *for themselves* for the purposes of making themselves seem more popular and meeting traffic requirements, or that DouYu considered such transactions, half the value of which was kicked back to the streamers, to be legitimate revenue.

### 3. Users Were Stunned to Learn that DouYu Streamers Were Completely Misrepresenting Their Appearances Online

342. The Exchange Act Defendants' references to the Company's registration requirements, direct contracts with streamers, outsourcing of streamer management, systems used to identify top streamers, and Content Monitoring System assured investors that DouYu knew the identities of its streamers and monitored those streamers.

343. In spite of these assurances the Exchange Act Defendants knew or were reckless in not knowing that at the time of the IPO DouYu's platform included top streamers who were engaged in improper conduct and/or were misrepresenting themselves to users. Investors learned the truth when, on July 30, 2019, prominent DouYu IRL streamer Qiao Biluo Xiadian, who

purported to be an attractive Chinese 20-year-old was accidentally revealed to be a middle-aged woman. The revelation stunned both investors and Xiadian's over 100,000 devoted followers, who China's Global Times reported had been drawn to her "sweet and healing voice," "worshipped" her as a "cute goddess," had purchased virtual gifts for her of more than $14,500 each. The Global Times reported that during a session with her fans, Xiadian's filter stopped working and her real face became visible, at which point DouYu users began exiting her stream *en masse* and went on to stop following her and withdrew their transactions. Xiadian's misrepresentation of herself was plainly a "serious violation" because DouYu promptly closed her streaming room permanently.

344. News reports described how the Exchange Act Defendants had notice of streamers completely misrepresenting themselves on DouYu's platform and thus creating a known, but undisclosed, material risk to DouYu's business. For example, the Veryol Article reported that, "[s]ince the first half of 2018, DouYu has been entangled ***in a web of public backlash that included accusations of hosting a large number of false livestream rooms***, questioning of its paid membership system, mentions of the company's layoff bloodbath, suspicions of promoting illegal loan advertisements, and comments regarding the massive loss of streamer talents." The article went on to state that, during China's "Ministry of Public Security's 'Clean Web 2018' campaign," DouYu suffered heavy losses. The article also stated that "among DouYu's top ten streamers in 2017, six streamers, including Feng Timo, Snake Brother, B Zong 001, Qige Zhang Qige, Chen Yifaer and Wuwukai, were called out by official media accounts and completely banned."

345. In addition, on August 2, 2019, Jufu Finance, a mainland Chinese website that publishes news and commentary on the financial sector, described in an article on Xiandian how the Exchange Act Defendants were well aware of users misrepresenting themselves online. The article, which was published only in Chinese, stated that the revelation of Xiandian's true age had

come to be known as "Granny Gate." "Who would have thought," the article wrote, "instead of the pure and lovely image in everyone's mind, the voice actor was actually a 50 year old 'grandmother!' The 'Lolita to Grandma' reveal scared a quite a large number of fans." The article emphasized that this had happened before on DouYu's platform, stating that "***This is not the first time that DouYu has suffered a livestream room related scandal*** . . . . Consequently, DouYu once again became a central figure in the media frenzy . . . . The point is, ***for those fans who have spent money, especially a lot of money, the result of the scandal was a very bitter pill to swallow***." The article also emphasized that "According to relevant media reports, DouYu banned the streamer's room. However, as far as this matter is concerned, ***many people remain dissatisfied***" because, even though "Granny Gate" had received an enormous amount of media attention, DouYu "did not try to get to the bottom of the matter, choosing instead to ban the streamer from the platform, essentially burning that bridge."

346. The Exchange Act Defendants also knew that streamers were misrepresenting themselves because, Jufu Finance reported, a DouYu streamer previously had been implicated in a scandal that led to users abandoning the platform. A May 5, 2019 internet post described how popular singing stream "Aleng" had become unpopular after her "real face was revealed":

347. Likewise, another pre-IPO post on the site zhihu.com commented that "Another Douyu popular streamer 'Nado' is also fat in real person and looks like a human tank and she must be over 70kg. The Douyu streamer 'Zhang Qige' is oversized, and rich fans wanted to drop out of DouYu." Despite the knowing of the risk presented by users misrepresenting themselves on DouYu's platform, the Exchange Act Defendants failed to advise investors that users could alter their appearance on the site.

348. Statements from confidential witnesses corroborate these news accounts and highlight how the Exchange Act Defendants knew of or recklessly disregarded this conduct. CW1 told Plaintiffs that "DouYu has always had difficulty in monitoring streamers who misrepresent themselves. The platform also needs to make money, they absolutely need a lot of traffic. As long as the streamers aren't doing anything illegal, they will keep one eye closed and the other eye open, so to speak."

349. Similarly, CW2 said, "DouYu never really took monitoring this type of content seriously. For example, when I was working there, I would go into streaming room and there would be a streamer who would ask for a "rocket" [*i.e.*, a gift worth $15]. The streamer would then go into and they would go into a QQ group.[11] Then in the QQ group they would send a private message to a customer with a [sexually explicit] video. I think DouYu didn't really want to deal with it anyway, after all DouYu profited from it and gained traffic in the process."

350. CW7 also said that it was common for streamers to completely alter their appearance on DouYu's platform to be attractive women, including by using "fake noses and breasts." CW7 said that "100% of female streamers use filter to alter appearance. It is less common for male streamers." She said that "fans are not aware." CW9 said that it was common for DouYu streamers to change their appearance on DouYu's platform as well.

### 4. Tencent Had Been Planning Since *Late June 2019* to Make a Major Investment in Kuaishou

351. Although the Exchange Act Defendants emphasized to investors that Tencent was a strategic partner and valuable ally of DouYu, the Exchange Act Defendants knew, or were

---

[11] QQ, is an instant messaging software service and web portal developed by Defendant Tencent. QQ offers services that provide online social games, music, shopping, microblogging, movies, and group and voice chat software.

reckless in not knowing that shortly before and in advance of the IPO, Defendant Tencent was preparing to invest ***over $1 billion*** into DouYu's up-and-coming competitor, Kuaishou.

352. On June 24, 2019, just weeks before DouYu's IPO, *TechNode*, a website devoted to covering China technology news, reported that Tencent's app "WeChat" suddenly "unblocked links shared from short video app Kuaishou . . . . Shared videos play directly in user WeChat Moments newsfeeds as embedded videos." WeChat, one of the most popular social media applications in the world, is known as China's "app for everything" and a "super app" that provides text messaging, hold-to-talk voice messaging, broadcast (one-to-many) messaging, video conferencing, video games, sharing of photographs and videos and location sharing. There was no explanation as to why Tencent had suddenly decided to allow Kuaishou videos to be played on WeChat.

353. Opening WeChat up to Kuaishou videos gave Kuaishou an immense advantage over its competitors. For example, videos from video applications like "Douyin" (better known in the United States as "TikTok"), which is run by a Chinese company called ByteDance," did *not* play directly in WeChat, and thus lacked access to one of the most popular apps in China.

354. The sudden allowing of Kuaishou videos on WeChat could not have escaped the Exchange Act Defendants' attention and put the Exchange Act Defendants on notice that Tencent was already planning an additional transaction with Kuaishou. In addition, the suspiciously timed action by Tencent demonstrates that Tencent itself was plainly planning an additional investment in Kuaishou in the run-up to the IPO.

355. On July 18, 2019, only ***hours*** after the IPO was conducted, Beijing News published an article entitled "Kuaishou Will Receive Investment from Tencent, and Live Game Streaming Becomes Its 'Weapon' to Tackle Southern Market" ("Kuaishou Article"). The article expressly

stated that it was communicating news "[o]n the eve of DouYu's IPO." The article then stated that although Kuaishou was "known for its low profile," Beijing News's correspondent, Jinlei Bai, had "obtained the exclusive news that live game streaming had become the strong weapon for Kuaishou to 'tackle' the southern market," and that Kuaishou would soon "take a series of measures on the live game streaming market, including signing with the leading streamers, introducing the local guild, launching the paid videos of online game, launching the companion function in games, etc." The article then reported that Kuaishou was obtaining a round of funding from Tencent, or would form a new joint venture with Tencent, which would allow it to take these steps. In other words, moments after DouYu's IPO, a major Chinese newspaper was reporting that Defendant Tencent was making a major investment in a company specifically so that Company, which had not previously been considered a direct DouYu competitor, could transform into itself into a serious major direct competitor to DouYu in the live-game streaming sector.

356. The Kuaishou Article also specifically referenced WeChat, quoting "the internet analyst Xin Tang" as saying, "I believe the biggest variable is WeChat. WeChat has always been cautious about the commercialization process. But it has such a big number of users. *If some policies got relaxed, it is possible to change the pattern of the industry*." Of course, Tencent had abruptly opened WeChat to Kuaishou only three weeks earlier, and Kuaishou had access to the tools to "change the pattern" of the gaming industry.

357. Shockingly, the Kuaishou Article provided further details of how the Exchange Act Defendants had actual knowledge, or intentionally avoided knowing, Tencent's plans. According to the article, "institutional investors intending to purchase DouYu stock during the 'new shares subscription' begin to enquire the accuracy of Kuaishou live game streaming data and its future impact on the live game streaming sector. Their enquiry ***even involves the top management team***

***of DouYu in America*** and the already public listed Huya team." In other words, investors were directly asking DouYu about Kuaishou. The only way the Exchange Act Defendants could have not at least inquired into Tencent's plans based on these queries was to willfully—*i.e.*, recklessly, ignore them.

358. Moreover, the Kuaishou Article described how Defendant Cheng had interfered directly to prevent Kuaishou from poaching a "top streamer." According to the article, Kuaishou had planned to meet a leading streamer under contract with DouYu whose contract would expire in the second half of 2019. One week before the meeting between Kuaishou and the streamer, however, Defendant Cheng personally swooped in, visited the streamer at the streamer's home and signed the streamer to an additional two-year contract.

359. In the days after the Kuaishou Article, additional articles emerged confirming that Tencent had been planning to inject significant capital into Kuaishou. For example, barely two weeks later, on August 2, 2019, Beijing News published a second article by the same journalist, Jinlei Bai, entitled "Tencent's investment in Kuaishou is almost finished: Tencent will hold about thirty to forty percent of Kuaishou's shares and invest new assets or resources" (the "August Beijing News Article"). The article stated that

> "On August 2, a number of sources confirmed exclusively to The Beijing News that negotiation of Tencent's investment in Kuaishou is almost finished. The evaluation of Kuaishou for this round is more than USD $25 billion. The two parties may set up a new joint venture company with Tencent holding 30% to 40% of the shares and a cooperation model similar to that for Tencent's investment in JD.com before. Tencent will also invest new assets (or resources) in the new company."

360. The August Beijing News article went on to state that "a source close to Kuaishou's senior management also told The Beijing News that: 'Tencent and Kuaishou's relationship will change recently.'"

361. Similarly, on August 5, 2019, KrASIA, "a digital media company reporting on the most promising technology-driven businesses and trends in the world's emerging markets," published an article confirming the benefits of Tencent's opening of WeChat to Kuaishou. The article was entitled "Tencent will invest up to USD 1.5 billion in short video app Kuaishou, putting pressure on ByteDance" ("KrASIA Article"). The article disclosed that:

> Tencent's social messaging app WeChat, which has 1.1 billion monthly active users, has lifted a ban on links to Kuaishou's content so that WeChat users can share Kuaishou video links with their friends and on the Moments feed. On top of that, WeChat users are able to share links to the video app's content on the Kanyikan feed, which utilizes a design feature similar to Facebook's "Like" button for the web.
>
> For now, WeChat still blocks links to videos on ByteDance's video platforms Douyin and TikTok.

362. Ultimately, Defendant Tencent would invest ***$2 billion*** in Kuaishou by January 2020, catapulting the upstart firm into the ranks of DouYu's major competitors. Tencent's dramatically expanded investments in Kuaishou and related strategic support facilitated Kuaishou's rapid expansion into the Chinese live game streaming industry and the related growth and strengthening of Kuaishou's user base, content ecosystem, and revenue generation capabilities.

363. By the end of November 2019, Kuaishou's gaming unit boasted 51 million DAUs, a 46% increase over June 2019 user metrics. Defendant Tencent's massive support for Kuaishou had succeeded in eliminating significant barriers to Kuaishou entering eSports. Tencent's support had also materially undermined the competitive advantage DouYu had assured investors that the Company boasted in gaming.

### 5. Although DouYu Presented Itself as in Fine Financial Condition, It's Net Income Was Rapidly Decelerating

364. The Exchange Act Defendants also knowingly concealed that DouYu's financial fortunes had dipped downward dramatically before the IPO. It is well-established that a company's "Net Income (Loss)" is "[t]he figure that most comprehensively reflects a business's profitability—and used in publicly traded companies to calculate their earnings per share (EPS)" and "represents the renowned *bottom line* of an income statement.[12] Unbeknownst to investors, DouYu's bottom line was decelerating rapidly.

365. In the Offering Documents, the Exchange Act Defendants had stated that after DouYu had experienced a net *loss* for Q4 2018 of approximately $40.4 million, the Company reported its first-ever profit in Q1 2019 of $2.7 million, or a quarter-over-quarter increase of 106.67%. Less than a month after the IPO, however, DouYu reported net income for Q2 2019 of only $3.4 million, reflecting a quarter-over-quarter increase of only 27.5%—in stark contrast with the 106.67% reflecting a *rapid* deceleration in growth. Although Q2 2019 had ended only 17 days before the IPO, the Offering Documents did not disclose the Q2 2019 results or otherwise reveal this significant deceleration. Moreover, in Q3 2019, the quarter in which DouYu held the IPO, the Company reported a net *loss* of $24.6 million, representing an 813% decrease from the $3.45 million in net income of the previous quarter. In other words, as of the IPO, DouYu was operating at a loss and its revenue growth had decelerated effectively to zero.

---

[12] *See* Clarie Boyte-White, *Is Net Income the Same As Profit?*, Investopedia (Aug. 9, 2020), https://www.investopedia.com/ask/answers/122414/net-income-same-profit.asp/.

### C. The Exchange Act Defendants' Materially False and Misleading Statements Violation of The Exchange Act

366. The Exchange Act Defendants are makers of the statements contained in the Offering Documents, press releases, and merger agreement and alleged below because DouYu is the issuer of the statements and some or all of the Individual Defendants (except for Defendant Arthur) or Tencent signed their names to those statements, indicating that they were a maker thereof.

#### 1. The Exchange Act Defendants Misrepresented and/or Failed to Disclose that Yuchi and/or Lucky Draw Violated China's Regulations in the Offering Documents, Press Releases, and Merger Agreement

367. DouYu's Offering Documents, which were signed by the Exchange Act Defendants, touted to investors that the Company's virtual currency, Yuchi, could not be exchanged for cash or transferred between users, and that the platform's Lucky Draw feature drove purchases of Yuchi and virtual gifts. These statements were knowingly or recklessly false and misleading, however, because the Exchange Act Defendants knew or recklessly disregarded that users could and were exchanging Yuchi for cash and transferring Yuchi between each other, and that key interactive features of Lucky Draw were illegal gambling and thus did not comply with current regulatory requirements. As a result, the Exchange Act Defendants had to deactivate lucky draw shortly after the IPO, which negatively impacted user engagement activity and caused disappointing financial results.

368. For example, the Exchange Act Defendants stated in the Offering Documents that "Users can purchase the virtual currency on our site via various online third-party payment platforms, including WeChat Pay, AliPay and other payment platforms. In addition to purchasing these virtual currencies on our site, users can purchase virtual currencies from our online store at third-party websites such as Tmall.com. ***Other than the above-mentioned official purchase***

***channels, there is no other means to purchase Yuchi***." The Offering Documents then assured investors that Yuchi "is non-refundable and ***may not be converted back to cash or be transferred between users***." This statement was knowingly or recklessly false and misleading, however, because DouYu users were actively converting Yuchi back to cash and transferring Yuchi between each other.

369. The Offering Documents also included the following false and misleading warning about purchases of Yuchi:

> [F]rom time to time, certain third parties ***fraudulently claim that users can purchase Yuchi through them***. If our users choose to purchase our virtual currency from such third parties, they may suffer losses from such fraudulent activities by third parties. Although we are not directly responsible for such fraudulent activities conducted by third parties, our user experience may be adversely affected and they may choose to leave our platform as a result. Such fraudulent activities by third parties might also generate negative publicity, disputes or even legal claims. The measures we take in response to such negative publicity, disputes or legal claims may be expensive, time consuming and disruptive to our operations and divert our management's attention.

370. The statements in paragraphs 368–69 above were knowingly or recklessly false and misleading, however, because they only warned investors that third parties were claiming to sell counterfeit Yuchi and failed to disclose that users could exchange Yuchi for cash and/or transfer Yuchi between each other. This warning was also false and misleading because it communicated that these third parties were operating completely separately from DouYu's platform, when in fact DouYu's streamers were facilitating these transactions with DouYu's users.

371. The Offering Documents also touted DouYu's use of various social features to enhance user engagement, which according to the Exchange Act Defendants, would lead to user loyalty:

> Gamers have strong social attributes and seek to be part of a community sharing similar interest. Therefore, game-centric live streaming platforms introduced various social features for users to interact with each other, such

> as group chatting and bullet chatting. These platforms also offer ways for viewers to interact with streamers. For example, talented game streamers may play games together with their viewers. ***Creating and maintaining a social community among viewers and streamers create barriers of entry and is crucial to build strong engagement and loyalty to the live streaming platforms.***

372. Chief among these social features was Lucky Draw, a raffle offered on DouYu's platform to enable "viewers to interact with streamers[,]" which the Exchange Act Defendants identified as one of a handful of "***[k]ey success factors for game-centric live streaming platforms***[.]"

373. The Exchange Act Defendants also claimed in the Offering Documents that Lucky Draw and similar raffles complied with China's regulations:

> In addition, there are ***online lucky draws, raffles*** and other similar activities conducted on our platform to promote user engagement, which involve virtual currencies (such as Yuchi). ***The prize of such activities can only be used to purchase virtual gifts or to give to streamers as reward on our platform. We do not believe such activities are specifically prohibited under PRC laws and regulations***. We cannot assure you, however, that our platform will not be subject to liabilities due to third party activities (including steamers activities), or that the PRC government authority will not take a different view. ***If our platform is deemed to be engaged in illegal or inappropriate activities relating to issuance and use of virtual currencies by our platform (such as Yuchi), including due to third party activities, we may be subject to fines and penalties, which may have adverse impact our business, results of operations and reputation***.

374. The statements made in paragraphs 371–73 communicated to investors that Lucky Draw and other raffles complied with current regulatory requirements in China. However, these statements were knowingly or recklessly false and misleading because they failed to disclose that the Exchange Act Defendants knew that Lucky Draw constituted illegal gambling, that prizes from Lucky Draw were in fact being sold for currency and transferred between users, and that "Lucky Draw" accordingly did not comply with China's regulatory requirements and enhanced the risk

that DouYu would deactivate lucky draw, which would negatively impact user engagement activity and cause disappointing financial results.

375. On August 13, 2019, the Company issued a press release, which was also filed with the SEC as an Exhibit to a Form 6-K signed by DouYu and Defendant Chen. The press release quoted Defendant Chen as stating that "In this quarter, we continued to demonstrate our ability to maintain our steady growth as our revenues once again outperformed the high-end range of our guidance, increasing by 33.9% year over year to RMB2.51 billion in the quarter. In addition, our adjusted net income in the quarter grew at a rapid pace, increasing by 513.7% year over year to RMB322.9 million." The press release also quoted Defendant Cao as stating that "We continued to deliver solid financial results in the second quarter of 2020 as we increased investment in those initiatives with growth potential and higher operating efficiency. This investment strategy enabled us to sustain the growth trajectory of our revenues, bolster our ROI, and steadily improve the profitability of our platform."

376. Elsewhere in the August 13, 2019 press release, the Offering Documents disclosed that:

> Total net revenues in the second quarter of 2020 increased by 33.9% to RMB2,508.2 million (US$354.4 million) from RMB1,872.7 million in the same period of 2019, ***primarily driven by the increase in live streaming and advertising revenues***.
>
> Live streaming revenues in the second quarter of 2020 increased by 35.8% to RMB2,319.9 million (US$327.8 million) from RMB1,708.3 million in the same period of 2019. ***This increase was primarily due to the Company's optimization of its platform's interactive features and continuous refinement of its event models, both of which helped to further cultivate users' paying habits***.
>
> * * *
>
> Cost of revenues in the second quarter of 2020 increased by 26.3% to RMB1,985.3 million (US$280.5 million) from RMB1,571.7 million in the

> same period of 2019, ***primarily due to the increase in revenue sharing fees and content costs***.
>
> Revenue sharing fees and content costs in the second quarter of 2020 increased by 32.3% to RMB1,754.9 million (US$248.0 million) from RMB1,326.6 million in the same period of 2019. This increase was primarily explained by: 1) increases in revenue sharing fees, which were largely in line with the increases in total net revenues, 2) ***increases in content costs attributable to the Company's investments in eSports-related content and market expansion initiatives in Japan***, and 3) increased investment in tournament-related videos and in-house content production.

377. By touting the Company's performance and attributing it to the Company's abilities and initiatives, and by characterizing the increases in content costs, the Exchange Act Defendants took on an obligation to disclose that the Company's performance was also the result of illegal conduct, namely its use of Yuchi, which could be exchanged for cash and between users, and lucky draw games that constituted gambling, each of which violated Chinese law. The Exchange Act Defendants violated this duty by failing to disclose that the Company's performance was boosted by illegal conduct, and thus the statements in paragraphs 375–76 above were knowingly or recklessly false and misleading.

378. On October 12, 2020, the Company issued a press release, which was also filed with the SEC as an Exhibit to a Form 6-K signed by DouYu and Defendant Chen.

> The Company expects its total net revenue for the third quarter of 2020 to be in the range of RMB2,520 million to RMB2,550 million, representing a year-over-year growth between 35.6% and 37.2%, as compared to its previous guidance in the range of RMB2,640 million to RMB2,680 million. The primary reason for the updated guidance was the fact that the ***revenues generated from certain major fans events in this period were lower than expected***.
>
> Although maintaining a year-over-year growth as compared to the third quarter of 2019, the Company expects its net income in the third quarter of 2020 to decrease significantly from the second quarter of 2020 ***due to increased revenue sharing fees and content cost***. While the increased revenue sharing fees and content cost affected its profitability in the third quarter of 2020, the Company believes it will benefit from such increased spending in the long run.

379. By affirmatively characterizing the Company's revised guidance to lower revenues from "certain major fans events" and expected declines in revenues to be from "increased revenue sharing fees and content cost," the Exchange Act Defendants took on an obligation to disclose that the Company's revised guidance and expected revenue declines were because the Company had deactivated its lucky draws at the instruction of the Chinese government because they were illegal gambling. the Exchange Act Defendants violated this duty by omitting to disclose the deactivation of the lucky draws at the instruction of the Chinese government because they were illegal gambling, and thus the statements in paragraph 379 above were knowingly or recklessly false and misleading.

380. On October 14, 2020, the Company filed an Agreement and Plan of Merger ("Merger Agreement") with the SEC as an Exhibit to a Form 6-K signed by DouYu and Defendant Chen. Paragraph 3.10(b) of the Merger Agreement represented that:

> Neither DouYu nor any of its Subsidiaries is ***or has been*** in material violation of any Law applicable to DouYu or its Subsidiaries . . . except for violations which would not reasonably be expected to have, individually or in the aggregate, a DouYu Material Adverse Effect. ***No investigation or review by any Governmental Entity with respect to DouYu or its Subsidiaries is pending or, to DouYu's knowledge, threatened in writing***, nor, to DouYu's knowledge, has any Governmental Entity indicated in writing an intention to conduct the same, in each case with respect to a material violation of applicable Law.

381. The statements in paragraph 280 above were misleading because DouYu had been instructed by the Chinese government in August 2019 to deactivate its lucky draw games, which had a materially negative affect on DouYu, since the games were in violation of law and because the government had been, and was continuing to, investigate whether those games were illegal gambling.

382. The statements made in paragraphs 367–81 above were material because over 90% over DouYu's revenue came from purchases of Yuchi, which was then used to purchase virtual

gifts, and because the Exchange Act Defendants touted to investors that Lucky Draw and other games were used to increase users' interactions with streamers, which was essential to driving purchases of Yuchi and virtual gifts, and thus the Company's financial performance.

**2. The Exchange Act Defendants Made Knowing or Reckless Misrepresentations in Offering Documents and Press Releases Regarding DouYu's Revenues**

383. DouYu's Offering Documents, which were signed by the Exchange Act Defendants, touted to investors the Company's increasing revenues and ARPPU, as well as that the Company had reported "net income," *i.e.*, profits, for the first time in its history, and attributed those increases to users purchasing virtual gifts for streamers in response to the quality of the Company's product, *i.e.*, the appeal of the Company's streamers and the content those streamers created. These statements were knowingly or recklessly false and misleading, however, because the Offering Documents did not disclose that DouYu's revenues and ARPPU were inflated by *de facto* wash transactions where streamers purchased gifts on DouYu's platform, gave those "gifts" to themselves, and DouYu kicked back half of the purchase price to the streamer.

384. For example, the Exchange Act Defendants in the Offering Documents touted how the Company's revenues were driven by "user satisfaction," "diversified opportunities for user spending" on a "wide array of virtual gifts," when in reality the Company's revenues were inflated by streamers purchasing gifts for themselves:

> We believe ***the vibrant and interactive game community created on our platform drives user satisfaction, which provides diversified opportunities for user spending***. Leveraging a large number of viewers and a deep pool of streamers, our monetization channels mainly consists of live streaming, advertisement and others. ***These channels effectively supplement each other and unleash future monetization potential***. Live streaming is our main monetization channel and generated 77.7%, 80.7%, 86.1%, 81.5% and 90.9% of our total net revenue in 2016, 2017, 2018 and for the three months ended March 31, 2018 and 2019 respectively. ***Our live streaming revenue is primarily derived from the sales of a wide array of virtual gifts***.

385. Similarly, the Offering Documents repeatedly touted the Company's ever-increasing revenues, including turning a profit for the first time in Q1 2019, but failed to disclose that these revenues were driven by purchases by streamers purchasing gifts for themselves. For example, the Offering Documents disclosed that:

> ***We have grown rapidly since our inception.*** Our revenue increased from RMB786.9 million in 2016 to RMB1,885.7 million in 2017 and further to RMB3,654.4 million (US$544.5 million) in 2018. ***Our revenue increased from RMB666.5 million for the three months ended March 31, 2018 to RMB1,489.1 million (US$221.9 million) for the same period of 2019***. ***We had*** net loss of RMB782.9 million, RMB612.9 million and RMB876.3 million (US$130.6 million) in 2016, 2017 and 2018, respectively, and ***net loss of RMB155.7 million and net income of RMB 18.2 million (US$2.7 million) for the three months ended March 31, 2018 and 2019, respectively***.

386. Elsewhere, the Offering Documents falsely and misleadingly disclosed the Company's revenues for the three months ended March 31, 2019 as compared to compared to three months ended March 31, 2018:

> ***Revenue***. Our revenues were RMB1,489.1 million (US$221.9 million) for the three months ended March 31, 2019, representing an increase of 123.4% from RMB666.5 million for the three months ended March 31, 2018. The increase was mainly attributable to an increase in live streaming revenue.
>
> *Live streaming revenue*. Our live streaming revenue increased by 149.2% from RMB543.4 million for the three months ended March 31, 2018 to RMB1,354.1 million (US$201.8 million) for the three months ended March 31, 2019, ***primarily attributable to our continuing cultivation of users' paying habits and growth in the number of paying users and ARPPU***.

387. Elsewhere, the Offering Documents misleadingly disclosed the Company's "Revenue sharing fees and content cost" for the three months ended March 31, 2019 as compared to compared to three months ended March 31, 2018:

> ***Our revenue sharing fees and content cost increased by 121.1% from RMB482.7 million*** in the three months ended March 31, 2018 to RMB1,067.4 million (US$159.0 million) in the three months ended March 31, 2019, primarily due to the increases in (i) the revenue sharing fees in

> line with the increase in live streaming revenue, and (ii) ***content cost as we introduced high quality content in our platform and invest in eSports related content***.

388. Elsewhere, the Offering Documents misleadingly disclosed that the Company's revenues for the year ended December 31, 2018 compared with the year ended December 31, 2017:

> ***Revenue.*** Our revenue increased by 93.8% from RMB1,885.7 million in 2017 to RMB3,654.4 million (US$544.5 million), mainly attributable to the increase in (i) live streaming revenue and (ii) advertisement and other revenues.
>
> *Live streaming revenue.* Our live streaming revenue increased by 106.8% from RMB1,521.8 million in 2017 to RMB3,147.2 million (US$468.9 million) in 2018. During the same periods, our quarterly average paying users grew from approximately 2.4 million to 3.8 million, and our quarterly average ARPPU grew from RMB156 to RMB208. ***The growth in live streaming revenue, quarterly average paying users and quarterly average ARPPU were attributable to our continuing effort in growing our user base and developing users' willingness to pay, including offering of compelling content especially eSports related content, increased popularity of our platform, optimized product features and introduction of interactive streaming channels***.

389. The Offering Documents also misleadingly disclosed that the Company's revenues for the year ended December 31, 2017 compared with the year ended December 31, 2016:

> ***Revenue.*** Our revenue increased by 139.7% from RMB786.9 million in 2016 to RMB1,885.7 million in 2017, mainly attributable to the increase in (i) live streaming revenue and (ii) advertisement and other revenues.
>
> *Live streaming revenue.* Our live streaming revenue increased by 149.0% from RMB611.3 million in 2016 to RMB1,521.8 million in 2017, mostly attributable to the significant growth of quarterly average paying users from approximately 0.9 million to 2.4 million. As it takes time to cultivate new users' paying habits, the quarterly average ARPPU decreased slightly from RMB164 to RMB156. ***The growth in the live streaming revenue and paying user base were attributable to our continual effort in growing our user base and developing users' willingness to pay, including offering of compelling content especially eSports related content, increased popularity of our platform, optimized product features and introduction of interactive streaming channels***.

390. Elsewhere, the Offering Documents misleadingly disclosed the Company's "Revenue sharing fees and content cost" for the year ended December 31, 2018 compared with the year ended December 31, 2017:

> ***Our revenue sharing fees and content cost increased by 103.2% from RMB1,373.1 million in 2017 to RMB2,790.0 million (US$415.7 million) in 2018***, primarily due to the increases in (i) the revenue sharing fees in line with the increase in live streaming revenue, and (ii) ***content cost as we continuously introduce high quality content such as eSports related content on our platform***.

391. Elsewhere, the Offering Documents misleadingly disclosed the Company's "Revenue sharing fees and content cost" for the year ended December 31, 2017 compared with the year ended December 31, 2016:

> ***Our revenue sharing fees and content cost increased by 75.5% from RMB782.4 million in 2016 to RMB1,373.1 million in 2017***, primarily due to the increases in (i) the revenue sharing fees in line with the increase in live streaming revenue, and (ii) ***content cost as we continuously introduce high quality content, such as eSports related content on our platform***.

392. The Offering Documents also misleadingly disclosed that:

> ***Our cost of revenues grew for the nine quarters in the period from January 1, 2017 to March 31, 2019 as a result of our business growth, which requires higher revenue sharing fees and content cost*** as well as bandwidth costs. Growth in our cost of revenues accelerated in the period from January 1, 2018 to March 31, 2019 due to ***our strategic focus on recruiting top streamers to attract more users and diversify our content offerings, which contributed significantly to our revenue sharing fees and content cost***.

393. The Offering Documents further disclosed that:

> We have generally experienced steady growth in our quarterly net revenues for the nine quarters in the period from January 1, 2017 to March 31, 2019. ***The growth was mainly attributable to the growth of paying users from 1.7 million in the first quarter of 2017 to 6.0 million to the first quarter of 2019, and ARPPU from RMB135 to RMB226 in the same periods***. ***The increase in the number of paying users and ARPPU was a result of our continued efforts in growing user base and user engagement through popular streamers and rich and engaging content, and in cultivating active users' paying habit by creating various paying scenarios.*** The slight

> decrease in our net revenues in the first quarter of 2018 was due to the decrease in our advertisement revenues, as the demand for our advertisement services is generally lower in the first quarter of each year. This is primarily attributable to a general slowdown in business activities during the Chinese New Year holiday and the fact that advertisers typically limit their budgets for online platforms during this time of the year. The net revenues trend we experienced in the past may not apply to, or be indicative of, our future operating results.

394. The statements in paragraphs 384–93 above touted to investors that DouYu's ever-increasing revenues were the result of users purchasing virtual gifts for streamers in response to the quality of the Company's product, *i.e.*, appeal of the Company's streamers and the content those streamers created. The statements were knowingly or recklessly false and misleading because they described increases in revenue sharing fees and content costs without disclosing that these costs included payments to streamers, which the streamers then used to purchase Yuchi and gifts for themselves, as well as kickbacks of half the value of these purchases by streamers for themselves. These statements were also knowingly or recklessly false and misleading, however, because they failed to disclose that the Company's revenues were inflated by these *de facto* wash transactions.

395. The Offering Documents also communicated to investors that fans or supporters of streamers—*i.e.*, users separate from the streamers themselves—were purchasing virtual gifts for those streamers, which enabled the Company to become profitable for the first time in its history in Q1 2019 but failed to disclose that streamers were purchasing gifts for themselves as a way to boost their profiles on DouYu's platform. For example, the Offering Documents stated that:

> We have developed diversified monetization channels to capitalize on our large and active user base as well as high-quality content offered by our deep pool of top streamers. We primarily generate revenues through live streaming and advertisement. ***Revenue from live streaming mainly consists of sales of virtual gifts which viewers give to streamers during live streaming to show appreciation and support*** . . . . Our revenue has increased from RMB786.9 million in 2016 to RMB1,885.7 million in 2017 and further to RMB3,654.4 million (US$544.5 million) in 2018. Our

revenue increased from RMB666.5 million for the three months ended March 31, 2018 to RMB1,489.1 million (US$221.9 million) for the same period of 2019. We had net loss of RMB782.9 million, RMB612.9 million and RMB876.3 million (US$130.6 million) in 2016, 2017 and 2018, respectively, and ***net loss of RMB155.7 million and net income of RMB 18.2 million (US$2.7 million) for the three months ended March 31, 2018 and 2019, respectively***.

396. Similarly, the Offering Documents touted "large following bases" of fans who "support these streamers with virtual gifts," again communicating to investors that separate users—*i.e.*, not the streamers themselves—were purchasing virtual gifts for streamers without disclosing that streamers were buying gifts for themselves:

> "***Our top streamers tend to have large following bases who regularly support these streamers with virtual gifts***, and they also tend to attract many integrated promotion activities during live streaming compared to self-registered streamers. ***Their charisma and the high-quality content that they create are primary contributors to user stickiness and are hard to replicate with self-registered streamers***. In the first quarter of 2018 and 2019, ***our exclusive streamers accounted for 46.0% and 61.2% of our total live streaming revenue***, respectively."

397. Likewise, when describing the Company's model for paying streamers, the Exchange Act Defendants told investors that streamers received a percentage of the sales of virtual gifts bought by *other users* for those streamers, but did not disclose that streamers were purchasing virtual gifts for themselves:

> *Revenue sharing fees and content cost*. Our revenue sharing fees represent our payment to streamers based on a percentage of revenue from sales of virtual items, including virtual gifts and other subscription based privileges. ***When a viewer sends a virtual gift to a streamer, we pay a certain percentage of the sales of virtual gifts to the streamers or the talent agency of which the streamer is a member***. In addition, we give certain of our streamers a monthly pay that is determined based on the popularity of the streamer. ***Our content cost mainly covers costs we incurred in purchasing content rights, compensating and recruiting streamers, and those we incurred in generating self-produced content.*** We expect the revenue sharing fees and content cost to increase in absolute amount as our business grows and we further expand our content offerings, enhance user engagement and strengthen investment in eSports. We expect the

> percentage of revenue sharing fees and content cost of total net revenues to decline as we benefit from economies of scale.

398. In addition, the Exchange Act Defendants emphasized in the Offering Documents that the Company's revenues depended on growing the number of "paying users" on DouYu's platform, but failed to disclose that these "paying users" included streamers purchasing gifts for themselves in *de facto* wash transactions:

> The markets for our live streaming platform and the related products and services are relatively new and rapidly developing and are subject to significant challenges, especially in terms of ***converting non-paying users to paying users, maintaining a stable paying user base and attracting new paying users***. Our business plan relies heavily upon an expanding user base and the resulting increased revenue from live streaming and advertisement, as well as our ability to capitalize on the eSports industry and explore other monetization avenues.

399. Along the same lines as the statement in paragraph 398 above, the Offering Documents elsewhere disclosed that:

> We primarily generate live streaming revenues through the sales of virtual gifts. See "Business—Monetization opportunities—Live Streaming". ***We expect that our revenues from live streaming derived from the sale of virtual gifts to increase as we grow our user base, enhance our user engagement, expand virtual gifting scenarios, increase users' willingness to pay, and continue to capitalize on the significant market potential of eSports***."

400. In describing the Company's recognition of revenue, the Offering Documents also misleadingly communicated to investors that other users—*i.e.*, not the streamers themselves—were buying virtual gifts for streamers:

> We principally engage in operating our own live streaming platforms, ***which enable streamers and users to interact with each other during live streaming***. ***The users have the option to purchase virtual currency, which is non-refundable and can only be used to redeem for virtual items to be used in the live streaming sessions on the our [sic] platforms***. Unredeemed virtual currency is recorded as deferred revenue. Virtual currencies used to purchase virtual items are recognized as revenue according to the prescribed revenue recognition policies of virtual items addressed below unless otherwise stated.

401. Similarly, the Exchange Act Defendants in the Offering Documents misleadingly described the user-streamer interactions without disclosing that streamers purchased virtual gifts for themselves, including for the purpose of misleading users into believing that the streamer was more popular than in reality they were:

> Through playing and narrating games live, streamers play a vital role in attracting and retaining user traffic as well as enhancing user engagement, and therefore are crucial assets to game-centric live streaming platforms. ***Streamers can in turn monetize on game-centric live streaming platforms through measures such as receiving virtual gifts from users, advertisement income by streamer endorsement and commercialization of content created***. The top streamers can inspire a large fan base of viewers ***with their superior skillsets and passionate personality***, and generate significant monetization opportunity and user engagement.

402. The Exchange Act Defendants emphasized in the Offering Documents that *other users*, not the streamers themselves, purchased gifts for streamers when describing the "monetization channels," *i.e.*, sources of revenue, used by live-streaming platform companies:

> ***Users can purchase virtual items on the platforms for the purpose of rewarding streamers that they like, and live streaming platforms typically share a portion of the payment for virtual items. By giving streamers virtual gifts, viewers show their appreciation for the streamers and get to engage in live streaming on a more interactive and real-time basis.*** Compared with other live streaming formats, game-centric live streaming offers a more sustainable context for virtual gifting due to the massive base of game fans with high engagement and propensity to spend on game-centric entertainment formats.

403. The Exchange Act Defendants also detailed payments by the Company to its streamers in the Offering Documents without disclosing that the Company kicked back a portion of purchasers of virtual currency made by the streamers themselves:

> Our exclusive contracts have exclusivity clauses that require streamers to live stream on our platform only during the contract term. ***In addition to payments of a portion of virtual gift sales and advertisement sales, we typically pay our exclusive streamers base compensation based on the content he or she produces and the number of concurrent viewers who watch live streaming at the same time***. We have the right to review and adjust our streamers' base compensation taking into account their

> performance metrics. As such, ***our exclusive streamers are incentivized to produce engaging content that attracts more viewers and promotes spending on our platform.***

404. The Offering Documents also misleading described virtual gifts as items that *other users purchased and gave to streamers,* not as items that streamers *purchased for themselves* and received a kick-back from DouYu:

> ***Users are able to purchase virtual gifts on our platform using our virtual currency and send them to streamers as a gesture of appreciation or support.*** Users can purchase the virtual currency on our site via various online third-party payment platforms, including WeChat Pay, AliPay and other payment platforms. In addition to purchasing these virtual currencies on our site, users can purchase virtual currencies from our online store at third-party websites such as *Tmall.com*. The price of our virtual currency does not change and virtual currency does not expire. However, virtual currency is non-refundable and may not be converted back to cash or be transferred between users.
>
> ***When a streamer receives a virtual gift, that virtual gift is displayed in his or her profile. We pay our streamers fees based on a percentage of revenue from virtual gift sales on live streaming channels.*** We have the system in place to foster the interaction and promote spending on our platform.
>
> * * *
>
> A wide variety of virtual gifts are available to our users, with prices ranging from approximately RMB0.1 to approximately RMB2,000. We provide an innovative and diverse selection of virtual gifting to convert our active users to paying users and frequently release new virtual goods related to events and pop culture trends to increase sales. In addition, ***we organize streamer popularity contests to promote spending by viewers to show support of the streamers they follow***.

405. The Offering Documents also described how visitors to DouYu's platform could register to become streamers. While the Offering Documents disclosed that streamers could purchase virtual gifts, the Offering Documents misleadingly failed to disclose that streamers purchased and received a kickback on virtual gifts *for themselves*:

> To broaden our user base, we allow users to watch live streaming on our platform without registration, either through our website or mobile apps. ***To***

> ***become a streamer, a user must register on our platform and verify his or her identity with a government issued ID. As a result, certain of our streamers are also active users as well as paying users on our platform.*** After the streamer's identity is verified, he or she may apply to create a new room for streaming. Once a room or channel is created, our streamers may customize video, audio and other room settings.

406. The Offering Documents' disclosure of "new products and features to enhance user experience and increase user engagement" also misleadingly communicated to investors *other users* bought gifts for streamers without disclosing that streamers purchased the gifts for themselves and received a kickback from the Company on those purchases:

> We also develop new products and features to enhance user experience and increase user engagement. Our platform features *Yu Bar* ("鱼吧"), a short-blogging community where streamers can interact with their followers by posting and replying to short blogs. During 2018, Yu-Bar witnessed approximately 144 million interactions including posts, responses, likes and forwards. In addition, we offer features such as "Streamer Tailor-made Gifts" that ***allow top streamers to design unique gifts to be purchased by their followers***. Our "*DouYu Fleet*" ("斗鱼车队") allows users to create private groups of up to 2,000 members to complete certain tasks together to create vibrant interactions.

407. The Offering Documents also misleadingly described how the Company was working to control "streamer compensation," which was misleading because it failed to disclose that the compensation was used by streamers to purchase gifts for themselves:

> Our costs of revenues were RMB1,286.0 million (US$191.6 million) for the three months ended March 31, 2019, representing an increase of 100.4% from RMB641.9 million for the three months ended March 31, 2018, primarily attributable to the increase in revenue sharing fees and content costs in parallel with the growth in our live streaming revenue and business expansion, ***partially offset by our efforts to increase operating efficiency and control costs such as streamer compensation***.

408. The statements in paragraphs 395–407 above communicated to investors that DouYu's revenues from purchases of virtual gifts were the result of purchases of gifts by *other users* for streamers—*i.e.*, not the purchases of gifts by streamers for themselves. These statements were knowingly or recklessly false and misleading, however, because they failed to disclose that

the Company's revenues were inflated by *de facto* wash transactions where streamers purchased virtual gifts for themselves and the Company kicked back half the amount of the purchase to the streamer.

409. The Offering Documents also included numerous boilerplate Risk Factors that were misleading because they failed to disclose to investors that the Company's revenues also depended on the ability of streamers to purchase virtual gifts for themselves. For example, the Offering Documents advised investors that:

> ***we generated positive gross profit for the first time recently in 2017 and then in 2018 and generated net profit in the first quarter of 2019***, such positive trend may not translate into continued net after-tax profit. The time it will take for us to eventually achieve profitability hinges on our ability to grow rapidly in a cost-effective way, and we may not be able to grow this way successfully.
>
> While ***our future revenue growth will be linked with the realization of our monetization strategies, which will be affected by user engagement, streamer retention and product offering***, our cost-effective growth will primarily rely on improvement of operational efficiency, which has been reflected so far in the continually decreasing percentage of our content costs and bandwidth and server costs in our total operating costs. This trend of operational efficiency improvement may not continue in the future, or it may not reach a sufficient level to generate profitability. ***Our ability to continue to improve operational efficiency will depend on our ability to maintain stronger bargaining position in contract negotiations with top streamers, streamline our operation, achieve economies of scale and employ more advanced streaming technologies at lower cost, among other things***. Additionally, ***our ability to achieve profitability is affected by various external factors, many of which are beyond our control, such as the PC and mobile games market and eSports industry in China, and the development of social networking, live streaming services and mobile marketing services***. We cannot assure you that we will be able to improve our operational efficiency in the future.

410. Likewise, the Offering Documents also advised investors that:

> Our monetization model is new and evolving. Our streaming platform is free to access, and we generate revenues primarily from live streaming and advertisement. As a result, ***our revenue is affected by our ability to increase user engagement and convert non-paying users into paying users, which***

> ***in turn depends on our ability to offer content, virtual gifts, advertisements and other services***.

411. In addition, the Offering Documents disclosed that:

> ***Our revenue growth is heavily dependent on paying users and revenue per paying user. If we fail to continue to grow or maintain our paying user and continue to increase revenue per paying user, our live streaming revenue may not increase, which may materially and adversely affect our business operation and financial results***.
>
> Our quarterly average paying users grew from 0.9 million in 2016 to 2.4 million in 2017 and further to 3.8 million in 2018. Moreover, ***our average revenue per paying user ("ARPPU") per quarter changed from approximately RMB164 in 2016 to RMB156 in 2017 and increased to RMB208 in 2018. Whether we can continue this trend of increasing paying ratio amongst our users depends on many factors, and many of them are out of our control. For example, our paying users may have less disposable income as they need to meet financial obligations elsewhere, they may decide to no longer support a particular streamer that they used to follow financially, and an overall worsening economic conditions can lower disposable income for all existing paying users, causing them to spend less on our platform***. ***We expect that our business will continue to be heavily dependent on revenue collected from paying users in the near future***. Any decline in the number paying users or our paying ratio may materially and adversely affect our results of operations.

412. The statements in paragraphs 409–11 touted to investors that DouYu had become profitable for the first time in Q1 2019, and purported to advise investors as to the various risks that could affect the Company's revenue streams, but were knowingly or recklessly false and misleading because they failed to disclose that the Company's revenues were inflated by inflated by *de facto* wash transactions where streamers purchased virtual gifts for themselves and the Company kicked back half the amount of the purchase to the streamer, as well as that the Company's future profitability depended in part on its streamers' ability and willingness to continue making such purchases.

413. On August 13, 2019, the Company issued a press release, which was also filed with the SEC as an Exhibit to a Form 6-K signed by DouYu and Defendant Chen. The press release

quoted Defendant Chen as stating that "In this quarter, we continued to demonstrate our ability to maintain our steady growth as our revenues once again outperformed the high-end range of our guidance, increasing by 33.9% year over year to RMB2.51 billion in the quarter. In addition, our adjusted net income in the quarter grew at a rapid pace, increasing by 513.7% year over year to RMB322.9 million." The press release also quoted Defendant Cao as stating that "We continued to deliver solid financial results in the second quarter of 2020 as we increased investment in those initiatives with growth potential and higher operating efficiency. This investment strategy enabled us to sustain the growth trajectory of our revenues, bolster our ROI, and steadily improve the profitability of our platform."

414. Elsewhere in the August 13, 2019 press release, the Offering Documents disclosed that:

> Total net revenues in the second quarter of 2020 increased by 33.9% to RMB2,508.2 million (US$354.4 million) from RMB1,872.7 million in the same period of 2019, ***primarily driven by the increase in live streaming and advertising revenues***.
>
> Live streaming revenues in the second quarter of 2020 increased by 35.8% to RMB2,319.9 million (US$327.8 million) from RMB1,708.3 million in the same period of 2019. ***This increase was primarily due to the Company's optimization of its platform's interactive features and continuous refinement of its event models, both of which helped to further cultivate users' paying habits***.
>
> * * *
>
> Cost of revenues in the second quarter of 2020 increased by 26.3% to RMB1,985.3 million (US$280.5 million) from RMB1,571.7 million in the same period of 2019, ***primarily due to the increase in revenue sharing fees and content costs***.
>
> Revenue sharing fees and content costs in the second quarter of 2020 increased by 32.3% to RMB1,754.9 million (US$248.0 million) from RMB1,326.6 million in the same period of 2019. This increase was primarily explained by: 1) increases in revenue sharing fees, which were largely in line with the increases in total net revenues, 2) ***increases in content costs attributable to the Company's investments in eSports-related***

> ***content and market expansion initiatives in Japan***, and 3) increased investment in tournament-related videos and in-house content production.

415. By touting the Company's performance and attributing it to the Company's abilities and initiatives, characterizing the increases in content costs, the Exchange Act Defendants took on an obligation to disclose that the Company's performance was also the result of *de facto* wash transactions where users would take personal funds, including salaries paid to them by DouYu, and use those funds to purchase Yuchi and virtual gifts for themselves. The Exchange Act Defendants violated this duty by failing to disclose that the Company's performance was boosted by these transactions, and thus the statements in paragraphs 413–14 above were knowingly or recklessly false and misleading.

416. The statements in paragraphs 384–415 were material to investors because, as disclosed in the Registration statement purchases of virtual gifts made up the overwhelming majority of the DouYu's revenues, including 77.7%, 80.7%, 86.1%, 81.5% and 90.9% of its "total net revenue in 2016, 2017, 2018 and for the three months ended March 31, 2018 and 2019 respectively."

**3. The Offering Documents Misrepresented and/or Failed to Disclose that Streamers Could and Were Actively Misrepresenting Themselves on DouYu's Platform**

417. DouYu's Offering Documents, which were signed by all the Exchange Act Defendants, emphasized to investors that DouYu knew the identities of its streamers, who the Company relied on to generate revenue by inducing users of DouYu's platform to buy virtual gifts for streamers. In addition, the Exchange Act Defendants in the Offering Documents assured investors that it had implemented a "Content Monitoring System" designed to identify and punish streamers who engaged in fraudulent conduct. These statements were knowingly or recklessly false and misleading, however, because they failed to disclose that DouYu's platform allowed streamers

to misrepresent themselves to users, which created a material risk that users would leave DouYu when they learned the streamers' true identities.

418. The Exchange Act Defendants in the Offering Documents directly assured investors that the Company knew the identity of every streamer because: "To become a streamer, a user must register on our platform ***and verify his or her identity with a government issued ID*** . . . . After the streamer's identity is verified, he or she may apply to create a new room for streaming."

419. The Offering Documents also emphasized to investors that DouYu knew the identities of its "top streamers," who generated the most revenue, because it had a program to identify, recruit and develop such streamers, and entered into exclusive contracts directly with those streamers:

> Our platform brings together a deep pool of top streamers and provides a sustainable streamer development system. As of March 31, 2018 and 2019, our platform had 4.6 million and 6.5 million registered streamers, ***including more than 2,000 and 6,500 top streamers, each of whom entered into an exclusive contract with us directly as of each date, respectively***. These top exclusive streamers streamed an average of 4.1 and 4.3 hours per show in the first quarter of 2018 and 2019, respectively, and all of our streamers generated a total of 20.4 million and 30.2 million streaming hours during the same periods. Approximately 440 and 780 of our streamers had more than one million viewers during the first quarter of 2018 and 2019, respectively. Approximately 491,000 of our streamers are managed through talent agencies as of March 31, 2019. ***Our exclusive contract model with top streamers helps ensure a consistent supply of quality content***, which is effectively supplemented by the talent agency model that captures a large group of promising and rising streamers. ***With years of experience, we have developed a well-designed system to discover, train, and promote streamers who are already popular or have demonstrated the potential to become popular, and to help them grow and monetize their popularity***.

420. Indeed, the Offering Documents touted that one of DouYu's "Strengths" that "contribute[s] to our success and differentiate[s] us from our competitors" was its "[d]eep pool of top streamers empowered by ***a comprehensive streamer development system***."

421. The Offering Documents also included multiple statements emphasizing how DouYu's streamers drove the Company's revenue by engaging with and inducing users to buy virtual gifts, which were the source of over 61% of the Company's revenue in Q1 2019:

- "Our user base and level of user engagement help us ***attract top streamers who produce quality content***. ***The curated content and interactive features of our platform help attract and retain users and encourage user participation, which in turn drives up virtual gifting activities and our live streaming revenue***. Our game live streaming combined with a broad range of other entertainment contents have been highly effective in attracting user traffic and boosting user spending. In addition, the broad user reach and attractive commercial proposition of our platform continuously draw advertisers, game developers and other participants of the eSports industry to our platform."

- "As of March 31, 2019, our streamer pyramid consisted of 6.5 million registered streamers, including more than 6,500 top streamers, each of whom entered into an exclusive contract with us directly, approximately 491,000 streamers managed through talent agencies and the rest who are self-registered streamers. As of March 31, 2018, our platform had 4.6 million registered streamers, including more than 2,000 top streamers each of whom entered into an exclusive contract with us directly. ***Our top streamers tend to have large following bases who regularly support these streamers with virtual gifts, and they also tend to attract many integrated promotion activities during live streaming compared to self-registered streamers. Their charisma and the high-quality content that they create are primary contributors to user stickiness and are hard to replicate with self-registered streamers***. In the first quarter of 2018 and 2019, ***our exclusive streamers accounted for 46.0% and 61.2% of our total live streaming revenue, respectively***."

422. The Offering Documents assured investors that DouYu monitored its streamers for, among other things, fraudulent conduct, using a sophisticated "Content Monitoring System" that monitored streamers, including by regularly taking screen captures of and by punishing streamers who engaged in improper conduct. Specifically, the Offering Documents represented that:

> **Content Monitoring System**
>
> Our live streaming platform contains real-time content, which we monitor to maintain a healthy ecosystem and ensure compliance with PRC laws and

> regulations. We have developed a comprehensive system to monitor content on our platform and filter inappropriate and illegal content and content that may infringe on the intellectual property rights of third parties.
>
> * * *
>
> ***We have also developed a proprietary monitoring system in-house that takes screenshots of our live streaming channels every 10 seconds based on our "smart" image detection technology***.
>
> * * *
>
> ***All of the automatic detection results that are escalated are reviewed by our content monitoring staff manually***. We have a dedicated content monitoring team who also proactively check our rooms on a 24/7 basis for inappropriate or illegal content
>
> * * *
>
> We deal with violations of varying severity in accordance with our strict policies and applicable regulations. Our actions may include warnings, cutting off or temporary suspension of the room and/or account for minor violations, with follow-up review to ensure effective enforcement and rectification. ***For serious violations, the relevant account is deleted permanently and all virtual currency and items are forfeited, and the room may be permanently closed***. Our streamers agree to indemnify us for all damages arising from third-party claims against us caused by the infringing content produced by them.

423. While the Offering Documents contained a detailed Risk Warning stating that the Content Monitoring System "may not be effective in preventing misconduct by our platform users," that warning did not apprise investors of the risk that streamers could misrepresent themselves on the platform:

> We are a game-centric live streaming platform that provides real-time streaming and interactions. Because we do not have full control over how and what streamers or viewers will use our platform to communicate, ***our platform may be misused by individuals or groups of individuals to engage in immoral, disrespectful, fraudulent or illegal activities***. For example, we detect spam accounts through which illegal or inappropriate content is streamed or posted and illegal or fraudulent activities are conducted on a timely basis. Media reports and Internet forums have covered some of these incidents, which have in some cases generated negative publicity about our platform and brand. We have implemented control procedures to detect and

> block illegal or inappropriate content and illegal or fraudulent activities conducted through the misuse of our platform, but such procedures may not prevent all such content from being broadcasted or posted or activities from being carried out. Moreover, as we have limited control over real-time and offline behavior of our users, to the extent such behavior is associated with our platform, our ability to protect our brand image and reputation may be limited. Our business and the public perception of our brand may be materially and adversely affected by misuse of our platform.

424. In addition, while the Offering Documents informed investors that the DouYu's platform included a "Facial Beautification" feature, the accompanying description of that feature did not disclose that streamers could use the feature to comprehensively alter their appearance and misrepresent themselves to users:

> Streamers on our platform can utilize the beautification tools on our platform to ***improve their appearances*** during streaming. Our facial beautification feature has been serving many streamers as a useful tool since its launch."

425. In fact, while the Offering Documents included a screen capture of the DouYu's platform to show investors how a stream would appear to users, that screen capture *did not* show the "Facial Beautification" feature:

*Facial beautification.* Streamers on our platform can utilize the beautification tools on our platform to improve their appearances during streaming. Our facial beautification feature has been serving many streamers as a useful tool since its launch.

Below is a screenshot of our platform interface for streamers on our PC app:




151

426. The statements and screen capture in paragraphs 419–25 above were knowingly or recklessly false and misleading because DouYu's Offering Documents, which were signed by the Exchange Act Defendants, emphasized to investors that DouYu knew the identities of its streamers, who the Company relied on to generate revenue by inducing users of DouYu's platform to buy virtual gifts for streamers. In addition, DouYu's Offering Documents assured investors that it had implemented a "Content Monitoring System" designed to identify and punish streamers who engaged in fraudulent conduct. These statements were knowingly or recklessly false and misleading, however, because they failed to disclose that DouYu's platform allowed streamers to misrepresent themselves to users, which created a material risk that users would leave DouYu when they learned the streamers' true identities.

427. In addition, the statements and screen capture in paragraphs 419–25 were material because Company warned investors that "The size of our user base and the level of our user engagement are critical to our success. Our main monetization strategies—live streaming,

advertisement and others depend on our ability to maintain and increase the size of our user base and user engagement level." The Company also advised that "to maintain and improve this already large size of user base and high level of user engagement, we would have to ensure that we adequately and timely respond to changes in user preferences, ***attract and retain enough popular streamers***, and offer new features and content that may attract new users." The Company also emphasized the importance of "top streamers," advising investors that "Our top streamers tend to have large following bases who regularly support these streamers with virtual gifts, and they also tend to attract many integrated promotion activities during live streaming compared to self-registered streamers. ***Their charisma and the high-quality content that they create are primary contributors to user stickiness and are hard to replicate with self-registered streamers***. In the first quarter of 2018 and 2019, our exclusive streamers accounted for 46.0% and 61.2% of our total live streaming revenue, respectively." The Offering Documents further advised that "***running a successful live streaming platform requires intensive capital outlay and a large team of quality streamers, who remain in short supply*** due to the fact that most have signed contracts with existing platforms, there are high entry barriers for our industry."

**4. The Offering Documents' Misstatements and Omissions Regarding Tencent**

428. The Exchange Act Defendants in the Offering Documents also repeatedly emphasized the importance of DouYu's relationship with Tencent. For example, the Offering Documents stated: "We also benefit from the strong capabilities and support of Tencent, our major shareholder and strategic partner, in live streaming, advertisement and game distribution, which helps reinforce and solidify our position as a leading game-centric live streaming platform in China." The Offering Documents further highlighted DouYu's "Relationship with Tencent," in

particular emphasizing the purported benefits of a "strategic cooperation agreement" that the two partners had entered into at the time of the IPO:

> Our Relationship with Tencent
>
> Tencent became a shareholder of Wuhan Douyu, one of our wholly-owned subsidiaries, in April 2016 when it purchased certain of Wuhan Douyu's shares through Linzhi Lichuang, an entity controlled by Tencent. Tencent subsequently increased its investment in Wuhan Douyu by purchasing shares in Wuhan Douyu's subsequent rounds of financing and in our company by subscribing for Series E Preferred Shares. Upon the completion of this offering, Tencent will hold 37.2% of our total outstanding ordinary shares (excluding 2,106,321 ordinary shares issued to Douyu Employees Limited, our employee shareholding platform established for the RSUs granted under the Amended and Restated 2018 RSU Scheme) through Nectarine, representing 37.2% of our total voting power, assuming the underwriters do not exercise their over-allotment option.
>
> * * *
>
> On December 20, 2017, we and Tencent, through our respective PRC affiliated entities, entered into a strategic cooperation agreement, which became effective on January 31, 2018 and was subsequently replaced by the Amended and Restated SCFM [Strategic Cooperation Framework Memorandum] dated April 1, 2019. Pursuant to the Amended and Restated SCFM, the parties agreed to pursue strategic cooperation in various areas of game live streaming, advertisement and game distribution. We plan to promote content related to games owned by or licensed to Tencent at certain prominent places of our platform. The specific location, content, and operations of the cooperation between Tencent and us are subject to further negotiation pursuant to market principles. The Amended and Restated SCFM has a term of three years, which may be renewed if certain conditions are met. We also use CDN, P2P streaming technologies, online payment and website technology support services provided by Tencent and engage in other related party transactions with Tencent.
>
> * * *
>
> In addition to the Amended and Restated SCFM, we also entered into a share purchase agreement (the "Share Purchase Agreement") with Nectarine on March 8, 2018. Pursuant to the Share Purchase Agreement, we issued 7,828,728 of Series E Preferred Shares to Nectarine at a price of approximately US$80.6 per share, representing 25.95% of our total outstanding shares on an as-converted basis as of the closing of the transaction. Nectarine also holds 3,125,000 of our Series B-2 Preferred Shares and 1,114,376 of our Series C-1 Preferred Shares.

429. In addition, the Exchange Act Defendants in the Offering Documents stated that Tencent had bolstered DouYu's business through the provision of support services worth several hundred million RMB in the lead up to the IPO and that DouYu had likewise generated significant fees through its provision of services to Tencent. As the Offering Documents stated:

> **Transactions with Tencent**
>
> ***In 2016, 2017, 2018 and for the three months ended March 31, 2019, we provided services to Tencent's PRC affiliated entities in relation to advertisements, game distribution and promotional activities on our platform for the total amount of approximately RMB9.5 million, RMB21.7 million, RMB50.8 million and RMB17.3 million in fees, respectively.*** As of March 31, 2019, we had an amount of approximately RMB24.2 million due from certain of Tencent's PRC affiliated entities, representing the unsettled balance of fees for the services we provided to them.
>
> ***In 2016, 2017, 2018 and for the three months ended March 31, 2019, Tencent provided services to us through its PRC affiliated entities in relation to CDN, P2P streaming technologies, online payment and website technology support and licensed certain copyrights to us for the total amount of approximately RMB77.0 million, RMB219.2 million, RMB387.7 million and RMB86.3 million in fees, respectively.*** As of March 31, 2019, we had an amount of approximately RMB234.0 million due to certain of Tencent's PRC affiliated entities, representing the unsettled balance of fees for the services and copyrights they provided to us.
>
> We have entered into the Amended and Restated SCFM and other agreements with Tencent through its PRC affiliated entities.

430. Moreover, the Offering Documents claimed DouYu would "***further solidify our strategic cooperation with Tencent in the future***," indicating that DouYu was set to further strengthen its relationship with Defendant Tencent and that Tencent would continue to support DouYu's operations.

431. The Offering Documents also downplayed the potential competitive threat from newcomers in the eSports industry. For example, the Offering Documents stated, "Since running a successful live streaming platform requires intensive capital outlay and a large team of quality

streamers, who remain in short supply due to the fact that most have signed contracts with existing platforms, ***there are high entry barriers for our industry***." The Offering Documents further claimed that DouYu's only "major competitors" were "streaming platforms with an established presence in the industry" (citing Huya while omitting any mention of Kuaishou) and that "***such competition may only come from a few established players instead of many newcomers***."

432. In addition, the Offering Documents stated that DouYu was "at the forefront of the game-centric live streaming industry in China" and also listed several "competitive strengths" that purportedly "contribute to [DouYu's] success and differentiate [it] from [its] competitors," including DouYu's: (a) "Leading game-centric live streaming platform"; (b) "Large and highly engaged user base"; (c) "Deep pool of top streamers empowered by a comprehensive streamer development system"; (d) "Strategic[] position[] in eSports" that had "secure[d] coveted access to premium content"; (e) "Technology-and big data-enabled user experience and value proposition"; (f) "Multiple monetization channels with significant potential"; and (g) "Visionary and experienced management team with strong shareholder support."

433. Unbeknownst to investors, however, the statements identified in paragraphs 428–32 were knowingly or recklessly false and misleading because they failed to disclose that, as of the IPO, Defendant Tencent was preparing to invest ***over $1 billion*** into Kuaishou.

434. The Offering Documents also knowingly or recklessly false and misleading stated that "Tencent ***may*** devote resources or attention to the other companies it has an interest in, including our direct or indirect competitors," which "***may*** materially and adversely affect our business and results of operations." The Offering Documents also knowingly or recklessly false and misleading stated that Tencent "***may*** in the future continue to invest in our direct or indirect competitor." However, these and similar statements regarding DouYu's relations with Tencent

(and the so-called potential "risk" of Tencent investments) were knowingly or recklessly false and misleading because they failed to disclose that, as of the IPO, Tencent had already planned (and indeed was on the verge of consummating) a massive new investment in a direct competitor of DouYu, namely Kuaishou, ultimately valued at $2 billion. Indeed, by using language characterizing any possibility that Tencent "may" support a competitor as merely a contingent and future possibility, the Offering Documents were knowingly or recklessly false and misleading in indicating to the market that Tencent was not planning to make such an investment as of the IPO.

435. Indeed, Tencent's investment of more than $1 billion in Kuaishou greatly facilitated Kuaishou's ability to dramatically expand its eSports streaming business and to undercut DouYu's market dominance in that area. Tencent, despite being Kuaishou's controlling shareholder and strategic business partner, almost singlehandedly launched Kuaishou from a minor eSports position into a major market player and competitive threat to DouYu, based on Tencent's calculus that Kuaishou provided favorable economics compared to DouYu and that a massive investment in Kuaishou (though detrimental to DouYu) would serve Tencent's own financial interests. ***Yet the Offering Documents did not even mention Kuaishou***, let alone the fact that Tencent was on the cusp of catapulting this formerly minor player into a highly dangerous and well-financed competitor. This omission was all the more notable because, as the Offering Documents noted, the eSports industry in which DouYu operated had "high barriers to entry."

436. The failure of the Exchange Act Defendants to disclose Tencent's plans as of the IPO to invest mor than $1 billion in Kuaishou—at the same time the Offering Documents highlighted Tencent's ostensible strategic benefits to DouYu—rendered the Offering Documents' statements regarding Tencent's relationship with DouYu (and the purported competitive advantages flowing to DouYu as a result thereof) knowingly or recklessly false and misleading.

### 5. The Offering Documents' Misstatements Concerning DouYu's Growth Trajectory

437. The Offering Documents, which were signed by the Exchange Act Defendants, also claimed that DouYu was the "***largest game-centric live streaming platform in China***" and that it was poised for further significant growth as it took advantage of China's "massive and growing gaming community." In addition to noting that DouYu has "grown rapidly since our inception," the Offering Documents also highlighted that DouYu had, for the first time, finally turned a profit in the quarter ending March 31, 2019 (the last quarter of financial results publicly available before the IPO). In addition to increasing its revenue from $117.2 million in 2016 to $544.5 million in 2018, DouYu's ability to turn a profit represented an important milestone for it after years of losses: a quarterly profit of $2.7 million compared to reported losses of $23.2 million in Q1 2018. The Offering Documents also discussed how DouYu's growth was fueled primarily by revenue derived from its users' spending on "virtual gift" features, including Lucky Draw, and how its business model was built on DouYu's success in hiring and retaining the largest number of its top streamers.

438. The Offering Documents also stated that DouYu had experienced a 28% sequential net revenue increase in the first quarter of 2019, providing the following chart:

| | For Three Months Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **March 31, 2017** | **June 30, 2017** | **September 30, 2017** | **December 31, 2017** | **March 31, 2018** | **June 30, 2018** | **September 30, 2018** | **December 31, 2018** | **March 31, 2019** |
| | (RMB in millions) | | | | | | | | |
| **Net revenues** | **283.0** | **371.0** | **548.9** | **682.8** | **666.5** | **802.9** | **1,024.8** | **1,160.2** | **1,489.1** |
| Costs of revenues | (372.0) | (421.9) | (526.3) | (570.2) | (641.9) | (770.3) | (967.3) | (1,123.9) | (1,286.0) |
| **Gross profit (loss)** | **(89.0)** | **(50.9)** | **22.6** | **112.6** | **24.6** | **32.6** | **57.5** | **36.3** | **203.1** |
| **Operating expenses:** | | | | | | | | | |
| Sales and marketing expenses | (104.6) | (76.9) | (65.3) | (63.5) | (76.7) | (143.0) | (146.0) | (173.2) | (123.6) |
| General and administrative expenses(1) | (19.5) | (22.9) | (27.8) | (30.4) | (31.1) | (37.0) | (54.6) | (74.1) | (63.5) |
| Research and development expenses | (38.2) | (48.0) | (52.8) | (73.1) | (72.6) | (82.9) | (81.4) | (92.4) | (79.4) |
| Other operating income, net | 0.4 | 2.4 | (0.7) | 7.2 | 0.0 | 21.3 | 16.4 | 17.2 | 14.9 |
| **Total operating expenses** | **(161.9)** | **(145.4)** | **(146.6)** | **(159.8)** | **(180.4)** | **(241.6)** | **(265.6)** | **(322.5)** | **(251.6)** |
| **Loss from operations** | **(250.9)** | **(196.3)** | **(124.0)** | **(47.2)** | **(155.8)** | **(209.0)** | **(208.1)** | **(286.2)** | **(48.5)** |
| Other income (expenses), net | (0.0) | (0.1) | 0.0 | (0.2) | (1.0) | (0.2) | 0.5 | (19.5) | (0.1) |
| Foreign exchange gain (loss), net | — | — | — | — | — | (27.2) | (51.6) | 3.2 | 32.1 |
| Interest income | 2.2 | 0.2 | 2.4 | 2.1 | 2.5 | 10.1 | 40.6 | 32.6 | 34.0 |
| **Income (loss) before income taxes** | **(248.7)** | **(196.2)** | **(121.6)** | **(45.3)** | **(154.3)** | **(226.3)** | **(218.6)** | **(269.9)** | **17.5** |
| Income tax expenses | — | — | — | — | — | — | — | — | — |
| Share of gain (loss) in equity method investments | (0.2) | 1.3 | (2.7) | 0.5 | (1.4) | (2.4) | (1.9) | (1.5) | 0.7 |
| **Net income (loss)** | **(248.9)** | **(194.9)** | **(124.3)** | **(44.8)** | **(155.7)** | **(228.7)** | **(220.5)** | **(271.4)** | **18.2** |

439. The Offering Documents also portrayed the Chinese live-stream gaming market as experiencing significant and sustained growth, as reflected by the following chart contained therein:




The Offering Documents further stated: "As one of the first game-centric live-streaming platforms to make the foray into eSports, ***we are strategically positioned to benefit from the proliferation of the eSports industry in China***." These statements, together with the historical growth trends leading up to the IPO provided in the Offering Documents, indicated to investors that these favorable trends were continuing at the time of the IPO.

440. The Exchange Act Defendants also assured investors in the Offering Documents that DouYu's favorable growth trends were continuing at the time of the IPO. The Offering Documents repeatedly emphasized the "steady" consistency of the favorable trends that the Company was purportedly experiencing. For example, the Offering Documents stated: "We have generally achieved steady growth in our user base during these periods." Similarly, the Offering Documents stated: "We have generally experienced a steady increase in the number of our paying users and paying ratio due to active cultivation of our users' paying habits through compelling

content and various promotional activities and events." Likewise, the Offering Documents represented: "We have generally experienced steady growth in our quarterly net revenues for the nine quarters in the period from January 1, 2017 to March 31, 2019" due to "the growth of paying users."

441. In particular, the Offering Documents highlighted revenues generated by the sale of virtual gifts on the DouYu platform and other interactive features. For example, the Offering Documents stated that "***[w]e expect that our revenues from live streaming derived from the sale of virtual gifts to increase*** as we grow our user base, enhance our user engagement, expand virtual gifting scenarios, increase users' willingness to pay, and continue to capitalize on the significant market potential of eSports."

442. Unbeknownst to investors, however, the statements identified in paragraphs 437–441 were knowingly or recklessly false and misleading because, as of the IPO: (a) DouYu's margins and the rate of growth in its meager profits had declined to effectively zero; (b) the robust 28% sequential revenue growth described in the Offering Documents had decelerated to effectively zero by the time of the IPO; (c) DouYu was operating at a loss by the time of the IPO; and (d) DouYu was suffering from heightened competitive dynamics from other streaming companies, such as Huya and Kuaishou, and limited monetization capabilities—and thus was not positioned to catch up with Huya's profitability in the near term while also on the verge of ceding significant competitive ground to upstart Kuaishou.

443. Furthermore, in the Offering Documents, the Exchange Act Defendants included "risk disclosure" language that failed to apprise investors of the negative financial trends that DouYu was experiencing as of the IPO, instead presenting these so-called "risks" as future, contingent possibilities. For example, the Offering Documents stated that "[o]ur business ***may***

suffer ***if*** we fail to successfully implement our monetization strategies" and that "***[i]f*** we fail to continue to grow or maintain our paying user and continue to increase revenue per paying user, our live streaming revenue ***may*** not increase, which ***may*** materially ***and*** adversely affect our business operation and financial results." These and similar statements were materially in the Offering Documents because they failed to disclose that, as of the IPO, DouYu was ***already*** experiencing undisclosed financial trends.

**6. The Offering Documents Violated the Requirements of Form F-1 and Regulation S-K.**

444. In addition to the foregoing affirmative misrepresentations, the Offering Documents also violated Item 5 of Form 20-F because it failed to disclose material information.

445. The Registration Statement DouYu filed for the IPO, which forms a part of the Offering Documents, was filed on Form F-1. Item 4 of Form F-1 requires a registrant to disclose "Information required by Part I of Form 20-F." Item 5 of Form 20-F is in Part I of Form 20-F, thus the information that must be disclosed under Item 5 must be disclosed on Form F-1.

446. The SEC states that Item 5 of Form 20-F "call[s]for the same disclosure as Item 303" of SEC Regulation S-K, 17 C.F.R. § 229.101 *et seq*, *i.e.*, or "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition." Accordingly, DouYu was required to disclose in the Offering Documents events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.

447. As of the IPO and the issuance of the Offering Documents, the Exchange Act Defendants were aware, but did not disclose, that Tencent was planning to invest over $1 billion in a direct competitor, Kuaishou, and that such an investment was likely to have a material adverse effect DouYu's future performance. Such knowledge can be inferred from, *inter alia*: (a) Defendant Tencent itself had direct involvement in the investment; (b) Defendant Tencent appointed several directors to the DouYu Board, including Tencent employees, and the two companies maintained an extremely close strategic partnership; (c) news reports surfaced in China ***within hours*** of the IPO, stating that Tencent had decided to make a substantial investment in Kuaishou; (d) the magnitude of the investment, ultimately valued at $2 billion; (e) the material importance to DouYu's business of competition and maintaining the competitive advantage for DouYu in the eSports industry, as acknowledged in the Offering Documents; and (f) the nature of the investment, which indicated a deliberate negotiation process over a period of time that preceded the IPO.

448. As of the IPO and the issuance of the Offering Documents, the Exchange Act Defendants were also aware, but did not disclose, that DouYu's revenue growth was decelerating significantly and its ability to compete with Huya's profitability (and with upstart Kuaishou) was suffering and that these factors would negatively impact DouYu's future performance.

449. As of the IPO and the issuance of the Offering Documents, the Exchange Act Defendants were also aware, but did not disclose, that DouYu's failure to comply with then-existing regulatory requirements placed lucrative interactive product offerings by the Company at risk of termination or suspension by the Chinese government, which would negatively impact DouYu's future performance.

450. As of the IPO and the issuance of the Offering Documents, the Exchange Act Defendants also knew, but did not disclose, that its revenues were inflated by *de facto* wash transactions where streamers purchased virtual gifts for themselves to artificially simulate commercial activity on DouYu's platform.

451. The undisclosed negative events, trends and uncertainties referenced in paragraphs 447–50 each represented known trends or uncertainties that were reasonably expected to have a material unfavorable impact on the Company's business, sales, revenues, and/or income from continuing operations and, therefore, were required to be (but were not) disclosed in the Offering Documents.

452. The failure of the Offering Documents to disclose material adverse information also violated Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105") and Item 3.D of Form 20-F ("Item 3.D"). Specifically, both Item 105 and Item 3.D provide, in pertinent part, that the "Risk Factors" section of Offering Documents filed with the SEC discuss the most significant factors that make an offering risky or speculative and that each risk factor adequately describe the risk.

453. As detailed above, the Offering Documents' discussion of risk factors were themselves materially misleading because they provided generic statements of potential or contingent risk yet failed to disclose that the potential future adverse impacts described were ***already*** occurring at the time of the IPO. For example, the Offering Documents noted that Tencent "***may*** in the future continue to invest in our direct or indirect competitor," but failed to disclose Tencent's decision and preparation at the time of the IPO to provide more than $1 billion in financial assistance to DouYu's lesser-known rival, Kuaishou, for the specific purpose of boosting that platform's entry into live video game streaming in direct competition with DouYu. Indeed,

the Offering Documents failed to make ***any*** mention of a competitive threat from Kuaishou to DouYu's business and prospects, as was required by SEC rules and regulations. Under Item 105, the Exchange Act Defendants were required to disclose in the Offering Documents the known risks and likely impacts of this massive, planned investment.

454. Similarly Offering Documents purported to warn that "[r]estrictions on virtual currency ***may*** adversely affect our revenue, business and reputation," but failed to disclose the need to modify or remove lucrative interactive feature on DouYu's platform and instead specifically disclaimed that "such activities are specifically prohibited under PRC laws and regulations." Further, the Offering Documents stated: "***If*** we fail to continue to grow or maintain our paying user and continue to increase revenue per paying user, our live streaming revenue ***may*** not increase," but failed to disclose that the Company was already suffering significantly slower revenue growth that would call into question its purported market dominance for the reasons identified above.

455. In addition, by affirmatively raising these topics, the Exchange Act Defendants assumed a duty to be complete and truthful about such topics. The Exchange Act Defendants violated that duty by failing to disclose the material information described herein.

**D. The Truth Slowly Emerges**

456. The falsity and misleading nature of the statements in the Offering Documents, Press Releases and Merger Agreement were revealed through a series of corrective disclosures and/or materialization of risks in the weeks following DouYu's IPO.

457. For example, on July 18, 2019, correspondent Jinlei Bai of Beijing News published an article in Chinese (the "Kuaishou Article") stating that "live game streaming had become the strong weapon for Kuaishou to 'tackle' the southern market," and that "[b]efore the end of summer vacation, Kuaishou would take a series of measures on the live gaming streaming market,

including signing with the leading streamers, introducing the local guild, launching the paid videos of online game, launching the companion function in games, etc." The Kuaishou Article then went on to state that "[a]ccording to information from ***several independent sources***, Kuaishou will announce a new round of funding from Tencent in the coming days, or it will form a new joint venture with Tencent with the valuation of above USD 25 billion." Although the IPO had priced DouYu's ADSs at $11.50 on July 18, 2019, by the end of the day after the IPO, July 19, 2019, the price of DouYu's ADSs had fallen $1.00 per share, or 8.7%.

458. On August 3, 2020, a local Chinese media outlet, *IPO Zaozhidao*, also reported that Tencent would be investing up to $1.5 billion in Kuaishou, followed by various additional stories reported in China over the next few days that headlined Tencent's plans to invest between US $1.0 and US $1.5 billion in Kuaishou. DouYu's ADSs declined the next trading day from $8.80 per share to $8.18 per share, or 7%.

459. These stories were then picked up, and reported, by various English language outlets. For example, on August 6, 2019, *www.kr-asia.com* published an English language report, titled "Tencent will invest up to USD 1.5 billion in short video app Kuaishou" The report cited the earlier *IPO Zaozhidao* and August 2, 2019 *Bejing News* reports. On this news, the price of DouYu's ADSs declined from $8.20 per ADS to $7.84 per ADS, or 4.4%.

460. On July 30, 2019, less than two weeks after the IPO, investors learned that DouYu streamers were misrepresenting themselves on the Company's platform when *BBC News* published an article about how Xiadian had been completely misrepresenting her appearance. A screen capture of Xiadian's actual appearance and altered appearance demonstrated for investors how DouYu's streamers could completely change their appearance and deceive users.



Your Highness Qiao Biluo's real appearance (left) and one of her filtered faces (right) from an earlier livestream on Douyu

461. The *BBC News* article reported that fans were left stunned after a glitch during a live stream revealed Xiadian to be a middle-aged woman and not the young glamorous girl DouYu users had been "worship[ing]." According to the article:

> The blogger, who initially boasted ***a follower count of more than 100,000 on DouYu***, is believed to have used a filter on her face during her appearances, and had been renowned for her "sweet and healing voice".
>
> China's Global Times said she had been "worshipped" as a "cute goddess" by ***some members of her loyal audience with some fans even giving her more than 100,000 yuan ($14,533, £11,950)***.
>
> *** * ***
>
> The Global Times reports that all was as normal and that her fans urged her to show her face and remove her filter but she refused, instead apparently saying: "I can't show my face until I receive gifts worth 100,000 yuan ($11,950). After all, I'm a good-looking host."
>
> ***Followers began to send her donations with the largest reported to be 40,000 yuan ($5,813, £4,780) during the session.***
>
> However, at some point, it seems the filter being used by the Vlogger stopped working and her real face became visible to her viewers.

> She is reported to have noticed only when people who had signed up to her VIP access room ***started exiting en masse.***
>
> Many of her original followers - especially men - are said to have ***stopped following her and withdrawn their transactions*** after seeing her true identity.

462. The next day, July 31, 2019, a *Mic.com* article titled "Popular Chinese DouYu streamer revealed to be much older thanks to livestream glitch" (the "Mic Article"), further reported on the glitch that revealed the true identity of Xiadian whose DouYu users "fawned over the videos and photos that she uploaded . . . which showed a young woman posing, playing games, and talking to the camera." According to the Mic Article, "***the revelation caused a considerable amount of drama, with many of her male subscribers expressing outrage that they had been tricked. They left the stream in droves, unsubscribed from her account and pulled donations.***"

463. A day later, on August 1, 2019, *TechNode*, an online information outlet catering to the tech and startup community both inside and outside of China, revealed that DouYu "***banned [Xiadian]*** on Thursday for drumming up hype surrounding her accidental face reveal." The *TechNode* article, titled "DouYu bans livestreamer for hyping face reveal," noted how:

- The livestreamer said in an earlier broadcast that she wouldn't show her face until she had received gifts totaling more than RMB 100,000 ($11,950).
- After the incident, the host claimed that the face reveal was planned, saying that she paid RMB 280,000 for it.
- According to the company's statement, the livestreamer's comments "challenged the bottom line of the public and caused negative social influence." As punishment, DouYu permanently banned her channel and remove all her content.

464. *TechNode* also put the incident in context, revealing that a number of well-known Chinese live-streamers have been banned for inappropriate behavior in the past, including "Lu Benwei, ***one of DouYu 's most popular hosts, [who] was banned from all live-streaming***

***platforms*** by the country's top internet regulator, the Cyber Administration of China, for verbally abusing a content creator who accused him of cheating."

465. The media continued to publish accounts of the Qiao Biluo incident over the next few days, often repeating the fact that the glitch caused her followers to unsubscribe en masse and rescind their gifts. On July 29, 2019, the day before the incident was first reported, DouYu ADSs closed at $10.08 per ADS. After the market absorbed all this information, on August 6, 2019, DouYu ADSs closed at $7.84 per ADS, or down 22.22%.

466. Then, on August 11, 2019, *Bloomberg* published an article, profiling Liu, the above-described top streamer who, according to an analyst with Aequitas Research, purportedly was responsible for as much as 3% of DouYu's revenues in the second quarter of 2019 alone ("Bloomberg Article"). The article was published by the *South China Morning Post* on August 12, 2019. It was also updated by *Bloomberg* after the markets closed on August 12, 2019. The article revealed to investors for the first time that "***[s]treamers often need to spend their own money to buy fan support***—a common industry practice that calls to question whether company revenue is inflated." The article went on that "[s]oon after DouYu signed on Liu in March, he spent nearly ***20 million yuan [USD $3.15 million]*** to buy himself votes during DouYu's annual online idol competition. Half of that money goes to DouYu, and ***the other half returns to Liu's pocket. DouYu's CEO confirmed this.***" The Bloomberg Article then quoted a Global Equity Research analyst as stating that "These 'fake' votes will be still counted as revenue as, under accounting standards, the streamer will be considered a paying customer . . . ***DouYu's focus on top streamers makes it more susceptible to this issue compared to Huya***."

467. In addition, based on the Bloomberg Article and DouYu's disclosure, investors realized that Liu himself was responsible for 3%, or ***$8.2 million*** of those revenues, and that the

prior quarter Liu had spent over ***$3 million***, or just under half that amount, on his own purchases on DouYu's platform. Investors also realized that, since top streamers like Liu were responsible for "***61.2% of the total live streaming revenue generated from [DouYu's] platform***," according to the Offering Documents, a substantial portion of approximately $152 million—*i.e.*, 61.2% of 272.8 million—in DouYu's revenue could be *de facto* wash transactions by streamers trying to build their profiles, half of which is kicked back to the streamers themselves. In addition, the disclosure in the Bloomberg Article was especially shocking because Liu's purchase of $3.15 million for himself was more than the Company's entire ***$2.7 million*** reported net profit for Q1 2019. In other words, it was very likely that the Company had not been profitable in that quarter, and the Exchange Act Defendants had increased the size of DouYu's IPO by $274 million under false pretenses.

468. On August 13, 2019, DouYu released its earnings for the Second Quarter of 2019 and reported $272.8 million in net revenues. DouYu issued a press release announcing its financial results for the quarter ended June 30, 2019—the quarter that had closed more than two weeks before the IPO. The press release stated that DouYu generated only RMB 1872.7 million (US $264.5 million) in revenue and only RMB 23.2 million (US $3.3 million) in net income for the quarter, implying a net margin of only 1.2%. The release also provided disappointing revenue trends, including an expected slowing of the Company's revenue growth rate for the third quarter (*i.e.*, the quarter in which the IPO had been completed) to just 5% sequential growth at the projected midpoint, as compared to the prior 28% sequential revenue growth rate referenced in the Offering Documents.

469. A Morgan Stanley analyst report issued later that same day stated that the disappointing revenue trend "suggests [DouYu] may not catch up with HUYA's profitability in

the near term." Indeed, Huya issued its own second quarter 2019 earnings release on August 13, 2019, stating that its net income had grown to RMB 121.8 million (US $17.2 million), or roughly five times higher that DouYu's net income results for the same quarter.

470. On August 13, 2019, DouYu ADSs closed at $8.84 per ADS, falling from $9.93 per ADS the day before, or nearly 11%, before declining even further to $8.14 per share on August 14, 2019, a total decline of over 18%.

471. On August 20, 2019, DouYu implemented a series of operational changes, including what was later described as the "temporary suspension" and removal of the Company's "lucky draw" feature. On August 21, 2019 (China time), an article ran in China that reported that DouYu had taken the lucky draw feature offline overnight due to "gambling" characteristics of the feature that drew the concern of government regulators, adding that DouYu's game hosts could no longer use this feature to "fleece the flock." Although DouYu reinstated a modified version of "lucky draw" on October 10, 2019, the new version had significant revisions that materially reduced the feature's revenue potential, including stronger restrictions on in-game consumption and caps on virtual gift amounts.

472. On October 15, 2019, J.P. Morgan disclosed to investors in an analyst report that DouYu had temporarily removed its "lucky draw feature in late Aug[ust] 2019," before "reinstat[ing]" it "on Oct 10," which, according to J.P. Morgan, "***will cause its 3Q19 revenue to decline 1.5% QoQ . . . 5% below the low end of company's 3Q19 guidance . . . and 7% lower than current Bloomberg consensus***." J.P. Morgan, which characterized the suspension of luck draw features as a "headwind," stated, in relevant part:

> On Aug 20 2019, DouYu started a round of operation changes Which include: 1) removal of lucky draw feature, 2) enhance content monitoring within live broadcasting show room. On Oct 10 2019, DouYu re-launched lucky draw feature after National Day holiday with ***stronger restriction on***

> ***in-game consumption (cap on virtual gift amount etc). We estimate lucky draw feature to contribute to ~10% of DouYu 's revenue before 3Q19***.

In reality, DouYu had disabled the lucky draw feature because it was likely rigged online gambling in violation of China's regulations. In addition, J.P. Morgan was estimating that, going forward, the loss of the original "lucky draw" feature (and its replacement with the significantly modified version after October 2019) would cost the Company at least RMB 1 billion in each of 2020 and 2021 and would cause its third quarter 2019 revenues to actually decline quarter-over-quarter.

473. DouYu closed at $7.12 per ADS on October 16, 2019, or 4.69% lower than the previous day's close of $7.47 per ADS.

474. On November 6, 2019, an article titled "DouYu: The Changing Face of Sports Media," published on *Seeking Alpha*, stated that DouYu's lucky draw feature had run afoul of regulators and allowed users to engage in the illicit conversion of virtual currency into fiat currency:

> To remind investors, DOYU launched its virtual currency, Yuchi, in 2015 that can be used by the viewers to purchase virtual gifts on the site. ***Viewers can participate in the lucky draw games by gifting a small amount of the virtual gif to the host and in return, they could receive a virtual gift that worth thousands of RMB, or virtual currency worth up to tens of thousands of RMB.*** The virtual gifts and the currency can only be used within the DOYU platform and are not allowed to be converted into fiat currency.
>
> Given that much of the user traffic involving streaming platforms is largely stable and that viewers will only shift from one platform to another when there is a shift in streamers, ***DOYU's streamers are under increasing pressure to utilize lucky draws to attract more traffic onto their broadcast***.
>
> There is nothing wrong with using a lottery system to attract viewers in China, ***but the issue is that some of the virtual coins gained from lucky draws could be converted into real currency, which the regulators find it unacceptable hence it was stopped for some time.***

475. On November 27, 2019, DouYu released its third quarter 2019 financial results. During the question-and-answer portion of the earnings call held the same day, the Company addressed the temporary removal of its "lucky draw" features:

> **Chun Man Poon** - Morgan Stanley, Research Division - Equity Analyst
>
> (foreign language) I'll translate my question. My first question is since **late August, you have removed certain lucky draw features. And can you let us know the reason why you took it off and also the revenue impact in Q3?** And also since you have restated these features, how is the revenue run rate at present? Is it better than before you removed these features already? And from here onwards, **how does the regulatory landscape look like for these features?**
>
> **Shaojie Chen** - DouYu International Holdings Limited - Founder, CEO & Director
>
> * * *
>
> [Interpreted]. Okay. Regarding the reason of the temporary removal of our quiz features since August, we have always prioritized the long-term and sustainable growth of DouYu. So in order to contribute to a positive Internet environment, **our management team made decision to carry out an assessment of certain interactive features in mid-August 2019** prior to China's anniversary celebration. And **as a result of our internal assessment, we adjusted certain functions of the interactive product featuring**.
>
> * * *
>
> [Interpreted]. Regarding the revenue impact, **our interactive features, including quiz, were designed to enhance the interaction between the streamers and users.** So consequently, **the removal of certain features has somehow affected users' engagement activity with streamers for a certain period of time in third quarter.** And we -- after revision and improvement, we initially reacted (sic) [activated] part of the features in late third quarter, and we activated the rest in the fourth quarter. So after resuming the access to our interactive features, the users engagement for these interactive features are **gradually recovering**, and we have also factored in all of these into our fourth quarter guidance for 2019.
>
> * * *
>
> [Interpreted]. Regarding future risk adjustment, **we will pay close attention to development laws and regulations issued by the local authorities**,

> while maintaining active communication with government departments. Thank you.

476. The Company's ADSs closed at $7.46 per share on November 29, 2019, the next trading day, representing a decline of over 4.8%.

> On December 13, 2019, CCB International released an analyst report commenting on DouYu's "***heavy reliance on top streamers***," such as the former top performer Qiao Biluo. The report noted that DouYu's top streamers contributed over 61% of its live streaming revenue in the first quarter of 2019, but that "Douyu has little control over the behavior of its non-exclusive top streamers, whether on the platform or offline. It may need to increase its compensation to these players if it is to retain them while attracting new players. The added expense could hurt its financial performance."

477. By December 2019, Tencent had invested ***over $2 billion*** in Kuaishou, leading a funding round that generated hundreds of millions of dollars in additional financing for the platform from other institutional investors. As a result, Kuaishou was able to rapidly expand its live game-streaming capabilities, boost user engagement, and significantly encroach on DouYu's business turf.

478. On December 16, 2019, HSBC released an analyst report commenting on DouYu's "***bumpy road ahead***" related to "***[c]ompetition intensifying with Tencent-backed Kuaishou***."

479. On January 23, 2020, J.P. Morgan released an analyst report commenting on the suspension of interactive features and crediting the Company's 12% drop in ADS price on January 22, 2020, to investor concerns about "***the financial implications of such a broad-based key monetization feature suspension***[,]" stating, in relevant part:

> [O]n January 22, 2020, all of the listed digital entertainment platforms (DouYu, Huya, . . .) that operate live broadcasting services have ***suspended interactive features that drive meaningful monetization for live streaming operators***. Share prices of DouYu/Huya . . . fell by 12%/10% . . . on Jan. 22, 2020, ***in our view due to investors' concerns about the financial implications of such a broad-based key monetization feature suspension***.

J.P. Morgan added: "We believe investors' cautious sentiment will remain in the near term ***due to a lack of clarity on the duration of this suspension***[.]"

**E. <u>The Exchange Act Defendants' Scienter</u>**

480. The Exchange Act Defendants acted with scienter when they made the misstatements in DouYu's Offering Documents, press releases, and merger agreement alleged above because the Exchange Act Defendants had a motive to defraud, knew, or recklessly disregarded, that the public documents and statements disseminated in the name of the Company, or in their own name, were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

481. Defendant Zhang's sales of shares during the IPO also demonstrates his motive, and thus his scienter. Prior to the IPO, Defendant Zhang owned 892,402 DouYu ordinary shares, or approximately 3.2% of the Company's total outstanding stock. Defendant Zhang sold 345,575 DouYu ordinary shares in the IPO and profited directly at the expense of investors.

482. Multiple factors also support a strong inference of the Defendant DouYu, the Individual Defendants (except Defendant Arthur), and Defendant Tencent's scienter during the Class Period, including: (i) knowledge of facts contradicting their false and misleading statements, (ii) high-level positions within and/or control over DouYu, (iii) the misstatements and omissions were of material facts concerning the Company's core operations, and (iv) corporate scienter.

483. The Exchange Act Defendants also had actual knowledge that streamers were using money paid to them by DouYu to purchase Yuchi and provide themselves with virtual gifts to make themselves seem more popular than they actually were, and that DouYu recorded these transactions as revenue to inflate the platform's number of transactions and revenues. For example,

in March 2019, DouYu entered into a contract with prominent streamer Liu. Shortly thereafter, Liu spent nearly $3.15 million from that contract to buy himself votes during DouYu's annual online idol competition, half of which the Company then kicked back to Liu after his purchase. Defendant Chen personally confirmed such activity in a Bloomberg article published less than a month after the IPO. In addition, CW7 stated that she came to learn during the years she worked for DouYu that management was well aware that streamers purchased Yuchi to give themselves virtual gifts. Likewise, the Exchange Act Defendants' scienter further supported by the fact that, as CW8 described, DouYu's own policies, which the Exchange Act Defendants created, knew of, or were reckless in not knowing, set monthly traffic requirements that drove streamers to purchase Yuchi to give themselves virtual gifts to meet. Finally, CW3, CW4, CW5, and CW6 said that it was widely known throughout DouYu that streamers bought Yuchi for themselves.

484. On an earnings call held on November 27, 2019, Defendant Chen admitted that he and Defendants Zhang, Cheng, Su, and Cao had known the lucky draws were deactivated in August 2019 because they, as members of DouYu's management team, had decided to deactivate them. Specifically, Defendant Chen, in response to an analyst's question, said, that "Regarding the reason of the temporary removal of our great features, in August we have always prioritized the long-term and sustainable growth of DouYu. So in order to contribute to a positive Internet environment, ***our management team made the decision*** to carry out an investment of certain interactive features in mid-August 2019 prior to China's anniversary celebration."

485. In addition, the Exchange Act Defendants the sudden allowing of Kuaishou videos on WeChat could not have escaped the Exchange Act Defendants' attention. This action by Tencent and put DouYu and the Individual Defendants (except for Defendant Arthur) on notice that Tencent was already planning an additional transaction with Kuaishou. In addition, the

suspiciously timed action by Tencent demonstrates Tencent's scienter because that company plainly took the action as part of its plans to make an additional investment in Kuaishou.

486. In addition, the Kuaishou Article described how DouYu, as well as the Individual Defendants (except for Defendant Arthur), were well aware of Kuaishou's plans to compete with DouYu and had taken steps to protect itself. For example, the article stated that "Kuaishou planned to meet a leading streamer whose contract with DouYu would expire in the second half of the year for cooperation opportunities. However, DouYu had super high risk control awareness and one week before the meeting between Kuaishou and the streamer, COO [and Defendant] Chao Cheng and the channel director came to the home of the streamer and signed a contract of another two years."

487. Defendants Chen, Zhang, Cheng, Su, and Cao each knew of the false and misleading nature of the statements discussed above, or at a minimum was reckless for not knowing these matters.

488. Defendant Chen was the CEO and Director of the Company at all relevant times. DouYu identified Chen as an "Executive Officer" of the Company during the Class Period and a member of the Company's management team. As CEO, Chen was the head of DouYu's management and operations teams. Chen, by virtue of his responsibilities and activities as CEO and Director of the Company, was privy to all material information concerning Yuchi and DouYu's lucky draw games, payments to streamers and streamers purchases of Yuchi, misrepresentations of streamers on DouYu's platform, and DouYu's growth trajectory.

489. Defendant Zhang was the co-CEO and Director of the Company at all relevant times. DouYu identified Zhang as an "Executive Officer" of the Company during the Class Period and a member of the Company's management team. As co-CEO, Zhang was the head of DouYu's

management and operations teams. Zhang, by virtue of his responsibilities and activities as co-CEO and Director of the Company, was privy to all material information concerning Yuchi and DouYu's lucky draw games, payments to streamers and streamers purchases of Yuchi, misrepresentations of streamers on DouYu's platform, and DouYu's growth trajectory.

490. Defendant Cheng was the COO and Director of the Company at all relevant times. DouYu identified Cheng as an "Executive Officer" of the Company during the Class Period. Cheng was a member of the Company's management team. Cheng, by virtue of his responsibilities and activities as COO and Director of the Company, was privy to all material information concerning Yuchi and DouYu's lucky draw games, payments to streamers and streamers purchases of Yuchi, misrepresentations of streamers on DouYu's platform, and DouYu's growth trajectory.

491. Defendant Su was the Chief Strategy Officer and Director of the Company at all relevant times. DouYu identified Su as an "Executive Officer" of the Company during the Class Period. Su was a member of the Company's management team. Su, by virtue of his responsibilities and activities as Chief Strategy Officer and Director of the Company, was privy to all material information concerning Yuchi and DouYu's lucky draw games, payments to streamers and streamers purchases of Yuchi, misrepresentations of streamers on DouYu's platform, and DouYu's growth trajectory.

492. Defendant Cao was the Vice President and Director of the Company at all relevant times. DouYu identified Cao as an "Executive Officer" of the Company during the Class Period. Cao was a member of the Company's management team. Cao, by virtue of his responsibilities and activities as Vice President and Director of the Company, was privy to all material information concerning Yuchi and DouYu's lucky draw games, payments to streamers and streamers purchases of Yuchi, misrepresentations of streamers on DouYu's platform, and DouYu's growth trajectory.

493. Defendant Yin served, at all relevant times, as both an employee of Defendant Tencent and as a director on the Board. DouYu identified Yin as a "Director" of the Company during the Class Period. Yin, by virtue of his responsibilities and activities as Director of the Company, was privy to all material information concerning Yuchi and DouYu's lucky draw games, payments to streamers and streamers purchases of Yuchi, misrepresentations of streamers on DouYu's platform, and DouYu's growth trajectory.

494. Defendant Yu served, at all relevant times, as both an employee of Defendant Tencent and as a director on the Board. DouYu identified Yu as a "Director" of the Company during the Class Period. Yu, by virtue of his responsibilities and activities as Director of the Company, was privy to all material information concerning Yuchi and DouYu's lucky draw games, payments to streamers and streamers purchases of Yuchi, misrepresentations of streamers on DouYu's platform, and DouYu's growth trajectory.

495. Defendant X. Cao served, at all relevant times, as a director on the Board. Defendant X. Cao reviewed, contributed to, and signed the Offering Documents. DouYu identified X. Cao as a "Director" of the Company during the Class Period. X. Cao, by virtue of his responsibilities and activities as Director of the Company, was privy to all material information concerning Yuchi and DouYu's lucky draw games, payments to streamers and streamers purchases of Yuchi, misrepresentations of streamers on DouYu's platform, and DouYu's growth trajectory.

496. Defendant Wang was a director appointee of the Board at the time of the IPO. Defendant Wang consented to the F-1/A. DouYu identified Wang as a "Director" of the Company during the Class Period. Wang, by virtue of his responsibilities and activities as Director of the Company, was privy to all material information concerning Yuchi and DouYu's lucky draw

games, payments to streamers and streamers purchases of Yuchi, misrepresentations of streamers on DouYu's platform, and DouYu's growth trajectory.

497. Defendant Z. Chen was a director appointee of the Board at the time of the IPO. Defendant Z. Chen consented to the F-1/A. DouYu identified Z. Chen as a "Director" of the Company during the Class Period. Z. Chen, by virtue of his responsibilities and activities as Director of the Company, was privy to all material information concerning Yuchi and DouYu's lucky draw games, payments to streamers and streamers purchases of Yuchi, misrepresentations of streamers on DouYu's platform, and DouYu's growth trajectory.

498. Defendant Yan was a director appointee of the Board at the time of the IPO. Defendant Yan consented to the F-1/A. DouYu identified Zhi Yan as a "Director" of the Company during the Class Period. Zhi Yan, by virtue of his responsibilities and activities as Director of the Company, was privy to all material information concerning Yuchi and DouYu's lucky draw games, payments to streamers and streamers purchases of Yuchi, misrepresentations of streamers on DouYu's platform, and DouYu's growth trajectory.

499. The fraud alleged herein relates to the core business and operations of DouYu so knowledge of the fraud may be imputed to DouYu, the Individual Defendants (except for Defendant Arthur), and Defendant Tencent. As explained in Section VII.C *supra*, DouYu made the overwhelming majority of its revenue from streamers and maintaining delicate relationships between streamers and users were essential to those revenues.

500. In addition, as explained in Section VII.C *supra*, the overwhelming majority of revenues DouYu generated came from purchases of Yuchi virtual currency, and games like lucky draws were pivotal for the Company to use in driving both user engagement and revenue. Given the importance of lucky draws to the Company, the Individual Defendants (except for Defendant

Arthur) would have issued the instruction to deactivate the lucky draws and/or been aware that the lucky draws were deactivated in August 2019 and January 2020. Finally, the Company itself emphasized the importance of its relationship with Tencent to the Company's future operations, as explained Section VII.C.4 *supra*. Accordingly, it is appropriate to presume that Defendant DouYu, the Individual Defendants (except for Defendant Arthur) and Defendant Tencent were apprised of, had access to, or had actual knowledge of all material information related to DouYu, Yuchi, lucky draws, purchases of Yuchi and virtual gifts by streamers for themselves, and misrepresentations of streamers likenesses online during the Class Period, *i.e.*, all the material information that was improperly withheld and/or misrepresented to investors.

501. Further, by virtue of their receipt of information reflecting the true facts regarding DouYu's operations and its marketplace, as well as their control over and/or receipt of the Company's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning DouYu, the Individual Defendants (except for Defendant Arthur) and Defendant Tencent were active and culpable participants in the fraudulent scheme alleged herein. The Individual Defendants (except for Defendant Arthur) and Defendant Tencent knew of and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public. The fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Individual Defendants (except for Defendant Arthur) and Defendant Tencent.

502. The allegations above also establish a strong inference that each of DouYu and Tencent as an entity acted with corporate scienter throughout the Class Period, as its officers, management, and agents, including, but not limited to, the Individual Defendants (except for

Defendant Arthur) and Defendant Tencent, had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing DouYu's true operating condition and present and expected financial performance from the investing public. By concealing these material facts from investors, DouYu maintained and/or increased its artificially inflated common stock prices throughout the Class Period.

### F. Loss Causation

503. As alleged in Section VII above, corrective disclosures throughout the Class Period revealed previously unknown information to the market or represented the materialization previously undisclosed or concealed risks and therefore caused Plaintiff Huang's losses.

504. On August 3, 2020, a local Chinese media outlet, *IPO Zaozhidao*, reported that Tencent would be investing up to $1.5 billion in Kuaishou, followed by various additional stories reported in China over the next few days that headlined Tencent's plans to invest between US $1.0 and US $1.5 billion in Kuaishou.

505. For example, on August 6, 2019, *www.kr-asia.com* published an English language report, titled "Tencent will invest up to USD 1.5 billion in short video app Kuaishou" The report cited the earlier *IPO Zaozhidao* and August 2, 2019 *Bejing News* reports. On this news, the price of DouYu's ADSs declined from $8.20 per ADS to $7.84 per ADS, or 4.4%.

506. On July 30, 2019, less than two weeks after the IPO, investors learned that DouYu streamers were misrepresenting themselves on the Company's platform when *BBC News* published an article about how Xiadian had been completely misrepresenting her appearance. A

screen capture of Xiadian's actual appearance and altered appearance demonstrated for investors how DouYu's streamers could completely change their appearance and deceive users.

507. The media continued to publish accounts of the Qiao Biluo incident over the next few days, often repeating the fact that the glitch caused her followers to unsubscribe *en masse* and rescind their gifts. On July 29, 2019, the day before the incident was first reported, DouYu ADSs closed at $10.08 per ADS. After the market absorbed all this information, on August 6, 2019, DouYu ADSs closed at $7.84 per ADS, or down 22.22%.

508. Then, on August 11, 2019, *Bloomberg* published an article, profiling Liu, the above-described top streamer who, according to an analyst with Aequitas Research, purportedly was responsible for as much as 3% of DouYu's revenues in the second quarter of 2019 alone. The article was published by the *South China Morning Post* on August 12, 2019 and was updated by *Bloomberg* after the markets closed on August 12, 2019. The article revealed to investors for the first time that "***[s]treamers often need to spend their own money to buy fan support***—a common industry practice that calls to question whether company revenue is inflated." Then, on August 13, 2019, before the markets opened, DouYu released its earnings for the Second Quarter of 2019 and reported $272.8 million in net revenues. DouYu issued a press release announcing its financial results for the quarter ended June 30, 2019—the quarter that had closed more than two weeks before the IPO. The press release stated that DouYu generated only RMB 1872.7 million (US $264.5 million) in revenue and only RMB 23.2 million (US $3.3 million) in net income for the quarter, implying a net margin of only 1.2%. The release also provided disappointing revenue trends, including an expected slowing of the Company's revenue growth rate for the third quarter (*i.e.*, the quarter in which the IPO had been completed) to just 5% sequential growth at the

projected midpoint, as compared to the prior 28% sequential revenue growth rate referenced in the Offering Documents.

509. A Morgan Stanley analyst report issued later that same day stated that the disappointing revenue trend "suggests [DouYu] may not catch up with HUYA's profitability in the near term." Indeed, Huya issued its own second quarter 2019 earnings release on August 13, 2019, stating that its net income had grown to RMB 121.8 million (US $17.2 million), or roughly five times higher that DouYu's net income results for the same quarter.

510. On August 13, 2019, the Company reported its Q2 2019 financial results, which revealed the stunning deceleration in growth from 106.67% to 27.5%. While DouYu's ADSs closed at $8.84 per ADS, falling from $9.93 per ADS the day before, or nearly 11%, before declining even further to $8.14 per share on August 14, 2019, a total decline of over 18%, as the markets digested the disclosure about streamers buying Yuchi for themselves and the Company's deceleration in growth.

511. On October 15, 2019, J.P. Morgan disclosed to investors in an analyst report that DouYu had temporarily removed its "lucky draw feature in late Aug[ust] 2019," before "reinstat[ing]" it "on Oct 10," which, according to J.P. Morgan, "***will cause its 3Q19 revenue to decline 1.5% QoQ . . . 5% below the low end of company's 3Q19 guidance . . . and 7% lower than current Bloomberg consensus***." This was both a disclosure that Yuchi and Lucky Draw had been in violation of Chinese law and that the Chinese government had been investigating Yuchi and Lucky Draw, as well as a materialization of the concealed risk that users could exchange Yuchi between each other and for cash, as well as that Lucky Draw was illegal gambling.

512. On this news, DouYu closed at $7.12 per ADS on October 16, 2019, or 4.69% lower than the previous day's close of $7.47 per ADS.

513. On November 27, 2019, DouYu released its third quarter 2019 financial results. During the question-and-answer portion of the earnings call held the same day, the Company addressed the temporary removal of its "lucky draw" features:

> **Chun Man Poon** - Morgan Stanley, Research Division - Equity Analyst
>
> (foreign language) I'll translate my question. My first question is since **late August, you have removed certain lucky draw features. And can you let us know the reason why you took it off and also the revenue impact in Q3?** And also since you have restated these features, how is the revenue run rate at present? Is it better than before you removed these features already? And from here onwards, **how does the regulatory landscape look like for these features?**
>
> **Shaojie Chen** - DouYu International Holdings Limited - Founder, CEO & Director
>
> *** * ***
>
> [Interpreted]. Okay. Regarding the reason of the temporary removal of our quiz features since August, we have always prioritized the long-term and sustainable growth of DouYu. So in order to contribute to a positive Internet environment, **our management team made decision to carry out an assessment of certain interactive features in mid-August 2019** prior to China's anniversary celebration. And **as a result of our internal assessment, we adjusted certain functions of the interactive product featuring**.
>
> *** * ***
>
> [Interpreted]. Regarding the revenue impact, **our interactive features, including quiz, were designed to enhance the interaction between the streamers and users.** So consequently, **the removal of certain features has somehow affected users' engagement activity with streamers for a certain period of time in third quarter.** And we -- after revision and improvement, we initially reacted (sic) [activated] part of the features in late third quarter, and we activated the rest in the fourth quarter. So after resuming the access to our interactive features, the users engagement for these interactive features are **gradually recovering**, and we have also factored in all of these into our fourth quarter guidance for 2019.
>
> * * *
>
> [Interpreted]. Regarding future risk adjustment, **we will pay close attention to development laws and regulations issued by the local authorities**,

> while maintaining active communication with government departments. Thank you.

514. The Company's ADSs closed at $7.46 per share on November 29, 2019, the next trading day, representing a decline of over 4.8%. This was both a disclosure that Yuchi and Lucky Draw had been in violation of Chinese law and that the Chinese government had been investigating Yuchi and Lucky Draw, as well as a materialization of the concealed risk that users could exchange Yuchi between each other and for cash, as well as that Lucky Draw was illegal gambling.

515. On January 23, 2020, J.P. Morgan released an analyst report commenting on the suspension of interactive features and crediting the Company's 12% drop in ADS price on January 22, 2020, to investor concerns about "***the financial implications of such a broad-based key monetization feature suspension***[,]" stating, in relevant part:

> [O]n January 22, 2020, all of the listed digital entertainment platforms (DouYu, Huya, . . .) that operate live broadcasting services have ***suspended interactive features that drive meaningful monetization for live streaming operators***. Share prices of DouYu/Huya . . . fell by 12%/10% . . . on Jan. 22, 2020, ***in our view due to investors' concerns about the financial implications of such a broad-based key monetization feature suspension***.

J.P. Morgan added: "We believe investors' cautious sentiment will remain in the near term ***due to a lack of clarity on the duration of this suspension***[.]" This was both a disclosure that Lucky Draw continued to be in violation of Chinese law and that the Chinese government had been investigating Lucky Draw, as well as a materialization of the concealed risk that Lucky Draw was illegal gambling.

**G. <u>Applicability of Presumption of Reliance (Fraud-On-The-Market Doctrine)</u>**

516. The market for DouYu's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, DouYu' securities traded at artificially inflated prices during the Class Period. On July 18, 2018, the Company's share price closed at a Class Period high of $11.05 per share. Plaintiff

Huang and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of DouYu' securities and market information relating to DouYu and have been damaged thereby.

517. During the Class Period, the artificial inflation of DouYu's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff Huang and other members of the Class. As described herein, during the Class Period, the Exchange Act Defendants made or caused to be made a series of materially false and/or misleading statements about DouYu's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of DouYu and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares. The Exchange Act Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff Huang and other members of the Exchange Act Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

518. At all relevant times, the market for DouYu's securities was an efficient market for the following reasons, among others:

a) DouYu shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

b) As a regulated issuer, DouYu filed periodic public reports with the SEC and/or the NASDAQ;

c) DouYu regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d) DouYu was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

519. As a result of the foregoing, the market for DouYu's securities promptly digested current information regarding DouYu from all publicly available sources and reflected such information in DouYu's share price. Under these circumstances, all purchasers of DouYu's securities during the Class Period suffered similar injury through their purchase of DouYu's securities at artificially inflated prices and a presumption of reliance applies.

520. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on the Exchange Act Defendants' material misstatements and/or omissions. Because this action involves the Exchange Act Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## VIII. PLAINTIFFS' CLASS ACTION ALLEGATIONS

521. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased or otherwise acquired shares or DouYu ADSs during the Class Period and who were damaged thereby; and a class consisting of all persons or entities that purchased common stock pursuant and/or traceable to the Company's Registration Statement, Prospectus Supplements, and/or the

Offering Documents. Excluded from the Securities Act Class and Exchange Act Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants and/or the officers and directors of the Company have or had a controlling interest.

522. The members of the Exchange Act Class and/or Securities Act Class are so numerous that joinder of all members is impracticable. There were over 67 million ADSs sold in the IPO. Since the IPO and throughout the Class Period, the Company's securities have actively traded on NASDAQ. While the exact number of the Exchange Act Class members and/or Securities Act Class members is unknown to Plaintiffs at this time, and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in each of the proposed Exchange Act Class and/or Securities Act Class. Record owners and other members of the Exchange Act Class and/or Securities Act Class may be identified from records maintained by DouYu or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

523. Plaintiffs' claims are typical of the claims of the members of the Exchange Act Class and/or Securities Act Class, as all members of each of the Exchange Act Class and/or Securities Act Class are similarly affected by the Securities Act Defendants' and Exchange Act Defendants', respectively, wrongful conduct in violation of federal law that is complained of herein.

524. Plaintiffs will fairly and adequately protect the interests of the members of each of the Exchange Act Class and/or Securities Act Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of each of the Exchange Act Class and/or the Securities Act Class.

525. The prosecution of separate actions by individual members of the Securities Act Class and/or Exchange Act Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Securities Act Class and/or Exchange Act Class that would establish incompatible standards of conduct for the party opposing the Securities Act Class and/or Exchange Act Class.

526. Common questions of law and fact exist as to all members of each of the Exchange Act Class and/or Securities Act Class and predominate over any questions solely affecting individual members of each of the Exchange Act Class and/or Securities Act Class. Among the questions of law and fact common to each of the Exchange Act Class and/or Securities Act Class are:

(a) whether the federal securities laws were violated by the Securities Act Defendants' or Exchange Act Defendants' acts as alleged herein;

(b) whether statements made by the Securities Act Defendants or Exchange Act Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of DouYu;

(c) whether, for the misstatements and omissions alleged in Section VI.C above, the Offering Documents were negligently prepared and contained materially misleading statements and/or omitted material information required to be stated therein;

(d) whether for the misstatements and omissions alleged in Section VII.C above, those misstatements and omissions were made with scienter;

(e) the extent to which members of the Securities Act Class and Exchange Act Class have sustained damages; and

(f) the proper measure of damages.

527. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Exchange Act Class and/or Securities Act Class may be relatively small, the expense and burden of individual litigation make it impossible for

members of the Exchange Act Class and/or Securities Act Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

528. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the untrue and misleading statements pleaded in this Complaint.

529. *First*, none of the misstatements complained of herein were forward-looking statements. Rather, they were misstatements concerning current facts and conditions existing at the time or prior to when the statements were made.

530. *Second*, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted the Securities Act Defendants' or the Exchange Act Defendants' statements. Given the then-existing facts contradicting the Securities Act Defendants' or the Exchange Act Defendants' statements, any generalized risk disclosure made by the Securities Act Defendants or the Exchange Act Defendants was not sufficient to insulate the Securities Act Defendants or the Exchange Act Defendants from liability for their materially untrue and misleading statements.

## X. SECURITIES ACT COUNTS

531. For the purposes of the claims alleged in this section, it is as though Sections I.B, VII, and XI are not part of this Complaint. As stated herein, the allegations in this Section X arise under strict liability and/or negligence, and none of the allegations herein shall be interpreted as alleging intentional or reckless misconduct or alleging that any of the Securities Act Defendants acted with scienter or fraudulent intent.

**COUNT I**

**(Violations of Section 11 of the Securities Act Against the Securities Act Defendants)**

532. As alleged in paragraph 531 above, this claim does not sound in fraud. Plaintiffs do not allege that any Securities Act Defendant acted with fraudulent intent. This claim is based on strict liability and negligence.

533. Plaintiffs repeat, reallege, and incorporate each and every allegation contained in paragraphs 1–3, 6–27, 35–300, and 521–531 above as if fully set forth herein, *except* any allegation of fraud, recklessness or intentional misconduct.

534. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Securities Act Defendants.

535. The Offering Documents and Registration Statement for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading, and failed to disclose required material information.

536. DouYu is the registrant for the IPO. The Securities Act Defendants named herein were responsible for the contents and dissemination of the Offering Documents and Registration Statement.

537. As issuer of the shares, DouYu is strictly liable to Plaintiffs and the Securities Act Class for the misstatements and omissions.

538. As signatories of the Offering Documents and Registration Statement, the Individual Defendants, Tencent, and Cogency Global are liable to Plaintiffs and the Securities Act Class for the materially untrue statements and omissions that appeared in or were omitted from the Offering Documents and the Registration Statement.

539. None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents and the Registration Statement were true and without omissions of any material facts and were not misleading.

540. By reasons of the conduct herein alleged, each Securities Act Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

541. Plaintiffs acquired shares of DouYu's ADSs pursuant and/or traceable to the Registration Statement for the IPO.

542. Plaintiffs and the Securities Act Class have sustained damages. The value of DouYu ADSs has declined substantially subsequent to and because of the Securities Act Defendants' violations.

543. This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## COUNT II

**(Violations of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants and Defendants DouYu, Chen, and Su)**

544. Plaintiffs repeat and reallege every allegation contained in paragraphs 1–3, 6–27, 35–300, and 521–543 above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Securities Act Defendants to defraud Plaintiffs or members of the Class.

545. This claim is brought pursuant to Section 12(a)(2) of the Securities Act against the Underwriter Defendants and Defendants DouYu, Chen, and Su in connection with the Offering.

546. The stock that was sold in the Offering was owned specifically by the Underwriter Defendants and/or DouYu. Thus, each of the Underwriter Defendants and/or DouYu was an offeror and seller of the DouYu common stock that was sold in the Offering pursuant to defective Offering Materials. In addition, Defendants Chen and Su directly solicited purchases of DouYu ADSs by, among other things, participating in the preparation and dissemination of the Offering's "road show," *i.e.*, presentation to investors soliciting their purchases of ADSs in the Offering, as well as the road show's presentation, talking points, and script. Defendants Chen and Su participated in making materially inaccurate, misleading, and/or incomplete statements during the road show presentation. Defendants Chen and Su were motivated by their desire to serve their own financial interest or those of DouYu securities owner.

547. The Prospectus included (and/or by incorporated by reference) untrue statements of material fact and/or omitted to state (and/or incorporated by reference documents that omitted to state) material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

548. The Underwriter Defendants and Defendants DouYu, Chen, and Su acted negligently in that it did not exercise reasonable care to ensure that the Prospectus did not include, or incorporate by reference, untrue or misleading statements or omissions of material fact.

549. This Count does not sound in fraud. Rather, this Count is based solely on negligence. For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that any of the Underwriter Defendants or Defendants DouYu, Chen, and Su acted with intentional, reckless or otherwise fraudulent intent, except that any challenged statements of opinion or belief made in (or incorporated by) the Registration Statement are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Offering.

550. When they acquired DouYu ADSs directly from DouYu and/or the Underwriter Defendants, Plaintiffs and other members of the Securities Act Class did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the Prospectus.

551. Plaintiffs and other members of the Securities Act Class suffered damages in connection with the purchase or acquisition of DouYu ADSs in, pursuant to, and/or traceable to the IPO.

552. By reason of the foregoing, the Underwriter Defendants and Defendants DouYu, Chen, and Su are liable to Plaintiffs and other members of the Securities Act Class for either (i) the consideration paid for DouYu's ADSs, with interest thereon, less the amount of any income received thereon, upon tender of such securities; or (ii) damages as to the DouYu ADSs no longer owned.

553. This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

**COUNT III**

**(Violations of Section 15 of the Securities Act Against the Individual Defendants, Tencent, and Cogency Global)**

554. Plaintiffs repeat and incorporates each and every allegation contained in paragraphs 1–3, 6–27, 35–300, and 521–553 above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

555. This Count is asserted against the Individual Defendants, Tencent, and Cogency Global, and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

556. The Individual Defendants, Tencent, and Cogency Global were each control persons of DouYu by virtue of their positions as directors, senior officers, major shareholders and/or authorized representatives of DouYu. The Individual Defendants, Tencent, and Cogency Global had the power and influence and exercised the same to cause DouYu to engage in the acts described herein. The Individual Defendants, Tencent, and Cogency Global each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of DouYu.

557. DouYu, the Individual Defendants, and Cogency Global were culpable participants in the violations of §11 of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

558. This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## XI. EXCHANGE ACT COUNTS

559. For the purposes of the claims alleged in this section, it is as though Sections I.A, VI, and X are not part of this Complaint. As stated herein, the allegations in this Section XI arise under the Exchange Act and therefore allege scienter, fraud, and intentional or reckless conduct by DouYu, the Individual Defendants (except Defendant Arthur), and Defendant Tencent.

### COUNT IV

**(Violations of Section 10(b) of the Exchange Act Against the Exchange Act Defendants)**

560. Plaintiff Huang repeats and realleges each and every allegation contained in paragraphs 1, 4–12, 28–123, 301–530 and 559 above as if fully set forth herein.

561. This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

562. During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff Huang and the other members of the Exchange Act Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff Huang and other Exchange Act Class members, as alleged herein; (ii) artificially inflate and maintain the market price of DouYu securities; and (iii) cause Plaintiff Huang and other members of the Exchange Act Class to purchase or otherwise acquire DouYu securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants and each of them, took the actions set forth herein.

563. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for DouYu securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about DouYu.

564. By virtue of their positions at DouYu, the Individual Defendants (except for Defendant Arthur) and Defendant Tencent had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff Huang and the other members of the Exchange Act Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants. Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth. In addition, each Exchange Act Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

565. Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control. As the senior managers and/or directors of DouYu, the Individual Defendants (except for Defendant Arthur) and Defendant Tencent had knowledge of the details of DouYu's internal affairs.

566. The Individual Defendants (except for Defendant Arthur) and Defendant Tencent are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants (except for Defendant Arthur) and Defendant Tencent were able to and did, directly or indirectly, control the content of the statements of DouYu. As officers and/or directors of a publicly held company, the Individual Defendants (except for Defendant Arthur) and Defendant Tencent had a duty to disseminate timely, accurate, and truthful information with respect to DouYu's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading

reports, releases and public statements, the market price of DouYu securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning DouYu's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiff Huang and the other members of the Exchange Act Class purchased or otherwise acquired DouYu securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants and were damaged thereby.

567. During the Class Period, DouYu securities were traded on an active and efficient market. Plaintiff Huang and the other members of the Exchange Act Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of DouYu securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct. Had Plaintiff Huang and the other members of the Exchange Act Class known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff Huang and the Exchange Act Class, the true value of DouYu securities was substantially lower than the prices paid by Plaintiff Huang and the other members of the Exchange Act Class. The market price of DouYu securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff Huang and Exchange Act Class members.

568. By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

569. Plaintiff Huang and members of the Exchange Act Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for DouYu's securities. Plaintiff Huang and the Exchange Act Class would not have purchased the Company's securities at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements. As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff Huang and the other members of the Exchange Act Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon disclosure of the Exchange Act Defendants' wrongful conduct.

## COUNT V

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants (excluding Defendant Arthur) and Defendant Tencent)**

570. Plaintiff Huang repeats and realleges each and every allegation contained in paragraphs 1, 4–12, 28–123, 301–530 and 559–569 above as if fully set forth herein.

571. The Individual Defendants (except for Defendant Arthur) and Defendant Tencent acted as controlling persons of DouYu within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/ or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, The Individual Defendants (except for Defendant Arthur) and Defendant Tencent had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff Huang contends are false and misleading. Individual Defendants (except for Defendant Arthur) and Defendant Tencent were provided with or had unlimited access to copies of the

Company's reports, press releases, public filings, and other statements alleged by Plaintiff Huang to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

572. In particular, the Individual Defendants (except for Defendant Arthur) and Defendant Tencent had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the transactions giving rise to the securities violations as alleged herein, and exercised the same.

573. As set forth above, the Exchange Act Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants (except for Defendant Arthur) and Defendant Tencent are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff Huang and other members of the Exchange Act Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII. PRAYER FOR RELIEF

574. WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the each of the Securities Act Class and Exchange Act Class, as defined herein, and a certification of Plaintiffs as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory and punitive damages in favor of Plaintiffs and the other Securities Act Class and Exchange Act Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C. Awarding Plaintiffs and other members of the Securities Act Class and Exchange Act Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D. Awarding Plaintiffs and the other Securities Act Class and Exchange Act Class members such other relief as this Court may deem just and proper.

## XIII. JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury.

Dated: June 11, 2021

Respectfully submitted,

POMERANTZ LLP

*/s/ Brian Calandra*
Jeremy A. Lieberman
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: bcalandra@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Brian Calandra, hereby certify that I filed true and correct copy of the foregoing Amended Class Action Complaint with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated: June 11, 2021

By: *Brian Calandra*
Brian Calandra